UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

ESTATE OF SIVAN SHA'ARABANY                 :
By and through its Administrator            :
Karen Goldstein                             :
                                            :
and                                         :
                                            :
KAREN GOLDSTEIN                             :
                                            :
and                                         :
                                            :
RAZ SHA'ARABANY                             :       Civil Action No.
                                            :
and                                         :
                                            :
NIMROD ARNIN                                :
                                            :
and                                         :
                                            :
OFER ARNIN                                  :
                                            :
and                                         :
                                            :
ESTATE OF AVRAHAM HANKIN                     :
By and through its representative           :
Rebecca Goldstein Hankin                     :
                                            :
and                                         :
                                            :
REBECCA GOLDSTEIN HANKIN                     :
                                            :
and                                         :
                                            :
E.S.H.                                      :
By and through his legal guardian           :
Rebecca Goldstein Hankin                     :
                                            :
and                                         :
                                            :
Y.H.                                        :
By and through her legal guardian           :
Rebecca Goldstein Hankin                     :
                                            :

and                                                    :
                                                       :
G.H.                                                   :
By and through his legal guardian                      :
Rebecca Goldstein Hankin                               :
                                                       :
and                                                    :
                                                       :
T.H.                                                   :
By and through her legal guardian                      :
Rebecca Goldstein Hankin                               :
                                                       :
and                                                    :
                                                       :
CARL STEVEN HANKIN                                     :
                                                       :
and                                                    :
                                                       :
YAFFA HANKIN                                           :
                                                       :
and                                                    :
                                                       :
MOSHE SHALOM HANKIN                                    :
                                                       :
and                                                    :
                                                       :
RACHEL ETHEL HANKIN                                    :
                                                       :
and                                                    :
                                                       :
MIRIAM HANKIN                                          :
                                                       :
and                                                    :
                                                       :
ESTATE OF ORI MORDECHAI SHANI                          :
By and through its Administrator                       :
Miriam Shani                                           :
                                                       :
and                                                    :
                                                       :
R.S.                                                   ;
By and through his legal guardian                      :
Miriam Shani                                           :
                                                       :
and                                                    :
                                                       :

| | |
|---|---|
| SHULAMIT SHANI | : |
| | : |
| and | : |
| | : |
| YEHOSHUA SHANI | : |
| | : |
| and | : |
| | : |
| ELIYAHU YISHAI SHANI | : |
| | : |
| and | : |
| | : |
| MALACHI SHANI | : |
| | : |
| and | : |
| | : |
| RINAT BAT ZION GOLDSTEIN | : |
| | : |
| and | : |
| | : |
| ELISHA SHANI | : |
| | : |
| and | : |
| | : |
| ZOFIYA ZAGURI | : |
| | : |
| and | : |
| | : |
| ESTATE OF BEN ZUSSMAN | : |
| By and through its Administrator | : |
| Steven Zvi Zussman | : |
| | : |
| and | : |
| | : |
| STEVEN TZVI ZUSSMAN | : |
| | : |
| and | : |
| | : |
| MIKA ZUSSMAN | : |
| | : |
| and | : |
| | : |
| BOAZ ZUSSMAN | : |
| | : |
| and | : |
| | : |

ESTATE OF NAFTALI GORDON                          :
By and through its representative                  :
Pesia Roth Gordon                                  :
                                                   :
and                                                :
                                                   :
PESIA ROTH GORDON                                  :
                                                   :
and                                                :
                                                   :
L.M.G.                                             :
By and through her legal guardian                  :
Pesia Roth Gordon                                  :
                                                   :
and                                                :
                                                   :
G.T.G.                                             :
By and through her legal guardian                  :
Pesia Roth Gordon                                  :
                                                   :
and                                                :
                                                   :
BEATRICE MIRIAM GORDON                             :
                                                   :
and                                                :
                                                   :
DANIEL YIGAL GORDON                                :
                                                   :
and                                                :
                                                   :
JACOB JOSHUA GORDON                                :
                                                   :
and                                                :
                                                   :
SARAH AHUVA GORDON                                 :
                                                   :
and                                                :
                                                   :
SHIRA GORDON POSNER                                :
                                                   :
and                                                :
                                                   :
RIVKA ZIONA GORDON RUSH                            :
                                                   :
and                                                :
                                                   :

4

DEVORA SHOSHANA GORDON                              :
                                                   :
and                                                :
                                                   :
M.H.                                               :
By and through her legal guardians                 :
Mordechai and Tova Horowitz                        :
                                                   :
and                                                :
                                                   :
MORDECHAI HOROWITZ                                 :
                                                   :
and                                                :
                                                   :
TOVA HOROWITZ                                      :
                                                   :
and                                                :
                                                   :
LILACH NAFTALYAHU                                  :
                                                   :
and                                                :
                                                   :
DRORA WIZNER                                       :
                                                   :
and                                                :
                                                   :
ADELE RAEMER                                       :
                                                   :
and                                                :
                                                   :
ADAM LEVY                                          :
                                                   :
and                                                :
                                                   :
MECHEL FENDEL                                      :
                                                   :
and                                                :
                                                   :
DAVID FENDEL                                       :
                                                   :
and                                                :
                                                   :
BINYAMIN BEZALEL FENDEL                            :
                                                   :
and                                                :
                                                   :

GEDALYA FENDEL                                          :
                                                       :
and                                                    :
                                                       :
MERAV SARA FENDEL                                      :
                                                       :
and                                                    :
                                                       :
A.Z.F.                                                 :
by and through her legal guardians                     :
Gedalya and Merav Fendel                               :
                                                       :
and                                                    :
                                                       :
BRACHA F. VAKNIN                                       :
                                                       :
and                                                    :
                                                       :
SHILO VAKNIN                                           :
                                                       :
and                                                    :
                                                       :
E.V.                                                   :
by and through her legal guardian                      :
Bracha F. Vaknin                                       :
                                                       :
and                                                    :
                                                       :
M.V.                                                   :
by and through his legal guardian                      :
Bracha F. Vaknin                                       :
                                                       :
and                                                    :
                                                       :
S.V.                                                   :
by and through her legal guardian                      :
Bracha F. Vaknin                                       :
                                                       :
and                                                    :
                                                       :
A.V.                                                   :
by and through her legal guardian                      :
Bracha F. Vaknin                                       :
                                                       :
and                                                    :
                                                       :

K.V.                                             :
by and through her legal guardian                :
Bracha F. Vaknin                                 :
                                                 :
and                                              :
                                                 :
Ak.V.                                            :
by and through her legal guardian                :
Bracha F. Vaknin                                 :
                                                 :
and                                              :
                                                 :
MICHAL HALEV                                     :
                                                 :
and                                              :
                                                 :
NAOMI PETEL ADLER                                :
                                                 :
and                                              :
                                                 :
E.P.A.                                           :
by and through their legal guardian              :
Naomi Petel Adler                                :
                                                 :
and                                              :
                                                 :
N.A.                                             :
by and through their legal guardian              :
Naomi Petel Adler                                :
                                                 :
and                                              :
                                                 :
A.C.A.                                           :
by and through their legal guardian              :
Naomi Petel Adler                                :
                                                 :
and                                              :
                                                 :
GENADI BARZMAN                                   :
                                                 :
and                                              :
                                                 :
NAOMI SHAYA                                      :
                                                 :
and                                              :
                                                 :

IDDO COHEN                                                    :
                                                             :
and                                                          :
                                                             :
GIL KAPELUK                                                  :
                                                             :
and                                                          :
                                                             :
HOWARD LOEWENSTERN                                           :
                                                             :
and                                                          :
                                                             :
SHARON LOEWENSTERN                                           :
                                                             :
and                                                          :
                                                             :
YAKIR LOEWENSTERN                                            :
                                                             :
and                                                          :
                                                             :
DAVID LOEWENSTERN                                            :
                                                             :
and                                                          :
                                                             :
NOAM LOEWENSTERN                                             :
                                                             :
and                                                          :
                                                             :
YECHIEL LOEWENSTERN                                          :
                                                             :
and                                                          :
                                                             :
YOCHEVED LOEWENSTERN                                         :
                                                             :
and                                                          :
                                                             :
ESTATE OF GIORA DUVDEVANI                                    :
By and through its representative,                           :
Margaret Duvdevani                                           :
                                                             :
and                                                          :
                                                             :
MARGARET DUVDEVANI                                           :
                                                             :
and                                                          :
                                                             :

MICHAEL LOUIS DUVDEVANI                        :
                                               :
and                                            :
                                               :
DANIEL DUVDEVANI                               :
                                               :
and                                            :
                                               :
JEREMY DUVDEVANI                               :
                                               :
and                                            :
                                               :
GILAD SHILOH ALBOHER                           :
                                               :
and                                            :
                                               :
OZ AVRAHAM OLBOHER                             :
                                               :
and                                            :
                                               :
ADIN GESS                                      :
                                               :
and                                            :
                                               :
E.G.                                           :
by and through his legal guardian             :
Adin Gess                                      :
                                               :
and                                            :
                                               :
N.G.                                           :
by and through his legal guardian             :
Adin Gess                                      :
                                               :
and                                            :
                                               :
Y.G.                                           :
by and through his legal guardian             :
Adin Gess                                      :
                                               :
and                                            :
                                               :
NOACH NEWMAN                                   :
                                               :
and                                            :
                                               :

GAVRIEL NEWMAN                                        :
                                                     :
and                                                  :
                                                     :
DVIR NEWMAN                                           :
                                                     :
and                                                  :
                                                     :
BATYA SPREI                                           :
                                                     :
and                                                  :
                                                     :
SHAKED KOGAN                                          :
                                                     :
and                                                  :
                                                     :
O.K.                                                 :
by and through their legal guardian                  :
Shaked Kogan                                          :
                                                     :
and                                                  :
                                                     :
S.K.                                                 :
by and through their legal guardian                  :
Shaked Kogan                                          :
                                                     :
and                                                  :
                                                     :
N.M.K.                                               :
by and through their legal guardian                  :
Shaked Kogan                                          :
                                                     :
and                                                  :
                                                     :
SAAR AXELRAD                                          :
                                                     :
and                                                  :
                                                     :
JOSEF AXELRAD                                         :
                                                     :
and                                                  :
                                                     :
ESTHER AXELRAD                                        :
                                                     :
and                                                  :
                                                     :

SMADAR HAYMOVICH                                    :
                                                   :
and                                                :
                                                   :
D.A., a Minor                                      :
By and Through His Parent and Guardian             :
Saar Axelrad                                       :
                                                   :
and                                                :
                                                   :
ISAAC BLUTH                                         ;
                                                   :
and                                                :
                                                   :
N.B.                                               :
by and through his legal guardians                 :
Isaac and Roni Bluth                               :
                                                   :
and                                                :
                                                   :
D.B.                                               :
by and through his legal guardians                 :
Isaac and Roni Bluth                               :
                                                   :
and                                                :
                                                   :
I.B.                                               :
by and through his legal guardians                 :
Isaac and Roni Bluth                               :
                                                   :
and                                                :
                                                   :
EPHRAIM BLUTH                                       :
                                                   :
and                                                :
                                                   :
ARYEH YEHUDA BLUTH                                  :
                                                   :
and                                                :
                                                   :
ABRAHAM AHARON BLUTH                                :
                                                   :
and                                                :
                                                   :
CHANINA SAMUEL BLUTH                                :
                                                   :

and                                                    :
                                                       :
TSIPORA BLUTH-REICHER                                  :
                                                       :
and                                                    :
                                                       :
JOSEPH SHIMSHON BLUTH                                  :
                                                       :
and                                                    :
                                                       :
NETHANIEL BLUTH                                         :
                                                       :
and                                                    :
                                                       :
YIGAL AMICHAI BLUTH                                     :
                                                       :
and                                                    :
                                                       :
JUDITH RAANAN                                           :
                                                       :
and                                                    :
                                                       :
NATALIE RAANAN                                          :
                                                       :
and                                                    :
                                                       :
URI RAANAN                                              :
                                                       :
and                                                    :
                                                       :
ESTATE OF ARNON BENVENISTE                             :
By and through his representative                      :
Vered Vaspi-Tsabari Benveniste                         :
                                                       :
and                                                    :
                                                       :
VERED VASPI-TSABARI BENVENISTE                         :
                                                       :
and                                                    :
                                                       :
YOSEF YITZCHAK BENVENISTE                              :
                                                       :
and                                                    :
                                                       :
CHAYA MUSHKA BENVENISTE                                :
                                                       :

and                                                        :
                                                           :
RACHEL OHNONA                                              :
                                                           :
and                                                        :
                                                           :
JEFFREY LUDMIR                                             :
                                                           :
and                                                        :
                                                           :
ADI RUTH BOSI                                              :
                                                           :
and                                                        :
                                                           :
D.E.B.                                                     :
by and through their legal guardians                      :
Adi Bosi and Dorian Bosi                                  :
                                                           :
and                                                        :
                                                           :
S.H.B.                                                     :
by and through their legal guardians                      :
Adi Bosi and Dorian Bosi                                  :
                                                           :
and                                                        :
                                                           :
DEBORAH BEN ADERET                                         :
                                                           :
and                                                        :
                                                           :
L.B.                                                       :
by and through their legal guardians                      :
Deborah Ben Aderet and Yosef Ben Aderet                   :
                                                           :
and                                                        :
                                                           :
R.B.                                                       :
by and through their legal guardians                      :
Deborah Ben Aderet and Yosef Ben Aderet                   :
                                                           :
and                                                        :
                                                           :
NEVO SHOULIAN                                              :
                                                           :
and                                                        :
                                                           :

ELCHANAN YAIR SEGAL                                    :
                                                      :
and                                                   :
                                                      :
N.Y.S., by and through their legal guardians          :
Elchanan Yair Segal and Elysheva Segal                :
                                                      :
and                                                   :
                                                      :
M.Y.S., by and through their legal guardians          :
Elchanan Yair Segal and Elysheva Segal                :
                                                      :
and                                                   :
                                                      :
R.Y.S., by and through their legal guardians          :
Elchanan Yair Segal and Elysheva Segal                :
                                                      :
and                                                   :
                                                      :
ESTATE OF SHACHAR DEBORAH TROEN                       :
MATHIAS                                               :
By and through its representatives,                   :
Shir Tziporah Mathias, Shakked Sarah Mathias,         :
and Rotem Eliyahu Mathias                             :
                                                      :
and                                                   :
                                                      :
ESTATE OF SHLOMI DAVID MATHIAS                        :
                                                      :
and                                                   :
                                                      :
SHAKKED SARAH MATHIAS                                 :
                                                      :
and                                                   :
                                                      :
SHIR TZIPORAH MATHIAS                                 :
                                                      :
and                                                   :
                                                      :
ROTEM ELIYAHU MATHIAS                                 :
                                                      :
and                                                   :
                                                      :
ILAN TROEN                                            :
                                                      :
and                                                   :

14

CAROL TROEN                                         :
                                                    :
and                                                 :
                                                    :
BAR YUVAL SHANI                                     :
                                                    :
and                                                 :
                                                    :
ARON MILTON TROEN                                   :
                                                    :
and                                                 :
                                                    :
SUSAN TROEN                                         :
                                                    :
and                                                 :
                                                    :
JOSHUA WILLIAM TROEN                                :
                                                    :
and                                                 :
                                                    :
JUDAH TROEN                                         :
                                                    :
and                                                 :
                                                    :
HADASSAH TROEN                                      :
                                                    :
and                                                 :
                                                    :
ABRAHAM TROEN                                       :
                                                    :
and                                                 :
                                                    :
THE ESTATE OF ARI FULD                              :
By and through its representative Miriam Fuld       :
                                                    :
and                                                 :
                                                    :
MIRIAM FULD                                         :
                                                    :
and                                                 :
                                                    :
ELIEZER YAKIR FULD                                  :
                                                    :
and                                                 :
                                                    :

NAOMI FULD                                                          :
                                                                   :
and                                                                :
                                                                   :
TAMAR FULD                                                         :
                                                                   :
and                                                                :
                                                                   :
NATAN FULD                                                         :
                                                                   :
and                                                                :
                                                                   :
HARVEY JONAS YONAH FULD                                            :
                                                                   :
and                                                                :
                                                                   :
MARY ALICE FULD                                                   :
                                                                   :
and                                                                :
                                                                   :
DANIEL YAAKOV FULD                                                :
                                                                   :
and                                                                :
                                                                   :
EYTAN FULD                                                         :
                                                                   :
and                                                                :
                                                                   :
HILLEL CHAIM SHLOMO FULD                                          :
                                                                   :
and                                                                :
                                                                   :
ANNE CHANA HENKIN                                                 :
                                                                   :
and                                                                :
                                                                   :
ESTATE OF JUDAH HERZEL HENKIN                                     :
                                                                   :
and                                                                :
                                                                   :
ADERET RIVKAH HENKIN STERN                                        :
                                                                   :
and                                                                :
                                                                   :
ELIASHIR ELIJAH HENKIN                                            :
                                                                   :

and                                                    :
                                                       :
JACOB BECHOR-SHALOM HENKIN                             :
                                                       :
and                                                    :
                                                       :
JOSEPH GIL HENKIN                                      :
                                                       :
and                                                    :
                                                       :
TAAMA FREIDA HENKIN YAAKOVSON                          :
                                                       :
and                                                    :
                                                       :
DAVID RAMATI                                           :
                                                       :
and                                                    :
                                                       :
MARTA RAMATI                                           :
                                                       :
and                                                    :
                                                       :
ELISHEVA RAMAT FEDERMAN                                :
                                                       :
and                                                    :
                                                       :
SARA RAMATI URIEL                                      :
                                                       :
and                                                    :
                                                       :
TAMAR RAMATI MELAMED                                   :
                                                       :
and                                                    :
                                                       :
SAMUEL RAMATI                                          :
                                                       :
and                                                    :
                                                       :
AVITAL RAMATI NATAN                                    :
                                                       :
and                                                    :
                                                       :
LIORA RAMATI COHEN                                     :
                                                       :
and                                                    :
                                                       :

RAY COOPER                                              :
                                                        :
and                                                     :
                                                        :
ORA COOPER                                              :
                                                        :
        Plaintiffs,                                     :
v.                                                      :
                                                        :
United Nations Relief and Works Agency                  :
for Palestine Refugees in the Near East (UNRWA)         :
                                                        :
and                                                     :
                                                        :
FRIENDS OF UNRWA ASSOCIATION INC.                       :
d/b/a UNRWA USA NATIONAL COMMITTEE INC.                 :
                                                        :
        Defendants.                                     :

## NATURE OF THE ACTION

1.      Plaintiffs bring this Complaint pursuant to 18 U.S.C. § 2333(d) of the Anti-
Terrorism Act ("ATA"), 18 U.S.C. §§ 2331-2339D, against Defendants, the United Nations Relief
and Works Agency for Palestine Refugees in the Near East ("UNRWA"), and the US-based charity
it has used to raise money from private American donors, Friends of UNRWA Association Inc.
d/b/a UNRWA USA National Committee Inc ("UNRWA USA"), which have collectively and
collaboratively spent decades knowingly helping Harakat al-Muqawama al-Islamiyya a/k/a the
Islamic Resistance Movement ("HAMAS"), Palestinian Islamic Jihad ("PIJ"), Popular Front for
the Liberation of Palestine ("PFLP") and/or , HEZBOLLAH build up the necessary terror
infrastructure and to recruit, indoctrinate, radicalize, train and/or compensate many of those who
have carried out terrorist attacks throughout Israel.

2.      These terrorist attacks include the wave of brutal terrorist attacks both prior to and
those launched on October 7, 2023 and continuing thereafter from Gaza and Lebanon involving
thousands of terrorists including those from HAMAS, PIJ, PFLP and HEZBOLLAH organizations

which targeted innocent civilians, including American and Israeli citizens. , Thousands of civilian victims were murdered, wounded, raped, tortured, mutilated and over two hundred fifty civilians were kidnapped and held hostage by these terrorists including those from HAMAS, PIJ, PFLP and HEZBOLLAH ("October 7th Attack").

3.      The reign of terror led by HAMAS did not begin with the October 7th Attack, rather it was an operation that has been growing and terrorizing Israelis, Americans and others for decades with the unconditional and integral support of the Defendants. Out of the very schools that were operated and funded by these Defendants, HAMAS in coordination with employees of Defendant UNRWA, has been recruiting, indoctrinating, radicalizing, preparing, training, incentivizing, rewarding and/or compensating UNRWA students and/or the HAMAS operatives that Defendant UNRWA employed as teachers and school administrators, to commit acts of terror.

4.      As alleged herein, Defendants also knowingly provided HAMAS (a) with the U.S. dollars in cash that it needed to pay smugglers for weapons, explosives, and other terror materials; (b) access to UNRWA's schools and buildings to use directly as operational cover, launch attacks, operate from and store weapons and explosives; and (c) access to UNWRA's schools and buildings to use as entrances, enabling the construction and operational capacity including electricity, to HAMAS's terror tunnels. As discussed throughout, Defendants were always aware and publicly stated that their policies, resources and staff were directly involved in HAMAS's operations. With this well-documented knowledge, Defendants continued those very policies.

5.      The Defendants knew that HAMAS and HEZBOLLAH openly proclaimed their goals to target and murder innocent civilians in violation of U.S. law and international law; and they knew the support they were providing was material to HAMAS's and HEZBOLLAH's' capability to do so. Despite being repeatedly admonished by donors, which for UNRWA was

primarily the US government and for UNRWA USA was exclusively American contributing taxpayer persons, the Defendants continued to knowingly provide critical support for the terrorist organizations.

6.    The Defendants did so knowing their own role in facilitating funds transfers and providing other support to HAMAS and HEZBOLLAH would encourage and enable these terror attack to occur and were fully aware of the FTO's violent activities.

7.    Plaintiffs are U.S. citizen victims of HAMAS and HEZBOLLAH acts of terror dating back to 2015 and include victims of the October 7th Attack and/or the estates, near family members and other U.S. citizen survivors of HAMAS and HEZBOLLAH terror whose individual stories and suffering are given in detail below.

## JURISDICTION AND VENUE

8.    This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 and 18 U.S.C. §§ 2333 and 2338, as a civil action brought by nationals of the United States and the survivors of a national of the United States who were killed or injured by reason of acts of international terrorism, and their estates, survivors, and heirs.

9.    Venue is proper in this District pursuant to 28 U.S.C. §§ 1391(b) and (d) and 18 U.S.C. § 2334(a).

10.    Defendant UNRWA is subject to personal jurisdiction in the District of Columbia pursuant to 18 U.S.C. § 2334(a), DC Code § 13-423(a)(1),(5), and Fed. R. Civ. P. 4(k)(1)-(2) as it has transacted business and/or owns and/or maintains offices within the District of Columbia), which they have used for the benefit of HAMAS and HEZBOLLAH and have purposefully availed themselves of jurisdiction in the District of Columbia in the course of committing the wrongful acts alleged herein.

11.     Defendant UNRWA USA is a 501(c)(3) nonprofit organization incorporated in the State of Delaware and registered in the District of Columbia.  UNRWA USA is subject to personal jurisdiction in the District of Columbia pursuant to 18 U.S.C. § 2334(a), DC Code § 13-423(a)(1),(5), and Fed. R. Civ. P. 4(k)(1)-(2) as it has transacted business and/or owns and/or maintains offices within the District of Columbia), which they have used for the benefit of HAMAS and HEZBOLLAH and have purposefully availed themselves of jurisdiction in the District of Columbia in the course of committing the wrongful acts alleged herein.

12.     UNRWA USA's website, *unrwausa.org* states "UNRWA USA is an independent 501c3 nonprofit that supports the work of UNRWA through fundraising, education, and advocacy in the United States."  It continues "UNRWA USA aims to educate the American public about the plight of Palestine refugees and generate financial support for specific UNRWA programs."

13.     The website also states, in pertinent part, "UNRWA USA was created to educate the American public about the work of UNRWA (the UN Agency) to benefit Palestine refugees and fundraise for specific UNRWA projects where we can have an impact. We like to think of ourselves as goodwill ambassadors for UNRWA. We carry out our work here in the States through events like the Gaza 5K, a charity walk/run that raises funds to provide mental health counseling to children in the Gaza Strip suffering from PTSD and other psychological trauma."  In supporting UNRWA, UNRWA USA knowingly provides material support for UNRWA's pernicious activities in Gaza, including the educating, incentivizing, rewarding and encouraging acts of terror, including but not limited to those committed in the October 7th Attacks.

14.     UNRWA has a prominent presence in Washington, D.C. UNRWA directly employs staff in Washington, DC at its UNRWA Representative Office located at 1901 Pennsylvania Ave. NW, Suite 804, Washington, District of Columbia 20006, Telephone: (+1) 202-

569-1375. Notable roles in UNRWA's Washington, DC Representative Office include senior-level positions such as the Senior Liaison Officer and Director of the Representative Office. These positions typically focus on business outreach and liaison work, including but not limited to outreach to U.S. government bodies, advocacy, and partnership development, which is believed to include relationships with other non-governmental entities based in and/or doing business within Washington, DC. The Director of UNRWA's Washington DC-based Representative Office also works within both the legislative and executive branches of the U.S. government.

15.     In a current job posting for a Senior Liaison Officer for | UNRWA - United Nations Relief and Works Agency for Palestinian Refugees in Washington, DC, found at *impactpool.org/jobs/1087775,* it states in pertinent part that "UNRWA, the largest United Nations operation in the Middle East with over 30,000 staff working across five areas of operation, is looking for highly committed personnel wishing to make a change. If you are looking for a rewarding opportunity to make a tangible difference for one of the most vulnerable communities in the world, UNRWA would like to hear from you. The Senior Liaison Officer, reports to the Director, UNRWA Representative Office, Washington DC.

> Responsibilities:
>
> Assists the Director, UNRWA Representative Office, Washington DC to represent the interests of UNRWA vis-à-vis US government and non-governmental entities, with particular reference to the US executive and legislative branches of government by: - Participating in the active and regular engagement with relevant US executive branch agencies and the US congress including its members and their staffs to advance understanding of UNRWA's role in the context of the regional issues of the Middle East, the Agency's operations and the situation of Palestine refugees in the five fields and globally. - Clarifying UNRWA's mission, positions, programmes, initiatives and institutional practices, including its application of the humanitarian principles, and explaining the evolving challenges confronting the Agency. –

Notably, the job description continues to describe UNRWA's relationships with non-US government and other organizations, "Building and sustaining partnerships with international organisations headquartered in the US, national and local non-profit institutions; maintains awareness and support, including organizing or attending special events. The job description further continues and states that candidates will,

"Updates the results framework in line with the project proposals including elements like indicators, outputs, and outcomes. Supports the building of institutional relationships with relevant US government and non-governmental entities, maintaining and managing these relationships in the interests of Palestine refugees and UNRWA.

Monitors, on a daily basis, relevant developments in the US congress and US political ecosystem, with a view to formulating and leading the implementation of an outreach strategy dedicated to optimizing UNRWA's relations with the US congress the executive branch, *and non-governmental agencies (emphasis added)*. In close consultation with relevant UNRWA colleagues, supports the drafting, preparation and presentation of materials required for briefings before congress, executive branch agencies, the media and *other non-governmental agencies in the Washington, DC or broader US setting (emphasis added)*. Supports the implementation of UNRWA's resource mobilization and strategic communications framework. Arranges and supports visits to Washington, DC by senior UNRWA officials."

16.     For years, UNRWA has received a significant share of its funding from the U.S. government primarily through annual voluntary contributions, which the United States allocates as part of its foreign aid budget. These contributions have been typically directed through the U.S. Department of State and USAID (U.S. Agency for International Development) by engaging with personnel in these offices who are based in Washington DC, including the USAID Administrator, Department of State Under Secretary for Management, Department of State Bureau of Budget and Planning Director, Department of State Comptroller, their staff and others. The funds from the U.S. are allocated by UNRWA ostensibly to its programs, including education, which is a material source of support for HAMAS, as HAMAS uses UNRWA schools as terror bases, and includes

among its membership UNRWA compensated staff who recruit, indoctrinate, incentivize, reward and train future HAMAS members and martyrs from among the UNRWA student population.

17.    The U.S.-UNRWA Framework for Cooperation agreements outline regular interactions and coordination between UNRWA and the State Department, specifically with the Bureau of Population, Refugees, and Migration (PRM). According to the Agreements, UNRWA is expected to provide semi-annual reports to PRM and conduct ongoing consultations to address U.S. requirements on neutrality, humanitarian transparency, and funding compliance. For instance, the 2021-2022 and 2023-2024 agreements detail structured interactions, including ad hoc meetings, semi-annual reviews, and reporting to ensure alignment with U.S. standards on operational and financial oversight. The U.S. Department of State's PRM officers in Washington, D.C., and program officers in the field have heretofore maintained active communication with UNRWA, focusing on compliance with U.S. requirements and addressing operational challenges.

18.    UNRWA officials also engage with U.S. Congress in Washington D.C., typically when there are or have been specific policy, funding, or oversight concerns. The organization communicates with Congress through briefings, testimony before congressional committees, and direct meetings to explain its work, address U.S. lawmakers' concerns, and discuss how U.S. funding is allocated within its programs. Notably, U.S. funding for UNRWA has faced scrutiny, especially related to accountability, transparency, and concerns about anti-Semitic materials and potential links to organizations classified as foreign terrorist groups, such as HAMAS. These testimonies have become more frequent in recent years due to increased scrutiny of UNRWA's operations, especially concerning reports of inappropriate conduct or statements by some staff. Congressional interest remains high because the U.S. has been one of the primary donors to UNRWA, and there is bipartisan concern that U.S. taxpayer funds are not being used effectively

and do not align with American values and policies, nor the peace keeping mission of the United Nations. For example:

a. In 2018, in response to U.S. funding cuts to UNRWA, there were discussions within Congress regarding the future of the agency and its operations. UNRWA officials testified about how reduced funding would impact the agency's services for Palestinian refugees, particularly in education and healthcare.

b. In 2021, UNRWA's Commissioner-General Philippe Lazzarini testified before the House Foreign Affairs Committee, emphasizing the agency's humanitarian role and the challenges faced by Palestinian refugees, particularly in Gaza and the West Bank. This hearing also dealt with U.S. funding decisions under the Biden administration, which resumed U.S. funding to UNRWA, following a pause in funding during the first Trump administration.

c. In 2023, Congress held hearings examining UNRWA's role, with particular focus on oversight, challenges in Gaza, and allegations related to the agency's neutrality policy. During these hearings, UNRWA officials were questioned on topics like staff members' ties to groups such as HAMAS, the distribution of aid in Gaza and issues around accountability for staff actions.

d. In early 2024, members of the House Foreign Affairs Committee, led by Chairman Michael McCaul, formally requested that Lazzarini testify regarding troubling allegations that HAMAS has been stealing

humanitarian aid meant for Gaza civilians, which would be a direct diversion of U.S. taxpayer-funded supplies.

