## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

ESTATE OF SIVAN SHA'ARABANY, et al.       :
                                          :
Plaintiffs                                :
                                          :   Civil Action No. 1:25-cv-02490-RCL
         v.                               :
                                          :
UNITED NATIONS RELIEF AND WORKS           :
AGENCY FOR PALESTINE REFUGEES IN          :
THE NEAR EAST (UNRWA), et al.             :
                                          :
         Defendants.                      :
……………………………………………………:

## PLAINTIFFS' MEMORANDUM OF LAW
## IN OPPOSITION TO DEFENDANT UNRWA'S MOTION TO DISMISS

Dated:  February 13, 2026          Respectfully Submitted,

                                   HEIDEMAN NUDELMAN & KALIK P.C.


                                   By:      /s/ Tracy R. Kalik_____
                                            /s/Joseph H. Tipograph_____
                                            Richard D. Heideman (No. 377462)
                                            Noel J. Nudelman (No. 449969)
                                            Tracy Reichman Kalik (No. 462055)
                                            Joseph H. Tipograph (No.997533)
                                            HEIDEMAN NUDELMAN & KALIK, PC
                                            5335 Wisconsin Avenue, NW; Suite 440
                                            Washington, DC  20015
                                            Telephone: 202.463.1818
                                            Facsimile: 202.463.2999

# TABLE OF CONTENTS

TABLE OF CONTENTS ............................................................................................................. i

TABLE OF AUTHORITIES ..................................................................................................... 1

INTRODUCTION ....................................................................................................................... 4

   I.    LEGAL FRAMEWORK GOVERNING IMMUNITY ................................................... 8

   II.   UNRWA IS NOT IMMUNE UNDER THE IOIA ......................................................... 10

     A.   UNRWA is not a "Public International Organization" Under § 288 ............................ 10

     B.   The U.S. Does Not Participate in UNRWA ................................................................. 11

     C.   The U.S. is Not Authorized to Participate in UNRWA ................................................. 20

     D.   UNRWA Is Not Designated As An International Organization ................................... 21

   III.   UNRWA IS NOT IMMUNE UNDER ANY RELEVANT TREATY ........................ 22

     A.   The CPIUN Does Not Immunize UNRWA ................................................................. 22

     B.   The UN Charter Does Not Immunize UNRWA ........................................................... 24

     C.   The Cases Upon Which UNRWA Relies Are Unavailing ........................................... 25

   IV.   UNRWA CANNOT ESTABLISH DERIVATIVE IMMUNITY ............................... 27

   V.   UNRWA'S OTHER RULE 12 ARGUMENTS FAIL ................................................... 28

CONCLUSION......................................................................................................................... 29

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Al-Bihani v. Obama*,
  619 F.3d 1 (D.C. Cir. 2010) ........................................................................................ 9
*Belhas v. Ya'alon*,
  515 F.3d 1279 (D.C. Cir. 2008) ................................................................................ 28
*Bisson v. United Nations*,
  2007 WL 2154181 (S.D.N.Y. July 27, 2007) ............................................... 13, 26, 27
*Bob Jones Univ. v. United States*,
  461 U.S. 574 (1983) .................................................................................................. 18
*Broidy Cap. Mgmt. LLC v. Muzin*,
  12 F.4th 789 (D.C. Cir. 2021) ........................................................................ 8, 27, 28
*Chamber of Commerce v. Reich*,
  74 F.3d 1322 (D.C. Cir. 1996) .................................................................................. 22
*Crist v. Republic of Turkey*,
  995 F. Supp. 5 (D.D.C. 1998) ................................................................................. 8, 9
*Diggs v. Richardson*,
  555 F.2d 848 (D.C. Cir. 1976) ................................................................................... 9
*Dole Food Co. v. Patrickson*,
  538 U.S. 468, 4(2003) ........................................................................................ passim
*El Omari v. Int'l Crim. Police Org. (Interpol)*,
  35 F.4th 83 (2d Cir. 2022) ........................................................... 10, 11, 14, 16
*Estate of Siman Tov v. UNRWA*,
  2025 WL 2793701 (S.D.N.Y. Sept. 30, 2025) .................................................... passim
*FDA v. Brown & Williamson Tobacco Corp.*,
  529 U.S. 120 (2000) ............................................................................................ 11, 18
*Flaherty v. Ross*,
  373 F. Supp. 3d 97 (D.D.C. 2019) ............................................................................ 21
*Flores v. S. Peru Copper Corp.*,
  414 F.3d 233 (2d Cir. 2003) ....................................................................................... 9
*Freedom Watch, Inc. v. OPEC*,
  766 F.3d 74 (D.C. Cir. 2014) .................................................................................... 29
*Fuld v. Palestine Liberation Org.*,
  145 S. Ct. 2090 (2025) ........................................................................................ 19, 29
*Hunter v. United Nations*,
  6 Misc. 3d 1008(A), 800 N.Y.S.2d 347 (Sup. Ct. 2004) .................................... 13, 26
*In re OPM Data Sec. Breach Litig.*,
  928 F.3d 42 (D.C. Cir. 2019) .............................................................................. 27, 28
*Jam v. Int'l Fin. Corp.*,
  586 U.S. 199, 2(2019); ......................................................................................... passim
*Jordan v. Medley*,
  711 F.2d 211 (D.C. Cir. 1983) .................................................................................. 28
*Lempert v. Rice*,
  956 F. Supp. 2d 17 (D.D.C. 2013) ..................................................................... 13, 26

*Lorillard v. Pons*,
   434 U.S. 575 (1978)..................................................................................................... 18
*Medellín v. Texas*,
   552 U.S. 491 (2008)................................................................................................. 9, 18
*Phoenix Consulting, Inc. v. Republic of Angola*,
   216 F.3d 36 (D.C. Cir. 2000)........................................................................................ 8
*Republic of Austria v. Altmann*,
   541 U.S. 677 (2004)..................................................................................................... 28
*Rodriguez v. Pan Am. Health Org.*,
   29 F.4th 706 (D.C. Cir. 2022)...................................................................................... 24
*Russello v. United States*,
   464 U.S. 16 (1983)....................................................................................................... 18
*Sadikoglu v. U.N. Dev. Programme*,
   2011 WL 4953994 (S.D.N.Y. Oct. 14, 2011)............................................... 13, 26, 27
*Samantar v. Yousuf*,
   560 U.S. 305 (2010)..................................................................................................... 28
*Sosa v. Alvarez-Machain*,
   542 U.S. 692 (2004)....................................................................................................... 9
*TRW Inc. v. Andrews*,
   534 U.S. 19 (2001)......................................................................................... 18, 19, 22
*U.S. Dep't of Navy v. FLRA*,
   665 F.3d 1339 (D.C. Cir. 2012).................................................................................. 19
*United States v. Sineneng-Smith*,
   590 U.S. 371 (2020)..................................................................................... 10, 12, 20
*United States v. Worrell*,
   2021 WL 2366934 (D.D.C. June 9, 2021)................................................... 10, 12, 20
*Webster v. Fall*,
   266 U.S. 507 (1925)..................................................................................................... 27
*Werner v. Miller Tech. Mgmt., L.P.*,
   831 A.2d 318 (Del. Ch. 2003).............................................................................. 11, 14
*Whitney v. Robertson*,
   124 U.S. 190 (1888)................................................................................................... 6, 9
*Youngstown Sheet & Tube Co. v. Sawyer*,
   343 U.S. 579 (1952)..................................................................................... 19, 20, 22
*Zivotofsky v. Kerry*,
   576 U.S. 1 (2015)......................................................................................................... 20