19.    Periodically, U.S. legislators have introduced bills proposing restrictions or conditions on UNRWA funding, especially when concerns about its operations have arisen, for example:

a.    The "UNRWA Accountability Act of 2018" addressed concerns over the agency's employment practices, including allegations that UNRWA has employed individuals affiliated with HAMAS, a U.S.-designated Foreign Terrorist Organization. This bill proposed withholding U.S. funding until more robust safeguards were in place to prevent terrorist-affiliated personnel within UNRWA.

b.    The "UNRWA Accountability and Transparency Act" introduced in 2021 by Senator James Risch, seeks to halt U.S. contributions to UNRWA until the U.S. Secretary of State can certify that the agency is free from ties to terrorism. The bill also aims to ensure that U.S. funds are not used in activities or education that promote anti-Semitism. The UNRWA Accountability and Transparency Act has been re-introduced multiple times in Congress to increase oversight of UNRWA by requiring the U.S. Secretary of State to certify that UNRWA adheres to specific standards, such as ensuring funds are not used for purposes linked to terrorist activities or incitement of violence. However, as of the latest legislative sessions, none of these bills have successfully passed into law.

20.     In addition to its direct contacts, UNRWA also subjects itself to jurisdiction in Washington, D.C. indirectly through UNRWA USA, which supports UNRWA's humanitarian initiatives by conducting fundraising, advocacy, and education efforts specifically geared toward American audiences. A visit to UNRWA's website by an American taxpayer takes one to the UNRWA-USA website in order to provide a tax-deductible contribution through UNRWA-USA to UNRWA itself. Located at 1875 K Street NW, Washington, DC, UNWRA USA's office on behalf of UNWRA facilitates outreach to U.S. policymakers, the public, non-governmental organizations and potential donors to bolster financial and moral support for UNRWA's programs across the Middle East, including in Gaza, Judea, Samaria, Lebanon, Syria, and Jordan.

21.     UNRWA USA maintains regular contacts in Washington, advocating for continued U.S. financial support for Palestine refugee services. The organization's executive staff includes individuals with deep experience in policy and advocacy, such as the Director and Senior Congressional Advisor, who plays a key role in bridging UNRWA's needs with U.S. congressional interests and shaping the conversation around UNRWA's work among U.S. legislators.

22.     This U.S.-based branch allows UNRWA to sustain a diplomatic and fundraising footprint within the United States, focusing on activities that align with its mission and raising funds in the name of UNRWA and/or its National Committee – UNRWA USA – to provide funding to the various activities of UNRWA, including to provide aid to Palestine refugees and to HAMAS and HEZBOLLAH. The presence of UNRWA USA in Washington, D.C., underscores its strategic efforts to maintain American taxpayer support despite ongoing political debates and scrutiny concerning its neutrality and relationships within the Middle East.

23.     The Defendants have, directly and/or indirectly, knowingly aided and abetted HAMAS and provided material support to HAMAS by,

a.   Encouraging HAMAS violent terror campaign by proclaiming that as "Palestinian refugees", HAMAS terrorists are entitled to live and possess property rights in Israel by force of arms, in flagrant disregard for Israel's immigration policies, international treaties and conventions concerning the rights and treatment of refugees, the United Nation's mandate to promote international peace, security and territorial integrity and the safety and security of Israelis and American citizens and others in Israel;

b.    Providing HAMAS access to, and safe harbor in UNRWA owned-and-funded facilities, including (but not limited to) schools to be used for weapons storage and deployment, command and control operations, and planning/staging areas for the October 7th Attack including enabling underground facilities to be constructed and to access electricity and other utilities from UNRWA.

c.   Providing HAMAS access to, and safe harbor in UNRWA property for launching an unprecedented volume of rockets directed at civilian targets in Israel, including rockets launched as part of the barrage intended as a diversion and distraction to Israeli defenses on the morning of the October 7th Attack.

d.   Despite knowing of HAMAS's use of UNRWA premises, consistently taking the position with Israel that UNRWA premises were inviolate, thus making them safe havens for terrorists and their materiel and preventing Israel from disabling HAMAS's terror infrastructure prior to and during the ongoing October 7th Attack. Indeed, this intentionally and predictably

protected HAMAS terror infrastructure deliberately installed (including rocket launchers) so close to UNRWA property that it could not be struck by Israeli forces without risk of damage to UNRWA property and harm to children and noncombatants present in UNRWA schools and other facilities – enabling HAMAS'S use of human shields on UNWRA premises.

e.  Having the schools they operate in Gaza use HAMAS-approved textbooks, curriculum and teachers' guides that indoctrinate children from a young age into a death-cult ideology of hatred and genocide, predictably producing the next generation of HAMAS recruits and martyrs willing to commit terrorist acts;

f.  Allowing HAMAS's youth wing al-Kutla direct access to UNRWA schools and students to organize in-school and after-school programs to propagandize, indoctrinate, incentivize, reward and recruit future terrorists, with the encouragement of HAMAS-affiliated teaching staff;

g.  Permitting local employees on UNRWA's payroll to simultaneously be active HAMAS members, many of whom personally participated in the atrocities of the October 7th Attack;

h.  Deliberately paying its local personnel in the form of cash in US dollars, which requires the personnel to turn to HAMAS-affiliated moneychangers to trade for the local currency (Israeli shekels) needed to make purchases, thus predictably generating millions of dollars per month of additional income for HAMAS from the spread charged by the HAMAS

moneychangers – income that was not merely denominated in dollars but was in cash; and

i.   By doing so, providing HAMAS with access to hard U.S currency, which HAMAS desperately needed to pay its illicit weapons procurement network to smuggle into Gaza vast quantities weapons, ammunition, explosives, rockets, and other materials needed by HAMAS to perpetrate the October 7th Attack as well as numerous other genocidal attacks on civilians.

24.   The Defendants have knowingly aided and abetted HEZBOLLAH and provided material support to HEZBOLLAH by,

a.   Encouraging HEZBOLLAH violent terror campaign by proclaiming that as "Palestinian refugees", Palestinian "refugees" in Lebanon are exclusively entitled to live and possess property rights in Israel, thereby creating a permanent refugee problem in Lebanon that could be resolved only by the elimination of Israel, in flagrant violation of international treaties and conventions concerning the rights and treatment of refugees, and the United Nation's mandate to promote international peace, security and territorial integrity;

b.    Providing HEZBOLLAH access to, and safe harbor in UNRWA owned-and-funded facilities, including (but not limited to) schools to be used for weapons storage, command and control operations, and planning/staging areas for terrorist attacks.

c.    Providing HEZBOLLAH access to, and safe harbor in UNRWA property for launching rockets directed at civilian targets in Israel, including rockets launched as part of the barrage intended as a diversion and distraction to Israeli defenses since the October 7th Attack.

d.    Despite knowing of HEZBOLLAH'S use of UNRWA premises, consistently taking the position with Israel that UNRWA premises were inviolate, thus making them safe havens for terrorists and their materiel and preventing Israel from disabling HEZBOLLAH'S terror infrastructure deliberately installed (including rocket launchers) so close to UNRWA property that it could not be struck by Israeli forces without risk of damage to UNRWA property and harm to children and noncombatants (who were used as human shields) present in UNRWA schools and other facilities.

e.    Having the schools they operate in Gaza use HEZBOLLAH-approved textbooks, curriculum and teachers' guides that indoctrinate children from a young age into a death-cult ideology of hatred and genocide, predictably producing the next generation of HEZBOLLAH recruits willing to commit terrorist acts and become martyrs.

f.    By financing the training of HEZBOLLAH operatives, including the providing of weapons, ammunition, explosives, rockets and other materials used by HEZBOLLAH to continue terror activities.

g.    Allowing HEZBOLLAH to use UNRWA facilities that have been used for intelligence gathering and operations.

> h.    Coordinating with U.N. Interim Force in Lebanon (UNIFIL) to provide human shields, intelligence, and employment to HEZBOLLAH members.

**PARTIES**

**I.    The Plaintiffs**

**A.  The Sha'arabany Family**

25.    Plaintiff Sivan Sha'arabany was heinously murdered on October 7, 2023 at NOVA festival after suffering prolonged and great fear, anxiety and pain as a result of the HAMAS perpetrated October 7th Terrorist Attacks.   At the time of the acts alleged, and at all other times relevant hereto, Sivan Sha'arabany was a citizen of the United States. Plaintiff Estate of Sivan Sha'arabany can sue and be sued in this Court.

26.    Plaintiff Karen Goldstein is the biological mother of Sivan Sha'arabany and has been, at all times relevant hereto, a citizen of the United States. Plaintiff Karen Goldstein has suffered greatly as a result of the murder of her daughter and can sue and be sued in this Court.

24.    Plaintiff Raz Sha'arabany is the biological brother of Sivan Sha'arabany and has been, at all times relevant hereto, a citizen of the United States. Plaintiff Raz Sha'arabany has suffered greatly as a result of the murder of his sister and can sue and be sued in this Court.

**B.  The Arnin Family**

25.    Ayelet Arnin was heinously murdered on October 7, 2023 after suffering prolonged and great fear, anxiety and pain as a result of the HAMAS perpetrated in the October 7th Terrorist Attacks upon innocent attendees at the Supernova Music Festival ("NOVA").

26.    Plaintiff Nimrod Arnin, Ayelet Arnin's brother, a renowned producer of the NOVA music festival, was also injured on October 7, 2023 after being attacked and suffering prolonged and great fear, anxiety and pain during the October 7th Terrorist Attack upon NOVA. At the time

of the acts alleged, and at all other times relevant hereto, Plaintiff Nimrod Arnin was a citizen of the United States. Plaintiff Nimrod Arnin has suffered greatly as a result of the murder of his sister and the injuries he sustained and can sue and be sued in this Court. Plaintiff Nimrod Arnin can sue and be sued in this Court.

27.    Plaintiff Ofer Arnin is the brother of both Ayelet Arnin and Nimrod Arnin and has been, at all times relevant hereto, a citizen of the United States. Plaintiff Ofer Arnin has suffered greatly as a result of the murder of his sister and the injuries to his brother. Ofer can sue and be sued in this Court.

**C. The Hankin Family**

28.    Avraham Hankin was murdered on October 7, 2023 as a result of the October 7th Terrorist Attacks.   At the time of the acts alleged, and at all other times relevant hereto, Avraham Hankin was a citizen of the United States and was fighting terror while serving in the Israel Defense Forces at the time of his murder by a HAMAS terrorist attack. Plaintiff Estate of Avraham Hankin can sue and be sued in this Court.

29.    Plaintiff Rebecca Goldstein Hankin was, at all times relevant hereto, the wife of Avraham Hankin and a United States citizen. Plaintiff Rebecca Goldstein Hankin has suffered greatly as a result of the murder of her husband and can sue and be sued in this Court.

30.    Plaintiff E.S.H. is the biological son of Avraham Hankin and has been, at all times relevant hereto, a United States citizen. Plaintiff E.S.H. has suffered greatly as a result of the murder of his father and can sue and be sued in this Court.

31.    Plaintiff Y.H. is the biological daughter of Avraham Hankin and has been, at all times relevant hereto, a United States citizen. Plaintiff Y.H. has suffered greatly as a result of the murder of her father and can sue and be sued in this Court.

32.    Plaintiff G.H. is the biological son of Avraham Hankin and has been, at all times relevant hereto, a United States citizen. Plaintiff G.H. has suffered greatly as a result of the murder of his father and can sue and be sued in this Court.

33.    Plaintiff T.H. is the biological daughter of Avraham Hankin and has been, at all times relevant hereto, a United States citizen. Plaintiff T.H. has suffered greatly as a result of the murder of her father and can sue and be sued in this Court.

34.    Plaintiff Carl Steven Hankin is the biological father of Avraham Hankin and has been, at all times relevant hereto, a United States citizen. Plaintiff Carl Steven Hankin has suffered greatly as a result of the murder of his son and can sue and be sued in this Court.

35.    Plaintiff Yaffa Hankin is the biological mother of Avraham Henkin and has been, at all times relevant hereto, a United States citizen. Plaintiff Yaffa Hankin has suffered greatly as a result of the murder of her son and can sue and be sued in this Court.

36.    Plaintiff Moshe Shalom Hankin is the biological brother of Avraham Hankin and has been, at all times relevant hereto, a United States citizen. Plaintiff Moshe Shalom Hankin has suffered greatly as a result of the murder of his brother and can sue and be sued in this Court.

37.    Plaintiff Rachel Ethel Hankin is the biological sister of Avraham Hankin and has been, at all times relevant hereto, a United States citizen. Plaintiff Rachel Ethel Hankin has suffered greatly as a result of the murder of her brother and can sue and be sued in this Court.

38.    Plaintiff Miriam Hankin is the biological sister of Avraham Hankin and has been, at all times relevant hereto, a United States citizen. Plaintiff Miriam Hankin has suffered greatly as a result of the murder of her brother and can sue and be sued in this Court.

**D.  The Shani Family**

39.    Ori Mordechai Shani was in Kissufim and murdered while defending civilians on

34

October 7, 2023 as a result of the October 7th Terrorist Attacks.  At the time of the acts alleged, and at all other times relevant hereto, Ori Mordechai Shani was a citizen of the United States, and was fighting terror while serving in the Israel Defense Forces at the time of his murder by a HAMAS terrorist attack. Plaintiffs Estate of Ori Mordchai Shani can sue and be sued in this Court.

40.     Plaintiff R.S. is the biological son of Ori Mordechai Shani and has been, at all times relevant hereto, a citizen of the United States. Plaintiff R.S. has suffered greatly as a result of the murder of his father and can sue and be sued in this Court.

41.     Plaintiff Shulamit Shani is the biological mother of Ori Mordechai Shani and has been, at all times relevant hereto, a citizen of the United States. Plaintiff Shulamit Shani has suffered greatly as a result of the murder of her son and can sue and be sued in this Court.

42.     Plaintiff Yehoshua Shani is the biological father of Ori Mordechai Shani and has been, at all times relevant hereto, a citizen of the United States. Plaintiff Yehoshua Shani has suffered greatly as a result of the murder of his son and can sue and be sued in this Court.

43.     Plaintiff Eliyahu Yishai Shani is the biological brother of Ori Mordechai Shani and has been, at all times relevant hereto, a citizen of the United States. Plaintiff Eliyahu Yishai Shani has suffered greatly as a result of the murder of his brother and can sue and be sued in this Court.

44.     Plaintiff Rinat Bat Zion Goldstein is the biological sister of Ori Mordechai Shani and has been, at all times relevant hereto, a citizen of the United States. Plaintiff Rinat Bat Zion Goldstein has suffered greatly as a result of the murder of her brother and can sue and be sued in this Court.

45.     Plaintiff Elisha Shani is the biological brother of Ori Mordechai Shani and has been, at all times relevant hereto, a citizen of the United States. Plaintiff Elisha Shani has suffered greatly as a result of the murder of his brother and can sue and be sued in this Court.

46.     Plaintiff Malachi Shani is the biological brother of Ori Mordechai Shani and has been, at all times relevant hereto, a citizen of the United States. Plaintiff Malachi Shani has suffered greatly as a result of the murder of his brother and can sue and be sued in this Court.

47.     Plaintiff Zofiya Zaguri is the biological sister of Ori Mordechai Shani and has been, at all times relevant hereto, a citizen of the United States. Plaintiff Zofiya Zaguri has suffered greatly as a result of the murder of her brother and can sue and be sued in this Court.

### E.  The Zussman Family

48.     Ben Zussman was murdered in Gaza on December 3, 2023 as a result of the October 7th Terrorist Attacks. At the time of the acts alleged, and at all other times relevant hereto, Ben Zussman was a citizen of the United States, and was fighting terror while serving in the Israel Defense Forces at the time of his murder by a HAMAS terrorist attack. Plaintiff Estate of Ben Zussman, acting by and through his father, Steven Tzvi Zussman, can sue and be sued in this Court.

49.     Plaintiff Steven Tzvi Zussman is the biological father of Ben Zussman and has been, at all times relevant hereto, a United States citizen. Plaintiff Steven Tzvi Zussman has suffered greatly as a result of the murder of his son and can sue and be sued in this Court.

50.     Plaintiff Mika Zussman is the biological sister of Ben Zussman and has been, at all times relevant hereto, a United States citizen. Plaintiff Mika Zussman has suffered greatly as a result of the murder of her brother and can sue and be sued in this Court.

51.     Plaintiff Boaz Zussman is the biological brother of Ben Zussman and has been, at all times relevant hereto, a United States citizen. Plaintiff Boaz Zussman has suffered greatly as a result of the murder of his brother and can sue and be sued in this Court.

### F.  The Gordon Family

36

52.     Naftali Gordon was murdered in Gaza on December 7, 2023 as a result of the October 7th Terrorist Attacks.  At the time of the acts alleged, and at all other times relevant hereto, Naftali Gordon was a citizen of the United States, and was fighting terror while serving in the Israel Defense Forces at the time of his murder by a HAMAS terrorist attack. Plaintiff Estate of Naftali Gordon can sue and be sued in this Court.

53.     Plaintiff Pesia Roth Gordon is the widowed wife of Naftali Gordon and has been, at all times relevant hereto, a United States citizen. Plaintiff Pesia Roth Gordon has suffered greatly as a result of the murder of her husband and can sue and be sued in this Court.

54.     Plaintiff L.M.G. is the biological daughter of Naftali Gordon and of Pesia Roth Gordon, each United States citizens. Plaintiff L.M.G has suffered greatly as a result of the murder of her father and can sue and be sued in this Court.

55.     Plaintiff G.T.G. is the biological daughter of Naftali Gordon and Pesia Roth Gordon, each United States citizens. Plaintiff G.T.G. has suffered greatly as a result of the murder of her father and can sue and be sued in this Court.

56.     Plaintiff Beatrice Miriam Gordon is the biological mother of Naftali Gordon and has been, at all times relevant hereto, a United States citizen. Plaintiff Beatrice Miriam Gordon has suffered greatly as a result of the murder of her son and can sue and be sued in this Court.

57.     Plaintiff Daniel Yigal Gordon is the biological father of Naftali Gordon and has been, at all times relevant hereto, a United States citizen. Plaintiff Daniel Yigal Gordon has suffered greatly as a result of the murder of his son and can sue and be sued in this Court.

58.     Plaintiff Jacob Joshua Gordon is the biological brother of Naftali Gordon and has been, at all times relevant hereto, a United States citizen. Plaintiff Jacob Joshua Gordon has suffered greatly as a result of the murder of his brother and can sue and be sued in this Court.

59.     Plaintiff Sarah Ahuva Gordon is the biological sister of Naftali Gordon and has been, at all times relevant hereto, a United States citizen. Plaintiff Sarah Ahuva Gordon has suffered greatly as a result of the murder of her brother and can sue and be sued in this Court.

60.     Plaintiff Shira Gordon Posner is the biological sister of Naftali Gordon and has been, at all times relevant hereto, a United States citizen. Plaintiff Shira Gordon Posner has suffered greatly as a result of the murder of her brother and can sue and be sued in this Court.

61.     Plaintiff Rivka Ziona Gordon Rush is the biological sister of Naftali Gordon and has been, at all times relevant hereto, a United States citizen. Plaintiff Rivka Ziona Gordon Rush has suffered greatly as a result of the murder of her brother and can sue and be sued in this Court.

62.     Plaintiff Devora Shoshana Gordon is the biological sister of Naftali Gordon and has been, at all times relevant hereto, a United States citizen. Plaintiff Devora Shoshana Gordon has suffered greatly as a result of the murder of her brother and can sue and be sued in this Court.

**G.  The Horowitz Family**

63.     Plaintiff M.H. was emotionally injured as a result of being within the "zone of danger" of the October 7th Terrorist Attacks.  At the time of the acts alleged, and at all other times relevant hereto, M.H. has been a citizen of the United States. Plaintiff M.H. has suffered greatly as a result of the October 7Th Terrorist Attacks during which people were murdered and can sue and be sued in this Court.

64.     Plaintiff Mordechai Horowitz is the biological father of M.H. and was emotionally injured as a result of being within the "zone of danger" of the October 7th Terrorist Attacks. At the time of the acts alleged, and at all other times relevant hereto, Mordechai Horowitz has been a citizen of the United States. Plaintiff Mordechai Horowitz has suffered greatly as a result of the October 7th Terrorist Attacks during which people were murdered and can sue and be sued in this

Court.

65.      Plaintiff Tova Horowitz is the biological mother of M.H. and was emotionally injured as a result of being within the "zone of danger" of the October 7th Terrorist Attacks. At the time of the acts alleged, and at all other times relevant hereto, Tova Horowitz has been a citizen of the United States. Plaintiff Tova Horowitz has suffered greatly as a result of the October 7th Terrorist Attacks during which people were murdered and can sue and be sued in this Court.

**H.  Drora Wizner**

66.      Yair Wizner was injured in the October 7th Terrorist Attacks at the Keren Sholom Kibbutz.  Plaintiff Drora Wizner is the biological mother of Yair Wizner and has been, at all times relevant hereto, a citizen of the United States.  Plaintiff Drora Wizner has suffered greatly as a result of the October 7th Terrorist Attacks during which people were murdered and during which her son Yair was injured and can sue and be sued in this Court.

**I.  The Raemer Family**

67.      Plaintiff Adele Raemer sustained emotional injuries as a result of being within the "zone of danger" of the October 7th Terrorist Attacks.   At the time of the acts alleged, and at all other times relevant hereto, Adele Raemer was a citizen of the United States. Plaintiff Adele Raemer has suffered greatly as a result of the October 7th Terrorist Attacks during which people were murdered and can sue and be sued in this Court.

68.      Plaintiff Lilach Naftalyahu, daughter of Adele Raemer, was emotionally injured as a result of being within the "zone of danger" of the October 7th Terrorist Attacks.  At the time of the acts alleged, and at all other times relevant hereto, Lilach Naftalyahu has been a citizen of the United States. Plaintiff Lilach Naftalyahu has suffered greatly as a result of the October 7th Terrorist Attacks during which people were murdered and can sue and be sued in this Court.

69. Plaintiff Adam Levy, son of Adele Raemer, sustained emotional injuries as a result of being within the "zone of danger" of the October 7th Terrorist Attacks At the time of the acts alleged, and at all other times relevant hereto, Adam Levy was a citizen of the United States. Plaintiff Adam Levy has suffered greatly as a result of the October 7th Terrorist Attacks during which people were murdered and can sue and be sued in this Court.

**J. The M. Fendel Family**

70. Plaintiff Mechi Fendel is the wife of David Fendel and sustained emotional injuries as a result of being within the "zone of danger" of the October 7th Terrorist Attacks. At the time of the acts alleged, and at all other times relevant hereto, Plaintiff Mechi Fendel was a citizen of the United States. Plaintiff Mechi Fendel has suffered greatly as a result of the October 7th Terrorist Attacks during which people were murdered and can sue and be sued in this Court.

71. Plaintiff David Fendel is the husband of Plaintiff Mechi Fendel and was emotionally injured as a result of being within the "zone of danger" of the October 7th Terrorist Attacks. At the time of the acts alleged, and at all other times relevant hereto, David Fendel was a citizen of the United States. Plaintiff David Fendel has suffered greatly as a result of the October 7th Terrorist Attacks during which people were murdered and can sue and be sued in this Court.

72. Plaintiff Binyamin Bezalel Fendel is the son of Plaintiffs David Fendel and Mechi Fendel and was emotionally injured as a result of being within the "zone of danger" of the October 7th Terrorist Attacks. At the time of the acts alleged, and at all other times relevant hereto, Bezalel Fendel was a citizen of the United States. Plaintiff Binyamin Bezalel Fendel has suffered greatly as a result of the October 7th Terrorist Attacks during which people were murdered and can sue and be sued in this Court.

**K. The G. Fendel Family**

73.    Plaintiff Gedalya Fendel is the husband of Merav Fendel and sustained emotional injuries as a result of being within the "zone of danger" of the October 7th Terrorist Attacks. At the time of the acts alleged, and at all other times relevant hereto, Plaintiff Gedalya Fendel was a citizen of the United States. Plaintiff Gedalya Fendel has suffered greatly as a result of the October 7th Terrorist Attacks during which people were murdered and can sue and be sued in this Court.

74.    Plaintiff Merav Sara Fendel is the wife of Plaintiff Gedalya Fendel and was emotionally injured as a result of being within the "zone of danger" of the October 7th Terrorist Attacks. At the time of the acts alleged, and at all other times relevant hereto, Meray Sara Fendel was a citizen of the United States. Plaintiff Merav Sara Fendel has suffered greatly as a result of the October 7th Terrorist Attacks during which people were murdered and can sue and be sued in this Court.

75.    Plaintiff A.T.F. is the daughter of Plaintiffs Gedalya Fendel and Merav Sara Fendel and was emotionally injured as a result of being within the "zone of danger" of the October 7th Terrorist Attacks. At the time of the acts alleged, and at all other times relevant hereto, A.T.F. was a citizen of the United States. Plaintiff A.Z.F. has suffered greatly as a result of the October 7th Terrorist Attacks during which people were murdered and can sue and be sued in this Court.

**L.  The Vaknin Family**

76.    Plaintiff Bracha F. Vaknin was emotionally injured as a result of being within the "zone of danger" of the October 7th Terrorist Attacks.  At the time of the acts alleged, and at all other times relevant hereto, Bracha F. Vaknin was a citizen of the United States. Plaintiff Bracha F. Vaknin has suffered greatly as a result of the October 7th Terrorist Attacks during which people were murdered and can sue and be sued in this Court.

77.    Plaintiff Shilo Vaknin is the biological daughter of Bracha F. Vaknin and was

emotionally injured as a result of being within the "zone of danger" of the October 7th Terrorist Attacks. At the time of the acts alleged, and at all other times relevant hereto, Shilo Vaknin was a citizen of the United States. Plaintiff Shilo Vaknin has suffered greatly as a result of the October 7th Terrorist Attacks during which people were murdered and can sue and be sued in this Court.

78.    Plaintiff E.V. is the biological daughter of Bracha F. Vaknin and was emotionally injured as a result of being within the "zone of danger" of the October 7th Terrorist Attacks At the time of the acts alleged, and at all other times relevant hereto, E.V. was a citizen of the United States. Plaintiff E.V. has suffered greatly as a result of the October 7th Terrorist Attacks during which people were murdered and can sue and be sued in this Court.

79.    Plaintiff M.V. is the biological son of Bracha F. Vaknin and was emotionally injured as a result of being within the "zone of danger" of the October 7th Terrorist Attacks At the time of the acts alleged, and at all other times relevant hereto, M.V. was a citizen of the United States.  Plaintiff M.V. has suffered greatly as a result of the October 7th Terrorist Attacks during which people were murdered and can sue and be sued in this Court.

80.    Plaintiff S.V. is the biological daughter of Bracha F. Vaknin and was emotionally injured as a result of being within the "zone of danger" of the October 7th Terrorist Attacks. At the time of the acts alleged, and at all other times relevant hereto, S.V. was a citizen of the United States.  Plaintiff S.V. has suffered greatly as a result of the October 7th Terrorist Attacks during which people were murdered and can sue and be sued in this Court.

81.    Plaintiff A.V. is the biological daughter of Bracha F. Vaknin and was emotionally injured as a result of being within the "zone of danger" of the October 7th Terrorist Attacks At the time of the acts alleged, and at all other times relevant hereto, A.V. was a citizen of the United States. Plaintiff A.V. has suffered greatly as a result of the October 7th Terrorist Attacks during

which people were murdered and can sue and be sued in this Court.

82.    Plaintiff K.V. is the biological daughter of Bracha F. Vaknin and was emotionally injured as a result of being within the "zone of danger" of the October 7th Terrorist Attacks At the time of the acts alleged, and at all other times relevant hereto, K.V. was a citizen of the United States. Plaintiff K.V. has suffered greatly as a result of the October 7th Terrorist Attacks during which people were murdered and can sue and be sued in this Court.

83.    Plaintiff Ak.V. is the biological daughter of Bracha F. Vaknin and was emotionally injured as a result of being within the "zone of danger" of the October 7th Terrorist Attacks At the time of the acts alleged, and at all other times relevant hereto, Ak.V. was a citizen of the United States. Plaintiff Ak.V. has suffered greatly as a result of the October 7th Terrorist Attacks during which people were murdered and can sue and be sued in this Court.

**M. Michal Halev**

84.    Plaintiff Michal Halev is the biological mother of Laor Abramov and has been, at all times relevant hereto, a United States citizen.  Laor Abramov was heinously murdered on October 7, 2023 after suffering prolonged and great fear, anxiety and pain as a result of the HAMAS perpetrated October 7th Terrorist Attacks.  Plaintiff Michal Halev has suffered greatly as a result of the murder of her son and can sue and be sued in this Court.

**N.  Naomi Adler**

85.    Naomi Petel Adler was emotionally injured as a result of being within the "zone of danger" of the October 7th Terrorist Attacks.  At the time of the acts alleged, and at all other times relevant hereto, Naomi Petel Adler was a citizen of the United States. Plaintiff Naomi Petel Adler has suffered greatly as a result of the October 7th Terrorist Attacks during which people were murdered and can sue and be sued in this Court.

86.     E.P.A. is the biological son of Naomi Petel Adler and was emotionally injured as a result of being within the "zone of danger" of the October 7th Terrorist Attacks.   E.P.A is a citizen of the United States. Plaintiff E.P.A has suffered greatly as a result of the October 7th Terrorist Attacks during which people were murdered and can sue and be sued in this Court.

87.     N.A. is the biological son of Naomi Petel Adler and was emotionally injured as a result of being within the "zone of danger" of the October 7th Terrorist Attacks.   N.A. is a citizen of the United States. Plaintiff N.A. has suffered greatly as a result of the October 7th Terrorist Attacks during which people were murdered and can sue and be sued in this Court.

88.     A.C.A. is the biological son of Naomi Petel Adler and was emotionally injured as a result of being within the "zone of danger" of the October 7th Terrorist Attacks.   A.C.A. is a citizen of the United States. Plaintiff A.C.A. has suffered greatly as a result of the October 7th Terrorist Attacks during which people were murdered and can sue and be sued in this Court.

**O.  Genadi Barzman**

89.     Plaintiff Genadi Barzman is the biological son of Elizabeta Nayidis and has been, at all times relevant hereto, a citizen of the United States.  Elizabeta Nayidis was injured in the city of Ashkelon on October 9, 2023 as a result of the October 7th Terrorist Attacks. Plaintiff Genadi Barzman has suffered greatly as a result of the October 7th Terrorist Attacks during which people were murdered and during which his mother Elizabeta was injured and can sue and be sued in this Court.