**Statutes**

18 U.S.C. § 2334(a) ........................................................................................................... 29
22 U.S.C. § 276c-5(c)(1)–(2) ............................................................................................. 12
22 U.S.C. § 283j ................................................................................................................. 12
22 U.S.C. § 286a ................................................................................................................. 12
22 U.S.C. §§ 287(a), 288, 288a(b) ............................................................................. passim
2 U.S.C. §§ 288, 288a(b). ........................................................................................... passim
22 U.S.C. §§ 289–289c ...................................................................................................... 12
22 U.S.C. §§ 289a–289c .................................................................................................... 14

Pub. L. No. 111-32, § 1114, 123 Stat. 1859, 1905 (2009)....................................................... 17-19
Pub. L. No. 113-235, § 7048(c)–(d), 128 Stat. 2130, 2660–61 (2014).................................... 17-19
Pub. L. No. 116-260, § 7048(c)–(d), 134 Stat. 1182, 1789–91 (2020).................................... 17-19
Pub. L. No. 117-328, § 7048(c)–(d), 136 Stat. 4459, 5070–71 (2022).................................... 17-19
Pub. L. No. 117-103, § 7048(c)–(d), 136 Stat. 49, 663–64 (2022)........................................... 17-19
Pub. L. No. 118-47..................................................................................................................... 20

## Treaties

Agreement Between Egypt & UNRWA (Sept. 12, 1950) ........................................................ 23
Agreement Between Jordan & UNRWA (Mar. 14, 1951)....................................................... 23
Constitution of the International Refugee Organization ........................................................ 14, 15
Constitution of UNESCO ............................................................................................................ 17
Convention on the Privileges and Immunities of the United Nations  ................................. passim
Exchange of Notes Constituting an Over-All Agreement Between Lebanon & UNRWA (Nov.
    26, 1954) ................................................................................................................................. 23
Protocol Relating to the Status of Refugees ............................................................................. 25
The 1951 Convention Relating to the Status of Refugees ................................................ 14, 15, 25
United Nations Charter ............................................................................................... 7, 8, 24, 25
United Nations Juridical Yearbook 1968, ch. II ..................................................................... 23, 24
U.S. Dep't of State, Bureau of Population, Refugees, & Migration, *Framework for Cooperation
    Between the United States Government and the United Nations Relief and Works Agency for
    Palestine Refugees in the Near East*  ..................................................................................... 24

## Executive Orders

Exec. Order No. 9698 .......................................................................................................... 21, 22
Exec. Order No. 10864 ............................................................................................................. 22
Exec. Order No. 14199 ...................................................................................................... passim

## Other Authorities

Congressional Research Service, U.S. Foreign Aid to the Palestinians, (Dec. 12, 2018) ........... 15
E.S.C. Res. 672(XXV) (Apr. 30, 1958).................................................................................... 14
G.A. Res. 302(IV)....................................................................................................................... 15
G.A. Res. 60/251......................................................................................................................... 17
H.R. Rep. No. 79-1203 ......................................................................................................... 10, 14
*Law to Cease UNRWA's Activities*, 5785-2024 (Isr.)................................................................ 24
Library of Congress, *Israel: Law to Cease UNRWA Activities Amended* (Dec. 29, 2025)  ........ 24
S. Exec. Rep. No. 91-17 (1970).......................................................................................... 6, 23
*International Organizations: Accountability and Responsibility*,
    97 ASIL Proc. 231 (2003)....................................................................................................... 12
*Restatement (Third) of the Foreign Relations Law of the United States* § 115 ............................. 9
U.S. DEP'T OF STATE, REP. To CONGRESS on UNRWA VETTING FOR IMPARTIALITY
    ..................................................................................................................................................19

## INTRODUCTION

Plaintiffs are American citizens who were killed, injured, and/or taken hostage by Hamas, Hezbollah, and other U.S.-designated terrorist organizations, or are immediate family members of such victims. Am. Compl. ¶¶ 25–204. Plaintiffs sued the United Nations Relief and Works Agency for Palestine Refugees in the Near East ("UNRWA") under the Anti-Terrorism Act for injuries arising from international terrorism. *Id*. UNRWA's culpability is not peripheral. For decades, UNRWA's policies and operations—particularly in Gaza—have fostered and entrenched a symbiotic partnership with Hamas, including through staffing, facilities, logistics, and programming that materially supported and assisted Hamas's capabilities and advanced its ideology. *Id*. ¶¶ 217, 221–225, 228, 249, 251, 262–267, 282–286, 287–318, 319–347.

The Amended Complaint alleges, *inter alia*, that UNRWA's structure and mandate intentionally perpetuated refugee status generationally and incubated a grievance culture, which UNRWA then reinforced through a heavily funded education system that, for decades, taught that territorial "rights" in Israel could be pursued violently through force of arms. *Id*. ¶¶ 211–218, 221–225, 228, 319–347. The Complaint further alleges that UNRWA forged a deeply entrenched partnership with Hamas that benefited Hamas financially and operationally, including by employing Hamas operatives and supporters, enabling Hamas's consolidation of control in Gaza, and permitting militant use of UNRWA facilities. *Id.* ¶¶ 247–248, 251, 262–267, 282–286, 287–311. By 2018, UNRWA policies allegedly enriched Hamas and facilitated Hamas's access to U.S. cash dollars otherwise prohibited to it. *Id*. ¶¶ 312–318.

On, after and since October 7, 2023, Hamas led a mass attack in which approximately 1,200 people were murdered, thousands injured, acts of mass rape committed, and more than 250 hostages taken. *Id.* ¶ 348. The Complaint alleges that UNRWA personnel celebrated the attack as

the fulfillment of the "return" UNRWA had encouraged, and that, in the months that followed, UNRWA's complicity was further revealed—through findings of tunnels near UNRWA schools, use of UNRWA headquarters for power and weapons storage, hostage accounts describing captivity by UNRWA teachers or in UNRWA facilities, and staff participation in the raid itself. *Id.* ¶¶ 345–350, 356.

An independent review commissioned by the United Nations concluded that UNRWA's internal governance and oversight mechanisms were inadequate to ensure neutrality compliance and left the Agency structurally vulnerable to infiltration and misuse. *Independent Review of Mechanisms and Procedures to Ensure Adherence by UNRWA to the Humanitarian Principle of Neutrality*, at 8 (Apr. 22, 2024) attached hereto as Exhibit 1

Those findings underscore the structural problem at the heart of this motion: UNRWA seeks the extraordinary benefit of immunity from judicial review, yet it is structurally insulated from member-state governance and therefore lacks the statutorily required accountability mechanisms that justify extending immunity to non-sovereign organizations.

That structural reality is dispositive under U.S. law. Immunity under the International Organizations Immunities Act ("IOIA") is not a status conferred by UN creation or General Assembly labeling. It is a statutory privilege conditioned on Congress's express requirements that the organization be: (1) a public international organization (2) in which the United States participates (3) pursuant to authorization by treaty or Act of Congress, and (4) designated by Executive Order. 22 U.S.C. §§ 288, 288a(b). Those predicates must be satisfied at the time suit is filed, and failure to satisfy any one of them ends the inquiry. *Jam v. Int'l Fin. Corp.*, 586 U.S. 199, 209–10 (2019); *Dole Food Co. v. Patrickson*, 538 U.S. 468, 478 (2003).

UNRWA cannot satisfy any of the four requirements:

(1) It is not governed by a member-state executive board or comparable structure through which the United States can participate as a member;

(2) the United States was not participating in UNRWA at the time this action was filed, and Congress never treated UNRWA as an organization in which the United States participates under U.S. law;

(3) UNRWA falls outside the scope of UN-affiliated entities for which Congress authorized U.S. participation; and

(4) UNRWA has never been designated—by name or categorical reference—by Executive Order as entitled to IOIA immunities, while its lack of participation status has now been reinforced by Executive Order 14199.

Accordingly, UNRWA is not eligible for immunity under the IOIA.