**P.  Naomi Shaya**

90.     Plaintiff Naomi Shaya has been, at all times relevant hereto, a United States citizen. Plaintiff Naomi Shaya is publicly known as the common law wife of Nir Binyamin.  Nir Binyamin was murdered in Gaza on January 22, 2024 as a result of the October 7th Terrorist Attacks. Nir

Binyamin was fighting terror while serving in the Israel Defense Forces at the time of his murder by a HAMAS terrorist attack. Plaintiff Naomi Shaya has suffered greatly as a result of the murder of Nir and can sue and be sued in this Court.

### Q. Iddo Cohen

91.     Plaintiff Iddo Cohen was attacked and physically injured on October 7, 2023 at the NOVA festival and has suffered and is suffering prolonged and great fear, anxiety and pain as a result of the October 7th Terrorist Attack upon NOVA. At the time of the acts alleged, and at all other times relevant hereto, Iddo Cohen was a citizen of the United States.

### R. Gil Kapeluk

92.     Plaintiff Gil Kapeluk is the biological brother of Hadar Kapeluk and has been, at all times relevant hereto, a United States citizen. Hadar Kapeluk was murdered in Gaza on January 22, 2024 as a result of the October 7th Terrorist Attacks. Hadar Kapeluk was fighting terror while serving in the Israel Defense Forces at the time of his murder by a HAMAS terrorist attack. Plaintiff Gil Kapeluk has suffered greatly as a result of the murder of his brother and can sue and be sued in this Court.

### S. The Loewenstern Family

93.     Elisha Loewenstern was murdered in Gaza on December 13, 2023 as a result of the October 7th Terrorist Attacks. At the time of the acts alleged, and at all other times relevant hereto, Elisha Loewenstern was a citizen of the United States. He was fighting terror while serving in the Israel Defense Forces at the time of his murder by a HAMAS terrorist attack.

94.     Plaintiff Howard Loewenstern was, at all times relevant hereto, the father of Elisha Loewenstern and a United States citizen. Plaintiff Howard Loewenstern has suffered greatly as a result of the murder of his son and can sue and be sued in this Court.

95.     Plaintiff Sharon Loewenstern was, at all times relevant hereto, the mother of Elisha Loewenstern and a United States citizen. Plaintiff Sharon Loewenstern has suffered greatly as a result of the murder of her son and can sue and be sued in this Court.

96.     Plaintiff Yakir Loewenstern was, at all times relevant hereto, the brother of Elisha Loewenstern and a United States citizen. Plaintiff Yakir Loewenstern has suffered greatly as a result of the murder of his brother and can sue and be sued in this Court.

97.     Plaintiff David Loewenstern was, at all times relevant hereto, the brother of Elisha Loewenstern and a United States citizen. Plaintiff David Loewenstern has suffered greatly as a result of the murder of his brother and can sue and be sued in this Court.

98.     Plaintiff Noam Loewenstern was, at all times relevant hereto, the brother of Elisha Loewenstern and a United States citizen. Plaintiff Noam Loewenstern has suffered greatly as a result of the murder of his brother and can sue and be sued in this Court.

99.     Plaintiff Yechiel Loewenstern was, at all times relevant hereto, the brother of Elisha Loewenstern and a United States citizen. Plaintiff Yechiel Loewenstern has suffered greatly as a result of the murder of his brother and can sue and be sued in this Court.

100.    Plaintiff Yocheved Loewenstern was, at all times relevant hereto, the sister of Elisha Loewenstern and a United States citizen. Plaintiff Yocheved Loewenstern has suffered greatly as a result of the murder of her brother and can sue and be sued in this Court.

**T.  The Duvdevani Family**

101.    Giora Duvdevani was heinously murdered on October 10, 2023 after suffering prolonged and great fear, anxiety and pain as a result of the HAMAS perpetrated October 7th Terrorist Attacks.   At the time of the acts alleged, and at all other times relevant hereto, Giora Duvdevani was a citizen of the United States. Plaintiff Estate of Giora Duvdevani can sue and be

sued in this Court.

102.    Plaintiff Margaret Duvdevani is the wife of Giora Duvdevani and has been, at all times relevant hereto, a citizen of the United States. Plaintiff Margaret Duvdevani has suffered severe mental anguish, loss of consortium, and extreme emotional pain and suffering as a result of the murder of her husband and can sue and be sued in this Court.

103.    Plaintiff Michael Louis Duvdevani is the son of Giora Duvdevani and has been, at all times relevant hereto, a citizen of the United States. Plaintiff Michael Louis Duvdevani has suffered greatly as a result of the murder of his father and can sue and be sued in this Court.

104.    Plaintiff Daniel Duvdevani is the son of Giora Duvdevani and has been, at all times relevant hereto, a citizen of the United States. Plaintiff Daniel Duvdevani has suffered greatly as a result of the murder of his father and can sue and be sued in this Court.

105.    Plaintiff Jeremy Duvdevani is the son of Giora Duvdevani and has been, at all times relevant hereto, a citizen of the United States. Plaintiff Jeremy Duvdevani has suffered greatly as a result of the murder of his father and can sue and be sued in this Court.

**U.  The Alboher Family**

106.    Adam Agmon was murdered at Kibbutz Kissufim on October 7, 2023 as a result of the October 7th Terrorist Attacks.  He was fighting terror while serving in the Israel Defense Forces at the time of his murder by a HAMAS terrorist attack.

107.    Plaintiff Gilad Shiloh Alboher was, at all times relevant hereto, the step-brother of Adam Agmon and a United States citizen. Plaintiff Gilad Shiloh Alboher has suffered greatly as a result of the murder of his step-brother and can sue and be sued in this Court.

108.    Plaintiff Oz Avraham Alboher was, at all times relevant hereto, the step-brother of Adam Agmon and a United States citizen. Plaintiff Gilad Shiloh Alboher has suffered greatly as a

result of the murder of his step-brother and can sue and be sued in this Court.

**V.  The Gess Family**

109.    Plaintiff Adin Gess was emotionally injured when he and his family were within the "zone of danger" of Kibbutz Holit during the October 7th Terrorist Attacks where approximately fifteen victims were murdered.  At the time of the acts alleged, and at all other times relevant hereto, Adin Gess was a citizen of the United States. Plaintiff Adin Gess has suffered greatly as a result of the October 7th Terrorist Attacks during which people were murdered and can sue and be sued in this Court. This action, on behalf of Plaintiff Adin Gess, individually, is at the time of initial filing only against Defendant UNRWA and not against Defendant UNRWA USA.

110.    Plaintiff E.G., the minor son of Adin Gess was emotionally injured when he and his family were within the "zone of danger" of Kibbutz Holit during the October 7th Terrorist Attacks where approximately fifteen victims were murdered.  E.G. is a citizen of the United States. Plaintiff E.G. has suffered greatly as a result of the October 7th Terrorist Attacks during which people were murdered and can sue and be sued in this Court.

111.    Plaintiff N.G. the minor daughter of Adin Gess was emotionally injured when she and her family were within the "zone of danger" of Kibbutz Holit during the October 7th Terrorist Attacks where approximately fifteen victims were murdered.  N.G. is a citizen of the United States. Plaintiff N.G. has suffered greatly as a result of the October 7th Terrorist Attacks during which people were murdered and can sue and be sued in this Court.

112.    Plaintiff Y.G. the minor daughter of Adin Gess was emotionally injured when she and her family were within the "zone of danger" of Kibbutz Holit during the October 7th Terrorist Attacks where approximately fifteen victims were murdered.  Y.G. is a citizen of the United States.

Plaintiff Y.G. has suffered greatly as a result of the October 7Th Terrorist Attacks during which people were murdered and can sue and be sued in this Court.

### W. The Newman Family

113.    David Yair Shalom Newman was heinously murdered on October 7, 2023 after suffering prolonged and great fear, anxiety and pain as a result of the HAMAS perpetrated October 7th Terrorist Attacks.

114.    Plaintiff Noach Newman is the biological brother of David Yair Shalom Newman and has been, at all times relevant hereto, a citizen of the United States. Plaintiff Noach Newman has suffered greatly as a result of the murder of his brother and can sue and be sued in this Court. This action, on behalf of Plaintiff Noach Newman, individually, is at the time of initial filing only against the Defendant UNRWA and not against Defendant UNRWA USA.

115.    Plaintiff Gavriel Newman is the biological brother of David Yair Shalom Newman and has been, at all times relevant hereto, a citizen of the United States. Plaintiff Gavriel Newman has suffered greatly as a result of the murder of his brother and can sue and be sued in this Court.

116.    Plaintiff Dvir Newman is the biological brother of David Yair Shalom Newman and has been, at all times relevant hereto, a citizen of the United States. Plaintiff Dvir Newman has suffered greatly as a result of the murder of his brother and can sue and be sued in this Court.

117.    Plaintiff Batya Sprei is the biological sister of David Yair Shalom Newman and has been, at all times relevant hereto, a citizen of the United States. Plaintiff Batya Sprei has suffered greatly as a result of the murder of her brother and can sue and be sued in this Court.

### X.  The Kogan Family

118.    Dovi Kogan was heinously killed in Gaza on November 9, 2023 by a HAMAS Terrorist.

119. Plaintiff Shaked Kogan, Dovi's wife, is a citizen of the United States, and has suffered greatly as a result of her husband's death. Shaked was also, at all times relevant hereto, the step-sister of Adam Agmon and a United States citizen. Plaintiff Shaked Kogan has suffered greatly as a result of the murders of her husband and step-brother. Shaked can sue and be such in this Court.

120. O.K. is the biological son of Shaked Kogan and was emotionally injured as a result of the October 7th Terrorist Attacks in which his father Dovi Kogan was killed. O.K. is a citizen of the United States. Plaintiff O.K. has suffered greatly as a result of the October 7th Terrorist Attacks can sue and be sued in this Court.

121. S.K. is the biological daughter of Shaked Kogan and was emotionally injured as a result of the October 7th Terrorist Attacks in which her father Dovi Kogan was killed. S.K. is a citizen of the United States. Plaintiff S.K. has suffered greatly as a result of the October 7th Terrorist Attacks can sue and be sued in this Court.

122. N.M.K. is the biological son of Shaked Kogan and was emotionally injured as a result of the October 7th Terrorist Attacks in which his father Dovi Kogan was killed. N.M.K. is a citizen of the United States. Plaintiff N.M.K. has suffered greatly as a result of the October 7th Terrorist Attacks can sue and be sued in this Court.

**Y. The Axelrad Family**

123. Plaintiff Saar Axelrad is an American citizen who was injured by a Hezbollah rocket in a HAMAS terror attack on February 14, 2024. At the time of the acts alleged, and at all other times relevant hereto, Saar Axelrad was a citizen of the United States. Plaintiff Saar Axelrad can sue and be sued in this Court.

124.    Plaintiff Josef Axelrad is the father of Saar Axelrad and has been, at all times relevant hereto, a citizen of the United States. Plaintiff Josef Axelrad has suffered greatly as a result of the injuries his son suffered and can sue and be sued in this Court

125.    Plaintiff Esther Axelrad is the mother of Saar Axelrad and has been, at all times relevant hereto, a citizen of the United States. Plaintiff Esther Axelrad has suffered greatly as a result of the injuries her son suffered and can sue and be sued in this Court

126.    Plaintiff Smadar Haymovich is the sister of Saar Axelrad and has been, at all times relevant hereto, a citizen of the United States. Plaintiff Smadar Haymovich has suffered greatly as a result of the injuries her brother suffered and can sue and be sued in this Court.

127.    Plaintiff D.A. is the son of Saar Axelrad and was seven months old and was in the process of obtaining his U.S. citizenship, which he has since received, at the time of the rocket attack in which his father Saar was injured.  D.A. can sue and be sued in this Court.

**Z.  The Bluth Family**

128.    Plaintiff Isaac Bluth is an American citizen who was injured by terrorist gunfire on October 9, 2023. At the time of the acts alleged, and at all other times relevant hereto, Isaac Bluth was a citizen of the United States. Plaintiff Isaac Bluth can sue and be sued in this Court.

129.    Plaintiff N.B. is the son of Isaac Bluth and has been, at all times relevant hereto, a citizen of the United States. Plaintiff N.B. has suffered greatly as a result of the injuries his father suffered and can sue and be sued in this Court.

130.    Plaintiff D.B. is the son of Isaac Bluth and has been, at all times relevant hereto, a citizen of the United States. Plaintiff D.B. has suffered greatly as a result of the injuries his father suffered and can sue and be sued in this Court.

131.    Plaintiff I.B. is the son of Isaac Bluth and has been, at all times relevant hereto, a citizen of the United States. Plaintiff I.B. has suffered greatly as a result of the injuries his father suffered and can sue and be sued in this Court.

132.    Plaintiff Ephraim Bluth is the father of Isaac Bluth and has been, at all times relevant hereto, a citizen of the United States. Plaintiff Ephriam Bluth has suffered greatly as a result of the injuries his son suffered and can sue and be sued in this Court.

133.    Plaintiff Aryeh Yehuda Bluth is the brother of Isaac Bluth and has been, at all times relevant hereto, a citizen of the United States. Plaintiff Aryeh Yehuda Bluth has suffered greatly as a result of the injuries his brother suffered and can sue and be sued in this Court.

134.    Plaintiff Abraham Aharon Bluth is the brother of Isaac Bluth and has been, at all times relevant hereto, a citizen of the United States. Plaintiff Abraham Aharon Bluth has suffered greatly as a result of the injuries his brother suffered and can sue and be sued in this Court.

135.    Plaintiff Chanina Samuel Bluth is the brother of Isaac Bluth and has been, at all times relevant hereto, a citizen of the United States. Plaintiff Chanina Samuel Bluth has suffered greatly as a result of the injuries his brother suffered and can sue and be sued in this Court.

136.    Plaintiff Tsipora Bluth-Reicher is the sister of Isaac Bluth and has been, at all times relevant hereto, a citizen of the United States. Plaintiff Tsipora Bluth-Reicher has suffered greatly as a result of the injuries her brother suffered and can sue and be sued in this Court.

137.    Plaintiff Joseph Shimshon Bluth is the brother of Isaac Bluth and has been, at all times relevant hereto, a citizen of the United States. Plaintiff Joseph Shimshon Bluth has suffered greatly as a result of the injuries his brother suffered and can sue and be sued in this Court.

138.    Plaintiff Nethaniel Bluth is the brother of Isaac Bluth and has been, at all times relevant hereto, a citizen of the United States. Plaintiff Nethaniel Bluth has suffered greatly as a result of the injuries his brother suffered and can sue and be sued in this Court.

139.    Plaintiff Yigal Amichai Bluth is the brother of Isaac Bluth and has been, at all times relevant hereto, a citizen of the United States. Plaintiff Yigal Amichai Bluth has suffered greatly as a result of the injuries his brother suffered and can sue and be sued in this Court.

**AA.    Raanan Family**

140.    Plaintiff Judith Raanan was taken hostage by HAMAS during the terrorist attack committed by HAMAS at the Kibbutz Nahal Oz in Israel that began on October 7, 2023. At the time of the acts alleged, and at all other times relevant hereto, Judith Raanan was a citizen of the United States. Judith Raanan was released on or about October 20, 2023, after being held captive for approximately two weeks. Plaintiff Judith Raanan suffered severe mental anguish and extreme emotional pain and suffering as a result of HAMAS terrorists taking her and her daughter (Plaintiff Natalie Raanan) hostage from Kibbutz Nahal Oz, which they were visiting.

141.    Plaintiff Natalie Raanan was taken hostage by HAMAS during the terrorist attack committed by HAMAS at the Kibbutz Nahal Oz in Israel that began on October 7, 2023. At the time of the acts alleged, and at all other times relevant hereto, Natalie Raanan was a citizen of the United States and the daughter of Plaintiff Judith Raanan. At the time she was taken hostage, Natalie Raanan was a minor child. Plaintiff Natalie Raanan suffered severe mental anguish and extreme emotional pain and suffering as a result of HAMAS terrorist taking her and her mother hostage. HAMAS terrorists forcibly kidnapped Natalie Raanan and physically held her against her will, in fear for her and her mother's lives. At the time of her injury, Natalie Raanan was a citizen of the United States. Natalie Raanan was released on or about October 20, 2023, after

being held captive for approximately two weeks.

142.    Plaintiff Uri Raanan is the father of plaintiff Natalie Raanan, and the ex-husband of plaintiff Judith Raanan, and has been, at all times relevant hereto, a citizen of the United States. Plaintiff Uri Raanan suffered severe mental anguish and extreme emotional pain and suffering as a result of the fact that his daughter Natalie was attacked by HAMAS and taken hostage in the October 7th Terrorist Attacks.

**BB.    Benveniste Family**

143.    Arnon Benveniste was murdered in the October 7th Terrorist Attacks while serving in the Israel Defense Forces ("IDF").   At the time of his murder, Arnon Benveniste was a citizen of the United States. Plaintiff Estate of Arnon Benveniste can sue and be sued in this Court.

144.    Plaintiff Vered Benveniste is the mother of Arnon Benveniste. Plaintiff Vered Benveniste suffered severe mental anguish and extreme emotional pain and suffering as a result of the October 7th Terrorist Attacks that claimed the life of her son, Arnon Benveniste.  At the time of the acts alleged, and at all other times relevant hereto, Vered Benveniste was a citizen of the United States.

145.    Plaintiff Yosef Benveniste is the brother of Arnon Benveniste.  Plaintiff Yosef Benveniste suffered severe mental anguish and extreme emotional pain and suffering as a result of the HAMAS terrorist attack that claimed the life of his brother, Arnon Benveniste.  At the time of the acts alleged, and at all other times relevant hereto, Yosef Benveniste was a citizen of the United States.

146.    Plaintiff Chaya Benveniste is the twin sister of Arnon Benveniste.  Plaintiff Chaya Benveniste suffered severe mental anguish and extreme emotional pain and suffering as a result of the HAMAS terrorist attack that claimed the life of her brother, Arnon Benveniste.  At the time of

the acts alleged, and at all other times relevant hereto, Plaintiff Chaya Benveniste was a citizen of the United States.

### CC.    Rachel Ohnona

147.    Plaintiff Rachel Ohnona is the mother of Alexandre Look who was murdered at the age of 33 at the NOVA Festival during the October 7, 2023 by HAMAS.    Plaintiff Rachel Ohnona suffered severe mental anguish and extreme emotional pain and suffering as a result of the October 7, 2023, terrorist attack by HAMAS that claimed the life of her son.  At the time of the acts alleged, and at all other times relevant hereto, Plaintiff Rachel Ohnona was a citizen of the United States.

### DD.    Jeffrey Ludmir

148.    Plaintiff Jeffrey Ludmir is a U.S. citizen residing in Miami, Florida.  Mr. Ludmir is the uncle of Dr. Daniel Levi Ludmir, a native of Peru and a physician at the Soroka Medical Center in Beersheba, Israel, who was murdered during the joint HAMAS terrorist attack while treating the wounded at Kibbutz Be'eri on October 7, 2023.  Jeffrey Ludmir suffered severe mental anguish and extreme emotional pain and suffering as a result of the October 7th Terrorist Attack by HAMAS that claimed the life of his nephew Daniel Levi.

149.    When Daniel Levi was a young boy, his father abandoned his mother and siblings. With Daniel Levi's father being absent for over 25 years, Jeffrey Ludmir assumed the role of a father for his nephew, Daniel Levi.  Mr. Ludmir played a guardian-like role in providing monetary support to his sister (Daniel Levi's mother) to help her raise Daniel Levi and her other two children.  He would often speak with Daniel Levi on the phone and would visit him in Peru where he was born and raised.  Daniel Levi also traveled to Miami repeatedly in order to visit Jeffrey Ludmir.

### EE.    Bosi Family

150.    Plaintiff Adi Bosi was pregnant on October 7, 2023, when her city, Sderot, was attacked by HAMAS.  On the morning of October 7, 2023, the Bosi family was having breakfast when they heard a sound like thunder. From the sixth floor of her apartment, Adi Bosi saw vehicles on the streets and people being shot at.  Adi Bosi and her family escaped to their bomb shelter before gunfire hit their home.  For about twenty hours Adi Bosi hid in a shelter with her toddlers, D.B. aged three, S.B. aged two, and her husband as they heard rockets and missiles landing and the sound of bullets throughout the streets and feared for their lives.  After the bombing of her apartment, Adi Ruth Bosi delivered her third child.  Adi Bosi suffered severe mental anguish and extreme emotional pain and suffering as a result of the October 7th Terrorist Attack by HAMAS. At the time of her injury, Adi Bosi was a citizen of the United States. Plaintiff Adi Bosi brings this action individually and on behalf of her minor children, Plaintiffs D.B. and S.B.

151.    Plaintiff D.B. is a minor child and the son of United States citizen Adi Bosi. Plaintiff D.B. suffered severe mental anguish and extreme emotional pain and suffering as a result of the October 7th Terrorist Attack by HAMAS.  At the time of his injury, D.B. was a citizen of the United States.

152.    Plaintiff S.B. is a minor child and the daughter of United States citizen Adi Bosi. Plaintiff S.B. suffered severe mental anguish and extreme emotional pain and suffering as a result of the October 7th Terrorist Attack by HAMAS.  At the time of her injury, S.B. was a citizen of the United States.

**FF. Ben Aderet Family**

153.    Plaintiff Deborah Ben Aderet along with her two minor children, L.B. aged six, R.B. aged eight, and her husband Yosef Ben Aderet hid in their shelter in Zikim beginning early on October 7, 2023, when they heard the attack by HAMAS begin.  Fearing for their lives and

without any means of self-defense, Plaintiff Deborah Ben Aderet and her husband Yosef Ben Aderet armed themselves with kitchen knives.  The family heard the attacks until they were evacuated the next day by the IDF.  Upon their evacuation the family passed dead bodies in the streets.  At the time of her injury, Deborah Ben Aderet was a citizen of the United States. Plaintiff Deborah Ben Aderet brings this action individually and on behalf of her minor children, Plaintiffs L.B., and R.B.

154.    Plaintiff L.B. is a minor child and the son of United States citizen Deborah Ben Aderet.  Plaintiff L.B. suffered severe mental anguish and extreme emotional pain and suffering as a result of the October 7, 2023, terrorist attack by HAMAS.  At the time of his injury, L.B. was a citizen of the United States.

155.    Plaintiff R.B. is a minor child and the son of United States citizen Deborah Ben Aderet.  Plaintiff R.B. suffered severe mental anguish and extreme emotional pain and suffering as a result of the October 7, 2023, terrorist attack by HAMAS.  At the time of his injury, R.B. was a citizen of the United States.

**GG.    Nevo Shoulian**

156.    On October 7, 2023, Plaintiff Nevo Shoulian was at the NOVA Festival when HAMAS terrorists attacked.  Although Nevo Shoulian survived, he witnessed the attack, assault, murder of his friends who were attending the festival with him. Plaintiff Nevo Shoulian's friends were also kidnapped from the festival. Plaintiff Nevo Shoulian suffered severe mental anguish and extreme emotional pain and suffering as a result of the October 7, 2023, terrorist attack by HAMAS.  At the time of his injury, Nevo Shoulian was a citizen of the United States.

**HH.    Segal Family**

157.    On August 5, 2024, Plaintiff Elchanan Segal was fighting terror and serving on

reserve duty with the Israel Defense Forces in Abasan Al-Kabira in Khan Yunis when he sustained severe and life-threatening injuries as a result of an explosion caused by HAMAS. He suffered multiple traumatic injuries, including but not limited to, lacerations near the left kidney; laceration of the liver and small bowel; ruptured diaphragm; punctured gallbladder (requiring removal), transverse colon, and punctured left hemothorax; and fractures and nerve damage to the left hand and elbow. These injuries required extensive hospitalization, including 2.5 weeks in the Trauma Ward of the Intensive Care Unit. At the time of his injury, Plaintiff Elchanan Segal was a citizen of the United States. Plaintiff Elchanan Segal brings this action individually and on behalf of his minor children, Plaintiffs Elysheva Segal, N.Y.S., M.Y.S., and R.Y.S.

158.    Plaintiff N.Y.S. is the son of Plaintiff Elchanan Segal. Plaintiff N.Y.S. has suffered severe mental anguish and extreme emotional pain and suffering as a result of the fact that Plaintiff Elchanan Segal was attacked by an explosion caused by HAMAS on August 5, 2024. N.Y.S. is a citizen of the United States. Plaintiff N.Y.S. has suffered greatly as a result of the October 7th Terrorist Attacks can sue and be sued in this Court

159.    Plaintiff M.Y.S. is the daughter of Plaintiff Elchanan Segal. Plaintiff M.Y.S. has suffered severe mental anguish and extreme emotional pain and suffering as a result of the fact that Plaintiff Elchanan Segal was attacked by an explosion caused by HAMAS on August 5, 2024. M.Y.S. is a citizen of the United States. Plaintiff M.Y.S. has suffered greatly as a result of the October 7th Terrorist Attacks can sue and be sued in this Court.

160.    Plaintiff R.Y.S. is the son of Plaintiff Elchanan Segal. Plaintiff R.Y.S. has suffered severe mental anguish and extreme emotional pain and suffering as a result of the fact that Plaintiff Elchanan Segal was attacked by an explosion caused by HAMAS on August 5, 2024. R.Y.S. is a citizen of the United States. Plaintiff R.Y.S. has suffered greatly as a result of the October 7th

Terrorist Attacks can sue and be sued in this Court

## II.  Mathias - Troen Family

161.    Shachar Deborah Troen Mathias was heinously murdered together with her husband, Shlomi David Mathias, in their home by HAMAS during the October 7 terrorist attacks by HAMAS in Kibbutz Holit, a small kibbutz in Israel.   Her son, Rotem Eliyahu Mathias, was also physically injured during the same attack, and her husband Shlomi, was murdered. Shachar Deborah Troen Mathias suffered severe mental anguish and extreme emotional pain and suffering as a result of the October 7th Terrorist Attack that caused her direct injury and that claimed her life and the life of her husband, Shlomi David Mathias, physical and emotional injuries to her son, Rotem Eliyahu Mathias, and emotional injures to her daughters, Shakked Sarah Mathias and Shir Tziporah Mathias.  At the time of the acts alleged, and at all other times relevant hereto, Shachar Deborah Troen Mathias was a citizen of the United States. Plaintiff Estate of Shachar Deborah Troen Mathias can sue and be sued in this Court.

162.    Shlomi David Mathias was heinously murdered together with his wife, Shachar Deborah Troen Mathias, in their home by HAMAS during the October 7 terrorist attacks by HAMAS in Kibbutz Holit, a small kibbutz in Israel.   His son, Rotem Eliyahu Mathias, was also physically injured during the same attack.   During the attack, he witnessed with horror as the HAMAS terrorists broke into their home and   murdered his wife and physically injured his son, before succumbing to his own injuries inflicted during the attack. Accordingly, Shlomi David Mathias suffered extreme mental anguish and injury as he saw his wife murdered and son suffering, Although not a U.S. citizen himself, his Estate is an heir of his wife Shachar Deborah Troen Mathias, who was a U.S. citizen.  Accordingly, in his capacity as an heir of a U.S. citizen, Plaintiff Estate of Shlomi David Mathias may sue and be sued in this Court.

163.    Plaintiff Shir Tziporah Mathias is the daughter of Shachar Deborah Troen Mathias and Shlomi David Mathias and the sister of Rotem Mathias and Shakked Sarah Mathias.  Her parents were murdered by HAMAS in their home during the October 7th Terrorist Attacks by HAMAS on Kibbutz Holit, and her brother Rotem Eliyahu Mathias was also physically injured in the attack. Plaintiff Shir Tziporah Mathias's home was also destroyed at as result of the October 7th Terrorist Attack. Plaintiff Shir Tziporah Mathias suffered severe mental anguish and extreme emotional pain and suffering as a result of the October 7th Terrorist Attack that caused her direct injury and that claimed the life of her parents and physical and emotional injuries to her brother, Rotem Eliyahu Mathias and emotional injures to her sister, Shakked Sarah Mathias.  At the time of her injury, Plaintiff Shir Tziporah Mathias was a citizen of the United States.

164.    Plaintiff Shakked Sarah Mathias is the daughter of Shachar Deborah Troen Mathias and Shlomi David Mathias and the sister of Rotem Mathias and Shir Tziporah Mathias. Her parents were murdered by HAMAS in their home during the October 7 terrorist attacks by HAMAS on Kibbutz Holit and her brother Rotem Eliyahu Mathias was also physically injured in the attack.  Plaintiff Shakked Sarah Mathias's home was also destroyed as a result of the October 7th Terrorist Attack.  Plaintiff Shakked Sarah Mathias suffered severe mental anguish and extreme emotional pain and suffering as a result of the October 7th Terrorist Attack that caused her direct injury and that claimed the life of her parents and physical and emotional injuries to her brother, Rotem Eliyahu Mathias, and emotional injures to her sister, Shir Tziporah Mathias.  At the time of her injury, Plaintiff Shakked Sarah Mathias was a citizen of the United States.

165.    Plaintiff Rotem Eliyahu Mathias is the son of Shachar Deborah Troen Mathias and Shlomi David Mathias and the brother of Shakked Sarah Mathias and Shir Tziporah Mathias.

Plaintiff Rotem Eliyahu Mathias suffered severe physical injuries, severe mental anguish and extreme emotional pain and suffering as a result of the October 7th Terrorist Attack that caused his direct injury and that claimed the life of his parents and emotional injures to his sisters, Shakked Sarah Mathias and Shir Tziporah Mathias.  At the time of his injury, Plaintiff Rotem Eliyahu Mathias was a citizen of the United States.

166.    Plaintiff Ilan Troen is the father of Shachar Deborah Troen Mathias. Plaintiff Ilan Troen is also the husband of Carol Troen, father of Bar Yuval Shani, Aron Milton Troen, Joshua Willam Troen, Judah Troen, and Abraham Troen.  Plaintiff Ilan Troen suffered severe mental anguish and extreme emotional pain and suffering as a result of the October 7th Terrorist Attack that caused his direct injury and injury to his wife, Carol Troen, and that claimed the life of his daughter, Shachar Deborah Troen Mathias, and the emotional injuries to his children Bar Yuval Shani, Aron Milton Troen, Joshua William Troen,  Judah Troen, and Abraham Troen;. At the time of his injury, Plaintiff Ilan Troen was a citizen of the United States.