Nothing in the Convention on the Privileges and Immunities of the United Nations ("CPIUN") compels a different result. The CPIUN's sole grant of entity-level immunity applies to "the United Nations." CPIUN art. II, § 2, Feb. 13, 1946, 21 U.S.T. 1418, 1 U.N.T.S. 15. It does not purport to confer immunity on every program, agency, or entity created by the General Assembly, nor does it displace the domestic statutory framework Congress enacted to govern when a distinct organization may claim immunity in United States courts.

At ratification, Congress did not understand the CPIUN to expand entity-level immunity beyond what the IOIA already supplied. S. Exec. Rep. No. 91-17, at 5–6 (1970). Courts must therefore read the CPIUN and the IOIA harmoniously unless Congress clearly expressed an intent to displace the statute. *Whitney v. Robertson*, 124 U.S. 190, 194 (1888); *Jam*, 586 U.S. at 208–11. Nothing in the CPIUN's text, structure, or ratification history reflects such displacement.

Moreover, where courts have extended CPIUN-based immunity beyond the United Nations itself to UN-affiliated organizations, they have generally done so in reliance on affirmative Executive Branch support—consistent with the Executive's primacy in foreign affairs. Here, that principle cuts decisively against UNRWA: the United States has opposed UNRWA's immunity claim, as reflected in its amicus brief, filed in the Second Circuit, urging reversal of *Estate of Siman Tov v. UNRWA*, 2025 WL 2793701 (S.D.N.Y. Sept. 30, 2025) *Siman Tov*, the non-binding Southern District of New York decision as to UNRWA's claimed immunity. Brief for the United States as Amicus Curiae at 13, *Estate of Tamar Kedem Siman Tov, et al. v. United Nations Relief & Works Agency for Palestine Refugees in the Near East*, No. 25-2837, Dkt. 37.1 (2d Cir. Jan. 29, 2026) ("U.S. Amicus Br.") attached hereto as Exhibit 2.

*Siman Tov* is not persuasive and should not be followed. There, the district court held that CPIUN Article IV § 11 "plainly" confers immunity on UNRWA as a "subsidiary organ." But Article IV § 11 does not confer immunity on any entity at all. It grants privileges and immunities to "*Representatives of Members* to the principal and subsidiary organs of the United Nations," not to the organs themselves. CPIUN art. IV, § 11 (emphasis added). *Siman Tov* reached its result only by excising the grammatical subject of the provision—"Representatives of Members"— and treating the remaining modifier ("subsidiary organs") as the recipient, thereby transforming a clause that protects individuals into a silent, implied grant of entity-level immunity. *Siman Tov* therefore does not apply the treaty's plain text; it reconstructs it, effectively manufacturing for UNRWA an immunity that no treaty, statute, or Executive designation has ever conferred.

The Charter itself limits immunity to what is "necessary for the fulfillment of [the United Nations'] purposes." U.N. Charter art. 105. Those purposes include maintaining international peace and security, promoting international cooperation and respect for human rights, and serving

as a center for harmonizing the actions of nations—objectives Plaintiffs allege UNRWA's structure, policies and conduct have undermined rather than advanced. U.N. Charter art. 1.

That conclusion is reinforced by the United Nations' public repudiation of UNRWA's entanglement with HAMAS. Far from ordering, authorizing, or ratifying the acts alleged here, the UN's response confirms UNRWA cannot claim its immunity derivatively under U.S. law.

UNRWA's remaining Rule 12(b)(2), (4), and (5) arguments are derivative of its immunity claim. If UNRWA is not immune from suit, it is not immune from service, and the Court may exercise personal jurisdiction in this Anti-Terrorism Act action. The motion should be denied.

I.    **LEGAL FRAMEWORK GOVERNING IMMUNITY**

The burden of establishing immunity—including demonstrating that the threshold statutory predicates are satisfied—rests with the party asserting it. *Jam*, 586 U.S. at 209–10 (linking immunity under the IOIA to FSIA standards); *Broidy Cap. Mgmt. LLC v. Muzin*, 12 F.4th 789, 792 (D.C. Cir. 2021) ("[A] private party claiming foreign sovereign immunity bears a *heavy* burden.") (emphasis added); *see also Crist v. Republic of Turkey*, 995 F. Supp. 5, 10 (D.D.C. 1998) (placing the burden on the defendant to establish sovereign status). Where immunity is asserted in connection with a motion to dismiss, a court must resolve the operative jurisdictional facts—going beyond the pleadings where necessary—to determine whether the statutory predicates for immunity are satisfied. *Phoenix Consulting, Inc. v. Republic of Angola*, 216 F.3d 36, 40 (D.C. Cir. 2000).

The immunity conferred upon the United Nations is addressed both in U.S. statutes and treaties. 22 U.S.C. §§ 287(a), 288, 288a(b); CPIUN art. II, § 2; U.N. Charter art. 105. Where both treaties and statutes have domestic legal affect, courts must first seek to read statutes and treaties harmoniously, reaching a result that gives effect to both unless Congress clearly expresses an intent

to displace one. *See Whitney*, 124 U.S. at 194. The interpretation of each instrument is necessarily governed by controlling principles of United States law. *See Jam*, 586 U.S. at 203–06.

Congress implemented international organization immunity through the IOIA, which provides that organizations that satisfy the IOIA's definition of "international organizations. . .shall enjoy the same immunity from suit and every form of judicial process as is enjoyed by foreign governments," subject to modification by Congress or the Executive. 22 U.S.C. §§ 288, 288a(b). An organization's failure to qualify as an "international organization" ends the inquiry. *See e.g., Jam*, 586 U.S. at 209–10; *Crist*, 995 F. Supp. at 10.

Thus, only a treaty that reflects a clear congressional intent to displace the IOIA's definition of an "international organization" may confer immunity on an organization that otherwise fails to satisfy the definition. *See Jam*, 586 U.S. at 208–11. Such treaty must be "self-executing" or have been implemented by Congress to bind U.S. courts domestically. *Medellín v. Texas*, 552 U.S. 491, 509–10 (2008). In the absence of clear displacement by self-executing treaty, Courts may not consult non-binding international instruments to supply, relax, or override statutory eligibility requirements Congress has imposed. *Id.*; *Restatement (Third) of the Foreign Relations Law of the United States* § 115 cmt. a (1987). It is immaterial whether international instruments may bind Member States at the international level, such instruments do not provide domestically enforceable law absent congressional implementation. *Id.*; *Diggs v. Richardson*, 555 F.2d 848, 851–52 (D.C. Cir. 1976). Instruments that are expressly non-binding at the international level—such as United Nations General Assembly resolutions—have no domestic legal effect and offer no persuasive value as tools for interpreting U.S. domestic law. *Sosa v. Alvarez-Machain*, 542 U.S. 692, 734–35 (2004); *see also Flores v. S. Peru Copper Corp.,* 414 F.3d 233, 260, n. 37 (2d Cir. 2003); *Al-Bihani v. Obama*, 619 F.3d 1, 6 (D.C. Cir. 2010) (Brown, J., concurring in denial of reh'g en banc).

II.     **UNRWA IS NOT IMMUNE UNDER THE IOIA**

The IOIA defines an "international organization" as: (1) a public international organization; (2) in which the United States participates (3) pursuant to a treaty or under the authority of an Act of Congress authorizing such participation or making an appropriation for such participation; and (4) which has been designated by the President by Executive Order as entitled to IOIA immunities. *See El Omari v. Int'l Crim. Police Org. (Interpol)*, 35 F.4th 83, 87–88 (2d Cir. 2022) (quoting 22 U.S.C. § 288). Failure to satisfy any one of these predicates compels a finding of no immunity.   *Jam*, 586 U.S. at 209–10 (2019). As these predicates concern determinations of present legal status, they must all be actively satisfied at the time a lawsuit is filed for a defendant to be eligible for IOIA immunity. *See Id.; Dole Food*, 538 U.S. at 478.   As set forth below, UNRWA fails to satisfy any of the four requirements.