167.    Plaintiff Carol Troen is the mother of Shachar Deborah Troen Mathias.  Plaintiff Carol Troen is also the wife of Ilan Troen, and the mother of Bar Yuval Shani, Aron Milton Troen, Joshua Willam Troen, Judah Troen, and Abraham Troen. Plaintiff Carol Troen suffered severe mental anguish and extreme emotional pain and suffering as a result of the October 7th Terrorist Attack that caused the direct injury to her, and her husband, Ilan, and claimed the life of her daughter, Shachar Deborah Troen Mathias, and the emotional injuries to her children, Bar Yuval Shani, Aron Milton Troen, Joshua William Troen, Judah Troen, and Abraham Troen  At the time of her injury, Plaintiff Carol Troen was a citizen of the United States.

168.    Plaintiff Bar Yuval Shani is the sister of Shachar Deborah Troen Mathias.  Plaintiff Bar Yuval Shani is also the wife of Eran Shani, the daughter of Ilan Troen and Carol Troen,  and

the sister of Aron Milton Troen, Joshua William Troen, Judah Troen, and Abraham Troen. Plaintiff Bar Yuval Shani suffered severe mental anguish and extreme emotional pain and suffering as a result of the October 7th Terrorist Attack that caused the direct injury to her and claimed the life of her sister, Shachar Deborah Troen Mathias and the emotional injures to her husband Eran Shani, parents, Ilan Troen and Carol Troen, and siblings, Aron Milton Troen, Joshua William Troen Judah Troen and Abraham Troen,. At the time of her injury, Plaintiff Bar Yuval Shani was a citizen of the United States.

169.    Plaintiff Aron Milton Troen is the brother of Shachar Deborah Troen Mathias. Plaintiff Aron Troen is also the husband of Susan Troen, son of Ilan Troen and Carol Troen, and the brother of Bar Yuval Shani, Joshua William Troen, Judah Troen, and Abraham Troen. Plaintiff Aron Troen suffered severe mental anguish and extreme emotional pain and suffering as a result of the October 7th Terrorist Attack that caused his direct injury and claimed the life of his sister, Shachar Deborah Troen Mathias and the emotional injuries of his wife Susan Troen, parents, Ilan Troen and Carol Troen and siblings Bar Yuval Shani, Joshua William Troen, Judah Troen, and Abraham Troen. At the time of his injury, Plaintiff Aron Troen was a citizen of the United States. Plaintiff Aron Milton Troen brings this action individually.

170.    Plaintiff Susan Troen is Aron Troen's wife. Plaintiff Susan Troen suffered severe mental anguish and extreme emotional pain and suffering as a result of the October 7th Terrorist Attack that caused her own direct injury and emotional injuries to her husband, Aron Troen. At the time of her injury, Plaintiff Susan Troen was a citizen of the United States.

171.    Plaintiff Joshua William Troen is the brother of Shachar Deborah Troen Mathias. Plaintiff Joshua William Troen is also the son of Ilan Troen and Carol Troen, and the brother of Bar Yuval Shani, Aron Milton Troen, Judah Troen, and Abraham Troen. Plaintiff Joshua Troen

suffered severe mental anguish and extreme emotional pain and suffering as a result of the October 7th Terrorist Attack that caused his own direct injury and claimed the life of his sister, Shachar Deborah Troen Mathias and the emotional injuries of his parents, Ilan Troen and Carol Troen and siblings Bar Yuval Shani, Aron Milton Troen, Judah Troen and Abraham Troen. At the time of his injury, Plaintiff Joshua Troen was a citizen of the United States.

172.    Plaintiff Judah Troen is the brother of Shachar Deborah Troen Mathias. Plaintiff Judah Troen is also the husband of Hadassah Troen, the son of Ilan Troen and Carol Troen and the brother Bar Yuval Shani, Aron Milton Troen, Joshua William Troen and Abraham Troen. Plaintiff Judah Troen suffered severe mental anguish and extreme emotional pain and suffering as a result of the October 7th Terrorist Attack that caused his own direct injury and claimed the life of his sister, Shachar Deborah Troen Mathias and the emotional injuries of his wife Hadassah Troen, parents Ilan Troen and Carol Troen and siblings Bar Yuval Shani, Aron Milton Troen, Joshua William Troen and Abraham Troen.  At the time of his injury, Plaintiff Judah Troen was a citizen of the United States.

173.    Plaintiff Hadassah Troen is the wife of Judah Troen.  Plaintiff Hadassah Troen suffered severe mental anguish and extreme emotional pain and suffering as a result of the October 7th Terrorist Attack that caused her own direct injury and emotional injuries to her husband, Judah. At the time of her injury, Plaintiff Hadassah Troen was a citizen of the United States.

174.    Plaintiff Abraham Troen is the brother of Shachar Deborah Troen Mathias. Plaintiff Abraham Troen is also the son of Ilan Troen and Carol Troen and the brother Bar Yuval Shani, Aron Milton Troen, Joshua William Troen and Judah Troen.  Plaintiff Abraham Troen suffered severe mental anguish and extreme emotional pain and suffering as a result of the October 7th Terrorist Attack that claimed the life of his sister, Shachar Deborah Troen Mathias and the

emotional injuries of his parents, Ilan Troen and Carol Troen  and siblings Bar Yuval Shani, Aron Milton Troen, Joshua William Troen, and Judah Troen  At the time of his injury, Plaintiff Abraham Troen was a citizen of the United States.

### JJ. The Fuld Family

175.    Plaintiff Miriam Fuld brings this action in her role as the duly appointed Administrator of the Estate Ari Yoel Fuld.  Ari Yoel Fuld was murdered on September 16, 2018 by a terror attack committed by HAMAS, a Foreign Terrorist Organization  At the time of the acts alleged, and at all other times relevant hereto, Ari Fuld was a citizen of the United States. Plaintiff Estate of Ari Yoel Fuld can sue and be sued in this Court.

176.    Plaintiff Miriam Fuld, at all times relevant hereto, was the wife of Ari Fuld and a citizen of the United States. Plaintiff Miriam Fuld has suffered severe mental anguish and extreme emotional pain and suffering as a result of the September 16, 2018 terrorist attack that claimed the life of Ari Fuld. Plaintiff Miriam Fuld can sue and be sued in this Court.

177.    Plaintiff Natan S. Fuld, at all times relevant hereto, was the son of Ari Fuld and a United States citizen. Plaintiff Natan S. Fuld has suffered severe mental anguish and extreme emotional pain and suffering as a result of the September 16, 2018 terrorist attack that claimed the life of Ari Fuld. Plaintiff Natan S. Fuld can sue and be sued in this Court.

178.    Plaintiff Naomi Fuld, at all times relevant hereto, was the daughter of Ari Fuld and a United States citizen. Naomi Fuld has suffered severe mental anguish and extreme emotional pain and suffering as a result of the September 16, 2018 terrorist attack that claimed the life of Ari Fuld. Plaintiff N.F. can sue and be sued in this Court.

179.    Plaintiff Tamar Gila Fuld, at all times relevant hereto, was the daughter of Ari Fuld and a United States citizen. Plaintiff Tamar Gila Fuld has suffered severe mental anguish and

extreme emotional pain and suffering as a result of the September 16, 2018 terrorist attack that claimed the life of Ari Fuld. Plaintiff Tamar Gila Fuld can sue and be sued in this Court.

180.    Plaintiff Eliezer Yakir Fuld, at all times relevant hereto, was the son of Ari Fuld and a United States citizen. Plaintiff Eliezer Yakir Fuld has suffered severe mental anguish and extreme emotional pain and suffering as a result of the September 16, 2018 terrorist attack that claimed the life of Ari Fuld. Plaintiff Eliezer Yakir Fuld can sue and be sued in this Court.

181.    Plaintiff Harvey Jonas Yonah Fuld, at all times relevant hereto, was the biological father of Ari Fuld and a citizen of the United States. Plaintiff Harvey Jonas Yonah Fuld has suffered severe mental anguish and extreme emotional pain and suffering as a result of the September 16, 2018 terrorist attack that claimed the life of Ari Fuld. Plaintiff Harvey Jonas Yonah Fuld can sue and be sued in this Court.

182.    Plaintiff Mary Alice Fuld, at all times relevant hereto, was the biological mother of Ari Fuld and a citizen of the United States. Plaintiff Mary Alice Fuld has suffered severe mental anguish and extreme emotional pain and suffering as a result of the September 16, 2018 terrorist attack that claimed the life of Ari Fuld. Plaintiff Mary Alice Fuld can sue and be sued in this Court.

183.    Plaintiff Daniel Yaakov Fuld was, and at all times relevant hereto, the biological brother of Ari Fuld and a citizen of the United States. Plaintiff Daniel Yaakov Fuld has suffered severe mental anguish and extreme emotional pain and suffering as a result of the September 16, 2018 terrorist attack that claimed the life of Ari Fuld. Plaintiff Daniel Yaakov Fuld can sue and be sued in this Court.

184.    Plaintiff Eytan Fuld was, and at all times relevant hereto, the biological brother of Ari Fuld and a citizen of the United States. Plaintiff Eytan Fuld has suffered severe mental anguish

and extreme emotional pain and suffering as a result of the September 16, 2018 terrorist attack that claimed the life of Ari Fuld. Plaintiff Eytan Fuld can sue and be sued in this Court.

185.    Plaintiff Hillel Chaim Shlomo Fuld was, and at all times relevant hereto, the biological brother of Ari Fuld and a citizen of the United States. Plaintiff Hillel Chaim Shlomo Fuld has suffered severe mental anguish and extreme emotional pain and suffering as a result of the September 16, 2018 terrorist attack that claimed the life of Ari Fuld. Plaintiff Hillel Chaim Shlomo Fuld can sue and be sued in this Court.

### KK.    The Henkin Family

186.    Eitam Simon Henkin was murdered on October 1, 2015 by a terrorist attack committed by HAMAS, a Foreign Terrorist Organization.   At the time of the acts alleged, and at all other times relevant hereto, Eitam Simon Henkin was a citizen of the United States.

187.    Plaintiff Anne Chana Henkin, at all times relevant hereto, was the biological mother of Eitam Simon Henkin, and a citizen of the United States. Plaintiff Anna Chana Henkin has suffered severe mental anguish and extreme emotional pain and suffering as a result of the October 1, 2015 terrorist attack that claimed the life of Eitam Simon Henkin. Plaintiff Anne Chana Henkin can sue and be sued in this Court.

188.    Plaintiff Judah Herzel Henkin is represented in this action by Anna Chana Henkin, as the legal heir of Judah Herzel Henkin as recognized by the Jerusalem District Court. Judah Herzel Henkin, at all times relevant hereto, was the biological father of Eitam Simon Henkin, and a citizen of the United States. Prior to his death, Judah Herzel Henkin suffered severe mental anguish and extreme emotional pain and suffering as a result of the October 1, 2015 terrorist attack that claimed the life of Eitam Simon Henkin. Plaintiff Judah Herzel Henkin, by and through his recognized legal heir, can sue and be sued in this Court.

189.    Plaintiff Aderet Rivkah Henkin Stern, at all times relevant hereto, was the biological sister of Eitam Simon Henkin, and a citizen of the United States. Plaintiff Aderet Rivkah Henkin has suffered severe mental anguish and extreme emotional pain and suffering as a result of the October 1, 2015 terrorist attack that claimed the life of Eitam Simon Henkin. Plaintiff Aderet Rivkah Henkin Stern can sue and be sued in this Court.

190.    Plaintiff Eliashir Elijah Henkin, at all times relevant hereto, was the biological brother of Eitam Simon Henkin, and a citizen of the United States. Plaintiff Eliashir Elijah Henkin has suffered severe mental anguish and extreme emotional pain and suffering as a result of the October 1, 2015 terrorist attack that claimed the life of Eitam Simon Henkin. Plaintiff Eliashir Elijah Henkin can sue and be sued in this Court.

191.    Plaintiff Jacob Bechor-Shalom Henkin, at all times relevant hereto, was the biological brother of Eitam Simon Henkin, and a citizen of the United States. Plaintiff Jacob Bechor-Shalom Henkin has suffered severe mental anguish and extreme emotional pain and suffering as a result of the October 1, 2015 terrorist attack that claimed the life of Eitam Simon Henkin. Plaintiff Jacob Bechor-Shalom Henkin can sue and be sued in this Court.

192.    Plaintiff Joseph Gil Henkin was, and at all times relevant hereto, the biological brother of Eitam Simon Henkin, and a citizen of the United States. Plaintiff Joseph Gil Henkin has suffered severe mental anguish and extreme emotional pain and suffering as a result of the October 1, 2015 terrorist attack that claimed the life of Eitam Simon Henkin. Plaintiff Joseph Gil Henkin can sue and be sued in this Court.

193.    Plaintiff Taama Freida Henkin, at all times relevant hereto, was the biological sister of Eitam Simon Henkin, and a citizen of the United States. Plaintiff Taama Freida Henkin has suffered severe mental anguish and extreme emotional pain and suffering as a result of the October

1, 2015 terrorist attack that claimed the life of Eitam Simon Henkin. Plaintiff Taama Freida Henkin can sue and be sued in this Court.

**LL.    The Ramati Family**

194.    David Ramati was severely injured in November 2017 when HAMAS terrorists attacked and ran over him in a heinous HAMAS attack as part of the HAMAS Campaign of Terror. David suffered severe and permanent physical injuries, mental anguish and extreme emotional pain and suffering as a result of the terrorist attack that caused his direct injuries during a time period when hundreds of people were killed and injured by HAMAS during it Campaign of Terror during 2017, before and since. At the time of the acts alleged, and at all other times relevant hereto, David was a citizen of the United States. Plaintiff David Ramati can sue and be sued in this Court.

195.    Marta Ramati is the wife of Plaintiff David Ramati. Plaintiff Marta Ramati has suffered severe mental anguish, loss of consortium, and extreme emotional pain and suffering as a result of the fact that her husband, Plaintiff David Ramati was injured in a HAMAS terrorist attack in November 2017. Marta Ramati is a citizen of the United States. Marta Ramati can sue and be sued in this Court.

196.    Elisheva Ramati Federman is the daughter of David Ramati and has suffered severe mental anguish, loss of consortium, and extreme emotional pain and suffering as a result of the fact that her father, Plaintiff David Ramati was injured in a HAMAS terrorist attack in November 2017. Elisheva Ramati Federman is a citizen of the United States. Elisheva Ramati Federman can sue and be sued in this Court.

197.    Sara Ramati Uriel is the daughter of David Ramati and has suffered severe mental anguish, loss of consortium, and extreme emotional pain and suffering as a result of the fact that her father, Plaintiff David Ramati was injured in a HAMAS terrorist attack in November 2017.

Sara Ramati Uriel is a citizen of the United States. Sara Ramati Uriel can sue and be sued in this Court.

198.    Tamar Ramati Melamed is the daughter of David Ramati and has suffered severe mental anguish, loss of consortium, and extreme emotional pain and suffering as a result of the fact that her father Plaintiff David Ramati was injured in a HAMAS terrorist attack in November 2017. Tamar Ramati Melamed is a citizen of the United States. Tamar Ramati Melamed can sue and be sued in this Court.

199.    Samuel Ramati is the son of David Ramati and has suffered severe mental anguish, loss of consortium, and extreme emotional pain and suffering as a result of the fact that his father, Plaintiff David Ramati was injured in a HAMAS terrorist attack in November 2017. Samuel Ramati is a citizen of the United States. Samuel Ramati can sue and be sued in this Court.

200.    Avital Ramati Natan is the daughter of David Ramati and has suffered severe mental anguish, loss of consortium, and extreme emotional pain and suffering as a result of the fact that her father Plaintiff David Ramati was injured in a HAMAS terrorist attack in November 2017. Avital Ramati Natan is a citizen of the United States. Avital Ramati Natan can sue and be sued in this Court

201.    Liora Ramati Cohen the daughter of David Ramati and has suffered severe mental anguish, loss of consortium, and extreme emotional pain and suffering as a result of the fact that her father Plaintiff David Ramati was injured in a HAMAS terrorist attack in November 2017. Liora Ramati Cohen is a citizen of the United States. Liora Ramati Cohen can sue and be sued in this Court.

**MM.   The Cooper Family**

202.    Amiram Cooper and Nurit Cooper were violently abducted by Hamas from Kibbutz

Nir Oz on October 7, 2023. Nurit was released about two weeks later, on October 23 in poor condition after suffering prolonged and great fear, anxiety and pain as a result of the HAMAS perpetrated October 7th Terrorist Attacks.  Amiram remained captive and was confirmed to be still alive at least until December 2023. On June 3, 2024, the IDF announced he had been heinously murdered in captivity in Khan Younis several months earlier after suffering prolonged and great fear, anxiety and pain as a result of the HAMAS perpetrated October 7th Terrorist Attacks.

203.    Plaintiff Ray Cooper, who is also known by his Hebrew name Rotem, is the biological son of Amiram Cooper and Nurit Cooper and was, at all times relevant hereto, a citizen of the United States. Plaintiff Ray Cooper has suffered greatly as a result of the hostage taking, injuries and murder of his father, and the hostage taking and injuries of his mother and can sue and be sued in this Court. This action, on behalf of Plaintiff Ray Cooper, individually, is at the time of the initial filing only against Defendant UNRWA and not against Defendant UNRWA USA.

204.    Plaintiff Ora Cooper is the biological sister of Amiram Cooper and was, at all times relevant hereto, a citizen of the United States. Plaintiff Ora Cooper has suffered greatly as a result of the hostage taking, injuries and murder of her brother and can sue and be sued in this Court. This action, on behalf of Plaintiff Ora Cooper, individually, is at the time of the initial filing only against the Defendant UNRWA and not against Defendant UNRWA USA.

## II.    **The Defendants**

205.    Defendant UNRWA is affiliated with, but distinct from, the United Nations. It was first established by a UN General Assembly resolution in December 1949 and has operated since 1950. It has an office in Washington, DC at 1901 Pennsylvania Ave, Suite 804, and in Manhattan on East 44th Street, and staff working in those offices. It works with the US government, non-profit organizations and others in Washington, DC, and across the United States educating and

advocating regarding the needs of Palestinian populations in a number of areas outside Gaza, including Jordan, Lebanon, Syria, and Judea and Samaria.  It can sue and be sued in this Court.

206.    Defendant UNRWA USA aka Friends of UNRWA Association Inc. d/b/a the UNRWA National Committee is a 501(c)(3) nonprofit organization incorporated in the State of Delaware and registered in the District of Columbia.  Defendant UNRWA USA was formed in 2005 with its stated mission to "support[] the humanitarian work of the United Nations Relief and Works Agency for Palestine Refugees in the Near East (UNRWA) through fundraising, advocacy, and community engagement in the United States." It can sue and be sued in this Court.

## FACTUAL ALLEGATIONS

## I.    UNRWA: THE CATALYST OF PALESTINIAN TERROR

207.    The United Nations Relief and Works Agency for Palestine Refugees in the Near East (UNRWA) is an unincorporated association which purports to serve refugees of Palestine, a geographic descriptor of present-day Israel, which has never itself been a country or a UN member state. Where the UN and its members have agreed that the peaceful means of resolving refugee crises is through resettlement in home countries such that refugee status is not inherited, which principles and definitions apply to the work of the UN High Commission for Refugees ("UNHCR"), by contrast, UNRWA uniquely disclaims resettlement as a viable solution for Palestinian Arabs, instead recognizes perpetual inheritable refugee status for Palestinian Arabs, and funds, supports, validates and encourages the Palestinian population to believe that escaping their perpetual refugee status can only be achieved by their right to inhabit without citizenship and/or self-determine in the place of an existing UN member country, Israel, including in particular by force of arms or through the application of the vernacular "resistance..  UNRWA supports, teaches, advocates, incentivizes, rewards and teaches its students hate and indoctrination built upon

71

antisemitic, anti-Zionist and anti-Israel rhetoric and actions, including the encouragement and use of terror in all its reprehensible forms.

208.   UNWRA is not an organ of the United Nations and has never been designated by the United States as one. In fact, UNRWA's operation, structure and conduct inherently conflicts with the UN's fundamental mission as well as several of UN Charter Article 2's Principles, including: The principle of the sovereign equality of all its Members (including those of the State of Israel, a Member-State of the United Nations), (Article 2.1), as UNHCR Resettlement Goals results in persons displaced from a member country and forfeiting citizenship rights to that member country; and "refrain[ing] in their international relations from the threat or use of force against the territorial integrity or political independence of any state" (Article 2.4).

209.   UNRWA falsely presents itself as a humanitarian United Nations affiliated agency, established to provide services and aid to Palestinian refugees. However, UNRWA operates in a unique manner distinct from United Nations agencies and, rather than fostering peace or adhering to the UN's mission of neutrality, has instead become a catalyst, supporter, instrumentality, teacher, advocate and perpetuator of terrorism, and the destructive ideological and logistical aims shared by the terrorist organizations in the region.

210.   UNRWA, unlike UN agencies, has extended refugee status across generations, recognizing descendants of the original refugees, contrary to international norms upheld by UNHCR. Unlike UN agencies, which seek durable solutions and work toward resettlement, integration, or repatriation of refugees, UNRWA's policies perpetuate the unresolved status of Palestinian refugees indefinitely. This unique approach reinforces a powerful, unyielding narrative of displacement among Palestinian communities, particularly around the notion of the "Right of Return"—a goal expressly adopted and relentlessly pursued by UNRWA itself and by the terror

organizations it supports, *to wit,* HAMAS and HEZBOLLAH. By endorsing the concept of the "Right of Return" as a continued aspiration rather than working toward resettlement solutions, UNRWA sustains a refugee identity that fuels anti-Israel and antisemitic sentiment, violence, resentment, and ultimately serves as a justification for HAMAS's and HEZBOLLAH's violent terrorism.

211.    Shortly after Israel's victory in its 1948 War of Independence, the Arab League— in furtherance of a documented diplomatic, economic and propaganda-driven boycott of Israel— pursued a "lasting" internationally recognized Arab claim to the land of Israel using UNRWA as its vehicle. In this role, UNRWA has elected to define "Palestinian refugees" as those who trace their patrilineal ancestry to persons living in British Mandate Palestine during the two years preceding Israel's establishment, but who left Israel during or as result of the 1948 war. This expansive, backward-looking definition of who is a "refugee" significantly deviates from the forward-looking, solution-oriented policy applied to all other displaced persons around the world. The traditional definition of refugee requires that one demonstrate a "well-founded fear of being persecuted." This divergence comes to bear when Palestinian refugees fail to qualify as refugees when seeking asylum in other countries. Since they are not persecuted by the Israeli government, Palestinian Arabs are inappropriately relegated by the UN itself, and by the neighboring Arab governments who have refused even to this day to absorb Palestinian Arabs into their country's society and citizenry, to a lifetime of statelessness.

212.    In 1948, the UN member countries adopted the Universal Declaration of Human Rights, recognizing that "[e]veryone has the right to a nationality" and that "[n]o one shall be arbitrarily deprived of his nationality nor denied the right to change his nationality." In effect, this has enabled UNHCR to resettle millions of refugees into host nations, where they have become

citizens and members of their new societies. This came on the heels of World War II, when tens of millions of people, were displaced from their countries of origin with the well-founded fear of returning, including millions of Jewish people who on the heels of the Holocaust were driven from countries across Europe, the Middle East and North Africa, and were only able to find safe refuge by congregating together in their ancestral homeland, which they legally established as the Jewish State of Israel on May 14, 1948 in accordance with its Declaration of Independence.

213.    Since World War II, alleviating displaced persons and their children from the burdens of refugee status has become a primary objective of the global community. The term refugee carries legal status under international law. It is defined in Article 1 of the 1951 Convention Relating to the Status of Refugees:

> For the purposes of the present Convention, the term "refugee" shall apply to any person who: […] As a result of events occurring before 1 January 1951 and owing to well-founded fear of being persecuted for reasons of race, religion, nationality, membership of a particular social group or political opinion, is outside the country of his nationality and is unable or, owing to such fear, is unwilling to avail himself of the protection of that country; or who, not having a nationality and being outside the country of his former habitual residence as a result of such events, is unable or, owing to such fear, is unwilling to return to it.

214.    In 1950, the UN High Commissioner for Refugees (UNHCR) was created to help protect the right of a displaced person to a nationality. Under UNHCR policy, a refugee's offspring does not inherit this status or entitlement, which forces the agency to pursue "durable solutions" – such as voluntary repatriation, local integration, or resettlement for the refugees under its purview – to facilitate an expeditious transition for the refugees under its jurisdiction. This approach has

"helped well over 50 million refugees successfully restart their lives,"[1] some by becoming citizens of new countries where they can "contribute socially and economically." Today, it is believed, the agency's staff of 19,800 in 137 countries seeks to help over 100 million refugees "live their lives in dignity and peace."

215.    Because only Palestinian "refugees" are exclusively, specifically, and intentionally supported by UNRWA, they are excluded from UNHCR's services. Unlike UNHCR, UNRWA does not pursue durable solutions and does not seek to get Palestinian Arab people out of refugee status. Instead of helping them resettle and restart their lives in "dignity and peace," UNRWA preserves the refugee designation and pursues the comparably less ambitious goals: to "[a]chieve decent standards of living" and to "[e]njoy human rights to the fullest possible extent."

216.    Upon the creation of UNHCR, it was contemplated that UNRWA would be terminated so that Palestinian refugees could be served directly by UNHCR.  However, Arab leaders successfully opposed this from happening, arguing that the Palestinians have a better deal under UNRWA.  As a result, UNRWA over now almost seventy-five (75) years has cemented a view among the Palestinian Arab refugee population as possessing territorial rights to the country of Israel, which has been the catalyst of much if not all of the regional terrorism that has followed.

217.    It is not clear that UNRWA achieves or even tries to achieve its inferior benchmarks of "decent standards of living." It is believed that at the time of the October 7th Attack UNRWA's budget was approximately $1.2 billion and that UNRWA only spent 17 percent on health care and 4 percent on infrastructure, both of which are much higher priorities for refugees being served

---

[1] History of UNHCR | UNHCR *available at* https://www.unhcr.org/about-unhcr/overview/history-unhcr (last visited July 30, 2025)

under UNHCR. UNRWA's budgetary emphasis (58-60% of the budget) rather is allocated towards education, funding schools where the message that Palestinian Arab refugees possess territorial rights in the State of Israel, which they may achieve through force of arms aka resistance, is emphasized to the Palestinian youth, thereby making the pursuit of return through force of arms aka resistance a fundamental part of the Palestinian hate-filled ethos determined to demonize and destroy, through every means possible, the State and people of the sovereign state of Israel.

218.    Due to this heavy emphasis on confrontational education, Palestinian Arabs are deflected by their heavily funded schools away from the pursuit of economic growth and stability, causing them experience high levels of unemployment and poverty; a World Bank study of the West Bank and Gaza notes that, prior to October 7, unemployment rates reached as high as 27 percent. Thanks to Israel's efforts to integrate Palestinian Arabs into their economy, Palestinian Arabs in the West Bank and Gaza fare much better than those residing in neighboring Arab countries. In Lebanon, unemployment is at 56 percent because those of Arab Palestinian descent are only allowed to practice one of "36 liberal or syndicated professions," a list enforced by the Lebanese government. These work restrictions have left the refugees "highly marginalized, with two-thirds considered poor or extremely poor," living in camps that "suffer from serious overcrowding, poor housing conditions and insufficient infrastructure." In Syria, over 95 percent of those classified as Palestinian refugees "are in critical need of sustained humanitarian assistance in order to survive."

219.    UNRWA's structure and function is designed to effectuate a comprehensive economic, social, infrastructural, educational, and nationalist political enterprise. Most UNRWA employees appear to be exempt from the general staff rules and regulations of the UN and instead operate under UNRWA's own distinct rules and regulations. As UNRWA itself acknowledges,

over 90% of its "core funding is provided on the basis of voluntary contribution" rather than from UN's budget. UNRWA also maintains the capacity and independence to "enter[] into innumerable commercial contracts" in its own name.

220.    It is conservatively estimated that about 13% of HAMAS's annual budget of $2.5 billion comes from UNRWA, and the money that UNRWA does not give directly to HAMAS is mostly put towards uses that directly serve HAMAS.

221.    Instead of providing for Palestinian Arabs' basic needs, UNRWA's budget has been heavily allocated toward education programs that have been remarkably and unequivocally full of antisemitic, anti-Zionist and anti-Israel hate, as well as being counterproductive to the Palestinian Arabs short and long-term interests, despite its claim that the programs "encourage a tolerant and empowered Palestinian population who can serve as partners in peace."

222.    With these vast resources dedicated to education and simple goals, UNRWA might be expected to have invested in printing schoolbooks and developing curricula acknowledging Israel's lawful existence as the historic and rightful home of the Jewish people, a seemingly requisite condition for "tolerance and peace." However, in almost seventy years of providing education for Palestinian Arabs, it has done exactly the opposite.

223.    Instead, UNRWA uses textbooks that deny the Jewish people's connection to Israel and promote hatred, intolerance, incitement to violence, and antisemitism. In addition, a Hebrew University study published in April 2017 found that vicious antisemitic, anti-Israel statements extend to UNRWA-used textbooks at every grade level and for every subject, teaching "a strategy of violence and pressure and…[s]ystematic hatred of all things Jewish/Israeli…" These textbooks of hate are used throughout the UNRWA school system. Even math problems in the UNRWA-used textbooks reportedly have examples that use numbers of "martyrs" to teach Arab Palestinian

children to "martyr" themselves to kill Jews. Some books refer to Tel Aviv as Tel Al Rabiah (a Palestinian city that never existed) and omit Hebrew from official international documents dating to periods prior to the establishment of the State of Israel. Other textbooks include and legitimize the Nazis' anti-Jewish propaganda, describe Jews in the ugliest of terms and images, and blame the Palestinian Arabs' domestic problems on Israel's very existence, thereby promoting the narrative of the need to attack, terrorize and destroy Israel and the Jewish people.

224.    In Gaza, UNRWA's teachers' union is under the control of HAMAS, a US-designated foreign terrorist organization; school-children are taught to hate Israelis, hate Jews, and to praise the "glory" death of Islamic martyrdom in killing Jews. In a 2021 UN Watch Report, more than 100 UNRWA educators and staff were exposed for promoting antisemitism, jihad, and Hitler on Facebook and WhatsApp. Examples include:

    a.    A math teacher in Gaza posting: "By Allah, if you give me a machine gun, I will make a massacre of the Jews."

    b.    UNRWA staff sharing praise of Adolf Hitler, calling him a "great leader."

    c.    Teachers encouraging children to become martyrs and posting images of children with rifles.

225.    This is not third-party hearsay—it is staff employed by a UN agency, speaking openly on public platforms, with their names and school affiliations documented.

226.    As a matter of structure and of fact, UNRWA's leaders, employees and other beneficiaries lack incentive to resolve the Palestinian refugee crises by peaceful means, as doing so would mean the end of their jobs and benefits respectively.