A.     **UNRWA is not a "Public International Organization" Under § 288**

A "public international organization" ("PIO") is an entity structured to be composed of governments acting as members, through which states may participate institutionally to advance public interests. *El Omari*, 35 F.4th. at 87–89*; see also* H.R. Rep. No. 79-1203, at 1 (1945) (explaining that under IOIA an "international organization" is intended to be "specifically limited to public international organizations, i.e., those which are composed of governments *as members— and of these, to those of which the United States is a member* and which shall have been designated by the President by Executive order.") (emphasis added).

UNRWA does not argue that it is a "public international organization" and therefore waives the argument. *See United States v. Sineneng-Smith*, 590 U.S. 371, 375–76 (2020).[1]

---

[1] Even where a party fails to engage a threshold statutory issue, courts may resolve it to clarify the scope of executive authority and avoid recurring error. *United States v. Worrell,* 2021 WL 2366934, at *10, n.8 (D.D.C. June 9, 2021).

Nevertheless, as UNRWA lacks any governance structure through which governments act as members, as a matter of law UNRWA cannot be a PIO and cannot be immune under the IOIA. *El Omari*, 35 F.4th. at 87–89*; Appendix A. While the General Assembly has established an Advisory Commission ("AdComm") to UNRWA, AdComm is expressly limited to providing recommendations to UNRWA and does not allow for member state participation in UNRWA itself. *See* Appendix A; *Werner v. Miller Tech. Mgmt., L.P.*, 831 A.2d 318, 328 (Del. Ch. 2003) ("The suggestion that an advisory board participates in management simply because it contributes information to the decision-making process is untenable."). By its own rules, the AdComm exists solely to "advise and assist" the Commissioner-General and lacks authority to adopt binding decisions, approve budgets, direct operations, or act on behalf of the Agency. Appendix A ¶¶ 1, 3. Agenda control is monopolized by the Commissioner-General, with no mechanism for states to place items for a vote *Id*. ¶ 2.

Moreover, AdComm itself is hardly "public", as meetings are conducted in private, with restrictions on who may attend, no requirement to publish records, conclusions, or decisions, and UNRWA maintains no public archive comparable to those produced by executive boards governing other UN operational agencies. *Id*. ¶¶ 4, 5.

## B.    The U.S. Does Not Participate in UNRWA

The IOIA conditions immunity on the organization being one "in which the United States participates." 22 U.S.C. § 288. As the IOIA is found in Chapter 7 of Title 22—the statutory framework governing U.S. participation in international organizations—the term "participates" should be read consistently with Congress's usage across that chapter. *See FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 133 (2000).

11

Across Chapter 7, Congress uses "participation" to describe formal, institutional involvement in an organization's governance machinery, typically through legally recognized membership, designated representatives, voting roles, or other structured decision-making authority.[2] The specific mechanisms vary depending on the nature of the body involved, in some contexts participation entails financial governance through executive directors and capital-based voting; in others it entails treaty-based supervisory obligations; and in others it entails representation in organs and bodies.[3] The common thread is the same: "participation" reflects a formal governance relationship—not a mere funding relationship.[4]

UNRWA does not argue that the United States participates in UNRWA and therefore waives this argument as well. *See Sineneng-Smith*, 590 U.S. at 375–76; *Worrell,* 2021 WL 2366934, at *10, n.8.

In any event, UNRWA's immunity claim fails the IOIA's participation requirement. That conclusion is evident in two independent ways. First, when UNRWA's governance structure is compared to other UN operational agencies and refugee institutions, it becomes clear that UNRWA does not provide the structural mechanisms through which member-state participation is ordinarily exercised—mechanisms that supply the accountability and institutional discipline that justify immunity in the absence of judicial review.[5] Second, the political branches' consistent treatment of UNRWA confirms the same point: Congress and the Executive Branch do not view

---

[2] See 22 U.S.C. § 287(a) (authorizing U.S. representation "in any organ, commission, or other body of the United Nations"); 22 U.S.C. §§ 289–289c (providing for U.S. representatives and alternates to the International Refugee Organization); 22 U.S.C. § 286a (providing for U.S. Governors and Alternate Governors to the Bretton Woods institutions); 22 U.S.C. § 283j (implementing U.S. participation in the International Monetary Fund through designated U.S. officials and Executive Directors).

[3] *See* 22 U.S.C. §§ 286a, 283j; 22 U.S.C. §§ 289–289c; 22 U.S.C. § 287(a).

[4] *See* 22 U.S.C. § 276c-5(c)(1)–(2) (distinguishing "participation" in CEPI, including "through the governance of CEPI," from planned "financial contributions").

[5] See William E. Holder, *International Organizations: Accountability and Responsibility*, 97 ASIL Proc. 231, 232–36 (2003) (explaining that organizational charters allocate authority among governing organs, that executive boards answer to member states, thus accountability is exercised principally through governance structures rather than courts).

the United States's engagement with UNRWA as constituting "participation." Their characterizations confirm that, as a matter of U.S. law and practice, the United States has never participated in UNRWA within the meaning of § 288.

1.  <u>UNRWA Does Not Allow for U.S. Participation</u>

To illustrate that UNRWA does not allow for U.S. participation under IOIA, two points of comparison are instructive. First, UNRWA relies on a line of cases in which UN operational agencies were found immune; examining those entities' governance structures shows the institutional features through which the United States and other member states formally participate. Second, because UNRWA operates in the refugee-administration space, comparison to other refugee institutions in which the United States has participated illustrates the additional treaty-based supervision and governance mechanisms that have historically accompanied U.S. participation in that context. In both comparisons, UNRWA's structure stands apart: it lacks the governance and treaty architecture present in the entities that have been treated as qualifying for immunity.

Most U.N. operational agencies that have been found to be immune are controlled by executive boards comprised of member states that allocate seats regionally, rotate membership, permit agenda initiation by states, conduct public proceedings, adopt binding decisions, approve budgets, invite non-board members to participate in deliberations at meetings, and generate formal institutional records attributable to the organization itself. *Lempert v. Rice*, 956 F. Supp. 2d 17 (D.D.C. 2013) (UNDP); *Sadikoglu v. U.N. Dev. Programme*, 2011 WL 4953994 (S.D.N.Y. Oct. 14, 2011) (UNDP); *Bisson v. United Nations*, 2007 WL 2154181, at *2 (S.D.N.Y. July 27, 2007) (WFP); *Hunter v. United Nations*, 6 Misc. 3d 1008(A), 800 N.Y.S.2d 347 (Sup. Ct. 2004) (UNICEF); Appendix C ¶¶ 1–7 (UNDP); Appendix D ¶¶ 1–8 (UNICEF); World Food Programme,

General Rules, rr. 1–3, 12–14, 18–22 (governance, voting, agenda authority, and institutional decision-making).