227.    UNRWA operates extensively within Gaza, where HAMAS exercises significant political and military control, as well as other locations with extensive Palestinian "refugee"

populations, including Syria and Lebanon, creating conditions conducive to the rise of other terrorist organizations including HEZBOLLAH. UNRWA's local hiring policies result in a workforce that is heavily influenced by HAMAS and its supporters. The agency's teacher and staff unions, many of which operate in HAMAS-controlled territories, have been found to align with or show sympathy toward HAMAS's agenda. As a result, UNRWA's day-to-day operations and its staff's interactions with Palestinian refugees are shaped by local political allegiances. HAMAS's infiltration of unions within UNRWA has enabled it to influence the organization's operational culture, creating an atmosphere conducive to its militant objectives. This internal influence allows HAMAS to maintain indirect control over UNRWA's community outreach and educational content, transforming the agency from a neutral humanitarian actor into a tool of political influence.

228. UNRWA's educational programs and materials further embed HAMAS's ideological aims. UNRWA schools in Gaza and Judea and Samaria often use host country curricula, which incorporate narratives that emphasize historical grievances, the Right of Return, and resistance. While UNRWA ostensibly conducts reviews for neutrality, significant evidence indicates that politically charged content still reaches students, normalizing opposition to Israel and reinforcing the Right of Return by force of arms as a necessary outcome. This educational framework aligns with and propagates HAMAS's and HEZBOLLAH's narrative(s), producing generations that are ideologically sympathetic to HAMAS's and HEZBOLLAH's objectives and goals. In essence, UNRWA's educational system primes young Palestinians to support HAMAS's and HEZBOLLAH's resistance activities rather than fostering peace or neutrality, positioning UNRWA as an ideological perpetuator of the conflict.

229.    UNRWA facilities in Gaza have been repeatedly implicated in cases where weapons or military equipment belonging to HAMAS were stored or concealed within UNRWA buildings, particularly during active conflicts. Although UNRWA has claimed these incidents were unauthorized, the agency's inability to secure its facilities has made them susceptible to exploitation by HAMAS. These facilities, shielded under the guise of humanitarian neutrality, provide HAMAS with cover and operational advantages, allowing it to hide assets within civilian infrastructure. By failing to prevent this misuse, UNRWA acts as an instrumentality for HAMAS's operations, compromising its humanitarian mission and indirectly supporting terrorist objectives.

230.    UNRWA's continued existence relies heavily on international donations. By framing the Palestinian refugee situation as an unresolved humanitarian crisis, UNRWA attracts global funding that enables HAMAS to promote its narrative of Palestinian victimhood. This funding indirectly legitimizes HAMAS's resistance by keeping international focus on the refugee issue, further aligning UNRWA's operations with HAMAS's agenda. Through UNRWA's portrayal of Palestinian suffering, HAMAS gains international validation of its grievances, effectively using UNRWA as a mouthpiece to perpetuate its claims against Israel.

231.    Rather than acting as a UN agency promoting peace, integration, or stability, UNRWA has become a direct catalyst for, supporter of, instrumentality for, and perpetuator of HAMAS's and HEZBOLLAH's terrorism. By sustaining a perpetual refugee status, allowing ideological influence within its ranks, reinforcing anti-Israel narratives in educational settings, permitting the misuse of facilities, and drawing continuous international funding and attention, UNRWA operates counter to the UN's principles of neutrality and conflict resolution. In supporting HAMAS's and HEZBOLLAH's ideological and logistical objectives, UNRWA does

not function as a humanitarian agency but instead as an entity perpetuating conditions for continued conflict, fundamentally undermining the UN's mission to foster peace and security.

232.    UNRWA purports to provide education, health care (including mental health care), relief and social services, emergency assistance and microcredit to approximately 5 million Palestinians located in Gaza, the Judea and Samaria, Jordan, Lebanon, and Syria. It employs a staff of over 30,000 people.

233.    In Gaza alone, UNRWA operates 183 schools, staffed by over 9,400 employees and serving almost 287,000 students. It provides primary and secondary education to over half of the students in Gaza. Moreover, in Lebanon UNRWA operates 65 schools allegedly providing education to over 39,000 Palestinian refugee students.

234.    Numerous UNRWA facilities (educational, medical, administrative etc.) in Gaza were converted to active terrorist/military bases, a cynical violation of international humanitarian law, by storing weapons and building underground tunnels and attack shafts. According to numerous press reports, the IDF uncovered assault rifles, ammunition, grenades and missiles of HAMAS, hidden in and underneath UNRWA institutions on many occasions.

235.    Based on conservative projections, UNRWA's policies are responsible for enabling or materially contributing to many thousands of acts of terrorism in the region and elsewhere that would likely not have occurred under a conventional refugee resettlement model. These acts of terrorism have resulted in hundreds of thousands of deaths and injuries globally, with thousands of these casualties being U.S. citizens.  Furthermore, the financial support infrastructure enabled by UNRWA's policies—through personnel, facilities, indoctrination, and legitimization—has contributed tens of billions of dollars in additional terrorist financing over the last seven decades, significantly aiding the operational capacities of U.S.-designated Foreign Terrorist Organizations

including such organizations as HAMAS, HEZBOLLAH, PIJ, and PFLP. Similarly, UNRWA's refugee framework has incentivized millions of Palestinian and other people to become terrorist group members in the years between 1950 and 2023, as individuals were repeatedly recruited from populations intentionally denied integration, legal resolution, or political autonomy. Simply put Defendant UNRWA, through decades of knowingly unsustainable and politically charged refugee administration, has been a leading, if not the leading, provider of material support and substantial assistance to terrorist organizations, but even more alarming, it has been their backbone and incubator.

## II.    THE TERROR ORGANIZATIONS SUPPORTED BY UNRWA

### A. The Islamic Resistance Movement (HAMAS)

236.    UNRWA's refugee model created the social, ideological, and logistical conditions that made HAMAS possible, powerful, and enduring. By preserving statelessness, teaching grievance over reconciliation, and failing to police radicalization, UNRWA enabled a political culture in which HAMAS's founding principles were not only credible — but inevitable.

#### 1. Background on HAMAS

237.    HAMAS is an acronym for "Harakat al-Muqawama al-Islamiyya," the Islamic Resistance Movement. HAMAS was founded in December 1987 by Sheikh Ahmed Yassin, Salah Shehada, Abd al-Aziz al-Rantisi, Muhammad Sham'a, Ibrahim al-Yazuri, Issa al-Nashar and Abd al-Fatah Dukhan. HAMAS is an offshoot of the Muslim Brotherhood, a radical Islamic group founded in Egypt before World War II.

238.    HAMAS is a U.S. government-designated Foreign Terrorist Organization ("FTO") dedicated to radical Islamist principles and the destruction of the State of Israel. It uses violence,

including suicide bombings and missile attacks, and threats of violence to pressure Israel to cede territory to the Palestinian people.

239.    HAMAS is nominally divided into three interconnected wings: (i) a political organization; (ii) the "Da'wa," HAMAS's social service or humanitarian component; and (iii) a military operational wing known as the Izz-al-Din al-Qassam Brigades.

240.    Although these components have separate responsibilities, the HAMAS organization operates seamlessly, with each component working together to conduct and support the military operations and achieve the illegal objectives of the terrorist group as a whole.

241.    HAMAS's social services are, in large part, administered by local "zakat" committees and charitable societies. HAMAS either established these committees or coopted them by, *inter alia*, installing HAMAS members, operatives and activists as members of the zakat committees' governing bodies. These committees and organizations collect and distribute funds on behalf of HAMAS for the organizations' purposes.

242.    The zakat committees play important roles in channeling funds to pay expenses for, and assist the families of, terrorist operatives who are arrested, injured or killed.

243.    The zakats also assist with providing housing subsidies to the families of suicide bombers, whose homes are often demolished by the Israeli army after the bombers' identities are confirmed. The zakat committees also helped to identify and recruit potential terrorists.

244.    HAMAS regularly routes significant sums that it nominally collects for charitable and humanitarian purposes to terrorist and other operational uses. HAMAS used (and still uses) those funds to obtain weapons and explosives and to provide transportation services, safehouses, training and salaries for its terrorist operatives and recruiters.

245.    Even the funds the zakats utilize for charitable purposes free up other money for use in connection with terrorist acts.  And the funds HAMAS uses for charitable purposes directly support its military operations, as they bolster HAMAS's image-making machine, which increases its fundraising and attracts new foot soldier recruits.

246.    In 1989, the Government of Israel declared HAMAS a terrorist organization and designated it an "unlawful organization" because of its terrorist acts.  Notice of the designation was placed in the Announcements and Advertisements Gazette, an official Government of Israel publication.

247.    On September 23, 2001, in response to the September 11, 2001 terrorist attacks on the United States, President Bush issued Executive Order No. 13224, which declared a national emergency with respect to the "grave acts of terrorism ... and the continuing and immediate threat of further attacks on United States nationals or the United States." Executive Order No. 13224 designated HAMAS as an SDGT.  That Executive Order also blocked all property and interests in property of SDGTs, including HAMAS.

### 2.    UNRWA Elevates HAMAS to Power

248.    In an October 2004 interview, then UNRWA Commissioner-General Peter Hansen encapsulated the governing attitude at UNRWA, stating, "I am sure that there are HAMAS members on the UNRWA payroll, and I don't see that as a crime."  He made this statement in the final months of the Second Intifada, a deliberate campaign of murder carried out by HAMAS and other terror organizations on Israeli, Jewish and American civilians. Suicide bombers targeted cafés, seders, and school buses. Holocaust survivors were blown up at Passover. All told, over 1,100 Israelis and dozens of Americans were killed, 80% of them civilians.  HAMAS orchestrated 138 suicide bombings, which caused approximately 550 Israeli deaths and over 3,500 injuries.

More than 120 Israeli children were killed, some by snipers, others in bus bombings. Scores of school buses were bombed or shot at.

249.     UNRWA was not a neutral humanitarian actor during the Second Intifada—it was a compromised agency operating in a war zone, often indistinguishable from the very groups driving the violence. Despite documented infiltration by HAMAS and public warnings, UNRWA took no serious steps to vet staff, properly train its staff in an environment free of hatred toward Israel and Jewish people, secure its facilities, or protect its neutrality. Instead of being a force for de-escalation, UNRWA schools became ideological battlegrounds and logistical backstops for terrorists. Hundreds of Palestinian children recruited into terrorist organizations and were brainwashed to aspire to martyrdom in UNRWA-run schools.

250.     Indeed, UNRWA does not treat HAMAS, HEZBOLLAH and PIJ as terrorist organizations, despite their formal designation as such by the United States, United Kingdom, Australia, Canada, the European Union, and numerous other civilized nations that fund UNRWA's budget.

251.     The UNRWA Workers Union played an instrumental role in getting HAMAS elected to reign over Gaza in 2006. UNRWA staff, especially educators and social workers, had community influence and reach through their administration of the schools. The union gave HAMAS access to these networks, enabling it to organize, message, and mobilize voters. In the election, HAMAS leveraged its reputation for discipline and service. The presence of HAMAS-aligned individuals in service roles, in particular UNRWA positions, helped reinforce this image. HAMAS had significant influence in UNRWA schools through teachers affiliated with the Workers Union. While UNRWA has strict neutrality policies, curriculum content and school environments reflected pro-HAMAS or Islamist leanings. The UNRWA Workers Union's

alignment with HAMAS and its grassroots influence through education and community work contributed to an environment in which HAMAS's political appeal grew. This organizational and ideological support network helped bolster HAMAS's legitimacy and outreach, supporting its electoral success.

252.    It is conservatively estimated that about 13% of HAMAS's annual budget of $2.5 billion comes from UNRWA, which is indeed material support.  The money that UNRWA does not give directly to HAMAS is mostly put towards uses that directly serve HAMAS.

253.    Subsequent to 2007, HAMAS exploited its de facto control of Gaza both to use it as a staging ground for cross-border terrorist attacks targeting Israeli civilians and to slowly but continuously build up an infrastructure of facilities and personnel that would enable larger-scale terror attacks to be launched in the future, predictably culminating in the October 7th Attack.

254.    Before the October 7th Attack, there were HAMAS kidnappings of Israeli civilians hostage in Gaza, including, for example, the kidnapping of Avera Mengistu (an immigrant from Ethiopia who has been held captive since 2014 and was only recently released to return home) and of Hisham al-Sayed (a member of Israel's Bedouin Arab community who has been held captive since 2015 and similarly was only recently released to return home).

255.    HAMAS permits designated Foreign Terrorist Organization PIJ, to operate from Gaza with some autonomy and coordinates with PIJ terrorist attacks against Israeli civilians. PIJ likewise benefits from the material support provided by UNRWA to HAMAS.

256.    UNRWA provided material assistance in Gaza to HAMAS Because it operated openly on the ground in Gaza where others could not and exploited its claimed "civil servant" status to impede preemptive security measures aimed at protecting Israeli civilians from future

terror attacks. UNRWA's staff, facilities, and ability to truck cash in U.S. dollars into Gaza formed a potent pillar of HAMAS' plan to undertake the October 7th Attack.

257.    The Defendants were all well aware of HAMAS's continuing track record of genocidal terror attacks against Israeli civilians, both before and after its takeover of Gaza. For example, the following is partial list of mass-murder attacks perpetrated by HAMAS before it was in control of Gaza, all of which were extensively reported media print or otherwise available in Washington, D.C, and all major television media:

- August 31, 2004, 16 killed, 100 wounded, double suicide bombings on two buses;
- March 14, 2004, 10 killed, 16 wounded, double suicide bombings;
- September 9, 2003, 7 killed, 50 wounded, suicide bombing at Café Hillel;
- August 19, 2003, 22 killed, 135 wounded, suicide bombing on a bus;
- August 4, 2002, 9 killed, 38 wounded, suicide bombing on a bus;
- June 18, 2002, 19 killed, 74 wounded, suicide bombing on a bus;
- May 19, 2002, 3 killed, 59 wounded, suicide bombing in an outdoor market;
- May 7, 2002, 16 killed, 55 wounded, at a pool hall;
- April 10, 2002, 8 killed, 22 wounded, suicide bombing at Kibbutz Yagur;
- March 31, 2002, 14 killed, 40 wounded, suicide bombing at restaurant;
- March 27, 2002, 22 killed, 140 wounded, hotel Passover seder suicide bombing;
- March 9, 2002, 11 killed, 54 wounded, suicide bombing at a café;
- December 2, 2001, 15 killed, 46 wounded, suicide bombing on a bus;
- September 9, 2001, 3 killed, 90 wounded, suicide bombing oat train station;
- August 9, 2001, 15 killed, more than 130 wounded, suicide bombing at pizzeria;
- June 1, 2001, 21 killed, 120 wounded, all teenagers, suicide bombing of disco;
- May 18, 2001, 5 killed, more than 100 wounded, suicide bombing at shopping mall;
- April 22, 2001, 1 killed, 60 wounded, suicide bombing at bus stop;
- March 27, 2001, 28 wounded, suicide bomber;
- March 4, 2001, 3 killed, more than 65 wounded, suicide bombing;
- February 14, 2001; 8 killed, 21 wounded, bus driver plowed into a crowd;
- January 1, 2001, more than 50 wounded, car bomb;
- October 29, 1998, 1 killed, 8 wounded, suicide bomber attacks school bus;
- October 19, 1998, 59 wounded, grenades thrown in central bus station;
- August 20, 1998, 14 wounded, bomb detonated in garbage dumpster;
- September 4, 1997, 4 killed, 181 wounded, 3 suicide bombers at shopping mall;
- July 30, 1997, 3 killed, 178 wounded, 2 suicide bombers at outdoor market;
- March 21, 1997, 3 killed, 48 wounded, bomb detonated at a restaurant;
- March 3, 1996, 19 killed, 6 wounded, suicide bombing on a bus;
- February 25, 1996, 26 killed, 80 wounded, 2 suicide bombs on buses;
- July 24, 1995, 6 killed, 31 wounded, suicide bombing on a bus;

- April 9, 1995, 8 killed, 50 wounded, 2 suicide bombers;
- December 25, 1994, 13 wounded, suicide bombing at bus stop;
- October 19, 1994, 22 killed, 56 wounded, suicide bombing on a bus;
- October 9, 1994, 2 killed, 14 wounded, suicide bombing on a bus;
- April 13, 1994, 5 killed, suicide bombing;
- April 6, 1994, 8 killed, car bomb detonated next to public bus.

258.    In selecting these targets, HAMAS knew that it was likely that United States citizens would be injured or killed and it often sought targets that it knew were frequented by American citizens. HAMAS has openly embraced the killing of Americans as part of its broader ideological war against Israel, the West, and what it calls "Zionist-American imperialism." While its propaganda is usually focused on Israel, HAMAS has repeatedly justified, threatened, and celebrated violence against American citizens, especially American Jews, whom it equates with Zionist settlers and occupiers.

259.    After HAMAS's takeover of Gaza, HAMAS shifted its emphasis to cross-border mortar and rocket and incendiary balloon attacks, since it now had control of territory from which to launch such attacks. Hundreds and sometimes thousands of rockets were fired into Israel per year, with no attempt to focus on military targets. Instead, they were sent into communities in the south of Israel which were known to be inhabited by many American nationals living in these communities. Due to Israel's "Iron Dome" anti-missile defenses, and poor targeting technology used by HAMAS, most of these rockets were either intercepted or crashed harmlessly in empty fields. However, a significant minority killed or wounded civilians throughout the decade-plus before the October 7th Attack. While many of these attacks attracted less worldwide media coverage, Defendants were necessarily aware of them because of their own professional need to keep abreast of developments in Gaza, and because these attacks often led to retaliatory or preemptive military actions by Israel that UNRWA needed to take into account. These attacks include:

- A November 12, 2018 mortar attack on a bus, critically wounding a 19-year old;
- An August 8, 2018 rocket attack on Sderot injuring two;
- A July 14, 2018 rocket attack of Sderot injuring three;
- A May 29, 2018 mortar attack wounding five;
- An August 26, 2014 rocket attack killing two in Eshkol, together with multiple injuries in Eshkol and Ashdod from other rockets fired the previous day;
- An August 22, 2014 mortar attack that killed a four-year-old in Sha'ar Hanegev; and
- A July 28, 2014, mortar attack that killed four in Eshkol.

260.    Finally, large scale attacks against civilians mounted by HAMAS from Gaza in recent years before the October 7th Attack include:  Barrages of hundreds of rockets launched from Gaza on May 4 and 5, 2019, killing three civilians in Ashkelon; Barrages adding up to over 4,000 rockets launched from Gaza on May 10-20, 2021, killing ten civilians in multiple locations; and  Barrages adding up to approximately 1,500 rockets launched from Gaza on May 10-13, 2023, killing civilians in Israel, one of whom was a Palestinian laborer from Gaza who was working in Israel.

261.    The common thread in all of these HAMAS terror attacks, over a period of three decades, is the deliberate targeting of civilians for death, and in particular choosing locations where American citizens would visit, work and live. All of the assistance provided over the prior decade-plus to HAMAS and HEZBOLLAH by the Defendants had, by October 2023, the result and effect, which was at all relevant times entirely foreseeable to Defendants, of building up HAMAS and HEZBOLLAH's terror infrastructure to the point where atrocities of the magnitude of the October 7th Attack could be carried out.  Given HAMAS' prior words and deeds, Defendants knew of HAMAS' specific intent to perpetrate genocide and it was entirely foreseeable that the capacity to commit genocidal atrocities of that magnitude against Israeli civilians would in time be used to actually do so.

### 3.   Features of UNRWA's Deep Entanglement with HAMAS

#### a.   UNRWA-HAMAS Coordination

262.    UNRWA directors meet in person with senior HAMAS leaders at least once a year, including with HAMAS's head (at-the-time) Yahya Sinwar, designated by the United States State Department as a Specially Designated Global Terrorist pursuant to Executive Order 13224 and the mastermind of the October 7th Attack, contradicting their spin that they are merely unable to avoid certain "indirect" links to HAMAS.

263.    Defendant UNRWA coordinated its activities with HAMAS through high-level meetings with high-level HAMAS leaders and/or leaders of other HAMAS-allied terrorist groups, sometimes in Gaza, but other times in locations such as Lebanon that were thought more discreet for maintaining appearances.  The HAMAS leadership in Lebanon was in constant contact at all relevant times with the HAMAS leadership in Gaza.

264.    On or about December 16, 2014, UNRWA Regional Directors Muhammad Khaled, Ibrahim al-Khatib, Fawzi Kassab and Ahmad Moh met with Ali Baraka, HAMAS Head of Foreign Relations and Masahour Abdul Halim, HAMAS Relations Official, in connection with the "partnership arrangement" between UNRWA and HAMAS and congratulate HAMAS on the 27th anniversary of its launch.

265.    Ali Baraka is the Head of Foreign Relations for HAMAS and one of seven top HAMAS leaders sanctioned by the U.S. and U.K. for "heinous crimes." Baraka managed HAMAS ties with Tehran and other regimes including Syria and Iraq. Days after the HAMAS October 7th massacre, Baraka claimed that the group had been planning the attack for two years. "We made them think that HAMAS was busy with governing Gaza, and that it wanted to focus on the 2.5 million Palestinians there and has abandoned the resistance altogether. All the while, under the table, HAMAS was preparing for this big attack."

266.    Since May 2015, Ibrahim al-Khatib, UNRWA Regional Director, has held annual meetings with senior HAMAS leadership in Lebanon, spoken at HAMAS's yearly summit on UNRWA, and delivered communications on behalf of the UNRWA country director.

267.    On February 12, 2017, Defendant UNRWA Commissioner General Pierre Krahenbuhl, met with terrorist leaders Ali Baraka (HAMAS), Abu Imad Al-Rifai (Palestinian Forces Alliance), Ali Faisal (DFLP), Salah Al-Youssef (PLF), Abu Imad Ramez (Popular Front - General Command), and Hassan Zeidan (Fatah al-Intifada). In this meeting, Krahenbuhl asserted the necessity of continued coordination with the groups and promised to continue holding as many meetings as they would like to ensure a "spirit of partnership," stating:

> I hope that the spirit of partnership will be in both directions, that is, if you have any criticisms, comments, concerns or any matters that you are not satisfied with regarding UNRWA, that we return and hold such meetings even if we meet a thousand times and if you challenge our decisions and if you tell us that we do not want this decision and criticize it, we may change it or tear it up, but that the spirit of partnership prevails among us in our meetings and not be public because this is a challenge to us and our credibility, and what is more dangerous is what this could constitute in terms of a loss of trust between the funding countries and UNRWA, which may move towards reducing or stopping its funding. The issue of your cooperation with us in security aspects and not allowing the closure of UNRWA institutions, facilities, schools or offices, lies in the partnership between us, and if we reach that, it means that we are united and no one can separate us.

268.    On or about May 1, 2017, former UNRWA Lebanon Director Claudio Cordone and UNRWA Deputy Director of Programs Gwyn Lewis met with Ali Baraka (HAMAS), Abu Imad Al-Rifai (Palestinian Islamic Jihad in Lebanon), Ali Faisal (DFLP), Rafiq Ramidh (Fatah al-Intifada), and Hassan Zeidan (Fatah al-Intifada). Abu Imad al-Rifai is the leader of PIJ in Lebanon. PIJ is a designated Foreign Terrorist Organization by the United States and at all relevant times, has been designated as a terrorist organization by the European Union, the United Kingdom, Canada, Australia, and New Zealand for countless suicide bombings and attacks. PIJ participated in the October 7th atrocities. In 2003, Al-Rifai boasted about sending a wave of suicide bombers

to Baghdad to kill American and British troops.  Ali Faisal joined the DFLP when it was founded in 1969 and quickly rose in the ranks to hold senior positions. In 1971, soon after joining the DFLP, Faisal also began working as a teacher at UNRWA's Al-Fidaa School where he continued to work until 1984. As a senior DFLP member in the 1970s and 80s, Faisal oversaw some of the DFLP's largest terrorist attacks, including the 1974 Ma'alot massacre of l974 in which 28 Israelis children at a school outing were killed. Faisal endorsed the wave of Palestinian terror attacks launched from Gaza in 2015 and called a meeting to "build a unified resistance in the Gaza Strip to form a support for the intifada." The DFLP also participated in the October 7th attack. Hassan Zeidan is a leader of Fatah al-Intifada, a hardline terrorist group that splintered off from the original Fatah party in 1983 and has been fighting alongside HAMAS in Gaza since October 7, 2023.

269.    On or about January 25, 2018, Cordone met with HAMAS's Ahmad Abd Al-Hadi. At the meeting, the terrorists "stressed their adherence to the agency and their support for the 'Dignity is Priceless' campaign because the agency remains a living witness to the 1948 Nakba.

270.    Al-Hadi has been the representative of HAMAS's International Leadership in Lebanon since 2018. He has been affiliated with the Muslim Brotherhood in Lebanon since 1990 and has held leadership positions in HAMAS since 2003.

271.    In or about February 2018, Gwyn Lewis, UNRWA Deputy Director of Programs in Lebanon met with Ahmed Fadl, senior HAMAS leader, close friend and associate of HAMAS leader Ismail Haniyeh, and agreed on "ongoing cooperation and coordination."  Ahmed Fadl praised the October 7th Attack, stating that the "bravery of the resistance opened the door to liberation and return."

272.     On or about August 20, 2018, Cardone met with HEZBOLLAH Political Council member Hassan Hozballah and stated "UNRWA is the only witness to the barbarism of the Zionist occupation since 1948" and accused the United States administration of trying to end UNRWA.

273.     On February 12, 2019, former UNRWA Commissioner-General Pierre Krahenbuhl and former UNRWA Lebanon Director-General Claudio Cordone met with HAMAS Political and Media Relations Officer in Lebanon Abdul Majeed Al-Awad to coordinate freedom of movement, public service improvements, and lifting restrictions on the types of building materials that can be imported.

274.     That same day, Pierre Krahenbuhl, Claudio Cordone, and staff officer Hakam Shahwan also met with Ayman Shana'a, HAMAS Head of National Relations in Lebanon, Khaled Zuaiter, HAMAS political relations officer, and Jamal Khattab, Sheikh of Islamic Jihad (Mujahideen) in Lebanon.  In the meeting, Shana'a stressed the importance of "considering the Palestinian factions as a basic partner for UNRWA in preserving the dignity of our people and our camps with all the meanings they symbolize.

275.     Shana'a, educated and taught in UNRWA schools, is the Head of National Relations for HAMAS in Lebanon. Since October 7th, he has recruited hundreds of young men for HAMAS terrorist operations

276.     On or about April 28, 2021, Mohammad Abu Attia, UNRWA Director for Tyre hosted leadership of the Palestinian Forces Alliance, a coalition of terrorist groups, including HAMAS and PJIJ, operating in Lebanon and agreed "to continue communication, consultation, cooperation and coordination."

277.     UNRWA Commissioner General Lazzarini regularly meets with HAMAS leadership in Gaza, providing them with material support. On June 1, 2021, t Lazzarini and Thoms

White met with designated global terrorist Mahmoud Khalaf, senior leader of the Foreign Terrorist Organization DFLP (and member of leadership of the National Islamic Forces), discussing hiring employees and other matters.  At the end of the meeting the two sides stressed the need to "continue meetings" and the importance of their "partnership."

278.    On June 2, 2021,  UNRWA Deputy Commissioner General Leni Stenseth met with the head of HAMAS and commander of the October 7th Attack, Yahya Sinwar.  Sinwar stressed "the pride of our people in general, and its factions, especially HAMAS, in particular, n the positive and constructive relationship with UNRWA and the historic role it played in strengthening the steadfastness of our people and establishing tier rights.  Stenseth thanked Sinwar "for his positivity and desire to continue cooperation in facilitating the agency's work in Gaza."   The meeting concluded with both parties stressing the need for "direct communication and dialogue" and "cooperation."

279.    In a December 28, 2022, meeting with Thomas White, UNRWA Gaza Director, emphasized "the importance of joint work and cooperation between UNRWA and the Joint Refugee Committee," a consortium of HAMAS, PIJ and Democratic Front for the Liberation of Palestine, and other violent radical groups.

280.    On or about January 29, 2022, Mohammad Abu Attia, UNRWA Director for Tyre met with Jihad Muhammad, senior PIJ official, on "the need for cooperation between local forces and UNRWA."

### b.  HAMAS-member Employees of UNRWA

281.    UNRWA's leaders say the agency strives to ensure its 13,000 employees in Gaza uphold standards of neutrality, regularly training its staff to stay above politics and investigating those who do not. However, in practice Defendants turned a blind eye and covered up the

widespread infiltration of HAMAS leaders and terrorists throughout UNRWA's Gaza operations, only acting in response to unfavorable publicity. "What we want to make sure is that our staff does not have a *public* political function, because that would be completely incompatible with the function of a civil servant," as UNRWA Commissioner-General, Phillipe Lazzarini stated in an interview with the New York Times. (Emphasis added). But, Mr. Lazzarini added, "Our employees are part of the social fabric of Gaza and its ecosystem. And as part of the social fabric in Gaza, you have also HAMAS."

282.    But the problem is not that UNRWA failed to screen out 100% of terror-linked employees; it is that the Defendants welcomed the pervasive presence of HAMAS operatives within their organization. They only episodically reacted when third parties called attention to deviations from its supposed neutrality policy. According to a New York Times investigative report, UNRWA "has variously responded to tips [about HAMAS-linked employees] from Israel, the United States and its own networks, but rather than dealing with them in a systematic process, they dealt with them in a piecemeal way mostly in private, working with officials … in New York."

283.    In fact, HAMAS has controlled the UNRWA Gaza Staff Union since 2009. In September 2012, the HAMAS bloc, headed by senior HAMAS activist Suhail al-Hindi, again won a landslide victory in the elections to UNRWA Staff Union elections. With a high turnout of approximately 11,500 UNRWA employees who cast their ballot, the HAMAS bloc won all 11 seats of the teachers' sector, 6 out of 7 seats of the workers sector and 8 out of 9 seats of the services sector (winning 25 out of 27 seats in a vote among 10,000 staffers). UNWRA knew how these elections would turn out, given the overwhelming majority of its employees' affinity with HAMAS yet took no meaningful steps to prevent these employees from using their UNRWA positions to promote HAMAS's terror agenda.