In stark contrast, UNRWA lacks the executive governing body through which Member States may participate as members. *See* G.A. Res. 302(IV), ¶¶ 7–9; Appendix A. From inception, authority over UNRWA has been vested exclusively in a single official—the Commissioner-General. *Id.* As stated above, the AdComm created alongside UNRWA does not supply the missing governance, as it does not adopt binding decisions, approve budgets, direct operations, or act on behalf of the Agency. *Werner,* 831 A.2d at 328 ("The ability to offer ideas cannot be construed as an ability to manage the affairs..."). These features reflect the inverse of the accountability hallmarks embedded in operational agencies that qualify as public international organizations under U.S. law. See 22 U.S.C. § 288; H.R. Rep. No. 79-1203, at 1 (1945); *El Omari*, 35 F.4th at 87–89.  In fact, UNRWA's lack of governance has been identified by an independent commission as giving raise to the precise conduct at issue here.[6]

In refugee administration, U.S. participation in international organizations has always included treaty-based obligations in addition to governance.  U.S. participation both in the International Refugee Organization ("IRO") and the United Nations High Commissioner for Refugees ("UNHCR") required treaty-based supervision with binding legal constraints precisely because of the sovereign interests that refugee administration implicates: admission, resettlement, burden-sharing, and protection obligations.[7]

---

[6] Ex.1, *Independent Review of Mechanisms and Procedures to Ensure Adherence by UNRWA to the Humanitarian Principle of Neutrality* at 8, (Apr. 22, 2024)

[7] *See* 22 U.S.C. §§ 289a–289c; Constitution of the International Refugee Organization arts. I, XII,  Dec. 15, 1946, 62 Stat. 3037 ("IRO Constitution"); G.A. Res. 62 (I), Establishment of the International Refugee Organization (Dec. 15, 1946); The 1951 Convention Relating to the Status of Refugees, arts. 1, 35 ("Refugee Convention"), E.S.C. Res. 672(XXV), ¶¶ 1–2, U.N. Doc. E/RES/672(XXV) (Apr. 30, 1958); Appendix B.

UNRWA, on the other hand, is not bound by any treaty and that is by design. Under the Refugee Convention, those receiving services from UNRWA are explicitly and categorically denied the Conventions protections. Refugee Convention art. 1D. UNRWA was conceived as a provisional temporary agency whose functions would ultimately be folded into UNHCR's treaty-based protection regime. *Id.* Far from providing alternative protection, the U.S. government observes that by jettisoning the standards of Refugee Protection, UNRWA has perpetuated, created and expanded refugee-status among its service population, most of which it now fails to protect.[8] In 2018, this led the State Department to conclude that "the fundamental business model and fiscal practices that have marked UNRWA for years—tied to UNRWA's endlessly and exponentially expanding community of entitled beneficiaries—is simply unsustainable and has been in crisis mode for many years," and therefore the U.S. would cease further funding "to this irredeemably flawed operation" absent structural reform.[9]

Despite the lack of governance structures employed by all other operational agencies, the shedding of treaty protections employed by other refugee agencies and the observable consequences of both, UNRWA's mandate has been repeatedly renewed preserving the same structural design: administration by a Commissioner-General, operation outside the Refugee Convention, and denial of executive member-state governance. *See* G.A. Res. 302(IV); Appendix A. Each such renewal thus reaffirms the decision to administer refugee assistance without accountable member-state participation—governance and treaty obligations—thereby negating the structural premises on which immunity for international organizations is justified. *See* G.A. Res. 302(IV) (subsequent renewals); Appendix A; Refugee Convention, arts. 1, 35; IRO

---

[8] Congressional Research Service, U.S. Foreign Aid to the Palestinians, at 22 (Dec. 12, 2018), https://sgp.fas.org/crs/mideast/RS22967.pdf (noting UNRWA was created to serve approximately 860,000 refugees, but now claims responsibility for 5.9 million, but providing services to approximately only 2.5 million)
[9] *Id.*

Constitution arts. I, XII; *Jam*, 586 U.S. at 208–11. Under the IOIA, that choice is dispositive. *See* 22 U.S.C. § 288; *El Omari*, 35 F.4th at 87–89; *Jam*, 586 U.S. at 209–11. An entity that lacks a governing body through which governments act as members cannot satisfy § 288's threshold requirement, regardless of its humanitarian mission, UN affiliation, or duration of operation. *Id.* Accordingly, because UNRWA has been structurally maintained without member-state governance capacity, the U.S. does not and cannot participate in UNRWA and UNRWA is thus ineligible for immunity. *See* 22 U.S.C. § 288.

2.  The Political Branches Confirm that the U.S. Does Not Participate in UNRWA

The Executive Branch and Congress share a common understanding that UNRWA is not an organization in which the United States "participates" within the meaning of the IOIA. This is reflected in the way each of the political branches have structured enactments dealing with UNRWA and other UN affiliated entities.  In each instance, as set forth below, the political branches use the term "participation" to describe U.S. engagement only with entities that allow for member state membership and governance, while in adjacent provisions they describe U.S. engagement with UNRWA only as "funding" and not as "participation".

On February 4, 2025—months before this action was filed—President Trump issued an Executive Order barring further use of U.S. funds for UNRWA, terminating U.S. "participation" in UN Human Rights Council ("UNHRC"), reviewing U.S. "participation" in United Nations Educational, Scientific and Cultural Organization ("UNESCO"), and initiating a comprehensive review of U.S. support for international organizations.[10] *See Dole Food*, 538 U.S. at 478. The Executive Order is intentionally structured in a way that addresses UNRWA as an external aid

---

[10] Exec. Order No. 14199, *Withdrawing the United States from and Ending Funding to Certain United Nations Organizations and Reviewing United States Support to All International Organizations* at §§ 2-3, 90 Fed. Reg. 9,275 (Feb. 10, 2025).

recipient, in a section entitled "Funding," while reserving the legally operative characterization of "participation" for a separate section entitled "UNHRC and UNESCO Participation." *Compare* Exec. Order No. 14199 at § 2, *with id.* at §3. Other than to distinguish them from UNRWA as bodies in which the U.S. can participate, UNHRC and UNESCO have little in common to warrant being grouped together: they serve different purposes, were established through different institutional processes, operate under distinct governance frameworks and the Executive Order prescribes different consequences for each. *See generally* G.A. Res. 60/251 (establishing UNHRC); Constitution of UNESCO, Nov. 16, 1945, 4 U.N.T.S. 275; Exec. Order No. 14199 at § 2.

This intentional structuring is not a unique practice of the current Administration, nor is it a view of one political party. Executive Order 14199 mirrors longstanding Congressional practice, which similarly reflected the view that the U.S. does not participate in UNRWA.  Across successive Consolidated Appropriations Acts dating back to 2015, Congress has distinguished U.S. funding of UNRWA from U.S. participation in other U.N. affiliated entities.[11]  In one provision, Congress conditioned continued U.S. "participation" in UNHRC on an affirmative determination by the Secretary of State that such "participation. . . is important to the national interest of the United States." Appropriation Bills at § 7048(c). To that end, Congress required detailed reporting on agenda-setting, resolutions, and institutional reform—measures that reflect participation in a deliberative body. *Id.*

---

[11] *See, e.g.*, Consolidated Appropriations Act, 2023, Pub. L. No. 117-328, § 7048(c)–(d), 136 Stat. 4459, 5070–71 (2022); Consolidated Appropriations Act, 2022, Pub. L. No. 117-103, § 7048(c)–(d), 136 Stat. 49, 663–64 (2022); Consolidated Appropriations Act, 2021, Pub. L. No. 116-260, § 7048(c)–(d), 134 Stat. 1182, 1789–91 (2020); Consolidated and Further Continuing Appropriations Act, 2015, Pub. L. No. 113-235, § 7048(c)–(d), 128 Stat. 2130, 2660–61 (2014) (conditioning United States participation in the United Nations Human Rights Council); Supplemental Appropriations Act, 2009, Pub. L. No. 111-32, § 1114, 123 Stat. 1859, 1905 (2009) (imposing foreign-assistance oversight requirements on UNRWA without reference to participation or representation) (collectively, "Appropriation Bills")