284.    Senior HAMAS military operatives held influential positions within UNRWA for years. The following are examples:

a.    Member of HAMAS's Leadership in Gaza and long-time senior HAMAS member Suhail Ahmed Hassan al-Hindi, served as the Chairman of the UNRWA Staff Union in the Gaza Strip and principal of the UNRWA Palestine Boys' Elementary School for refugee children. In 1981, al-Hindi initially joined the Muslim Brotherhood and was involved in student politics in Ramallah. In 1984 he obtained a diploma from the Teachers' Institute affiliated with UNRWA in Ramallah. In 1987, after the founding of HAMAS, he assumed an active role in the movement's activities and was repeatedly detained by Israeli authorities. He was a member of HAMAS's Leadership in Gaza between 2006 and 2021; the elected head of the administrative body of HAMAS in the northern region between 2012-2015; and head of the Great Return Marches and Breaking the Siege Committee in the HAMAS's Leadership in Gaza in 2018. The Great Return Marches, where hundreds of HAMAS activists charged forward to the border wall, were the dry runs for the HAMAS infiltration on October 7. All this time, since 1988, al-Hindi worked as a teacher in UNRWA schools, and between 2006-2016 he served as a director for UNRWA schools. Between 2000 and 2016, he held senior positions in the UNRWA staff union, including President. In 2017 al- Hindi was finally suspended by UNRWA after the agency was confronted with al-Hindi's re-election to HAMAS's Leadership in Gaza, or what the movement purports to be its "Political Bureau". This, after UNRWA's management had been fully aware for years that Suhail al-Hindi

was a senior HAMAS activist, an elected member of multiple HAMAS bodies, and that he condoned jihad against Israel and suicide attacks carried out by HAMAS. UNRWA spokesperson, Chris Gunness, admitted knowledge of al-Hindi's senior role in HAMAS leadership in a published article on January 27, 2009. Despite this knowledge, UNRWA management continued to employ al-Hindi until 2017.

b.   Another member of HAMAS's Leadership in Gaza and long-time HAMAS member, Muhammad al-Jamassi, was chairman of the board of directors in the UNRWA engineering department for refugee camps in the central Gaza Strip. In February 2017, al-Jamassi, reportedly assumed a role in HAMAS's Leadership in Gaza. Jamassi had been involved with HAMAS since 2007.

c.   Jawad Abu Shamala, HAMAS's Minister of Economy Jawad Abu Shamala, a longtime former UNRWA teacher, was killed by the IDF on October 10, 2023. He was responsible for financially planning the funding of the Oct 7th attack.

d.   PIJ member Awad al-Qiq, an UNRWA science teacher and school headmaster in Rafah with an eight-year tenure, was at the same time leading a rocket engineering squad for the PIJ. Following his death in an Israeli airstrike in May 2008, Islamic Jihad hailed Al-Qiq as a martyr destined for 'paradise.' The terrorist organization prominently displayed a poster at the entrance of the UNRWA school where he taught, lauding Al-Qiq's involvement in terrorist activities.

e.   Issa Abd al-Hadi al-Batran, a graduate and longtime teacher in UNRWA schools was HAMAS's senior rocket-maker. Al-Batran graduated from

UNRWA's elementary and middle schools in al-Bureij and UNRWA's Gaza Training Center. For years, al-Batran worked as a teacher in UNRWA's schools in the central district of the Gaza Strip. He joined HAMAS in 1989 and by the beginning of the 1990s he was recruited to the al-Qassam Brigades. He participated in attacks against IDF forces without being a lawful combatant, placed explosive charges, participated in digging tunnels, took part in producing explosive charges, bombs, rockets and other military equipment needed. He also founded the media office of al-Qassam Brigades in al-Bureij refugee camp. According to al-Qassam Brigades, IDF failed to assassinate al-Batran in four attempts – the last failed attempt being during Operation Cast Lead (January 2009), in which his wife and children were killed. Despite this information that was publicly known, especially in the Gaza Strip, no action was taken by UNRWA against al-Batran even after he had been the target or four failed assassination attempts, which exposed his connection to terrorist activity. John Ging, UNRWA Director of Operations in Gaza, was notified as early as December 2008, that Issa al-Batran is an active operative of al-Qassam Brigades, and UNRWA took no action. All that time, al-Batran continued to work as a teacher in a school run by UNRWA in al-Bureij refugee camp. He was finally dismissed by UNRWA in 2009 months after being seriously wounded while assembling a bomb for the Izz al-Din al-Qassam Brigades where he served as a weapons expert, manufacturing explosives, IEDs and rockets, as well as excavation tools to build HAMAS's tunnel network. He was killed in an Israeli air strike on July 31, 2010.

  f.  HAMAS leader Ismail Haniyeh was a teacher in UNRWA schools.

  g.  At least eighteen school principals in Gaza are members of HAMAS's military wing.

285. UNRWA's auditors in their official reports to UNRWA management highlighted UNRWA's deficiencies with respect "lack of documentation and verification on the recruitment process." For example, in UNRWA's 2019 Financial Report and audited financial statements, the Board of Auditors reported that "the Board considers that there are concerns regarding the transparency of the recruitment and selection process, owing to such deficiencies with respect to checks and records for such relevant documents as the recruitment and selection report, as well as academic and professional qualifications, which provide traceability for the evaluation of candidates or the justification for hiring employees."

286. To stem criticism, UNRWA falsely asserts that it maintains strict staff conduct policies to ensure that its members are not affiliated with any other groups. Nevertheless in 2021, UNRWA spokeswoman Tamara Alrifai claimed that the organization takes action when its employees are found to hold a political position with HAMAS, and admitted that "after that, I don't know where the line is drawn".

   *c. HAMAS Use of UNRWA Facilities for Tunnels and Weapon Storage*

287. According to Israeli authorities, over thirty additional UNRWA facilities in Gaza, including UNRWA's headquarters complex, have been found to contain terror infrastructures such as tunnel shafts and weapons.  In 2007, the Israeli Air Force delivered to UNRWA a video showing mortar shells fired from Gaza by a three-man terrorist squad. The squad situated itself in close proximity to the central building in an UNRWA educational compound in Beit Hanoun, in the northern Gaza Strip. The video shows the operatives setting up their firing position and firing

mortar shells close to the building. After they fired the mortar shells, they took cover inside the UNRWA building.

288.    In general, UNRWA has claimed to be surprised whenever, over and over again, such use of its facilities by HAMAS was discovered by third parties, but never took meaningful steps to prevent the next incident, which it could then pretend to be surprised by.

289.    In fact, UNRWA has also permitted installation of rocket launching platforms and terrorist firing positions within and/or adjacent to UNRWA schools, medical clinics and offices.

290.    The existence and the construction of the HAMAS tunnels was public knowledge since at least 2014. There were multiple similar incidents documented in 2014 when a United Nations Headquarters Board of Inquiry investigated multiple incidents where weapons had been placed within UNRWA schools and UNRWA facilities that were used as terrorist firing platforms for launching rocket and mortar attacks. The military/terrorist use of UNRWA facilities by HAMAS and other terrorist organizations was widely exposed during the 2014 conflict between HAMAS and the IDF.

291.    On July 16, 2014, weaponry was discovered in the UNRWA Gaza Beach Elementary Co-educational "B" School. This school is located in the heart of the Beach refugee camp, in the midst of a densely populated area of Gaza City. Four other UNRWA schools and an UNRWA health center are located on the opposite side of the street. Two UNRWA school attendants were looking after the school prior to an on the day of the incident. Five guards hired as part of the UNRWA Job Creation Program were also assigned to the school.

292.    In addition, in 2015, a 120 mm mortar tube, a mortar bipod and twenty 120 mm mortar-round containers, with ammunition, were discovered under a blanket in a corner of a locked classroom. In the afternoon of July 17, UNRWA admitted in a press release stating that a cache of

approximately 20 rockets had been found hidden in a school. A UN Board of Inquiry confirmed in April 2015 that "a Palestinian armed group" (a term used as euphemism for HAMAS) had used the school premises to hide the weaponry.

293.    On July 22, 2014, weaponry was discovered in the UNRWA Jabalia Elementary "C" and Ayyobiya Boys School. The Board was informed that the area was known to be used by armed groups as a site for firing weapons and that it had been targeted by IDF in past conflicts.

294.    On July 22, 2014, UNRWA officials saw an object at the premises that seemed to be a weapon, covered with a piece of cloth, in an area under the cover of some trees behind the toilet block and near the boundary wall separating the school from the open area behind it. Though the UN Board of Inquiry was unable to confirm with certainty what type of weapon might have been hidden at the school, it concluded that it was highly likely that "a Palestinian armed group" [HAMAS] used the premises to hide weapons. On the evening of July 22, UNRWA issued a press release stating that rockets had been found hidden in a vacant school in Gaza. The Government of Israel showed the Board a video, which the Board concluded was authentic, showing the launching of a projectile from within the school premises on July 14th. The Israeli Government also provided a document to the Board that showed what was launched, together with the dates of those launches. The Board concluded that it was highly likely that "an unidentified Palestinian armed group" [HAMAS] could have used the school premises to launch attacks on or around July 14.

295.    On July 29, 2014, weaponry was discovered in the UNRWA Nuseirat Preparatory Co-educational "B" School. This school is located in a semi-rural area, north-west of the Nuseirat camp, south of Gaza city. On July 29, a 120 mm mortar tube, a 120 mm mortar bipod and three 120 mm mortar containers were found, covered by a blanket, behind a locked internal gate leading

to a stairwell. In the evening, UNRWA issued a press release reporting that rockets had been found in an UNRWA school.

296.    On August 17, 2014, a 120 mm mortar tube, a 120 mm mortar bipod and twenty 120 mm mortar containers were found in a small room under a stairwell. Water, lubricant oil bottles and boards apparently used as beds were also found as well as a blackboard with Arabic writing, seemingly depicting military operations. At the rear of the school, a mortar base plate was found embedded in the sand. The items were photographed. The mortar cases, mortar tube, bipod and base plate were removed from the school and rendered safe. The UN Board of Inquiry found that the presence of weapons and other evidence found in the school indicated that the premises could have been used for an unknown period of time by members of "a Palestinian armed group" [HAMAS] and that it was likely that such a group may have fired the mortar from within the premises of the school.

297.    HAMAS thus exploited the safe haven provided by UNRWA facilities for storing weapons and firing at Israeli population centers.

298.    The Board of Inquiry report made a number of recommendations for UNRWA management to employ. These were relayed in a letter dated April 27, 2015, from the Secretary General of the United Nations to the President of the Security Council, which stated, inter alia: "in my capacity as the Chief Administrative Officer of the Organization, I decided to establish a United Nations Headquarters board of inquiry to review and investigate…incidents …in which the presence of weapons was reported at [UNRWA] premises. My aim in taking this step was to develop a clear record of the facts of those serious incidents and their causes and to determine the persons or entities to which they might be attributable. That would make it possible for me, inter alia, to identify any gaps that there might have been in the Organization's procedures and to take

any measures and put in place any arrangements that might be needed, with a view to preventing a recurrence of such incidents in the future…"

299.    The Board made the following findings:

a.    That even though security of UNRWA premises is a matter of "paramount importance that needs to be addressed seriously," 897 of the 1034 guards providing security for all UNRWA facilities in Gaza were recruited from local workers, with no prior security training, and were given only "minimal training."

b.    "In relying upon the Job Creation Programme, UNRWA was entrusting one of the most dangerous and fundamental functions to low-paid individuals with no considered that a task bearing such a high level of responsibility requires specialized and properly trained individuals."

c.    "The guards worked only afternoons and evenings and no guards were on duty in the mornings."

d.    "UNRWA has no standard operating procedures articulating the duty of all staff members to report security incidents and the modalities for doing so. Witnesses informed the Board that there was no list of staff who should be informed of incidents, no lists of actions to be taken in the event of specific situations and no central mechanism for keeping a log of all events. As such, the transmission of information and the assignment of required actions were somewhat ad hoc, negatively affecting the ability of UNRWA to establish facts and account for actions taken and to be taken."

e.    "The Board further found that UNRWA did not have a policy or standard operating procedures to address situations involving the unauthorized presence of weapons

on UNRWA premises. After the disappearance of weapons from UNRWA Jabalia Elementary 'C' and Ayyobiya Boys School on 22 July, United Nations Headquarters suggested a procedure to be followed. Those suggestions have yet to be 'operationalized' through the issuance of detailed standard operating procedures."

f.  "The Board also noted that there was no reference document setting out security levels, standards for the identification and evaluation of security risks and mitigation measures that need to be in place for UNRWA premises including its schools."

g.  "The Board concluded that, during the conflict, UNRWA was operating in Gaza with an understaffed Safety and Security Division, which struggled to secure hundreds of premises with unskilled personnel. The Board considered that priority."

h.  The Board also considered that, as a matter of priority, UNRWA should reconsider its security approach in relation to its schools and other installations, both in the context of emergency situations and during normal operations, and revisit its school inspection systems, including during emergencies."

300.    Nevertheless, UNRWA did not take appropriate corrective action following this inquiry revealing the systematic employment of UNRWA facilities to support HAMAS. Each of the Defendants were on notice of this United Nations inquiry and they continued to enact and fund the policies which allowed this activity to occur.

301.    Subsequent events show that UNRWA and its management, and its funders, including UNRWA USA, did not make any serious efforts to "to take any measures and put in

place any arrangements that might be needed, with a view to preventing a recurrence of such incidents in the future" as had been anticipated in the Secretary-General's letter of April 27, 2015.

302.    Because UNRWA has consistently taken the position that its facilities are inviolate under international law, it has provided the terrorists using its facilities to prepare and launch attacks on innocent civilians, including the October 7th Attack, with a safe haven. As a result, UNRWA and its financier UNRWA USA protected these HAMAS facilities and weapons from discovery and being dismantled by the IDF.

303.    Reports on the subject of tunnels were published by HAMAS media outlets, and HAMAS officials openly boosted about the importance of the tunnels, particularly in light of the deaths of many HAMAS activists in collapses. HAMAS officials warned repeatedly that the movement is continuing to excavate tunnels, even during periods of calm, in preparation for the next conflict with Israel.

304.    HAMAS publicly announced the exact function of these attack tunnels, for example on January 29, 2016, when HAMAS leader Ismail Haniyeh stated: "Gaza has constructed twice as many tunnels as there were in Vietnam. The Al-Qassam Brigades have dug tunnels around Gaza in order to defend the people and liberate Al-Aqsa and the holy places… This weapon, the weapon of tunnels, played a prominent role in achieving our victory. … East of Gaza, there are heroes underground, digging through rock and constructing tunnels. West of Gaza, there are heroes who test-fire rockets every day - All these [activities] are preparations - underground in the tunnels, in the air by means of missiles, at sea, and everywhere. This constant preparation is for the sake of Palestine, for Jerusalem and Al-Aqsa, and for the Al-Quds Intifada".

305.    UNRWA subsequently admitted the discovery of HAMAS underground tunnels in its facilities.

306.    On June 9, 2017, UNRWA Spokesperson Christopher Gunness reported the exposure of a tunnel running under two of its schools in the al-Maghazi refugee camp in the central Gaza Strip, namely the Maghazi Elementary Boys A&B School and the Maghazi Preparatory Boys School.

307.    On October 15, 2017, UNRWA admitted the existence of a tunnel underneath the UNRWA boys' middle school in Beit Hanoun in the northern Gaza Strip.

308.    On June 10, 2021, UNRWA admitted the existence of another HAMAS tunnel under UNRWA's Zaitoun Preparatory Boys' School in Gaza City's Rimal neighborhood, after a rocket struck the courtyard.

309.    In 2022, the IDF also revealed an underground tunnel of HAMAS in the Tufah neighborhood in Gaza city, in the close vicinity of UNRWA's "Daraj" elementary school.

310.    On December 1, 2022, UNRWA admitted the presence of a tunnel underneath another one of its schools in Gaza.

311.    On December 14, 2022, the IDF published a HAMAS rocket launch site adjacent to UNRWA's Mo'ath Bin Jabal School in the Shejaiya neighborhood of Gaza City. Prior to May 2021, the school's principal, Mehammed Abu Oun, maintained contact with Jalal Abu Aoun, a commander in the HAMAS rocket division, who operated this launching site.

*d.    UNRWA Salary Payments are Designed to Enrich HAMAS*

312.    Gaza does not have a currency of its own but uses the Israeli shekel for ordinary local transactions. Large local employers pay their employees in shekels. UNRWA does not do so, even though it is logistically feasible for it to do so and even though it pays its staff in the Judea and Samaria in local currency (there, Israeli shekels). Indeed, UNRWA likewise pays its staff in Jordan, Lebanon, and Syria in the respective local currencies.

313.    By contrast, UNRWA, knowing that money changers would be needed, paid its Gaza local staff in U.S. dollars and does so in cash. Because U.S. dollars are not commonly accepted by merchants in Gaza for the staff's necessary routine purchases of groceries and other necessities, this compels the staff to go to local moneychangers to exchange their cash dollars for shekels. However, HAMAS runs the majority of the Gaza moneychangers, and those are that are not actually run by HAMAS are required by HAMAS to pay HAMAS a share of the fees they earn (often ranging from 10% up to 25%) for such exchange transactions, thus ensuring that a predictable percentage of UNRWA's payroll went to HAMAS. Dating back to at latest 2018, U.N. risk statements and audits acknowledge that paying in cash presents a risk due to what is called 'leakage'—i.e., when the cash leaks into illicit activities.

314.    HAMAS uses the moneychangers to finance its military activities, and there are multiple examples in recent years of HAMAS using currency exchange facilities in Gaza to finance its military activities. *See e.g.* Buy Cash, designated by the US Treasury Department's Office of Foreign Asset Control. In addition to these profits, HAMAS desperately needed the U.S. currency itself. U.S. dollars in cash form are vital to HAMAS for purposes such as obtaining weapons on the international black market to be smuggled into Gaza and used for terrorist purposes, including the October 7th Attack. From 2018 until September 2023, UNRWA inserted into Gaza at least $20 million a month in cash, and by putting into the hands of the HAMAS controlled moneychangers into HAMAS's hands.

315.    In fact, a 2018 report commissioned by UNRWA warned of numerous risks associated with making cash disbursements in cash in Gaza, including money laundering risks, the likelihood that funds could be diverted to terrorists or other inappropriate recipients ("leakage"), and the use of cash to facilitate illegal trade. Similarly, UNRWA's audits also warned UNRWA

management of risks with the cash distribution system in Gaza. For example, warning in the 2022 audit that "UNRWA may not always have the ability to monitor cash distributions in a timely manner, which could potentially increase the risk of incorrect, missed or multiple cash payments being distributed in Gaza."

316.    Each month, UNRWA staff in the United States instruct JP Morgan Chase to wire budgeted and approved amounts in U.S. dollars, via Arab Bank in New York, to Arab Bank's branch in Ramallah, in the West Bank. Funds required for UNRWA payroll and operations in the West Bank are converted and paid in Israeli shekels. By contrast, funds required for UNRWA payroll and operations in Gaza are transferred to the Bank of Palestine in Ramallah, which are withdrawn in cash U.S. dollars and then physically transported (across Israeli territory) in trucks to Gaza, with each truck containing millions of dollars in cash and posing significant security risks. If UNRWA paid its Gaza local staff in shekels, which could be transferred electronically from the Arab Bank or the Bank of Palestine in Ramallah directly to banks in Gaza (as, for example, the Palestinian Authority does for payment of its employees in Gaza), these burdens and risks would be unnecessary and the staff and employees would be benefit from increased purchasing power from their salaries because they would not need to pay fees to moneychangers. Only HAMAS benefits from UNRWA's current cash-handling practices.

317.    By way of note, HAMAS was otherwise prevented from obtaining U.S. cash dollars by, among other things, United States anti-money laundering statutes and regulations. UNRWA has provided an estimated two thirds of the cash U.S. dollars physically transferred into Gaza since 2018. HAMAS has used the over one billion in cash U.S. dollars brought into Gaza by UNRWA to buy via smugglers its weapons, ammunition, explosives, construction materials for the tunnels, and rocket-making supplies that have been used for a multitude of terrorist acts including but not

limited to the October 7th Attack. HAMAS's ability to carry out the October 7th Attack would have been significantly, and possibly fatally weakened without that UNRWA-provided cash. HAMAS's sponsors such as the current government of Iran lack the same ability to physically bring cash U.S. dollars in such quantities into Gaza due to Israeli control of Gaza's external borders.

318.    This entirely predictable consequence of UNRWA's Gaza payroll and cash infusion policy is not a hidden side effect but was and is well-known to Defendants. Defendants were aware that UNRWA's auditors as well as various other outside third parties had raised concerns about their cash-handling policies in Gaza. The risk that these massive amounts of funds would be used for wrongful purposes was fully known and foreseeable to the Defendants.

   e.  *UNRWA Schools as HAMAS Recruitment and Indoctrination Centers*

319.    For many decades, UNRWA has chosen to use textbooks and teaching curricula approved by HAMAS which contained incitement and indoctrination of Palestinian children to support and participate in HAMAS's jihadi culture, rather than using textbooks consistent with principles and requirements of the United Nations.

320.    UNRWA has made a deliberate and conscious decision that its schools teach a HAMAS-approved curriculum in Gaza even though it is not required to do so.

321.    Countless studies by governments and NGOs, known to Defendants, have found that UNRWA's textbooks glorify violence and terrorism, encourage jihad and martyrdom, incite antisemitism and hatred of Jews, reject the very existence of Israel and call for its destruction.

322.    More than 500,000 students study at schools in the Gaza Strip, with over half attending UNRWA-operated schools. Studies available to UNRWA New York staff by governments and international organizations such as the U.S. Government Accountability Office

("GAO"), the European Union, the UN's Committee on the Elimination of Racial Discrimination (CERD), the Institute for Monitoring Peace and Cultural Tolerance in School Education (IMPACT-se), and reviews by UNRWA itself all show the problematic nature of the Palestinian Authority/HAMAS approved textbooks used in its schools.

323.    The U.S. Government Accountability Office revealed in a 2019 report that UNRWA schools failed to offset "potentially problematic content" in the textbooks used in Gaza.

324.    A 2021 study commissioned by the European Union on Palestinian textbooks found "anti-Semitic narratives and glorifications of violence" in the same textbooks. The European Parliament repeatedly, and most recently in 2021, deplored "the problematic and hateful material in Palestinian school textbooks and study cards which has still not been removed".

325.    The UN's Committee on the Elimination of Racial Discrimination stated in September 2019 that it is concerned "About the existence of hate speech, in particular hate speech directed against Israelis, which at times fuels anti-Semitism towards this group, in certain media outlets, in particular those controlled by HAMAS, as well as on social media, in public officials' statements and in school curricula and textbooks, which also fuels hatred and may incite violence (art. 4)."

326.    The Institute for Monitoring Peace and Cultural Tolerance in School Education (IMPACT-se)'s extensive research of UNRWA-used school textbooks "has consistently found a systematic promotion of violence, martyrdom, overt antisemitism, and jihad across all grades and subjects, with the proliferation of extreme nationalism and Islamist ideologies throughout the curriculum, including science and math textbooks".

327.    UNRWA's willingly and knowingly kept the hateful content in the curriculum taught in its schools intact. Thus, UNRWA students are intentionally, systematically and

constantly indoctrinated to internalized victimization, glorify violence, mayhem and jihad, and support genocide of Jews, Israelis, and the State of Israel itself.

328.    UNRWA also produces its own institutional original teaching materials branded with its logo to complement and enrich host-country curricula. These supplement the teaching of PA textbooks.  Multiple studies by the NGO IMPACT-se in 2023, 2022 and 2021 reviewing these institutional UN supplementary materials found that UNRWA teachers, principals, schools, and education departments were regularly involved in drafting, approving, printing, and distributing thousands of pages of teaching materials including content that incites antisemitism, glorifies terrorism, and encourages jihad and martyrdom.

329.    Therefore, UNRWA makes a false claim when it states on its website: "Through its education system, UNRWA aims to ensure that Palestine refugee students develop their full potential and become 'confident, innovative, questioning, thoughtful, and open-minded, to uphold human values and tolerance…'"[2]"

330.    The content of these textbooks violates the UN's own standards for education. According to the Universal Declaration of Human Rights, adopted by the United Nations General Assembly 1948, "education shall be directed to the full development of human personality and to the strengthening of respect for human rights and fundamental freedoms. It shall promote understanding, tolerance and friendship among all nations, racial and religious groups and shall further the activities of the United Nations for the maintenance of peace."

331.    The UN maintains that school education should promote respect, peace and tolerance, and should be "free of wording, imagery and ideologies likely to create prejudices,

---

[2] What We Do | UNRWA, https://www.unrwa.org/what-we-do/education (last visited July 10, 2025)

misconceptions, stereotypes, misunderstandings, mistrust, racial hatred, religious bigotry, national hatred, as well as any other form of hatred or contempt for other groups or peoples". Moreover, the curriculum should be "free of language, content, and imagery that disseminate ideas or theories which justify or promote acts and expressions of violence, incitement to violence, hostility, harm and hatred toward other national, ethnic, racial or religious groups".

332.    In April 2021, the European Union froze all its funding to the Palestinian Authority of over 220 million EUR in April 2021 for 13 months due to problematic content in textbooks also used in UNRWA schools in Gaza, following an EU-funded report that found "antisemitic narratives and glorification of violence".

333.    UNRWA officials admitted UNRWA's awareness of incitement to violence, discrimination, antisemitism, intolerance, and glorification of terrorism in UNRWA's internal reviews of textbooks used in its schools in a September 2021 hearing in the European Parliament.

334.    In his testimony, UNRWA Commissioner General Lazzarini admitted: "We as UNRWA have identified three categories of problems in the textbooks when it comes to being in line with UN value[s], which is age appropriateness, gender perception, and then the issues related to incitement to violence, discrimination, and so on. [Turning to the Committee Chair, adding:] antisemitism, intolerance, absolutely. So, these are the type of issues which have been identified by UNRWA through the review of 150 books and we keep reviewing each of the books being issued by the authorities whenever they need to be used in our class[es]. And whenever we enter difficult issues, either we give guidance to our teachers on how to use it or we ask it not to be taught in the class. Especially when we start to talk about glorification of terrorism for example which has also been an issue."

112

335.    Findings of IMPACT-se's research contradict statements and promises made by UNRWA and its leaders to donor nations in relation to a change in using and teaching the HAMAS-approved curriculum.

336.    UNRWA admitted in 2021 that its teachers drafted hateful content, contradicting its claim of extensive training in countering hate.

337.    According to its own statements, UNRWA reviews the HAMAS-approved textbooks used in its school and is thus necessarily aware of their content.

338.    At the same time, UNRWA refuses to disclose the results or criteria of its textbook reviews that showcase lessons they deem problematic. It also refuses to disclose teacher guidance materials that allegedly instruct teachers to critically address itemized problematic content.

339.    Defendants knew that the European Parliament adopted resolutions in May and July 2023, May and December 2022, 2021, 2020 and 2018 which condemned the teaching of hate in textbooks used in UNRWA schools, expressed concerns over the continued failure to remove content not in line with UNESCO standards, and called for conditioning funding on the basis of a curriculum reform. The EU commissioned a report from 2021 from the Georg Eckhart Institute, a German academic institution forcing on international textbook research, which raised similar concerns about the textbooks used by UNRWA in Gaza to those set forth above.

340.    Moreover, intermittent and episodic attempts to make the curriculum in the Gaza schools more balanced were rapidly abandoned whenever HAMAS objected, as in 2011 when UNRWA proposed to teach children about the historical fact of the Holocaust but then failed to follow through.

341.    In 2024, UNRWA finally committed to make limited modifications in the textbooks it uses in Gaza, following a firestorm of international criticism. But by this time the October 7th

Attack and Plaintiffs' injuries had already occurred, facilitated in part by UNRWA's own role in indoctrinating future terrorists.

342.    The following are selected examples from HAMAS-authorized textbooks and other instructional material used by UNRWA in Gaza:

a.  3rd grade: Arithmetic is taught by counting martyrs. Math questions in Grade 3 ask children to write the number of martyrs killed during the First Intifada and the 2014 Gaza War. An Arabic language exercise instructs students to sing and learn by heart: "The land of Kurāma' [generosity]. I swear, I will sacrifice my blood to irrigate the land of generosity, and will remove the usurper from my country. And will exterminate the remnants of the foreigners."

b.  5th grade: An UNRWA-created 5th grade Arabic Language summary glorifies as heroes infamous terrorists and others affiliated with war, violence, and religious extremism. These include Dalal Mughrabi, known for her role in the 1978 Coastal Road Attack in which 38 civilians including 13 children were killed, and Izz ad-Din al-Qassam, the namesake of HAMAS's military wing who promoted Jihad against the British and the Zionists and was killed in action in 1935. These "heroes" are venerated as "the crown of their nation" and "the title of its glory." The text (p. 4) encourages impressionable Palestinian students to see these heroes as their role models: "each of us wishes to be like them."  Moreover, it encourages students to take the path of martyrs, as follows: "Drinking the cup of bitterness with glory is much sweeter than a pleasant long life accompanied by humiliation."

c.  6th grade: UNRWA-produced 6th grade Arabic study material includes an exercise under a lesson titled "Loving the Homeland" that promotes sacrificing one's life—

"the most precious thing" a person has—for the homeland "to nourish the homeland with his blood." Another exercise under the title "My Land" teaches students that their obligation to the homeland is to sacrifice "their blood" for it. The clear intention is to encourage students to pursue violent jihad to "liberate the homeland." This is confirmed by grammar exercises which include the example sentence "I will commit jihad to liberate the homeland".

d.  7th grade:  In the PA's Arabic Language study cards, 7th grade students are presented with a summary of a poem saying that the Palestinian "Right of Return" into Israel proper will take place though violence using "all the means of warfare" against Israel rescuing the land from the "filth of the occupation" instead of through negotiation. The horizon of the "Return" is described in the summary as "painted with the blood of martyrs."

e.  8th grade:  Reading comprehension is taught through a violent story which glorifies suicide bombings, recounting that "the daggers of the fedayeen [Arab guerilla fighters, commandos] fell on the necks" of enemy soldiers and that they "wore explosive belts." Israeli forces are said to "leave behind some of the bodies and body parts, to become food for wild animals on land and birds of prey in the sky." An accompanying illustration depicts Israeli soldiers in a tank, shot dead by a Palestinian gunman.

f.  9th grade: A reading comprehension exercise in 9th grade Arabic Language study material created by UNRWA, contains a story about a Palestinian firebombing attack on a Jewish bus near the West Bank city of Ramallah. The reading comprehension text celebrates the attack as a 'barbecue party' (*haflat shiwaa'*). The

translation of the text presented to the student as a reading comprehension exercise is as follows: The neighbor: "The curfew does not include us in Al-Sharafah [neighborhood]. It is imposed on Al-Tatarish [neighborhood]. It seems that there is a barbecue party [*haflat shiwaa'*] there with firebombs on one of the buses of the colonial settlement Psagot on Mount Al-Tawil."

g.  10th grade: In Islamic Education, students are taught that Jihad is "for the liberation of Palestine" and a "private obligation for every Muslim."

h.  11th grade:  An eleventh-grade Palestinian history textbook implies that Jews control the world, using classic antisemitic imagery.

i.  12th grade: PA Islamic Education textbook teach students that giving their lives is a religious duty that carries great rewards and much honor. It amounts to the central meaning of life, the highest point toward which one can aspire.