In the immediately following provision, Congress conditioned continued "funding" of UNRWA through mechanisms employed for foreign assistance oversight—certifications, inspections, audits, neutrality compliance, and internal controls—without any reference to United States "participation." *Id.* at § 7048(d); *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 133 (2000). Congress's characterization of "participation" in UNHRC in one provision but characterization of "funding" UNRWA in an adjacent one, across multiple statutes and years, is a distinction that is presumed intentional and relevant to the IOIA immunity analysis. *Russello v. United States*, 464 U.S. 16, 23 (1983); *Lorillard v. Pons*, 434 U.S. 575, 580–81 (1978). That this statutory pattern spanned multiple Presidential Administrations, and various political-majority formulations among the two chambers of Congress confirms Congress's settled understanding that the United States does not "participate" in UNRWA as an institutional matter for purposes of federal law, and that a pure funding relationship, even conditional funding, cannot be treated as a substitute for the participation relationship § 288 requires.[12]  *See* Appropriation Bills; *see also Bob Jones Univ. v. United States*, 461 U.S. 574, 600–01 (1983) (evidence of longstanding congressional acquiescence confirms settled understanding); *Jam,* 586 U.S. at 209–11; *TRW*, 534 U.S. at 31 (statutes should not be interpreted to render express requirements meaningless). This pattern also reflects that "participation"—and therefore immunity determinations—are assessed at the organizational-level, not across all UN-affiliated organizations wholesale; require representation in deliberative process or institutional governance;  and constitute substantive

---

[12] Section 288's reference to an "appropriation for such participation" presupposes a participation relationship Congress has otherwise authorized; it does not allow courts to convert foreign assistance into participation by implication. To hold otherwise would nullify the IOIA's participation requirement and collapse the distinction Congress drew between institutional membership and funding, contrary to the text of the statute and basic principles of statutory interpretation. *Jam*, 586 U.S. at 211; *see also TRW Inc. v. Andrews*, 534 U.S. 19, 31 (2001); *Medellín*, 552 U.S. at 525.

determinations tied to policy considerations.  22 U.S.C. §§ 287(a), 288; *Jam*, 586 U.S. at 209–11; *TRW*, 534 U.S. at 31; *U.S. Dep't of Navy v. FLRA*, 665 F.3d 1339, 1348 (D.C. Cir. 2012).

The distinction between UNRWA and UNHRC demonstrates that the Executive Branch and Congress share a common understanding that UNRWA is not an organization in which the United States participates within the meaning of U.S. law. *See* Exec. Order No. 14199 at §§ 2-3; Appropriation Bills at §7048(c), (d). When the Executive and Congress speak "with one voice" in foreign affairs, their coordinate actions get "the strongest of presumptions" and the "widest latitude of judicial interpretation." *Fuld v. Palestine Liberation Org.*, 145 S. Ct. 2090, 2107 (2025) (quoting *Youngstown Sheet & Tube Co. v. Sawyer,* 343 U.S. 579, 637 (1952) (Jackson, J., concurring)).

Moreover, Executive Order 14199 sought to terminate all engagement with UNRWA entirely. Exec. Order No. 14199 § 3. By July 31, 2025, when this action commenced, both the President and Congress had banned all funding for UNRWA, while the Department of State had sought return of unspent U.S. funding, announcing "a policy of minimal contact with UNRWA . . . seek[ing] its full dismantlement . . . ha[ving] determined UNRWA is irredeemably compromised[.]"[13] *Dole Food*, 538 U.S. at 478.  Today, the United States does not sit on AdComm.[14] In an amicus brief before the Second Circuit advocating for the reversal of the *Siman Tov* decision, the U.S. government stated, "it is hard to see how the United States otherwise participates" in UNRWA moving forward.  Ex. 2, U.S. Amicus Brief at 13.

---

[13] U.S. DEP'T OF STATE, REP. To CONGRESS on UNRWA VETTING FOR IMPARTIALITY 2 (2025), https://tinyurl.com/2kyzkd3e.
[14] UNRWA's current Advisory Commission webpage does not list the United States among its members. *See* Members of the Advisory Commission, UNRWA, https://www.unrwa.org/who-we-are/advisory-commission/members-advisory-commission (last visited Feb. 1, 2026) (listing current members and observers of the Advisory Commission, none of which include the United States). Archived captures of UNRWA's Advisory Commission membership page reflect that the United States has not appeared on the Commission's public member since September 28, 2023. Subsequent archived captures of the same URL following October 7, 2023 are blocked by UNRWA's own website configuration, returning a Cloudflare "Access Denied" response rather than page content. Plaintiffs rely on these public records solely to establish the absence of present United States participation and do not contend that advisory-body service—past or present—constitutes participation in UNRWA itself. Exhibit 3.

The Executive Branch's exclusive power to recognize foreign sovereigns and international organizations alike, here in total alignment with what Congress has for years set forth, clearly places UNRWA outside the class of organizations that are eligible for immunity and that judgment warrants the Court's maximal deference. *See Zivotofsky v. Kerry*, 576 U.S. 1, 10–12 (2015); *Youngstown*, 343 U.S. at 635 (Jackson, J., concurring); *see also* Further Consolidated Appropriations Act, 2024, Pub. L. No. 118-47, div. G, tit. III, § 301 (2024) (expressly conditioning and prohibiting United States contributions to UNRWA); Exec. Order No. 14199 § 3.

The United States does not participate in UNRWA, has never participated in UNRWA, and did not participate in UNRWA at the time this lawsuit was filed. *Dole Food*, 538 U.S. at 478–79. Indeed, UNRWA has never been conferred immunity by statute, treaty or executive order, not by name and not by categorical reference. Accordingly, UNRWA cannot be afforded immunity.

### C.    The U.S. is Not Authorized to Participate in UNRWA

As with the prior two elements, UNRWA does not argue that participation in UNRWA was authorized by treaty or Act of Congress and therefore waives this argument as well. *See Sineneng-Smith*, 590 U.S. at 375–76; *Worrell,* 2021 WL 2366934, at *10, n.8.

Regardless, UNRWA also fails the authorization requirement. The United Nations Participation Act ("UNPA") authorizes U.S. participation in the United Nations through the appointment of a representative to serve in "any organ, commission, or other body of the United Nations *other than specialized agencies of the United Nations.*" 22 U.S.C. § 287(a) (emphasis added).

While UNPA gives rise to a broad set of entities in which the U.S. may participate, UNRWA is excluded from that set for two reasons. First, it is not an organ, commission or body. Second, it is a specialized agency.

As the United States explained in its 2nd Circuit Amicus filing in the *Siman Tov* matter, the United Nations system comprises an "enormously wide range of organizational forms." Ex. 2, U.S. Amicus Br. at 18. The United States further argued that "UNRWA's 'unique' structure and operation place it at the very end of one side of the spectrum", not the side of being an "organ", but on the side where immunity cannot be conferred. *Id.* at 20. UNRWA for its part does not claim to be either a "commission" or a "body" and the UNPA's mechanism for authorizing participation in such organizations—i.e., appointing a representative—strongly suggests UNRWA's lack of participation capacity places it outside those categories as well. 22 U.S.C. § 287(a).

The United States observed that UNRWA, as an operational service provider with a specialized mandate, bears great resemblance to specialized agencies. U.S. Amicus Br. at 13, 18. Indeed, UNRWA's organizational name classifies it as an "Agency". As does its operational nature. *Flaherty v. Ross*, 373 F. Supp. 3d 97, 106–08 (D.D.C. 2019).

Accordingly, as UNRWA resembles the class of organizations excluded from the UNPA's authorization, while also lacking the capacity to fall within the scope of those included in the authorization, it fails the IOIA's authorization predicate; UNRWA cannot be immune.

### D.    UNRWA Is Not Designated As An International Organization

Lastly, UNRWA fails the designation requirement. Shortly after Congress enacted both the IOIA and the UNPA in 1945, President Truman issued Executive Order 9698 designating "The United Nations" as an international organization entitled to IOIA immunities. Exec. Order No. 9698, 11 Fed. Reg. 1809 (Feb. 19, 1946). Where the UNPA authorized U.S. participation more broadly in the United Nations' organs, commissions, and other bodies, the Executive Order designated only the United Nations itself. *Compare* 22 U.S.C. § 287(a) *with* Exec. Order No. 9698. This narrowing implicitly excludes the affiliated entities contemporaneously authorized, including UNRWA, as Executive Orders are construed in the context of the statutes that authorize them.