343.    The indoctrination of hatred of Jews and Israel that is taught in UNRWA's curriculum is further exacerbated by UNRWA's allowance of HAMAS's student activities in its schools.

344.    In every UNRWA school, HAMAS has a representative of its "Islamic Bloc", called in Arabic "Al-Kutla al-Islamiya" ("al-Kutla"). Al-Kutla is HAMAS's student wing and its official arm operating in all educational institutions in Gaza, from elementary schools to colleges and universities, including the educational institutions run by UNRWA. Al-Kutla's strategy in elementary and middle school is focused on attracting students to HAMAS through organizing a variety of activities inside school and after school hours that intend to strengthen the students' religious beliefs and exposing them gradually to HAMAS ideology in order to recruit them to the movement.

345. Examples of al-Kutla's activities inside UNRWA's facilities in Gaza or for students at middle schools run by UNRWA, are as follows:

a. On January 1, 2010, al-Kutla organized a soccer tournament in Rafah commemorating Mohammad al-Sharif, an operative of al-Qassam Brigades, who was killed on December 12, 2007. Teams from 18 middle schools in Rafah participated in the tournament, including those run by UNRWA. Rafah middle school G (UNRWA) won the finals defeating al-Omaria middle school (UNRWA). The event was held in the football field of the Services Club founded by UNRWA. This is just one example of the many sports tournaments that al-Kutla organizes for students of UNRWA schools.

b. On March 7, 2011, al-Kutla held an event in UNRWA's al-Qarara middle school to honor outstanding students. HAMAS senior official Hamad al-Ruqab and the UNRWA school's principle participated in this HAMAS event.

c. On April 27, 2011, al-Kutla organized a knowledge competition between Khan Yunis' middle schools, including schools run by UNRWA (al Qarara and al Ma'ari middle schools). Al Ma'ari middle school (UNRWA) won the competition, which was held in commemoration of HAMAS co-founder and former supreme leader 'Abd al Aziz al Rantisi, who directed many terrorist attacks by HAMAS during the Second Intifadah.

d. Events honoring senior leaders of HAMAS, including Sheikh Ahmad Yassin, founder and supreme religious authority of HAMAS, and Ahmad al-Ja'bari, former commander of al-Qassam Brigades, HAMAS's military/terrorist wing.

e.  The Islamic bloc spurred schoolchildren to participate in the 2018 so-called "Great March of Return" rallies along the border with Israel, which included acts of violence and terrorist attacks (shooting, throwing explosives, stabbing, arson and more) and served as test runs for the breaches of the border in the October 7th Attack. Videos prepared by the Islamic Bloc call for active participation in the "Great March of Return" rallies, and state that their ultimate goal is to bring about the destruction of the State of Israel.

346.   The UNRWA education system, its employment of teachers who are HAMAS members, its textbooks, and the activities of al-Kutla are a powerful vehicle for HAMAS to indoctrinate youth in UNRWA schools in the Gaza Strip and to pave the way for their future recruitment to al-Qassam Brigades.

347.   Reviewing the bio sketches of al-Qassam Brigades' fatalities reveals a repeated pattern. Hundreds of al-Qassam operatives are graduates of UNRWA's schools in Gaza, who joined HAMAS and later its military wing al-Qassam Brigades. All were also involved in terrorist attacks against Israel or in attacks against IDF forces.

4.  UNRWA's October 7th Involvement

348.   HAMAS has continued its reign of terror until today. On October 7, 2023, HAMAS carried out the bloodiest terror attack in Israel's history, which is now on record as the deadliest day for Jewish people since the Holocaust.  During the October 7th attack, HAMAS terrorists murdered approximately 1,200 people, injured thousands of others, burned homes and committed acts of mass rape.  HAMAS terrorists also took more than 250 people as hostages, dozens of whom have been since found to have been killed while in captivity, including men, women, children, and babies.  HAMAS has held these hostages for ransom.  Most recently HAMAS has demanded that

in exchange for the release of each hostage (or remains of a deceased hostage), Israel must release 30-50 Palestinian prisoners—many of whom are serving multiple life sentences for committing murder and other violent criminal acts—with assurances that the released Palestinian prisoners will not be re-arrested.

343.    This hostage-taking and ransom-demanding strategy has been a prominent feature of HAMAS's terror regime.  Indeed Yahya Sinwar, the HAMAS leader widely regarded as the mastermind of the October 7th attack, was himself previously released in a lopsided exchange in 2011 (over 1,000 convicted Palestinians were exchanged for a single Israel soldier) after being imprisoned for orchestrating the abduction and killing of two Israeli soldiers and four Palestinians he considered to be collaborators in 1989.  The stories of the horrific experiences of the named Plaintiffs herein and their murdered loved ones are given above in considerable detail but represent only a fraction of what the much larger number of other victims suffered that day and afterwards.

344.    In addition to genocide, mass murder, torture, and hostage-taking, the October 7th Attack included, as has been widely reported, numerous incidents of weaponized rape and sexual assault have been used by HAMAS and HEZBOLLAH as a terror tactic.  The horrific methods employed in these rapes were sufficiently uniform in different locations to show preplanning and coordination by HAMAS rather than opportunistic outrages committed by individual HAMAS terrorists.  Gang rape, sexualized torture, and deliberately leaving the mutilated and naked corpses of murdered rape victims in public locations in order to instill terror in others were all part of this modus operandi.  The United Nations confirmed these reports in statements by Pramila Patten, the Secretary General's Special Representative on Sexual Violence in Conflict, as have other prominent international figures with no pro-Israeli leanings.

345.    Despite these horrific acts, UNRWA teachers and staff applauded the Oct. 7th attack on social media. Examples are many. At 9:09 AM on October 7th, as news began to spread about the terrorist atrocities in Israel, UNRWA Gaza teacher Osama Ahmed posted "Allah is Great, Allah is Great, reality surpasses our wildest dreams." [3]   UNRWA principal Iman Hassan justified the Attack as "restoring rights" and "redressing" Palestinian "grievances."[4]  Rawia Helles, Director of the Khan Younis Training Center and featured in an UNRWA video, glorified one of the terrorists as a "hero," "raider," and "prince of Khan Younis."[5]  UNRWA Gaza School employee Hmada Ahmed, posted on October 7: "[We] welcome the great October" and on October 14: "This land cannot accommodate two identities. [It's] either us or us. We are the ones who will remain, and they are the ones passing by." [6]

346.    UNRWA teachers in a 3,000-member UNRWA staff Telegram group cheered and celebrated the October 7th Attack. The UNRWA staff in the group shared photos and video footage of those events and prayed for the terrorists' success and for Israel's destruction. Examples are many.  On the morning of October 7th, Israa Abdul Kareem Mezher (UNRWA Elementary School Arabic Language Teacher), ecstatically celebrated the HAMAS terrorists and prayed for their success ("May God keep their feet steady and guide their aim"; "pray for the Mujahidin")[7]. At 7:38 AM, as news of the HAMAS atrocities began to spread, Mezher cheered "God is the greatest God is the greatest." Minutes later he shared a photo of one of the HAMAS terrorists armed and

---

[3]  UN Watch, UNRWA: Hate Starts Here, at 11 *available at* https://unwatch.org/wp-content/uploads/2023/11/UNW_119___UNRWA_Report_2023_November__2023-11-05__web.pdf (last visited July 10, 2025)
[4] *Id.* at 13.
[5] *Id.* at 15.
[6] *Id.* at 23.
[7] Mujahadin (Arabic) means "holy warrior" that is one who conducts jihad.

in uniform, declaring that "Israel's time is over."[8]  UNRWA math teacher Shatha Husam Al Nawajha wished for the terrorists' "safe" return "and with booty."[9] At 8:00 AM, she lauded the terrorists for taking "their destiny into their own hands," and again prayed for God to "protect" them and make them "victorious."  UNRWA teacher Moreed Abdulaziz Issa Shouka (Elementary Coed School) exulted in the success of HAMAS' October 7th attack, calling it "beyond expectations."[10]

347.    Teachers and other educational staff of UNRWA have been reported praising HAMAS's terrorism on social media, referring to it as an "unforgettable glorious morning" and a "splendid sight." Besides such blatant incitement for ethnic cleaning and genocidal attacks, UNRWA employees are violating the following UN's principles of neutrality with their statements and actions:  UNRWA Staff Regulation 1.4 (staff must "avoid any action and in particular any kind of public pronouncement which may adversely reflect on their status or integrity, independence or impartiality…"); UNRWA Staff Regulation 1.7 (staff must not engage in "any political activity which is inconsistent with or might reflect upon the independence and impartiality required by their status).

348.    On November 8, 2023, the IDF located and destroyed over 100 HAMAS military fighting tunnels adjacent to UNRWA schools in northern Gaza.  UNRWA Headquarters in Gaza City provided power and cover to a HAMAS war room and strategic tunnel located directly underneath the building. This HAMAS complex with rows of computer servers functioned as an important communications center and the central intelligence facility. Before, during and after the

---

[8]  UN Watch, UNRWA'S TERRORGRAM, at __31-35, available at https://unwatch.org/wp-content/uploads/2024/01/UN-Watch-UNRWA-Terrorgram-.pdf (last visited July 10, 2025).
[9] *Id.* at 50.

[10] *Id.*

October 7th massacres, UNRWA's server room sat directly above the underground HAMAS data center and supplied HAMAS terrorist infrastructure with power through electric cables running down to and into the floor. The underground network also passed beneath a nearby UNRWA school. The tunnel was located at a depth of 18 meters, had a length of 700 meters, and contained several side doors. In offices within UNRWA headquarters itself, the personal effects of senior HAMAS military commanders and many weapons were found, including guns, ammunition, grenades and explosives. In the offices of UNRWA officials, intelligence tools and documents were found that testified that the same offices were also used by HAMAS terrorists.

349.    One of the hostages who was released from Gaza in November 2023, revealed that he was held for nearly 50 days in an attic by a teacher from UNRWA. The hostage also said that the teacher who held him captive was a father of 10 children. He was barely provided food or medical attention, and was locked away by the teacher.

350.    On January 26, 2024, UNRWA stated it received evidence from Israel revealing that numerous UNRWA staff took part in the abductions, killings and torturing that occurred during the October 7th Attack. Some examples of UNRWA staff who participated in the Attack include:

    a.   UNRWA school counselor Mousa Subhi Musa El Qidra was the deputy to the Qassam Brigades' Khan Younis Brigade Commander Mohammad Sinwar (the brother of HAMAS leader Yahya Sinwar). They were operating from the Qadsia compound in Khan Younis, which served as a training facility for HAMAS to train terrorists to carry out the October 7th Attack. The compound contained armored vehicles. On October 7, 2023, Mousa and his son abducted a woman from Israel.

b. Ala Abd al-Hamid Qassem Jouda, who worked for the agency as an Arabic Religion teacher at an elementary school, was a company commander in the Qassam Brigades' Nuseirat Battalion that led the horrendous rampage in the Israeli border Kibbutz Be'eri, one tenth of whose residents were killed, including Plaintiff Estate of Dror Kaplun. The chilling aftermath of the Be'eri Attack exposed a scene of merciless brutality, with approximately 80% of the recovered bodies showing signs of torture, with many torture victims also having been systematically raped. Some bodies were found decapitated, or burnt to death with their hands bound together, and entire families were butchered. This orchestrated onslaught resulted in the ruthless murder of over 130 community members, with 28 kidnapped to Gaza, leaving behind a legacy of terror that devastated the kibbutz. Jouda was arrested in Israeli territory.

c. UNRWA social worker Faisal Ali Mussalem al-Naami was a combatant in the same Qassam Brigades' Nuseirat Battalion that attacked Be'eri. He was filmed abducting from Be'eri to Gaza the corpse of a 21-year-old Israeli civilian, Yonatan Samerano, who had fled to Be'eri from the Nova music festival to seek safety. He also coordinated the movements of pick-up trucks used by the raiders and of weapons supplies. Al-Naami was killed in an IDF airstrike on 17 November 2023.

d. UNRWA elementary school teacher Ibrahim Atiya Mohammad Abu Ghafra (cell commander in the Qassam Brigades' Nuseirat Battalion) participated in the Nova Attack on Reim.

e. Three UNRWA employees, including an Arabic teacher at an UNRWA school, received a text from HAMAS to arm themselves at a staging area: UNRWA school

attendant Shadi Mohammad Jamal Razak Darabiah (operative in the Qassam Brigades' East Jabalia Battalion), UNRWA Arabic teacher Mohammad Tawfiq Ibrahim El Ghafari (Squad commander in the Qassam Brigades' Nuseirat Battalion), and UNRWA teacher Ali Isa Hamuda Matar (platoon commander in the Qassam Brigades' Nuseirat Battalion) all received a text calling them to report to the meeting point prior to the infiltration, along with logistical preparations.

f.  UNRWA Deputy School Principal Abd Al-Rahman Atiya Salem Abu Awad (platoon commander in the Al Qassam Brigades' Nuseirat Battalion) was updated about the infiltration in real time, was instructed to follow the events over the PTT radio and make sure the other relevant operatives do the same.

g.  The manager of a shop in an UNRWA school set up an operations room for the Palestinian Islamic Jihad on October 8, the day after the attack.

h.  Amer Yaser Nazmi Sada, a 24-year old graduate of an UNRWA school participated in the October 7th Attack. His UNRWA diploma was found in a vehicle of one of the terrorists in Israel in the aftermath of October 7.

i.  UNRWA School Counselor Baker Mahmoud Abdallah Darwish (operative in HAMAS' military intelligence unit) and UNRWA clerk Mohammad Nasser al-Din Mohammad Abu Naama were located in Israeli territory on October 7. Abu Naama was killed in an IDF airstrike on 11 October 2023. UNRWA health center clerk Ghassan Nabil Mohammad Sh'hadda El Jabari (an operative in the Qassam Brigades' al-Furkan Battalion) arrived in a hospital with a shot wound on October 7 and turned off his cellphone. UNRWA math teacher and Rami Mohammad Ramadan Sabbah was involved in receiving hostages on October 7 and holding

them captive. He was also seen photographing an elderly female hostage held by two terrorists on a motorcycle.

j.   UNRWA elementary school teacher Yusef Zidan Salimam Al-Khuajri (combatant in the Qassam Brigades' Central Camps Brigades) took part in the October 7th Attack and was revealed speaking on the phone roughly 7 hours after HAMAS began invading Israel, bragging about the female captive that he captured. The Arabic term "sabaya" that he used to refer to the Israeli woman, is a term in Islam that describes women and children as the property of a Muslim man. The interpretation also has the context of a slave and is exactly the same word as ISIS uses to refer to sex slaves.

k.   UNRWA elementary school teacher Mamdouh Hussein Ahmad al-Qak (an operative in the PIJ Rafah Brigades) took part in the October 7th Attack and was revealed speaking on the phone as follows: "I'm inside, I'm inside with the Jews!" He is asked by the other side "How will you get home?" and he replies with a laugh: "When I die."

351.   UNRWA has not denied that a material number of its staff personally participated in the October 7th Attack, although it has quibbled with the numbers estimated by credible outside sources.  Indeed, UNRWA has since the attack carried out a spin campaign trying to minimize the nature and degree of its institutional culpability in providing material support to HAMAS, trying to portray it as the work of a few rogue low-level employees rather than reflecting conscious institutional policy decisions made at the highest levels by the Individual Defendants.  Responding to the revelation of UNRWA staff's participation in the October 7th Attack, UNRWA posted to its official website a report entitled "Why Donors Should Not Suspend Aid to UNRWA," arguing

that "HAMAS' deep roots in Gaza could make it difficult or impossible for the agency to insulate itself from all indirect links with the militant group." The report also argued that UNRWA's "ubiquity throughout Gaza, combined with the degree to which HAMAS is embedded in the local population, makes it difficult for UNRWA to guarantee that its safeguards against staff misconduct or aid diversion are infallible." In light of the facts alleged herein, these are not defenses but admissions that UNRWA knew of the risks and yet failed to take action to mitigate them.

352.    For example, on January 26, 2024, Lazzarini, despite his own culpable actions, knowledge, and intent as set forth in detail above, issued the following statement (emphasis added): "The Israeli Authorities have provided UNRWA with information about the alleged involvement of several UNRWA employees in the horrific attacks on Israel on 7 October…I have taken the decision to immediately terminate the contracts of these staff members and launch an investigation in order to establish the truth without delay. *Any* UNRWA employee who was involved in acts of terror will be held accountable, including through criminal prosecution."

353.    The same day, a spokesperson for United Nations Secretary-General Antonio Guterres issued the following statemen (emphasis added): "The Secretary-General has been briefed by the Commissioner-General of the United Nations Relief and Works Agency for Palestine Refugees in the Near East (UNRWA), Philippe Lazzarini, regarding extremely serious allegations which implicate several UNRWA staff members in the terror attacks of 7 October in Israel. The Secretary-General is horrified by this news and has asked Mr. Lazzarini to investigate this matter swiftly and to ensure that *any* UNRWA employee shown to have participated or *abetted* what transpired on 7 October, or in any other criminal activity, be terminated immediately and referred for potential criminal prosecution."

354.   A subsequent purportedly-independent inquiry into certain aspects of UNRWA's conduct in Gaza headed by the French diplomat Catherine Colonna was largely a whitewash of UNRWA's culpability, but did find that certain aspects of UNRWA's school curriculum were inappropriate and contrary to the UN's espoused values.  UNRWA immediately pledged to take corrective action, but the damage from the prior terrorist-indoctrination curriculum has already been done, regardless of belated efforts supposedly now being undertaken "to mitigate the risks attached to the promotion of hate and the incitation of violence in textbooks and the classroom."

355.   Following the death of Yahya Sinwar, the HAMAS head, during an operation in Rafah's Tel Sultan, a UNRWA ID was found alongside his body, as well as a huge amount of cash, several weapons and mentos candies.

356.   On or about January 31, 2025, following her release from captivity, British-Israel hostage, Emily Damari revealed that in captivity, she was held in multiple UNRWA facilities in the Gaza Strip where her captors initially refused to give her access to medical treatment for the two fingers that were shot off of her hand during her abduction on October 7, only later providing her with an expired bottle of iodine for treatment.

357.   The October 7th Attack was a human catastrophe for its victims, but separately created a public relations and financial crisis for UNRWA, as it became subject to heightened and unwelcome international scrutiny regarding its prior terror enabling activities in Gaza and Lebanon and the U.S. and many other donor countries suspended their financial support.

358.   All told, UNRWA systematically and deliberately aided and abetted HAMAS and its goals, but providing material support to HAMAS as follows:

      a.   Turning UNRWA schools, medical clinics, warehouses and offices into military storage and deployment bases, including the storage and guarding over weapons,

ammunition, explosives, and other military supplies, to be used by terrorists as prepositioning for immediate firing;

b. Facilitating the construction of underground bunkers, attack tunnels, prison cells to hold hostages, and command and control centers, for HAMAS and PIJ;

c. Facilitating and concealing the placement of batteries of rocket launching platforms and rockets on and/or adjacent to UNRWA schools and medical facilities, in violation of international humanitarian laws, and, despite knowing of HAMAS's use of UNRWA premises, consistently taking the position with Israel that UNRWA premises were inviolate, thus making them safe havens for terrorists and their material in advance of the October 7th Attack.

d. Knowingly employing HAMAS terrorists, including senior HAMAS members and HAMAS commanders, as part of its staff.

e. Infusing over one billion dollars in cash, thus providing HAMAS with hundreds of millions of dollars in currency conversion fees and moreover providing United States currency to HAMAS which was necessary to obtain and smuggle the vast amounts of weapons, explosives, and ammunitions required to launch the October 7th Attack and other terrorist attacks.

f. Instructing and preparing children to die as martyrs for the cause of eliminating the Jewish people, by using HAMAS-approved textbooks and curriculum for instruction at all UNRWA schools located in Gaza, without any modifications to remove incitement of genocide and antisemitism, and by employing teachers who are members of HAMAS and allowing HAMAS recruitment activities at UNRWA schools.

## B.  HEZBOLLAH

### 1.  Background on HEZBOLLAH

359.    HEZBOLLAH, or "Party of God," is a Shiite Muslim political and militant organization based in Lebanon. It rose to prominence during the early 1980s and has since become one of the most influential non-state actors in the Middle East.

360.    Lebanon's complex sectarian composition and political instability led to a 15-year civil war from 1975 to 1990. Various militias represented different religious and political groups, including Maronite Christians, Sunni Muslims, Druze, and Shiite Muslims.

361.    In June 1982, Israel entered Lebanon to dismantle the Palestine Liberation Organization (PLO) base in southern Lebanon, which was being used to attack Israel. This invasion displaced many Lebanese, especially in the Shiite-majority south, fueling resentment against Israel and foreign intervention in Lebanon.

362.    In response to the Israel's presence and amid the political vacuum, a group of Shiite clerics, supported by Iran, formed HEZBOLLAH in 1982. HEZBOLLAH was inspired by Iran's Islamic Revolution and had strong ideological and financial backing from Iran's Islamic Revolutionary Guard Corps (IRGC). It sought to establish an Islamic state in Lebanon based on Shiite principles and leverage that power in furtherance of Iran's objectives to eliminate Israel.

363.    Iran played a crucial role in HEZBOLLAH's development, providing funding, training, and ideological guidance through the IRGC. The Iranian regime viewed HEZBOLLAH as a means to export its revolutionary ideals and extend its influence in the Arab world, particularly among the Shiite communities in Lebanon. The United States designated HEZBOLLAH as a Foreign Terrorist Organization (FTO) in 1997, citing its attacks on Western targets, its use of

violence against civilians, and its association with Iran. The U.S. Treasury has since imposed extensive sanctions targeting HEZBOLLAH's financial networks and its supporters.

364.    In 2013, the EU designated HEZBOLLAH's "military wing" as a terrorist group following a 2012 HEZBOLLAH-linked bus bombing in Burgas, Bulgaria, that killed five Israeli tourists and a Bulgarian driver. Countries and international organizations including Canada, Israel, the United Kingdom, the Arab League, and the Gulf Cooperation Council have designated HEZBOLLAH in full or in part as a terrorist organization, viewing it as a destabilizing force with close ties to Iran's regional strategy.

365.    HEZBOLLAH's involvement in the Syrian Civil War beginning in 2011 furthered its reputation as an Iranian proxy. HEZBOLLAH fought alongside Syrian government forces in support of President Bashar al-Assad, a key Iranian ally, effectively acting as a regional arm of Iran's influence in the Middle East. This involvement solidified HEZBOLLAH's role as a transnational Shiite militia and aligned it against Sunni-majority groups, further polarizing sectarian lines in the region.

366.    HEZBOLLAH has been involved in training and supporting other Iran-aligned militant groups, such as Iraq's Kata'ib HEZBOLLAH and Yemen's Houthi movement. This network of Iranian-aligned militias has allowed HEZBOLLAH to expand its influence beyond Lebanon, becoming a critical player in Iran's regional strategy and furthering its designation as a terrorist organization.

367.    HEZBOLLAH finances its operations through extensive global networks involving drug trafficking, money laundering, and arms smuggling. These networks span South America, Africa, and parts of Europe, with funds often channeled back to Lebanon to support

HEZBOLLAH's military and political activities. The U.S. and other nations have worked to disrupt these networks through sanctions and law enforcement actions.

368.    HEZBOLLAH has leveraged charitable fronts and business ventures worldwide to raise funds, complicating international efforts to target its financial network.

369.    HEZBOLLAH's rise from a local resistance movement to a powerful militant and political entity in Lebanon, backed by Iran, has been marked by its use of violence to garner support. Its attacks on Western and Israeli targets, involvement in international terrorism, participation in the Syrian Civil War, and alignment with Iran's regional objectives have led to its designation as a terrorist organization by many countries. This designation reflects HEZBOLLAH's transformation into an organization that operates beyond the Lebanese context, engaging in activities that destabilize the region and challenge international security. HEZBOLLAH gained attention for its militant tactics, including suicide bombings and kidnappings targeting American and Western interests.

370.    The most notorious early attacks linked to HEZBOLLAH include:

a.    1983 Beirut Barracks Bombings: HEZBOLLAH suicide bombers targeted the U.S. Marine barracks and the French military compound in Beirut, killing 241 U.S. and 58 French servicemen and marking one of the deadliest attacks on American forces overseas since WWII.

b.    1983 U.S. Embassy Bombing in Beirut: A HEZBOLLAH suicide bombing of the U.S. embassy in Beirut killed 63 people, including several American diplomats and intelligence personnel. This attack underscored HEZBOLLAH's capability to target Western interests.

c. Kidnappings and Hostage-Taking: Throughout the 1980s, HEZBOLLAH was involved in the kidnapping of dozens of Western nationals, including journalists, professors, and diplomats, as part of its resistance to foreign influence and to exert pressure on Western powers.

d. After the Lebanese Civil War ended with the Taif Agreement in 1989, HEZBOLLAH retained its arms, unlike most other militias, under the rationale that it was a "resistance force" against Israeli occupation. HEZBOLLAH established itself as both a military and political entity, eventually gaining seats in the Lebanese Parliament and playing a significant role in Lebanese politics.

371. Following the civil war, HEZBOLLAH continued to launch attacks on Israeli forces in southern Lebanon, justifying its actions as resistance to what it described as "Israeli occupation." Israel withdrew from southern Lebanon in 2000, which HEZBOLLAH claimed as a victory and used to further justify its armed presence.

372. In July 2006, HEZBOLLAH launched a cross-border raid, capturing two Israeli soldiers. This act triggered a 34-day war between HEZBOLLAH and Israel, resulting in significant destruction in Lebanon but further solidifying HEZBOLLAH's image as a resistance force against Israel. The conflict elevated HEZBOLLAH's reputation as a formidable force, reinforcing its ability to achieve its ideological objectives.

## 2. UNRWA Support for Hezbollah

373. UNRWA operations in Lebanon provide substantial support for HEZBOLLAH's ideological and political agenda. By sustaining an environment that aligns with HEZBOLLAH's regional goals and anti-Israel rhetoric, UNRWA has become a facilitator of HEZBOLLAH's influence in Palestinian refugee communities.

374.    *First,* UNRWA's unique approach of extending refugee status to the descendants of Palestinian refugees sustains an unresolved refugee issue across generations, which aligns with HEZBOLLAH's insistence on the Right of Return as a non-negotiable demand. By keeping the refugee issue unresolved, UNRWA reinforces a sense of displacement and grievance that HEZBOLLAH exploits, casting itself as a defender of Palestinian rights and leveraging this issue to legitimize its anti-Israel agenda.

375.    HEZBOLLAH has long championed the Right of Return, positioning itself as an advocate for Palestinian refugees' right to reclaim homes in Israel. By supporting this ongoing narrative and providing services that maintain the refugee identity indefinitely, UNRWA creates conditions that align with HEZBOLLAH's ideological position, bolstering its claims to be a protector of Palestinian rights.

376.    *Second,* as they do in Gaza, UNRWA schools in Lebanon use host-country curricula that often include narratives of Palestinian displacement and the Right of Return, which dovetail with HEZBOLLAH's anti-Israel messaging. This educational content reinforces the narrative of historical grievances and a right to return, creating an ideological overlap with HEZBOLLAH's agenda. This alignment helps cultivate a sympathetic base within refugee communities, which HEZBOLLAH can mobilize and use to bolster its political influence.

377.    Many UNRWA staff members in Lebanon are Palestinian refugees themselves, ideologically aligned with HEZBOLLAH's stances, reinforcing the anti-Israel sentiment and bolstering HEZBOLLAH's support.

378.    UNRWA, which operates 65 schools in Lebanon, is the primary education provider for Palestinian refugees in Lebanon. Having provided education to approximately 39,144 Palestinian refugee students, UNRWA educates a significant proportion of Palestinian refugee

children.  Many of these Palestinian refugees in Lebanon were primarily indoctrinated by their UNRWA schools before being recruited by HEZBOLLAH to participate in acts of terror against Israel, Israelis, Jews and Americans.

379.    *Third,* UNRWA operates in areas where HEZBOLLAH exercises significant influence, especially in southern Lebanon. UNRWA resorts to relying on HEZBOLLAH-aligned security forces for safe access to refugee camps and surrounding areas. This dependency ties UNRWA to HEZBOLLAH's control, limiting the agency's autonomy and creating an operational reliance that benefits HEZBOLLAH's control over these regions.

380.    UNRWA reinforces HEZBOLLAH's legitimacy as a de facto authority in Lebanon. HEZBOLLAH's support for UNRWA's activities frames HEZBOLLAH as an ally of Palestinian refugees, aligning the agency's interests with HEZBOLLAH's and providing HEZBOLLAH with a platform to present itself as a humanitarian and political advocate for Palestinian rights.

381.    *Fourth,* out of deference to HEZBOLLAH, UNRWA shirks its enforcement of neutrality policies. The agency's lack of accountability for educational materials and employee conduct within refugee camps allows HEZBOLLAH-aligned propaganda to permeate UNRWA's programs. This gap allows political narratives sympathetic to HEZBOLLAH to be disseminated within UNRWA facilities, aligning UNRWA's educational content with HEZBOLLAH's goals.

382.    UNRWA-administered camps operating in areas influenced by HEZBOLLAH positions the camps as ideological strongholds aligned with HEZBOLLAH's anti-Israel and anti-Western rhetoric, furthering HEZBOLLAH's broader goals of violent opposition to Israel's existence and consolidating its influence among the Palestinian refugee population.

383.    *Fifth*, HEZBOLLAH has frequently expressed support for UNRWA's funding and operations, particularly when funding reductions or conditions from Western nations threaten the

agency's work. HEZBOLLAH frames these threats as attacks on Palestinian rights, reinforcing its own role as a protector of Palestinian welfare. By promoting UNRWA's continued presence and funding, HEZBOLLAH aligns itself with the agency and gains a platform to advocate for Palestinian rights as part of its anti-Israel and anti-Western narrative. UNRWA, meanwhile, does nothing to distance itself from HEZBOLLAH, thereby tacitly endorsing the influence HEZBOLLAH seeks to assert.

384.    HEZBOLLAH's unimpeded involvement in UNRWA's work enables it to amplify grievances in support of Palestinian "resistance," a euphemism for violent terrorism, which creates a reinforcing cycle where UNRWA's so called "humanitarian services" keep the refugee issue in the international spotlight and effectively validate HEZBOLLAH's attacks on Israel. This alignment emboldens HEZBOLLAH's anti-Israel position, encouraging the terrorist organization to exploit UNRWA's humanitarian mission to bolster its own political goals.