*Youngstown*, 343 U.S. at 585–89 (Executive authority must derive from and remain within statutory authorization); *Chamber of Commerce v. Reich*, 74 F.3d 1322, 1332–33 (D.C. Cir. 1996) (Executive Orders must be grounded in and consistent with the statutory authority invoked; *See TRW*, 534 U.S. at 31(statutory interpretation must give effect to Congress's express structural choices). When Presidents have intended designation to encompass affiliated components, they have done so expressly. *See, e.g.,* Exec. Order No. 10864, 3 C.F.R. 1507 (1960) (designating both the Pan American Health Organization and its Secretariat).

The Executive Branch agrees that UNRWA is not part of the UN for the purposes of EO 9698, and that the Executive Order should be construed narrowly as written.  U.S. Amicus Br. at 13.  As shown above, Congress and the President both view "participation" on an entity-by-entity basis, not as a static feature across the United Nations wholesale.  Similarly, the UNPA authorizes participation in specific UN entities and not others.  Thus, there is no reason to assume that designation under the IOIA for UN affiliated entities could be satisfied by designating just the UN when the other predicates are analyzed on an entity-by-entity basis.

Moreover, Congress authorizes the President to withdraw immunity privileges as a matter of foreign-relations judgment. 22 U.S.C. § 288. In that regard, Executive Order 14199 functionally implemented both the President's alignment with Congress that the U.S. has never participated in UNRWA and the termination of the U.S.'s non-participatory engagements with UNRWA.

III.      **UNRWA IS NOT IMMUNE UNDER ANY RELEVANT TREATY**

UNRWA cites the CPIUN and the UN Charter as its sources of its immunity.  For numerous reasons, UNRWA's assertions fail.

A.      **The CPIUN Does Not Immunize UNRWA**

The CPIUN's text demonstrates that UNRWA is not immune from suit.  Article II of the CPIUN contains the Convention's sole grant of entity-level immunity. It provides that "*the United*

*Nations* . . . shall enjoy immunity from every form of legal process except insofar as in any particular case it has expressly waived its immunity." CPIUN art. II, § 2 (emphasis added). Consistent with the CPIUN's text, the United States described the CPIUN as a narrow instrument that confers entity-level immunity on the United Nations, and not on every organization or program created within the UN system. Ex. 2, U.S. Amicus Br. at 6, 13, 17-18. To that effect, the CPIUN does not establish a general immunity regime for UN-affiliated organizations, nor does it purport to displace domestic statutory frameworks governing when and how immunity attaches to distinct entities in U.S. courts. *Id.*; *see also* S. Exec. Rep. No. 91-17, at 5–6 (1970).

No Court has ever interpreted the CPIUN as displacing the IOIA or conferring immunity to any organization that it otherwise found to fail to qualify as an international organization under IOIA, as UNRWA is shown to be the case here. In fact, Congress understood at ratification that the CPIUN would not expand entity level immunity beyond the IOIA. S. Exec. Rep. No. 91-17, at 5–6. The Executive Branch agrees that the CPIUN did not expand immunity beyond what the IOIA conferred and was not understood to cover UNRWA. Ex. 2, U.S. Amicus Br. at 10-11.

The countries in which UNRWA operates, and implicitly UNRWA itself, agree the CPIUN does not naturally confer immunity on UNRWA. This was evident when UNRWA affirmatively sought and procured agreements to construe the CPIUN as applying to UNRWA's operation from several of these countries including Lebanon, Jordan, Egypt and Israel.[15] Most of these countries did not reach agreements with UNRWA for several years after signing the CPIUN. *Id.* Israel's agreement, which it reached with UNRWA just four days after assuming administrative control over UNRWA's service regions of Gaza and the West Bank, included Israel's agreement to

---

[15] See Agreement Between Egypt & UNRWA art. VII (Sept. 12, 1950); Agreement Between Jordan & UNRWA art. I (Mar. 14, 1951); Exchange of Notes Constituting an Over-All Agreement Between Lebanon & UNRWA ¶ 1 (Nov. 26, 1954); United Nations Juridical Yearbook 1968, ch. II ("Comay–Michelmore exchange").

recognize the CPIUN as governing its relationship with UNRWA and was explicitly a "provisional agreement which will remain in force until replaced or cancelled".[16]   Several months after discovering UNRWA employees participation in the October 7 attack, Israel terminated this agreement.[17]

The United States, by contrast, has entered into several agreements with UNRWA but in none of them has the U.S. ever agreed to recognize UNRWA as an immune entity.[18]

### B.    The UN Charter Does Not Immunize UNRWA

UNRWA claims that its immunity is established under Articles 22 and 105 of the UN Charter. UNRWA Motion to Dismiss at 5, 7. Here too, UNRWA's argument misses many determinative marks.

*First*, nothing in Article 22, which authorizes the General Assembly to create subsidiary organs states that those organs are entitled to immunity, and nothing in the Charter's immunity provision, Article 105, indicates that UN's immunity extends to "subsidiary organs".   UN Charter arts. 22, 105.

*Second*, this circuit has found that the UN Charter, including its immunity provisions, are not self-executing and do not have legal effect. *See Rodriguez v. Pan Am. Health Org.*, 29 F.4th 706, 719 n.7 (D.C. Cir. 2022).

---

[16] Comay-Michelmore exchange at (g).

[17] *Law to Cease UNRWA's Activities*, 5785-2024 (Isr.); see also Library of Congress, *Israel: Law to Cease UNRWA Activities Amended* (Dec. 29, 2025) (describing expiration of 1967 provisional agreement by operation of the 2024 legislation).

[18] See, e.g., U.S. Dep't of State, Bureau of Population, Refugees, & Migration, *Framework for Cooperation Between the United States Government and the United Nations Relief and Works Agency for Palestine Refugees in the Near East (UNRWA)* (2009) (describing the framework as a non-legally binding policy instrument governing U.S. support and oversight); U.S. Dep't of State, Bureau of Population, Refugees, & Migration, *Framework for Cooperation Between the United States Government and UNRWA* (2015–2016); U.S. Dep't of State, Bureau of Population, Refugees, & Migration, *Framework for Cooperation Between the United States Government and UNRWA* (2022) (all governing conditions on U.S. assistance and containing no grant of immunity)

*Third*, the United States—in its Amicus Brief—also concludes that UNRWA fails to qualify as a "subsidiary organ" as defined in Article 22.  Ex. 2, U.S. Amicus Br. at 3, 15.

*Fourth*, UN Charter Article 105 tethers the UN's immunity to an objective analysis of its "purposes."  *Id.* (emphasis added) ("[t]he Organization shall enjoy in the territory of each of its Members such privileges and immunities *as are necessary for the fulfillment of its purposes*.").  One purpose of the UN, as reflected by its Charter, is to establish conditions under which "justice and respect for the obligations arising from treaties and other sources of international law can be maintained." U.N. Charter pmbl. Another purpose is to promote international cooperation through conformity with international law and respect for human rights.; *Id.* art. 1(3).  A third purpose is "harmonizing the actions of nations in the attainment of these common ends." *Id.*, art. 1(4).

As applied here, UNRWA departed from these foundational commitments.  Instead of respecting the obligations set forth by the global refugee protection regime established under the 1951 Refugee Convention, UNRWA elected to *remove* the refugee population it purported to serve from those protections.  *See* Refugee Convention, arts. 1D.  In so doing, UNRWA denied the refugee population it served the basic human rights that the treaty inherently provides: state obligations, durable solutions, and supervisory enforcement. *Id.* at arts. 1-34; Protocol Relating to the Status of Refugees, Jan. 31, 1967, 606 U.N.T.S. 267.  Far from harmonizing the actions of nations, UNRWA's removal of refugee protections has given rise to unique and challenging circumstances across the region, fostering and perpetuating disharmony across its service mandate.