385.    UNRWA supports HEZBOLLAH's military activities through its operations in Lebanon, which significantly bolster HEZBOLLAH's ideological and political agenda. By perpetuating the unresolved status of Palestinian refugees, promoting narratives of historical grievance, and operating within HEZBOLLAH-influenced areas with limited autonomy, UNRWA functions as an instrument that supports HEZBOLLAH's claims, consolidates its influence and enables the militant organization to exploit UNRWA's humanitarian mission for its own political ends, positioning UNRWA as a facilitator of HEZBOLLAH's goals rather than a truly neutral agency.

386.    Following HAMAS's October 7, 2023, attack on Israel, HEZBOLLAH significantly escalated its military actions along the Israel-Lebanon border in a show of solidarity with HAMAS. Here's a timeline summarizing the key events:

a. **October 8, 2023**: The day after HAMAS's attack, HEZBOLLAH launched rockets into Israel's Shebaa Farms region, marking the beginning of continuous cross-border fire. This response was framed as support for HAMAS, with HEZBOLLAH indicating that its actions would continue until there was a ceasefire in Gaza.

b. **October 12–17, 2023:** Over this period, HEZBOLLAH intensified its attacks, including the firing of anti-tank missiles, artillery, and additional rocket strikes that killed Israeli soldiers and civilians. This escalated exchange caused heavy bombardments on both sides of the Blue Line, the UN-monitored border, and increased civilian displacement from northern Israel and southern Lebanon.

c. **Mid to Late October**: Over the next two weeks, HEZBOLLAH continued to fire rockets, mortars, and anti-tank missiles at Israeli positions. HEZBOLLAH deputy leader Sheikh Naim Qassem issued public statements affirming that HEZBOLLAH would act in support of Gaza according to its plans.

d. **Late October 2023**: Despite a brief ceasefire related to hostilities in Gaza, HEZBOLLAH resumed its attacks almost immediately, targeting Israeli drones and prompting further Israeli artillery fire into Lebanon. Cross-border hostilities continued to escalate as both sides fortified their positions and continued retaliatory attack.

e. **November 2023**: The hostilities continued with a pattern of exchanges, including retaliatory strikes by Israel and HEZBOLLAH's claims of successful attacks on Israeli military installations.

f. **December 5–17, 2023**: HEZBOLLAH sustained its pressure with regular cross-border attacks, including drone strikes on IDF bases that injured Israeli soldiers.

The IDF struck back with airstrikes on HEZBOLLAH targets in southern Lebanon and reported attacks on HEZBOLLAH facilities in Syria, targeting critical infrastructure and militants.

g. **January to April 2024**: Hostilities persisted into the new year, with HEZBOLLAH escalating both the scale and frequency of its strikes. Key incidents included large rocket barrages into the Galilee and drone attacks on IDF posts.

387.    These hostilities have led to significant casualties and displacement on both sides of the border. Over 1,000 people have reportedly been killed in Lebanon due to Israeli strikes, and tens of thousands of Lebanese and Israelis have been displaced due to the ongoing threat of cross-border attacks. This sustained engagement reflects the heightened tension in the region, with HEZBOLLAH leveraging the situation to support its ally HAMAS and reinforce its own stance against Israel.

### III.        UNRWA USA – UNRWA's US Based Private Donor Charitable Arm

388.    UNRWA is funded almost entirely by voluntary contributions, from foundations, individuals and governments. Much of the money UNRWA has spent in assisting terrorist organizations to build up their terror infrastructure in Gaza and Lebanon came as a result of donations solicited in the United States: both through the United States government and Private Donors based in the United States. The facilitator of private US donations to UNRWA is Defendant UNRWA USA.

389.    Founded in 2005, UNRWA USA is a 501(c)(3) nonprofit organization in the United States, with the stated mission of "supporting the humanitarian work of the United Nations Relief and Works Agency for Palestine Refugees in the Near East (UNRWA) through fundraising, advocacy, and community engagement in the United States."

390.    UNRWA and UNRWA USA are inextricably linked in their funding and support of HAMAS. UNRWA USA collects donations in the United States and then transfers nearly all its funds to UNRWA, and its significant operations in Gaza. Once the funds reach Gaza, UNRWA redistributes those funds to HAMAS members on their payroll, some of whom are directly engaged in acts of terrorism.

391.    At least as recent as April 5, 2023, the UNRWA website provided a link to UNRWA USA for any US-donors that wished to support UNRWA.

392.    As discussed below, UNRWA USA knew that UNRWA employees supported, engaged in, and celebrated the terrorist attacks on October 7, providing operational and financial support for their activities, but Defendant UNRWA USA continued to fund UNRWA and the terrorist activities it supports before, during, and after the October 7 terrorist attack.  UNRWA USA aids, abets, and provides material support for those activities under the guise of humanitarian assistance.

393.    UNRWA USA's beneficiaries include hundreds of thousands of individuals in the Gaza Strip. In the wake of the October 7, 2023 terrorist attacks against civilians in Israel, widely circulated public reports, including messages on the "UNRWA Teachers" Telegram channel, revealed that numerous UNRWA-affiliated personnel publicly celebrated and endorsed the atrocities.

394.    The funds raised by UNWRA USA and distributed by UNWRA not only supported the October 7th atrocities, but have also for years been going directly as described above to the schools that are used to store HAMAS's weapons and other equipment; and to the production of educational materials that are used as part of the role that UNRWA schools play in recruiting and

indoctrinating terrorists for HAMAS, including promoting violence against Jews, and the destruction of the state of Israel.

395.    UNRWA USA raises and transfers such funds knowingly, willfully, and with the intention that the funds be used by a designated foreign terrorist organization and its members for terrorist purposes. Indeed, it knowingly, willfully, and intentionally works directly and indirectly in confederation and agreement with UNRWA, HAMAS, and other terrorist organizations to provide material support to the designated foreign terrorist organizations and their members and for their terrorist activities.

396.    UNRWA USA operates its terrorist-financing scheme in violation of federal law and thereby misleading its donors, the United States government, and the international community.

397.    As a U.S.-based 501(c)(3) organization engaged in foreign grantmaking, UNRWA USA was under a legal duty—grounded in IRS Revenue Ruling 63-252, IRS Publication 4221-PC, and Treasury anti-terrorism guidance—to exercise oversight, conduct reasonable due diligence, and immediately investigate credible evidence that its grantee, UNRWA, was engaged in or materially connected to activities contrary to charitable purposes.

398.    At minimum, UNRWA USA knew of these celebratory postings and the related public revelations implicating UNRWA personnel. Despite such knowledge, UNRWA USA failed to sever its financial ties with UNRWA, in violation of its obligations under U.S. tax law, and thereby knowingly facilitated the continued diversion of charitable funds in a manner that undermines public policy and violates the statutory requirements for tax-exempt status.

399.    In summarizing its 2022 Annual Report, UNRWA USA declared on its website, "in 2022 we were able to disburse over $3.8 million to UNRWA."

400.    Similarly, in summarizing its 2021 Annual Report, UNRWA USA announced, "in 2021 we were able to disburse nearly $5 million to UNRWA."

401.    In 2021, UNRWA USA boasted that it was "[UNRWA]'s top institutional donor".

402.    Not only do UNRWA and Defendant UNRWA USA share common missions, finances, and activities, but they also employ overlapping staff.

403.    The official UNRWA USA "X" account has described UNRWA employee Motaz Azaiza as "our [UNRWA USA's] freelance content producer."

404.    Mr. Azaiza also identifies himself as a consultant for UNRWA USA and has made videos encouraging people to donate to UNRWA USA, which would then forward funds to his primary employer UNRWA.

405.    The official UNRWA USA "X" account refers to UNRWA employees as "colleagues" of UNRWA USA and describes UNRWA USA as working "hand in hand" with UNRWA.

406.    At all relevant times, Defendant UNRWA USA worked with and provided material support to UNRWA to aid and sponsor its activities and programs, including its support and employment of HAMAS and in providing material support for the terror activities of HAMAS, including but not limited to the October 7th Attack. And at all relevant times, Defendant UNRWA USA has been aware of UNRWA's involvement with HAMAS.

407.    For example, on January 11, 2024, UNRWA USA Communications Director Diala Ghneim hosted an Instagram live discussion with UNRWA USA Executive Director Mara Kronenfeld on the official UNRWA USA Instagram page. During this Instagram live feed, Ms. Ghneim and Ms. Kronenfeld discussed the UN Watch report "UNRWA'S TERRORGRAM." Ms. Kronenfeld said she was aware of this report and UN Watch's previous reports.

408.    UNRWA USA also similarly continued to outreach for support even after the revelations of the October 7th Attack.  For example, on January 29, 2024, following the revelation of UNRWA staff's participation in the October 7th Attack, UNRWA USA issued a statement acknowledging "the recent allegations against twelve UNRWA staff members." Notwithstanding the acknowledged link between UNRWA and HAMAS, UNRWA USA, in the very same official statement, restated its commitment to sending funding to UNRWA, stating "For our part, UNRWA USA will continue its tireless efforts to help Palestine refugees in desperate need in Gaza. The need for international aid is more urgent than ever, and UNRWA has a critical role to play in providing it. Rather than pulling back on aid to UNRWA, we are redoubling aid efforts, to ensure UNRWA can continue and increase its vital humanitarian support in Gaza."

409.    UNRWA USA's statement is shocking, yet unsurprising, given the anti-Israel sentiments and conduct in supporting HAMAS terror that perniciously pervade its staff.

410.    Indeed, the pro-HAMAS sentiment of Defendant starts at the top with UNRWA USA's Board Member, Karen AbuZayd.

411.    In 2005, Ms. AbuZayd was appointed UNRWA Commissioner-General to succeed outgoing Commissioner-General Peter Hansen. One year prior to Ms. AbuZayd's promotion, Hansen stated, as asserted prior, "Oh, I am sure that there are HAMAS members on the UNRWA payroll, and I don't see that as a crime." At that time, Ms. AbuZayd was Mr. Hansen's Deputy Commissioner-General; upon information and belief, she was aware of Hansen's comments and the pervasiveness of HAMAS's influence in UNRWA.

412.    To be sure, in April 2006, Ms. AbuZayd also stated that she commonly met with HAMAS and would continue to do so: "It doesn't make sense to reduce contacts when you've

been asked to increase your activities," she said, stressing that UNRWA had 'no intention of changing' its operations."

413.    With Ms. AbuZayd serving on the Board of Directors for Defendant, the leadership of UNRWA USA is, and at all relevant times, has been fully aware of HAMAS's intimate involvement in UNRWA's operations.

414.    Nonetheless, in furtherance of its conspiracy with UNRWA, HAMAS, and others, and as further evidence of its knowingly and intentionally aiding and abetting HAMAS and its terrorist activities, UNRWA USA has continued to send support to UNRWA and HAMAS year after year, including the transfer of approximately $3,000,000 in 2020-21; $5,000,000 in 2021-22; and $3,800,000 in 2022-23, the year of the October 7th Attack.

415.    With mounting public pressure due to the publicized HAMAS-UNRWA ties, UNRWA USA announced on March 1, 2024, that it was temporarily halting funding to UNRWA and that it "supports the ongoing investigations of UNRWA by the United Nations Office of Internal Oversight Services (OIOS) and the independent review group." But in that same public statement, UNRWA USA reaffirmed its commitment to funding terrorist activities again in the future: "[UNRWA USA] intends to resume financial support to UNRWA upon appropriate resolution of these investigations."

## IV.    HAMAS AND HEZBOLLAH'S TERROR ATTACKS VIOLATED FUNDAMENTAL "JUS COGENS" NORMS OF INTERNATIONAL HUMAN RIGHTS LAW

416.    HAMAS and HEZBOLLAH acts of terror, including but not limited to, the October 7th Attack violated fundamental "jus cogens" norms of international law and those violations were caused by, among other things, the substantial and knowing assistance provided to HAMAS by the Defendants.  Aiding and abetting violations of jus cogens norms is itself a jus cogens violation.

417. The just cogens norms violated by HAMAS and HEZBOLLAH with the substantial and knowing assistance of the Defendants included:   (a) the prohibition against the deliberate targeting of civilians, whether by regular military forces or irregular armed factions such as HAMAS and HEZBOLLAH; (b) the prohibition against actual or attempted mass killing of civilians, whether by regular military forces or irregular armed factions such as HAMAS and HEZBOLLAH; (c) the prohibition against taking civilian hostages,  whether by regular military forces or irregular armed factions such as HAMAS and HEZBOLLAH; (d) the prohibition against systematic and "weaponized" rape as a tool of terror and intimidation; and (e) the prohibition against actual or attempted genocide, whether by state actors or non-state actors.

418. Genocide is defined by international treaty as "any of the following acts committed with intent to destroy, in whole or in part, a national, ethical, racial or religious group, as such:

419. Treaties and the practice of international war-crimes tribunals in recent decades make clear that attempted genocide, conspiracy to commit genocide, and aiding and abetting of, or other complicity in, genocide are just as proscribed as direct commission of genocide.  Because the intent to destroy the group may be "in whole or in part" HAMAS's and HEZBOLLAH's goals to kill or drive into exile all Jews living in Israel is genocidal even if not coupled with a plan to commit genocide against Jews in other parts of the world.

420. To fund its operations UNRWA solicits donations from donor countries, and  donor non-governmental organizations. In general, it is not funded out of general UN revenues, however, the United Nations may supply occasional emergency bail-out funding or other incidental support.

421. Moneys earmarked for Gaza are broken out separately in UNRWA's budget documents. When installments of money are wired to the Middle East they are earmarked specifically either for Gaza or some other region. Because of the way the cash is transmitted, the

relevant UNRWA staff based in the United States are aware that moneys destined to Gaza are disbursed differently, as detailed above, from moneys sent for use in Jordan, Lebanon, Syria, or the Judea and Samaria.

422.    A 2018 report commissioned by UNRWA from an outside consultant reminded it, as Defendants were aware, of numerous risks associated with dealing in cash in Gaza, including money laundering risks, the likelihood that funds could be diverted to terrorists or other inappropriate recipients ("leakage"), and the use of cash to facilitate illegal trade.

423.    The principals of UNRWA under their supervision also continuously act to lobby and liaise with representatives of significant countries, including the United States to raise political support for UNRWA and with representatives of other United Nations affiliates.

424.    UNRWA's and also UNRWA USA's website is/are each hosted in the United States.  In addition, the substantial assets of UNRWA's pension fund for its employees in all locations, including Gaza, are held in the United States, and senior personnel are paid out of the United States even if they are primarily based in the Middle East.

## CLAIMS FOR RELIEF

### COUNT ONE
### VIOLATION OF THE ANTI-TERRORISM ACT

425.    Plaintiffs incorporate their factual allegations above.

426.    As a designated FTO under 8 U.S.C. § 1189, HAMAS has committed, planned, or authorized activities that involved violence or acts dangerous to human life that are a violation of the criminal laws of the United States, or that would be a criminal violation if committed within the jurisdiction of the United States, including *inter alia* the prohibition on killing, attempting to kill, causing serious bodily injury, or attempting to cause serious bodily injury to U.S. citizens as set forth in 18 U.S.C. § 2332.

427.    As a designated FTO under 8 U.S.C. § 1189, HEZBOLLAH and has committed, planned, or authorized activities that involved violence or acts dangerous to human life that are a violation of the criminal laws of the United States, or that would be a criminal violation if committed within the jurisdiction of the United States, including *inter alia* the prohibition on killing, attempting to kill, causing serious bodily injury, or attempting to cause serious bodily injury to U.S. citizens as set forth in 18 U.S.C. § 2332.

428.    The terrorist attacks that killed or injured Plaintiffs or their family members were acts of international terrorism as defined by 18 U.S.C. § 2331 committed by HAMAS and/or HEZBOLLAH.

429.    Defendants' acts of international terrorism were a proximate cause of the October 7 Attack, and all of the ATA Plaintiffs are nationals of the United States or the estates, survivors, and or heirs of such nationals, who were each injured in their person, property, and/or business as a result of the October 7 Attack and its predictable and foreseeable subsequent consequences and thus by Defendants' acts of international terrorism. While certain of the ATA Plaintiffs or their relevant U.S.-citizen decedents or relatives are or were dual citizens of the United States and Israel, dual citizens have all the same rights under the ATA as individuals who are only U.S. citizens do.

430.    These activities committed, planned, or authorized by HAMAS and/or HEZBOLLAH appear to have been, and were intended to do the following: (a) intimidate or coerce the civilian populations of Israel, the United States, and other countries; (b) influence the policy of the Governments of Israel, the United States, and other countries by intimidation or coercion; or (c) affect the conduct of the Governments of Israel, the United States, and other countries by mass destruction, assassination, or kidnapping.

431.    The terrorist attacks committed by HAMAS and/or HEZBOLLAH which killed or injured Plaintiffs and their family members, were violent acts and acts dangerous to human life

that violated the criminal laws of the United States and many States, or would have violated those laws had they been committed within the jurisdiction of the United States or of the States. In particular, each attack constituted one or more of, killing U.S. nationals abroad, use of weapons of mass destruction, commission of acts of terrorism transcending national boundaries, in violation of 18 U.S.C. §§ 844 (c)(1), f(2), f,(3); 18 USC §956 (a)(1); 18 USC §2332; 18 USC §2332a, 18 USC §2332b.

432.    UNRWA USA knowingly solicited funds for and provided substantial financial assistance to UNRWA, an organization that is openly and closely intertwined with HAMAS and/or HEZBOLLAH, which provides operational and financial support to HAMAS and/or HEZBOLLAH, and an organization that HAMAS exercises control over, especially its employees. Defendant UNRWA USA aided and abetted HAMAS and/or HEZBOLLAH in committing, planning, or authorizing acts of international terrorism, including the acts of international terrorism that injured U.S. Plaintiffs.

433.    Plaintiffs allege that UNRWA knowingly aided and abetted HAMAS and/or HEZBOLLAH within the meaning of 18 U.S.C. § 2333(d) and that it has "provided material support, directly or indirectly, to foreign organizations or persons that engage in terrorist activities against the United States." Justice Against Sponsors of Terrorism Act ("JASTA"), § 2b.

434.    Plaintiffs allege that UNRWA USA conspired with UNRWA to knowingly aid and abet HAMAS and/or HEZBOLLAH within the meaning of 18 U.S.C. § 2333(d) and that it has "provided material support, directly or indirectly, to foreign organizations or persons that engage in terrorist activities against the United States." JASTA, § 2b.

435.    By aiding and abetting HAMAS and/or HEZBOLLAH in committing, planning, or authorizing acts of international terrorism, including acts that caused each of the U.S. Plaintiffs to

be injured in his other person and property, Defendant is liable pursuant to 18 U.S.C. § 2333(d) for, threefold any and all, damages that U.S. Plaintiffs have sustained as a result of such injuries, and the costs of this suit, including attorney's fees.

436.    At all relevant times, UNRWA knew it was supporting HAMAS and/or HEZBOLLAH's illicit conduct and terrorist activities, including HAMAS's terror financing that supported its terrorist acts, including the October 7th Attack, in which American citizens and others were not only injured, but were killed as a result of acts of international terror committed abroad.

437.    At all relevant times, UNRWA USA knew it was supporting HAMAS and/or HEZBOLLAH's illicit conduct and terrorist activities, including HAMAS's and HEZBOLLAH's terror financing that supported its terrorist acts.

438.    Upon information and belief, every donation from Defendant UNRWA USA to UNRWA involved a bank transfer with supporting documentation and receipts exchanged between the parties.

439.    Each of these transactions was made with the explicit and implicit understanding and agreement that the contributions were provided to UNRWA to advance the common objectives and agenda of the Defendants and HAMAS and HEZBOLLAH, including, but not limited to, the following: paying HAMAS and/or HEZBOLLAH members, employing HAMAS and/or HEZBOLLAH members, building schools that stored HAMAS weapons, and developing profoundly antisemitic curricula that calls for the murder of Jewish people.

440.    As a direct and proximate result of the willful, wrongful and intentional act of the Defendants hereinabove described, for which the Defendants are vicariously, jointly and severally liable for acts of terror that include the murdering or killing of Plaintiffs committed during acts of international terror, each of the Plaintiffs, each being a US national, have endured extreme mental

anguish, physical injury, pain and suffering, solatium, and loss of the affection, love and companionship of their beloved family members for which all the Plaintiffs (except as to Plaintiffs (i) Adin Gess, (ii) Noach Newman, (iii) Ray  Cooper and (iv) Ora Cooper who as individually named Plaintiffs bring this action on their own behalf as against only Defendant UNRWA and not against Defendant UNRWA USA), seek an award of damages and judgment against each of the Defendants, jointly and severally, to the fullest extent of the law.

441.    HAMAS's and HEZBOLLAH's terrorist attacks, including the terrorist attacks that injured Plaintiffs, were foreseeable results of UNRWA and UNRWA USA's support for HAMAS and/or HEZBOLLAH's terrorist activities.

## COUNT TWO
## PROVIDING MATERIAL SUPPORT TO TERRORISTS IN VIOLATION OF THE ANTI-TERRORISM ACT

442.    Plaintiffs repeat and reallege every allegation of the foregoing paragraphs as if fully set forth herein.

443.    Plaintiffs assert this claim against UNRWA and UNRWA USA for violations of 18 U.S.C. §§ 2333(a) and 2339A. Under 18 U.S.C. § 2333(a), a civil cause of action may be asserted by U.S. nationals who are killed or injured as a result of an "act of international terrorism." The phrase "international terrorism" is defined under 18 U.S.C. § 2331(1) to include, among other things, "violent acts or acts dangerous to human life that are a violation of the criminal laws of the United States." The criminal laws of the United States include 18 U.S.C. §2339A, which provides for criminal lability for persons who provide material support to terrorists.

444.    Plaintiffs are nationals of the United States who were injured in their persons or property by acts of international terrorism, or the estates, survivors or heirs of such U.S. nationals.

445.    Defendants provided material support to HAMAS and HEZBOLLAH and facilitated their efforts to engage in acts of international terrorism, including the attacks that killed and injured Plaintiffs and their family members.

446.    Defendants UNRWA and UNRWA USA provided material assistance to HAMAS and HEZBOLLAH and in doing so they knew that HAMAS and HEZBOLLAH were FTO's and SDGT's.  Further, at the time it was foreseeable to UNRWA and UNRWA USA that HAMAS and HEZBOLLAH would use that material assistance to prepare for or carry out terrorist attacks. Plaintiffs' injuries were a foreseeable result of the material support an substantial assistance that Defendants provided to HAMAS and HEZBOLLAH.

447.    The material assistance that Defendants UNRWA and UNRWA USA provided to HAMAS and HEZBOLLAH constitutes activities dangerous to human life that violated 18 U.S.C. §2339A, that were unlawful under state law or would have unlawful under state law if committed in the United States.

448.    The material assistance that Defendants UNRWA and UNRWA USA provided to HAMAS and HEZBOLLAH was dangerous to human life because that assistance provided material support to HAMAS and HEZBOLLAH in financing their violent attacks and recruiting individuals to carry out those attacks.  The financial assistance also provided material support for them to expand their purported charitable activities and thereby attract additional donors and recruits for terrorist operations.

449.    The material assistance that Defendants UNRWA and UNRWA USA provided to HAMAS and HEZBOLLAH appeared to be intended to (or was made with reckless disregard for the risk that it would): (a) intimidate or coerce the civilian populations of Israel and the United States; (ii) influence the policies of Israel and the United States by means of intimidation and

coercion; or (iii) affect the conduct of the governments of Israel and the United States by mass destruction, assassination, or kidnapping.

450.    The substantial financial assistance that Defendants UNRWA and UNRWA USA provided to HAMAS and HEZBOLLAH occurred primarily outside the United States and transcended national boundaries in that Defendants operated internationally in providing financial assistance to HAMAS and HEZBOLLAH.

451.    As a result, Defendants committed acts of international terrorism, as defined by 18 U.S.C. § 2331.

452.    HAMAS and HEZBOLLAH's acts of violence caused the injuries that Plaintiffs suffered and the deaths of Plaintiffs' family members.

453.    The material support and substantial assistance that Defendants provided to HAMAS and HEZBOLLAH was a substantial factor in causing Plaintiffs' injuries. Moreover, the October 7 Terrorist Attacks, as well as Plaintiffs' injuries in the attacks, were foreseeable results of the material support and substantial assistance that Defendants provided to HAMAS and HEZBOLLAH.

454.    As a direct and proximate result of the willful, wrongful and intentional act of the Defendants hereinabove described, for which the Defendants are vicariously, jointly and severally liable for acts of terror that include the murdering or killing of Plaintiffs committed during acts of international terror, each of the Plaintiffs, each being a US national, have endured extreme mental anguish, physical injury, pain and suffering, solatium, and loss of the affection, love and companionship of their beloved family members for which the Plaintiffs (except as to Adin Gess, Noach Newman, Ray Cooper and Ora Cooper who bring this action against only UNRWA and not

against UNRWA USA), seek an award of damages and judgment against each of the Defendants, jointly and severally, to the fullest extent of the law.

455.    As a direct and proximate result of the material support and substantial assistance that Defendants UNRWA and UNRWA USA knowingly provided to HAMAS and HEZBOLLAH, Plaintiffs have suffered significant physical, psychological, and emotional injuries.

### COUNT THREE
### INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS
**(State or Foreign Law)**

456.    Plaintiffs repeat and reallege every allegation of the foregoing paragraphs as if fully set forth herein.

457.    Plaintiffs suffered injury and were present within the "zone of danger" produced by Defendants' intentional actions.

458.    Defendants' knowing and intentional acts of providing aid and support to HAMAS and/or HEZBOLLAH facilitated HAMAS and/or HEZBOLLAH's commission, planning, and authorization of acts of international terrorism.

459.    As a direct and proximate result of the willful, wrongful and intentional act of the Defendants hereinabove described, for which the Defendants are vicariously, jointly and severally liable for acts of terror that include the murdering or killing of Plaintiffs committed during acts of international terror, each of the Plaintiffs, each being a US national, have endured extreme mental anguish, physical injury, pain and suffering, solatium, and loss of the affection, love and companionship of their beloved family members for which the Plaintiffs (except as to Adin Gess, Noach Newman, Ray Cooper and Ora Cooper who bring this action against only UNRWA and not

against UNRWA USA), seek an award of damages and judgment against each of the Defendants, jointly and severally, to the fullest extent of the law.

460.    As a direct, foreseeable, and proximate result of the conduct of Defendants as alleged hereinabove, Plaintiffs have suffered severe emotional distress, and therefore Defendants are liable to the Plaintiffs for their severe emotional distress and related damages.

## COUNT FOUR
## NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS
### (State or Foreign Law)

461.    Plaintiffs repeat and reallege every allegation of the foregoing paragraphs as if fully set forth herein.

462.    Plaintiffs suffered injury and were present within the "zone of danger" produced by Defendants' negligent actions.

463.    Defendants' negligent actions of providing aid and support to HAMAS and/or HEZBOLLAH facilitated HAMAS and/or HEZBOLLAH's commission, planning, and authorization of acts of international terrorism.

464.    As a direct and proximate result of the willful, wrongful and negligent acts of the Defendants hereinabove described, for which the Defendants are vicariously, jointly and severally liable for acts of terror that include the murdering or killing of Plaintiffs committed during acts of international terror, each of the Plaintiffs, each being a US national, have endured extreme mental anguish, physical injury, pain and suffering, solatium, and loss of the affection, love and companionship of their beloved family members for which the Plaintiffs (except as to Adin Gess, Noach Newman, Ray Cooper and Ora Cooper who bring this action against only UNRWA and not against UNRWA USA), seek an award of damages and judgment against each of the Defendants, jointly and severally, to the fullest extent of the law.

465.    As a direct, foreseeable, and proximate result of the conduct of Defendants as alleged hereinabove, Plaintiffs have suffered severe emotional distress, and therefore Defendants are liable to the Plaintiffs for their severe emotional distress and related damages.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray that this Court:

(a)    Accept jurisdiction over this action;

(b)    Enter judgment against Defendants, jointly and severally and in favor of Plaintiffs, and each of them, for compensatory damages in amounts to be determined at trial;

(c)    Enter judgment against Defendants, jointly and severally and in favor of Plaintiffs, and each of them, for punitive damages under state and foreign law in amounts to be determined at trial

(d)    Enter judgment against Defendants, jointly and severally and in favor of Plaintiffs for treble damages pursuant to 18 U.S.C. § 2333(a);

(e)    Enter judgment against Defendants, jointly and severally and in favor of Plaintiffs for any and all costs sustained in connection with the prosecution of this action, including prejudgment interest and an award of reasonable attorneys' fees pursuant to 18 U.S.C. § 2333(a);

(f)    Grant Plaintiffs leave to amend this Complaint in accordance with the Federal Rules of Civil Procedure and as the interest of justice may require;

(g)    For Trial by Jury on all issues so triable; and

(h)    Grant such other and further relief as justice requires.

PLAINTIFFS DEMAND A TRIAL BY JURY ON ALL ISSUES SO TRIABLE.

Dated: July 31, 2025                    Respectfully submitted,

                                        /s/ Richard D. Heideman
                                        Richard D. Heideman
                                        Noel J. Nudelman
                                        Tracy Reichman Kalik
                                        Joseph H. Tipograph
                                        HEIDEMAN NUDELMAN & KALIK, P.C.
                                        5335 Wisconsin Avenue, NW, Suite 440
                                        Washington, DC 20015
                                        (202) 463-1818

                                        *Counsel for All Plaintiffs*

                                        Samuel Silverman, Esq.
                                        The Silverman Law Firm, PLLC
                                        16 Squadron Boulevard
                                        New York, NY 10956
                                        (845) 517-0351

                                        *Co-Counsel as to certain of the Fuld
                                        Plaintiffs and the Sha'arabany, Shani and
                                        Hankin Plaintiffs*

                                        Mark Goldfeder
                                        Ben Schlager
                                        Goldfeder & Terry, LLC
                                        1718 General George Patton Drive
                                        Brentwood, TN 37027
                                        (917) 301-8746

                                        *Co-Counsel to the Gess and Newman
                                        Plaintiffs*

                                        Robert W. Seiden
                                        Amiad Kushner
                                        Jake Nachmani
                                        Dov B. Gold
                                        Seiden Law
                                        322 8th Ave Suite 1200
                                        New York, NY 10001
                                        (646) 766-1703

                                        Steven R. Perles
                                        Joshua K. Perles
                                        Edward MacAllister

Perles Law Firm, PC
816 Connecticut Avenue, NW
12th Floor
Washington DC 20006
(202) 955-9055

*Co-Counsel to the Raanan, Benveniste, Ohnona, Ludmir, Bosi, Ben Aderet, Shoulian, Segal, and Mathias -Troen Plaintiffs*