For these several reasons, UNRWA is not conferred immunity by the UN Charter.

## C.    The Cases Upon Which UNRWA Relies Are Unavailing

UNRWA relies heavily on the case *Estate of Siman Tov v. UNRWA*, which concluded that the "plain text" of the CPIUN Article IV § 11 confers immunity on UNRWA as a "subsidiary

organ." 2025 WL 2793701, at *3 (S.D.N.Y. Sept. 30, 2025).[19] Notwithstanding that *Siman Tov* is not binding in this District, its conclusion is respectfully incorrect.

*Siman Tov*'s holding does not follow from the text the court there sought to apply. That text, in CPIUN Article IV § 11, as written, grants immunity to "Representatives of Members to the principal and subsidiary organs." CPIUN art. IV, § 11. The *Siman Tov* court erroneously removed the grammatical subject of the provision ("Representatives of Members") and treated the remaining modifier ("subsidiary organs") as the recipient of immunity. 2025 WL 2793701, at *3. That truncation altered the provision's meaning and transformed a grant of functional immunity to individuals into an unstated grant of entity immunity. When properly interpreted, Section 11 fits coherently within the CPIUN's structure: entity immunity for the United Nations (Article II), and functional immunity for individuals serving within the UN system (Articles IV–VI). To that effect, this issue is on appeal before the Second Circuit. The U.S. Government is advocating for reversal because it believes the *Siman Tov* decision was wrongly decided. *See generally* Ex.2, U.S. Amicus Brief. We agree.

As set forth above, all of the other cases upon which UNRWA relies, in which operational entities were found to be immune under the CPIUN, are distinguishable. *Lempert*, 956 F. Supp. 2d 17 (UNDP); *Sadikoglu*, 2011 WL 4953994 (UNDP); *Bisson*, No. 2007 WL 2154181, at *2 (WFP); *Hunter*, 800 N.Y.S.2d 347 (UNICEF). Unlike UNRWA, the organizations in these cases would have satisfied the IOIA's threshold requirements due to their governance structures, and as such, the issue was never presented to the Court. Appendix C ¶¶ 1–7 (UNDP); Appendix D ¶¶ 1–8 (UNICEF); World Food Programme, General Rules, rr. 1–3, 12–14, 18–22. As the IOIA definition

---

[19] *Siman Tov* assumed—rather than decided—that the organization at issue satisfied § 288's participation and designation requirements, questions that are squarely presented here.

of "international organization" was not an issue analyzed or ruled upon by the court in those cases, thus they are not persuasive here to that end. *Webster v. Fall*, 266 U.S. 507, 511 (1925).

Moreover, in those cases the organizations' immunity claims were either supported or not opposed by the Executive Branch *See, e.g.*, *Bisson*, 2007 WL 2154181, at *7; *Sadikoglu*, 2011 WL 4953994, at *3). As reflected by its *Siman Tov* amicus brief before the Second Circuit, the Executive Branch is opposing UNRWA's immunity claim. *See generally* Ex. 2. U.S. Amicus Br. Thus, none of the cases upon which UNRWA relies in which operational agencies were found to be immune, are binding or persuasive here. *Webster,* 266 U.S. at 511.

## IV.    **UNRWA CANNOT ESTABLISH DERIVATIVE IMMUNITY**

UNRWA invokes assertions by the United Nations Secretary-General regarding the Organization's institutional immunity. UNRWA Motion to Dismiss at 2, 5. UNRWA's invocation fails. Congress did not empower the Secretary-General to confer immunity; it reserved that role to the Executive Branch.

To the extent UNRWA maintains that it has derivative immunity of the UN, that theory fails as a matter of law. Derivative immunity is an exceptionally narrow doctrine. *Broidy*, 12 F.4th at 802–03. It applies only where an immune sovereign or international organization has specifically ordered, authorized and directed, or affirmatively ratified, the alleged conduct of the defendant asserting the immunity of the sovereign or international organization, such that allowing the suit to proceed would be tantamount to adjudicating claims against the sovereign or organization itself. *Id.*; *In re OPM Data Sec. Breach Litig.*, 928 F.3d 42, 69 (D.C. Cir. 2019) (per curiam).

For example, in *Belhas v. Ya'alon*, the D.C. Circuit relied on a contemporaneous letter from the State of Israel that expressly stated that the defendant's alleged conduct was undertaken "in the course of his official duties" and "in furtherance of official policies of the State of Israel," such

that the suit would effectively proceed against Israel itself. 515 F.3d 1279, 1282–83 (D.C. Cir. 2008).

UNRWA cannot establish derivative immunity, as the United Nations never ordered, authorized, directed, or ratified the conduct alleged in the Amended Complaint. To the contrary, the United Nations has expressly repudiated such conduct. On January 26, 2024, following public allegations that UNRWA staff members participated in terror attacks, the Office of the Spokesperson for the Secretary-General stated that the Secretary-General was "horrified" by the allegations, directed that any UNRWA employee involved be immediately terminated, and called for referral for potential criminal prosecution. *Daily Press Briefing by the Office of the Spokesperson for the Secretary-General* (Jan. 26, 2024). Condemnation, investigation, and referral for prosecution are the antithesis of authorization or ratification. *Jordan v. Medley*, 711 F.2d 211, 217 (D.C. Cir. 1983); *see also Broidy*, 12 F.4th at 802–03; *OPM*, 928 F.3d at 69. Accordingly, derivative immunity is unavailable as a matter of law. *See Broidy*, 12 F.4th at 802–03.

## V.    **UNRWA'S OTHER RULE 12 ARGUMENTS FAIL**

UNRWA does not dispute that it has sufficient contacts with the United States, that jurisdiction is available under the Anti-Terrorism Act, or that the exercise of jurisdiction would satisfy due process. Rather, UNRWA's 12(b)(2) challenge is entirely derivative of and based upon its asserted immunity from suit.

As set forth above, because UNRWA is not immune from suit, it is subject to the Court's jurisdiction. Likewise, it is not immune because of UNRWA's challenge concerning service of process under Rules 12(b)(4) and 12(b)(5). *See Samantar v. Yousuf*, 560 U.S. 305, 314–15 (2010) (immunity from service derives from immunity from suit); *Republic of Austria v. Altmann*, 541 U.S. 677, 691 (2004).

Because Plaintiffs validly effectuated service of process on UNRWA, the Court may exercise personal jurisdiction over it. UNRWA cites *Freedom Watch, Inc. v. OPEC,* for the uncontroversial proposition that personal jurisdiction requires valid service of process. 766 F.3d 74 (D.C. Cir. 2014). That principle does not aid UNRWA. *Freedom Watch* involved an entity that was undisputedly immune. Where, as here, immunity does not apply, service is effective and personal jurisdiction follows. In any event, Congress expressly authorized personal jurisdiction under the Anti-Terrorism Act for civil claims arising from acts of international terrorism, and UNRWA does not dispute and accordingly concedes, that statutory basis. 18 U.S.C. § 2334(a); *see also Fuld*, 145 S. Ct. at 2106–10.

## **CONCLUSION**

For the reasons set forth above, the Court should deny UNRWA's motion to dismiss.

Dated:  February 13, 2026                                  Respectfully Submitted,

                                                                HEIDEMAN NUDELMAN & KALIK P.C.

                                        By:      */s/ Tracy R. Kalik*
                                                  */s/ Joseph H. Tipograph*
                                                  Richard D. Heideman (No. 377462)
                                                  Noel J. Nudelman (No. 449969)
                                                  Tracy Reichman Kalik (No. 462055)
                                                  Joseph H. Tipograph (No.997533)
                                                  HEIDEMAN NUDELMAN & KALIK, PC
                                                  5335 Wisconsin Avenue, NW; Suite 440
                                                  Washington, DC  20015
                                                  Telephone: 202.463.1818
                                                  Facsimile: 202.463.2999