**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

ESTATE OF SIVAN SHA'ARABANY, *et al.*,

                         *Plaintiffs,*

           *v.*

UNITED NATIONS RELIEF AND WORKS
AGENCY FOR PALESTINE REFUGEES IN THE
NEAR EAST, *et al.*,

                         *Defendants.*

No. 25-Civ-2490(RCL)

**<u>DEFENDANT UNRWA USA'S MEMORANDUM OF LAW IN SUPPORT OF MOTION
TO DISMISS AMENDED COMPLAINT</u>**

# **TABLE OF CONTENTS**

PRELIMINARY STATEMENT ...................................................................................................1

STATEMENT OF FACTS ........................................................................................................4

    A. The Parties and Claims ...............................................................................................4

    B. Allegations Against UNRWA USA ...........................................................................6

        i. Allegation that UNRWA USA "Aided and Abetted" Hamas's Terrorist Attacks ...6

        ii. Allegations that UNRWA USA Committed Regulatory Violations .......................9

        iii. Allegations Regarding UNRWA USA's "Knowledge" that Hamas "Structurally
           Co-opted" UNRWA ......................................................................................10

    C. Allegations That UNRWA's Operations Furthered Hezbollah and Hamas's Terrorist
       Activities ...............................................................................................................16

        i. UNRWA and Hezbollah ......................................................................................16

        ii. UNRWA and Hamas ..........................................................................................17

LEGAL STANDARD ...............................................................................................................21

ARGUMENT .............................................................................................................................22

    I. PLAINTIFFS FAIL TO STATE AN ATA AIDING-AND-ABETTING CLAIM .........................22

    A. Plaintiffs Fail to Allege an Injury Traceable to an Attack by Hezbollah...............23

    B. Plaintiffs Fail to Allege General Awareness .........................................................25

    C. Plaintiffs Fail to Allege Knowing and Substantial Assistance................................33

        i. Plaintiffs Fail to Allege Any Nexus Between UNRWA USA's Aid and
           Attacks that Injured Them ...............................................................................34

        ii. Plaintiffs Fail to Allege that UNRWA USA Acted with the Requisite
           Culpability .......................................................................................................36

    II. PLAINTIFFS FAIL TO STATE A CONSPIRACY CLAIM UNDER THE ATA .........................38

    III. PLAINTIFFS FAIL TO STATE AN ATA DIRECT LIABILITY CLAIM..................................40

    A. Plaintiffs Fail To Plead that UNRWA USA Committed an Act of International
       Terrorism.............................................................................................................40

    B. Plaintiffs Fail to Allege Proximate Causation........................................................41

    IV. PLAINTIFFS FAIL TO STATE A CLAIM FOR INTENTIONAL OR NEGLIGENT INFLICTION OF
       EMOTIONAL DISTRESS.................................................................................................42

    V. THE COURT SHOULD DISMISS THE CLAIMS WITH PREJUDICE .....................................43

CONCLUSION...........................................................................................................................44

CERTIFICATE OF SERVICE .................................................................................................45

## <u>TABLE OF AUTHORITIES</u>

**Cases**

Page(s)

*Acosta Orellana v. CropLife Int'l*,
711 F. Supp. 2d 81 (D.D.C. 2010) ................................................................. 23

*Akins v. District of Columbia*,
526 A.2d 933 (D.C. 1987) ............................................................................ 44

*Ashbourne v. Hansberry*,
245 F. Supp. 3d 99 (D.D.C. 2017) ............................................................... 22

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) ...................................................................................... 22

\*    *Ashley v. Deutsche Bank AG.*,
144 F.4th 420 (2d Cir. 2025) .................................................................. *passim*

*Atchley v. Astrazeneca UK Ltd.*,
22 F.4th 204 (D.C. Cir. 2022) .................................................................. 25,42

\*    *Atchley v. Astrazeneca Uk Ltd.*,
2026 U.S. App. LEXIS 1742 (D.C. Cir. Jan. 23, 2026) .......................... *passim*

*Averbach v. Cairo Amman Bank*,
No. 19-cv-0004-GHW-KHP, 2020 U.S. Dist. LEXIS 10902 (S.D.N.Y. Jan. 21, 2020) .. 27

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007) .................................................................................. 22,40

\*    *Bernhardt v. Islamic Republic of Iran*,
47 F.4th 856 (D.C. Cir. 2022) ................................................................. *passim*

*Black Lives Matter D.C. v. Trump*,
544 F. Supp. 3d 15 (D.D.C. 2021) ............................................................... 40

*Cain v. Twitter Inc.*,
No. 17-cv-02506-JD, 2018 U.S. Dist. LEXIS 163457 (N.D. Cal. Sept. 24, 2018) ......... 39

*E.M. v. Shady Grove Reprod. Sci. Ctr., P.C.*,
No.: 24-956 (RC), 2025 U.S. Dist. LEXIS 59290 (D.D.C. Mar. 28, 2025) ............... 43,44

*Freeman ex rel. Est. Freeman v. HSBC Holdings Pub. Ltd. Co.*,
57 F.4th 66 (2d Cir. 2023) ............................................................................ 40

i

*Gonzalez v. Google L.L.C.*,
    2 F.4th 871 (9th Cir. 2021) ........................................................................................ 26

*Halberstam v. Welch*,
    705 F.2d 472 (D.C. Cir. 1983) ................................................................................... 24

\*   *Honickman v. BLOM Bank SAL*,
    6 F.4th 487 (2d Cir. 2021) ................................................................................... *passim*

*Jefferies v. District of Columbia*,
    916 F. Supp. 2d 42 (D.D.C. 2013) ............................................................................. 45

*Kemper v. Deutsche Bank AG*,
    911 F.3d 383 (7th Cir. 2018) ................................................................................. 41,42

*Lacy v. Tenn. Civ. Rule 15G Third Party*,
    No. 22-3537 (JMC), 2023 U.S. Dist. LEXIS 45912 (D.D.C. Mar. 20, 2023) ................. 45

*Lamm v. State St. Bank & Tr.* ,
    749 F.3d 938 (11th Cir. 2014) ................................................................................... 26

*Langeman v. Garland*,
    88 F.4th 289 (D.C. Cir. 2023) ................................................................................... 22

\*   *Lavi v. Unrwa USA Nat'l Comm., Inc.*,
    No. 24-312-RGA, 2025 U.S. Dist. LEXIS 153757 (D. Del. Aug. 8, 2025) ............ *passim*

*Leisrael v. Educ. for A Just Peace in the Middle E.*,
    66 F.4th 1007 (D.C. Cir. 2023) ........................................................................... 27,35,41

*Linde v. Arab Bank, Pub. Ltd. Co.*,
    882 F.3d 314 (2d Cir. 2018) ............................................................................... 26,28,30

*O'Sullivan v. Deutsche Bank AG*,
    No. 17 CV 8709-LTS-GWG, 2019 U.S. Dist. LEXIS 53134 (S.D.N.Y. Mar. 28, 2019) ......
27,39,41

*Ofisi v. BNP Paribas, S.A.*,
    77 F.4th 667 (D.C. Cir. 2023) ........................................................................... 23,35,42

\*   *Owens v. BNP Paribas, S.A.*,
    897 F.3d 266 (D.C. Cir. 2018) ............................................................................. *passim*

*Rise v. Bagshaw*,
    No. 1:24-cv-2388-RCL, 2025 U.S. Dist. LEXIS 90989 (D.D.C. May 13, 2025) ........... 40

*Rothstein v. UBS AG*,
    708 F.3d 82 (2d Cir. 2013) ......................................................................................... 43

*Siegel v. HSBC N. Am. Holdings, Inc.*,
   933 F.3d 217 (2d Cir. 2019) ........................................................................ 35

*Smith & Wesson Brands, Inc. v. Estados Unidos Mexicanos* ,
   605 U.S. 280 (2025) .................................................................................... 24

*Steele v. Isikoff*,
   130 F. Supp. 2d 23 (D.D.C. 2000) ............................................................... 44

\*   *Twitter, Inc. v. Taamneh*,
   598 U.S. 471 (2023) ............................................................................... *passim*

**Statutes**

18 U.S.C. § 2331(1)(A)................................................................................... 45

18 U.S.C. § 2333(d)(2) ...................................................................... 27, 28, 42

18 U.S.C. § 2339A........................................................................................ 45

31 C.F.R. § 594.519 ........................................................................................ 9

31 C.F.R. § 597.515....................................................................................... 10

**Other Authorities**

Consolidated Appropriations Act, 2022, Public Law No. 117-103, Sec. 7048(d)(1)-(7) 136 Stat
   663 (March 15, 2022) ................................................................................... 17

UNRWA Funding Emergency Restoration Act of 2024, H.R. 9649, 118th Cong. § 2(9) (2024) 42

## PRELIMINARY STATEMENT

The terrorist attacks carried out by Hamas on October 7 were heinous crimes. But the Amended Complaint alleges no facts and offers no viable legal theory that would justify holding Defendant UNRWA USA National Committee, Inc. ("UNRWA USA") liable for those atrocities.

UNRWA USA is an independent U.S.-based charity that, like dozens of private organizations and more than seventy governments, provides financial support to UNRWA—a humanitarian agency established by the U.N. General Assembly and entrusted with providing food, shelter, education, medical care, and other humanitarian services to millions of Palestinian refugees living in the West Bank, the Gaza Strip, Jordan, Lebanon, and Syria.

According to Plaintiffs' theory of the case, UNRWA USA not only aided and abetted every terrorist attack carried out by Hamas from 2015 to the present simply by donating funds to UNRWA—UNRWA USA's donations were, themselves, "acts of international terrorism." These remarkable assertions, if correct, would make terrorists or terrorist accessories out of 72 countries (including the United States) and countless NGOs and private donors who supported, and continue to support, UNRWA's humanitarian operations. In fact, their theory is legally and factually defective at every level.

To state an aiding-and-abetting claim under the Anti-Terrorism Act ("ATA"), Plaintiffs must allege that UNRWA USA "consciously and culpably participated in" the specific "act[s] of international terrorism that injured" them "in such a way as to help make [them] succeed." *Twitter v. Taamneh*, 598 U.S. 471, 497 (2023).[1] The Amended Complaint comes nowhere close to meeting

---

[1] Unless otherwise stated, quotations are cleaned up, internal citations and quotation marks are omitted, and emphasis is in original.

this standard. It does not allege that a solitary cent of UNRWA USA's funds (which accounted for roughly 1% of UNRWA's budget) was distributed to Hamas, diverted by Hamas, or otherwise spent in a manner that benefited Hamas's terrorist operations. It does not identify a single public report that would have given UNRWA USA cause to suspect that its contributions were likely to further Hamas's terrorist operations—to the contrary, it cites multiple reports putting UNRWA's donors on notice that more funding would help the agency keep offensive teaching materials out of its schools and resist Hamas's attempts to infiltrate its operations. And it does not plead any facts supporting the notion that UNRWA USA donated to UNRWA to further Hamas's terrorist activities rather than to provide lifesaving aid to Palestinian refugees.

Plaintiffs' remaining claims are equally deficient. To state an ATA conspiracy claim, Plaintiffs must allege an agreement between UNRWA USA and Hamas to commit an act of terrorism. The Amended Complaint pleads none. To state an ATA direct liability claim, Plaintiffs must plead that UNRWA USA committed an "act of international terrorism"—that is, a violent, criminal act intended to intimidate or coerce a government or its people—which proximately caused Plaintiffs' injuries. But UNRWA USA's provision of humanitarian funds to a bona fide international humanitarian organization plainly does not qualify as violent or criminal. Nor do Plaintiffs allege that UNRWA USA's funds played *any* role in the attacks that injured them, let alone proximately caused those attacks. Plaintiffs' intentional and negligent infliction of emotional distress claims, which likewise require a showing of proximate cause, fail for these reasons and more.

Unable to plead viable claims, Plaintiffs resort to rank speculation, exaggeration, and outright distortion. They make dubious, sweeping claims about UNRWA exacerbating Palestinian

grievances. They assert that UNRWA facilitated Hamas's access to hard currency by paying its Gazan staff in locally unusable U.S. dollars, thereby forcing them to turn to Hamas-controlled moneychangers. But U.S. dollars are fully legal tender and, indeed, the *preferred* currency in Gaza. They accuse UNRWA of facilitating Hamas's intrusion into or tunneling under UNRWA installations. But the same reports Plaintiffs rely upon to bolster these allegations show that UNRWA attempted to safeguard its facilities and that it exposed, protested, and—in at least one case—blocked off Hamas's tunnels. They list examples of "radicalizing" lesson plans that were supposedly used in UNRWA's Gazan schools in Grades 10 through 12. But UNRWA schools in Gaza only run through Grade 9. The list goes on.

Plaintiffs' allegations against UNRWA USA are equally contrived. They bombastically assert that "anti-Israel sentiments" "pervade" UNRWA USA's staff, but all they can muster in support of that claim is a 20-year-old remark by a future Board member who said that UNRWA needed to interact with Hamas officials to work in a Hamas-governed territory, and a cherry-picked press release, the full version of which shows that UNRWA USA forcefully condemned the October 7 attacks and called for the perpetrators to be prosecuted. Plaintiffs also claim that the U.S. Government "admonished" UNRWA USA to stop funding UNRWA and that the "overwhelming weight of public evidence" put UNRWA USA on notice before October 7 that its donations were funding terror. One need only consult the documents cited in the Amended Complaint to know that none of this is remotely true. The U.S. Government actively *encouraged* donors to contribute to UNRWA's operations, both before and after the October 7 attacks—and it implicitly certified that UNRWA was complying with the rigorous anti-terrorism benchmarks set

forth in appropriations laws by repeatedly reauthorizing orders of magnitude more funding than UNRWA USA ever provided.

Plaintiffs' claims are wholly devoid of merit. For the reasons set forth below, the Amended Complaint should be dismissed with prejudice.

## STATEMENT OF FACTS

### A.  The Parties and Claims

Defendant United Nations Relief and Works Agency for Palestine Refugees in the Near East ("UNRWA") is a humanitarian agency established by the U.N. General Assembly and entrusted with providing food, shelter, medical care, and other humanitarian services to 5.9 million eligible Palestinian refugees living in the West Bank, the Gaza Strip, Jordan, Lebanon, and Syria. Am. Compl. ¶¶ 15, 205, 232-33.[2] UNRWA, which hires most of its 30,000-strong workforce from the local refugee population,[3] is funded almost entirely from contributions by UN member states and, to a lesser degree, by private funders. *Id.* ¶ 388. For example, in 2023, 72 countries and dozens of NGOs made financial contributions toward UNRWA's $1.47 billion budget.[4] Of that, the United States—historically UNRWA's largest donor—contributed $371 million. *Id.* ¶¶ 5, 16, 18.[5]

---

[2] *See generally* Congressional Research Service ("CRS"), *UNRWA: Overview and the U.S. Funding Pause*, (Feb. 9, 2024), https://crsreports.congress.gov/product/pdf/IN/IN12316.

[3] CRS, *U.S. Foreign Aid to the Palestinians* (Dec. 12, 2018), at 21 ("U.S. Foreign Aid"), https://sgp.fas.org/crs/mideast/RS22967.pdf.

[4] *See also* CRS, *UNRWA Overview and the U.S. Funding Pause*, *supra* note 2, at 3; UNRWA, 2023 Confirmed Pledges towards UNRWA's Programmes, https://www.unrwa.org/sites/default/files/list_of_2023_confirmed_pledges_by_all_donors.pdf. Most of the U.S. Government contributions during that time went to "UNRWA's general program budget, which is not earmarked." *See* GAO, *West Bank and Gaza: State's Reporting on UN Efforts to Address Problematic Textbook Content Had Gaps Before Funding Ended*, GAO-26-107708 (Jan. 2026) ("2026 GAO Report"), at 3, http://gao.gov/assets/gao-26-107708.pdf.

[5] CRS, *UNRWA Overview and the U.S. Funding Pause*, *supra* note 2, at 1-2.

UNRWA operates in regions where Foreign Terrorist Organizations ("FTO") have a significant presence, including in Gaza, where Hamas has been the *de facto* governing authority since 2007. *Id.* ¶ 253. As a result, UNRWA must interface on a routine basis with FTO members and leadership. *See also id.* ¶ 379 (UNRWA must coordinate with "Hezbollah-aligned security forces" to access the refugee camps in Lebanon). Recognizing this reality, the Treasury Department has issued general licenses exempting UNRWA from large swaths of U.S. sanctions law. *See, e.g.*, 31 C.F.R. § 594.519 (authorizing all transactions otherwise prohibited by Global Terrorism Sanctions Regulations "that are for the conduct of the official business," except for the knowing transfer of funds to a blocked person unless the funds are to pay "taxes, fees, or import duties, or the purchase or receipt of permits, licenses, or public utility services"); 31 C.F.R. § 597.515 (same, for Foreign Terrorist Organizations Sanctions Regulations).

Defendant UNRWA USA is an independent, U.S.-based 501(c)(3) charity that raises funds on UNRWA's behalf. *Id.* ¶¶ 1, 403. UNRWA USA is not alleged to have any presence in UNRWA's five fields of operation nor any influence or control over any aspect of UNRWA's operations; and apart from a single UNRWA employee who did "freelance" content production consultant work for UNRWA USA over an unspecified period of time, the two entities are not alleged to have any overlapping personnel. *Id.* ¶¶ 409-10. In 2023, UNRWA USA contributed $22 million to UNRWA, amounting to just over 1% of UNRWA's operating budget. *Id.* ¶ 393.[6]

This action is brought by 175 Plaintiffs asserting aiding-and-abetting, conspiracy, and direct liability claims under the ATA, as well as claims for intentional and negligent infliction of emotional distress, all arising from injuries allegedly caused by Hamas's terrorist attacks. Twenty-five bring claims for attacks that occurred between 2015 and 2018. *Id.* ¶¶ 175-201. Approximately

---

[6] *See* CRS, *UNRWA Overview and the U.S. Funding Pause*, *supra* note 2, at 3.

100 bring claims for attacks that occurred on or immediately following October 7, 2023. *Id.* ¶¶ 25-47, 63-91, 101-17, 128-42, 147-56, 161-74, 202-04. Five bring claims arising out of an attack on February 14, 2024. *Id.* ¶¶ 123-27. The remaining Plaintiffs bring claims arising out of attacks on IDF soldiers between December 2023 and August 2024. *Id.* ¶¶ 48-51, 52-62, 90, 92-100, 118-22, 143-46, 157-60.[7] The Amended Complaint details Hezbollah's operations at length, but does not allege that Hezbollah committed, planned, or authorized any of the specific attacks that injured Plaintiffs.

**B. Allegations Against UNRWA USA**

    i.    <u>Allegation that UNRWA USA "Aided and Abetted" Hamas's Terrorist Attacks</u>[8]

Plaintiffs assert that UNRWA USA aided and abetted the attacks that injured them, not by providing direct support to Hamas (indeed, the Amended Complaint pleads no direct ties between UNRWA USA and Hamas), but by providing funds to UNRWA. Plaintiffs allege that UNRWA USA's contributions to UNRWA were "fungible and commingled with Defendant UNRWA's general operating budget," and that UNRWA used *its* budget "to employ individuals affiliated with or sympathetic to HAMAS, HEZBOLLAH and other terrorist organizations, to operate facilities that had been used for tunnel construction and weapons storage, and to disseminate educational content in schools that promoted hatred and violence." *Id.* ¶ 393.

The Amended Complaint, however, does not allege that a solitary cent of *UNRWA USA*'s donations were distributed to or diverted by Hamas, let alone used in furtherance of Hamas's

---

[7] With two exceptions (¶¶ 90, 157-160), the Amended Complaint does not offer any details about the location or circumstances of these attacks other than to allege that the IDF soldiers were injured in a Hamas terror attack while "fighting terror."

[8] This section is confined to Hamas because the Amended Complaint does not contain any factual allegations that Hezbollah committed an injury-causing attack, that UNRWA USA assisted Hezbollah's terrorism, or that UNRWA USA was aware that its aid was facilitating Hezbollah's illegal operations.

terrorist activities. In fact, Plaintiffs' sole allegations about UNRWA USA's aid consist of the total amounts ($5 million in 2021, $3.8 million in 2022, and $22 million in 2023, *id.* ¶¶ 393, 405-46) and a description of the humanitarian purposes for which the donations were raised. *See id.* ¶ 392 (UNRWA USA held a fundraiser for "mental health programming for Palestinian Gaza children"); *id.* ¶ 393 (UNRWA USA awarded funds for programs related to "education, health, protection, and emergency response").

Plaintiffs make a string of inflammatory and wholly conclusory assertions about UNRWA USA, claiming that it "raises and transfers . . . funds knowingly, willfully, and with the intention that the funds be used by [Hamas] and its members for terrorist purposes," *id.* ¶¶ 401; that "anti-Israel sentiments . . . perniciously pervade [UNRWA USA's] staff," *id.* ¶ 415; that the "pro-Hamas sentiment of [UNRWA USA] starts at the top," *id.* ¶ 416; and that UNRWA USA and Hamas share "common objectives and agenda." *Id.* ¶ 446. Not only does the Amended Complaint offer no factual support for these accusations, it repeatedly pleads facts and cites documents undermining them. For example, Plaintiffs cite a January 29, 2024 press release in which UNRWA USA reaffirmed its commitment to UNRWA's mission after Israel accused several staff members of participating in the October 7 attacks. *Id.* ¶ 414. But that press release explained that UNRWA USA was "redoubling aid efforts . . . to ensure UNRWA can continue and increase its *vital humanitarian support in Gaza.*" *Id.* (emphasis added). Moreover, Plaintiffs omit the prior two paragraphs of the press release:

> **UNRWA USA is horrified by the recent allegations against twelve UNRWA staff members.** UNRWA leadership has taken prompt action to terminate the contracts of those allegedly involved. We welcome the UNRWA Commissioner General's request that the UN Office of Internal Oversight Services (the highest UN investigative authority) undertake an investigation into the allegations against the

UNRWA staff who were allegedly implicated. **Anyone found to be involved in terrorism must be held accountable.**

We also appreciate the far-reaching efforts UNRWA makes in vetting its own staff, including screening its staff against the UN Security Council sanctions list and sharing its employee list with the State of Israel as obligated. UNRWA has informed us that the State of Israel has not raised any concerns or objections with regard to the content of those lists.[9]

Plaintiffs also acknowledge that UNRWA USA paused its contributions in early March 2024 pending an "appropriate resolution" of an independent audit of UNRWA's operations and an investigation by the UN Office of Internal Oversight Services into Israel's allegations of UNRWA staff complicity in the attacks. Am. Compl. ¶ 421.

Unable to identify any actual evidence of "pro-Hamas" bias within UNRWA USA, Plaintiffs reach back two decades to a remark by then-UNRWA Commissioner-General and later-UNRWA USA Board member, Karen AbuZayd, who told reporters that it did not "make sense" for UNRWA "to reduce contacts [with Hamas] when [UNRWA had] been asked to increase [its] activities." *Id*. ¶ 418. Nothing about that remark, however, evinces sympathy for Hamas. At the time, Hamas had just assumed control of Gaza's ministries following legislative elections and, as the underlying source of this quote makes clear, UNRWA had received "no instruction from UN Headquarters on not meeting Hamas ministers."[10] AbuZayd's point was practical, not ideological:

---

[9] *See* Press Release, UNRWA USA, *UNRWA USA Horrified by Allegations Against Some UNRWA Staff, Calls for Redoubled Efforts Amidst Catastrophic Humanitarian Crisis in Gaza to Aid Refugees* (Jan. 29, 2024), https://www.unrwausa.org/news/unrwa-usa-horrified-by-allegations-against-some-unrwa-staff-calls-for-redoubled-efforts-amidst-catastrophic-humanitarian-crisis-in-gaza-to-aid-refugees.

[10] *Chronology, United Nations, Chronological Review of Events Relating to the Question of Palestine* (April 2006), U.N. Doc. DPR/Chron/2006/4, https://www.un.org/unispal/document/auto-insert-198923.

UNRWA could not carry out its mandate to expand humanitarian operations while refusing to communicate with the *de facto* governing authorities.

       ii.      <u>Allegations that UNRWA USA Committed Regulatory Violations</u>

Plaintiffs devote all of three paragraphs to a claim that UNRWA USA violated federal tax law by failing to "sever its financial ties with UNRWA" after reports surfaced that some UNRWA staff celebrated the attacks. *Id.* ¶¶ 402-04. But Plaintiffs concede that UNRWA USA paused its funding pending two investigations into UNRWA's alleged ties to Hamas; and—more to the point—Plaintiffs identify no statute, regulation, finding, or official guidance requiring UNRWA USA to terminate its relationship with UNRWA. Their fabricated assertion that federal law required UNRWA USA to permanently sever ties with UNRWA is also at loggerheads with the position of the Biden Administration, whose senior officials publicly praised UNRWA's response to the investigations, emphasized the indispensability of its humanitarian work, and urged partners to sustain or increase support to offset Congress's refusal to authorize funds.[11]

Plaintiffs' suggestion that UNRWA USA violated Treasury's anti-terrorism guidance, *id.* ¶ 403, is equally mistaken. A month after the October 7 attacks, OFAC issued a Compliance

---

[11] White House Daily Briefing, July 25, 2024, https://www.c-span.org/program/public-affairs-event/white-house-daily-briefing/645419 (timestamp: 37:35) (John Kirby, National Security Council Advisor) ("[I]t's clear to us that UNRWA has taken [the allegations that personnel were involved in October 7] seriously, they fully investigated it. They eliminated the employment of those that they believe were involved in terrorist activities . . . I know we're not providing–funding to [UNRWA] now because of legislation [freezing funds]. But I think it's important for people to know that there are things that can't get done without UNRWA's cooperation and support on the ground."); On-the-Record Press Gaggle by White House National Security Communications Advisor John Kirby, Sept. 21, 2024, https://www.presidency.ucsb.edu/documents/the-record-press-gaggle-white-house-national-security-communications-advisor-john-kirby-29 ("In light of the fact that there is still an ongoing crisis in Gaza and the central role that UNRWA does play in the distribution of lifesaving assistance, . . . we're going to look forward to working with other partners—Japan, UK, Italy, Sweden, Germany, Canada, others—to ensure that those appropriate safeguards are adequate to the task and to help secure appropriate funding levels for UNRWA's humanitarian mission.")

Communique emphasizing that "U.S. sanctions do not stand in the way of legitimate humanitarian assistance to the Palestinian people." OFAC Compliance Communique, *Guidance for the Provision of Humanitarian Assistance to the Palestinian People* (Nov. 14, 2023).[12] Of particular relevance here, that Communique confirmed (i) that NGOs may engage in transactions with "blocked persons that are ordinarily incident and necessary to . . . humanitarian projects that meet basic human needs," "educational activities," as well as "the provision of healthcare and health-related services,"[13] and (ii) that "U.S. persons may donate funds to, and raise funds on behalf of, U.S. and third-country NGOs that provide permissible or authorized humanitarian assistance in Gaza." *Id.* at 2-3. The Communique also squarely refutes Plaintiffs' suggestion that UNRWA USA was barred from providing financial assistance to UNRWA because UNRWA employed some Hamas members. As the guidance explains, even where a blocked person has a "*leadership role*" within an institution (which is not alleged to be the case with Hamas and UNRWA), the institution is not blocked and U.S. persons may maintain "routine interaction[s] with [that] agency." *See id*. at 4 (emphasis added).

<blockquote>iii.   <u>Allegations Regarding UNRWA USA's "Knowledge" that Hamas "Structurally Co-opted" UNRWA</u></blockquote>

Plaintiffs allege that UNRWA USA was aware that it was funding terrorism because it was "repeatedly admonished" by the U.S. Government and because "the overwhelming weight of public evidence [prior to October 7]—including repeated U.S. government reporting, United Nations internal investigations, and third-party documentation—confirmed that Defendant

---

[12] https://ofac.treasury.gov/system/files/2023-11/palestinian_compliance_guidance.pdf.

[13] To be clear, UNRWA USA is *not* alleged to have engaged in any transactions with a blocked person. Plaintiffs allege that UNRWA USA gave money to UNRWA, a non-blocked entity, which used its budget to fund humanitarian programs that, at most, are alleged to have incidentally benefited Hamas.

UNRWA's Gaza-based operations had become structurally co-opted by Hamas." *Id.* ¶¶ 5, 394. The Amended Complaint offers zero factual support for this assertion. In fact, the documents referenced in the Amended Complaint and the judicially noticeable record show that the "overwhelming weight of public evidence" pointed in the opposite direction: that UNRWA was a responsible steward of donor funds that took steps to protect its facilities from militant misuse, exposed Hamas's tunneling efforts, trained and disciplined staff who violated neutrality rules, and worked to purge problematic curriculum.

U.S. Government Reports.    Plaintiffs' assertion that the U.S. Government "repeatedly admonished" UNRWA USA is flat wrong. *Id.* ¶ 5. In fact, the Government actively encouraged private donors to contribute to UNRWA.[14] Moreover, the Government tied its contributions to UNRWA meeting a long list of anti-terrorism conditions and implicitly affirmed that those conditions were being met by repeatedly reauthorizing that funding.

Since at least 2003, Congress required the Government Accountability Office ("GAO") to submit yearly reports certifying that UNRWA contributions did not run afoul of Section 301(c) of the Foreign Assistance Act, which requires the Executive to take "all possible measures to assure that no part of the United States contribution shall be used to furnish assistance to any refugee who is receiving military training as a member of . . . any other guerrilla type organization or who has engaged in any act of terrorism." 22 U.S.C. § 2221(c); *see, e.g.*, Consolidated Appropriations Resolution 2003, PL 108-7a, sec. 580. And in almost every appropriations bill from FY 2015 to

---

[14] *See, e.g.*, 2023-2024 Framework for Cooperation Between UNRWA And the United States of America, https://2021-2025.state.gov/wp-content/uploads/2023/06/2023-2024-US-UNRWA-Framework-for-Cooperation-FINAL.pdf ("[T]he United States intends to support UNRWA [in] . . . "[i]ncreasing the share of UNRWA's funding from diversified sources, including emerging donors and private fundraising" and in "[c]ontinuing outreach to expand the base of donors who contribute to UNRWA, with a focus on securing sufficient, predictable, and sustained voluntary contributions, and early fulfillment of pledges.").

FY 2024,[15] Congress included a provision requiring the Secretary of State to submit a report confirming, *inter alia*, that UNRWA (1) regularly inspected its installations and "report[s] any inappropriate use"; (2) addressed staff violations of UN "neutrality and impartiality" policies; (3) implemented a "no-weapons policy" in its facilities; and (4) took steps to "ensure the content of all educational materials currently taught in UNRWA-administered schools and summer camps is consistent with the values of human rights, dignity, and tolerance and does not induce incitement." *See, e.g.*, Consolidated Appropriations Act, 2022, Public Law No. 117-103, Sec. 7048(d)(1)-(7) 136 Stat. 663 (March 15, 2022).

In addition, a Framework Agreement in place since 2010 required UNRWA to submit semiannual reports to the Government outlining the steps it took to maintain compliance with Section 301(c). Am. Compl. ¶¶ 17-19. Among other things, UNRWA was required to submit proof that it: (1) conducted bi-yearly checks of all UNRWA staff against the Consolidated UN Security Council Sanctions List; (2) required UNRWA staff to undergo yearly trainings "on humanitarian principles, including neutrality"; (3) initiated investigations "upon receipt of credible information about alleged staff/personnel misconduct" and took "appropriate action when misconduct is found"; (4) conducted routine inspections of UNRWA properties, "[i]mmediate[ly] investigat[es] . . . incidents of misuse of installations," and takes "immediate steps . . to assure non-recurrence"; and (5) provided staff lists to Israeli authorities on an annual basis, and to UN Member States on request. The Agreement further required the State Department to monitor and evaluate compliance through monthly meetings and regular written communications with UNRWA.[16]

---

[15] UNRWA funding was paused in September 2018 and reinstated in 2021. *See* CRS, *U.S. Foreign Aid*, *supra* note 2, at 1; *see also id.* at 22 (noting that as of the report's date, December 12, 2018, "no arm of the U.S. government has found UNRWA to be out of compliance with Section 301(c)").
[16] Framework for Cooperation between the UNRWA and the U.S.A. 2023-2024 (signed May 30, 2023) (hereinafter "2023-2024 Framework Agreement"), https://www.state.gov/wp-

Although the Amended Complaint references several failed legislative attempts to freeze U.S. contributions to UNRWA before October 7, Am. Compl. ¶ 19, it cites no official finding that UNRWA violated any condition imposed in the appropriations laws or by the Framework Agreement. Plaintiffs cryptically assert that the GAO confirmed in 2019 that UNRWA "failed to offset 'potentially problematic content' in the textbooks used in Gaza." *Id.* ¶ 323. In fact, that report described how UNRWA undertook "rapid reviews" to identify lesson plans that contained discriminatory or violent content, prepared alternative teaching materials, and developed plans to train its staff to use the new curriculum. *See* GAO, *West Bank and Gaza: State Has Taken Actions to Address Potentially Problematic Textbook Content but Should Improve Its Reporting to Congress*, GAO-19-448 (June 2019) ("2019 GAO Report"), at 17-21.[17] The report explained that UNRWA's rapid review process was delayed by various circumstances outside the agency's control, one of which was "financial shortfalls," *id.* at 21—a finding that, if anything, put donors on notice that their contributions to UNRWA could foreseeably *accelerate* the agency's expurgation of inappropriate content.[18]

The GAO reports also directly undercut the factual premises underlying Plaintiffs' claim that UNRWA allowed its schools to become "Hamas recruitment and indoctrination centers." *Id.* at p. 109 & ¶¶ 318-19. According to the GAO, UNRWA follows "best refugee practice" and uses host government curricula to "ensure[] accreditation with host government ministries of education,

---

content/uploads/2023/06/2023-            2024-US-UNRWA-Framework-for-Cooperation-FINAL.pdf; Annex to 2023-2024 Framework Agreement, https://www.state.gov/wp-content/uploads/2023/06/2023-2024-U.S.-UNRWA-Framework-for-Cooperation-Annex-FINAL.pdf.

[17] https://www.gao.gov/assets/gao-19-448.pdf.

[18] The GAO's 2026 report on UNRWA schools also emphasized that financial constraints were impeding UNRWA's ability to remove problematic lesson plans from its schools. 2026 GAO Report at 16-21, 25-26, 30.

which allows students to transition to higher forms of education, pass national exams, and qualify for entry to local and regional colleges and universities." 2026 GAO Report at 1-2. "In keeping with this practice, UNRWA schools in . . . Gaza use the Palestinian Authority curriculum and textbooks"—not materials provided by Hamas. *Id.* at 2 & n.4.[19] Plaintiffs also allege that UNRWA used offensive materials "at every grade level" and claim to have identified offensive instructional material used in Grades 10-12 in UNRWA's Gaza schools. Am. Compl. ¶¶ 223, 326, 342(g)-(i). In fact, UNRWA's schools in Gaza only run through Grade 9. 2026 GAO Report at 2, n.3.

"UN Internal Investigations." Of the four pre-October 7 UN investigations and audits cited in the Amended Complaint, one negates the inference that UNRWA was "structurally co-opted by Hamas," two praise UNRWA's anti-fraud measures, and two make no mention of Hamas. The first—the 2015 UN Board of Inquiry Report (Am. Compl. ¶¶ 290-300)—investigated militant incursions into UNRWA properties during the 2014 conflict. That report (i) describes how teams of UNRWA Operations Support Officers conducted "unannounced inspections of UNRWA facilities, including schools, to ensure their neutrality, with each facility being visited at least once every four months," and (ii) details how, upon discovering a weapons cache, UNRWA management instructed that "inspections be conducted of all UNRWA schools" on a "daily" basis "to ensure that no weapons were being stored in them and that the premises were not being abused."[20] The report attributed the security lapses, in part, to resource constraints and recommended *additional* funding to cover the cost of hiring and training security personnel.[21]

---

[19] *Accord* 2019 GAO Report at 7 & n.13 (cited in Am. Compl. ¶ 322).
[20] U.N. Secretary-General, *Summary by the Secretary-General of the report of the United Nations Headquarters Board of Inquiry into certain incidents that occurred in the Gaza Strip between 8 July 2014 and 26 August 2014* ("2015 UNSG Report"), U.N. DOC. S/2015/286 (Apr. 27, 2015) ¶¶ 54, 64, 75, https://www.un.org/unispal/document/auto-insert-181630/.
[21] 2015 UNSG Report ¶¶ 84-85, 90.

Thus, to the extent this report put donors on notice of anything, it was that more financial contributions would bolster UNRWA's ability to protect its facilities against militant incursions.

The second two reports—a 2019 and 2022 audit report, *id.* ¶¶ 285, 315—neither reference Hamas nor discuss UNRWA's neutrality practices, and both reports found that UNRWA maintained "a system of internal controls that are intended to safeguard assets, ensure adherence to regulations and rules, including management policies and procedures, and prevent fraud."[22] The final report is a 2018 external audit, which Plaintiffs claim put UNRWA on notice that its cash disbursements in Gaza were subject to "leakage"—*i.e.*, that they were being "diverted to terrorists or other inappropriate recipients." Am. Compl. ¶¶ 314-15, 429. In fact, that report says that there is no "documented evidence" supporting the "perception" that cash payments carry greater "leakage" risks.[23]

<u>"Third-Party Documentation."</u> The Amended Complaint does not cite any public, "third-party documentation" remotely suggesting that Hamas had "structurally co-opted" UNRWA. Plaintiffs reference a 2021 "UN Watch" report purporting to identify more than 100 UNRWA teachers who promoted "antisemitism" and "jihad" on social media. *Id.* ¶ 224. But UNRWA employs nearly 20,000 education staff[24] who are hired from the local refugee population in areas where groups like Hezbollah, Islamic Jihad, and Hamas enjoy widespread support. *Id.* ¶ 315. That 100 of those 20,000 teachers promoted offensive content online is hardly evidence of structural

---

[22] Report of the Board of Auditors, *UNRWA: Financial Report and Audited Financial Statements*, A/75/5/Add.4 (July 21, 2020), ¶ 50; *see also* Report of the Board of Auditors, *UNRWA: Financial Report and Audited Financial Statements*, A/78/5/Add.4 (July 26, 2023), ¶ 50, https://digitallibrary.un.org/record/4023526?utm_=&v=pdf.

[23] Key Aid Consulting, *Social Transfers in the Gaza Strip* (Nov. 2018) at 58-59, https://www.unrwa.org/sites/default/files/unrwa_social_transfers_study_in_the_gaza_strip.pdf.

[24] UNRWA, *More than Half a Million Palestine Refugee Children go back to UNRWA Schools*, (Sept. 19, 2022), https://www.un.org/unispal/document/more-than-half-a-million-palestine-refugee-children-go-back-to-unrwa-schools-unrwa-press-release/.

cooptation. Plaintiffs also recount IDF allegations that Hamas dug tunnels near or fired weapons within UNRWA installations. *Id.* ¶¶ 287, 309, 311. But Plaintiffs do not offer any reports in which the IDF accused UNRWA of enabling or facilitating those activities.

In fact, Plaintiffs do not cite *any* public reports putting UNRWA USA on notice of most of their claims, including (i) that UNRWA officials clandestinely met with FTO members, *id.* ¶ 263, (ii) that UNRWA "covered up the widespread infiltration" of Hamas leaders throughout its operations, *see, e.g.*, *id.* ¶ 281, (iii) that UNRWA permitted militants to use its facilities or dig tunnels adjacent thereto, *see, e.g.*, *id.* ¶¶ 288-89, 297; (iv) that UNRWA failed to take corrective action in response to the 2015 Board of Inquiry Report, *id.* ¶¶ 300-01; (v) that UNRWA's U.S. dollar payments were facilitating Hamas's access to hard currency, *id.* ¶¶ 312-18; or (vi) that representatives of Hamas's "student wing," al-Kutla, were present "[i]n every UNRWA school." *Id.* ¶ 344.

## C.  Allegations That UNRWA's Operations Furthered Hezbollah and Hamas's Terrorist Activities

### i.    UNRWA and Hezbollah

The Amended Complaint contains only conclusory allegations that UNRWA assisted Hezbollah's terrorist operations. Most of Plaintiffs' claims in this vein consist of speculative and sweeping sociological assertions. For example, they claim that UNRWA "creates conditions that align with Hezbollah's ideological position," and that UNRWA "reinforces a sense of displacement and grievance." *Id.* ¶ 374-75. When the Amended Complaint does make verifiable claims, they are either irrelevant to their causes of action, *see, e.g.*, *id.* ¶ 376 (UNRWA schools "use host-country curricula that often include narratives of Palestinian displacement and the Right of Return"); *id.* ¶ 379 (UNRWA requires cooperation of Hezbollah-aligned security forces to enter

certain refugee camps), or devoid of factual enhancement. *See id.* ¶ 381 (alleging that UNRWA

"shirks its enforcement of neutrality policies" in Lebanon).

    ii.    <u>UNRWA and Hamas</u>

Plaintiffs make the same tendentious and speculative sociological claims blaming

UNRWA and its internationally agreed-upon mandate for creating the conditions in which Hamas

thrives. *See, e.g.*, *id.* ¶¶ 201, 207, 230. The Amended Complaint fails, however, to plead any facts

supporting Plaintiffs' contention that UNRWA assisted Hamas's terrorist operations, facilitated its

access to hard currency, shared unlawful "common objectives" with Hamas, or "welcomed the

pervasive presence of Hamas operatives within their organization." *See, e.g.*, *id.* ¶¶ 282, 441, 446.

The only factual allegations establishing any link between UNRWA and the attacks that

injured Plaintiffs are (i) an Israeli charge that around a dozen of UNRWA's 13,000 Gazan

employees participated in the October 7 attacks, *id.* ¶¶ 281, 350-51; (ii) a non-party's statement

(in January 2025) that she was held hostage in multiple UNRWA facilities, *id.* ¶ 356; and (iii) a

report that around 30 individuals on an UNRWA Telegram group "cheered and celebrated the

October 7th attack." *Id.* ¶ 346.[25] Plaintiffs, however, do not allege that UNRWA had prior

knowledge of the attacks or knowingly hired or employed individuals who planned on participating

in terrorist operations. Nor do they allege that UNRWA condoned, encouraged, or facilitated staff

participation in the attacks or staff use of UNRWA facilities to hold hostages. To the contrary, the

Amended Complaint pleads that UNRWA condemned the attacks, responded to Israel's

---

[25] The Amended Complaint alleges that an unspecified number of employees praised the attacks. But the report Plaintiffs rely upon identified 30 individuals who celebrated the attacks on a 3,000-member Telegram group called "UNRWA-Gaza Daily Vacancies," which "[a]nyone can access." The report only cited evidence of actual UNRWA employment for only about half of those 30. See UN Watch, *UNRWA's Terrogram* (2024), at 2, https://unwatch.org/wpcontent/uploads/2024/01/UN-Watch-UNRWA-Terrorgram-.pdf.

allegations by summarily terminating the accused staff, and called for "[a]ny UNRWA employee who was involved in acts of terror" to be "held accountable, including through criminal prosecution." *Id.* ¶ 352.

As for Plaintiffs' claim that UNRWA facilitated Hamas's access to hard currency, the documents incorporated into the Amended Complaint show that this allegation is fabricated from whole cloth. According to this claim, UNRWA pays its Gazan staff in U.S. dollars which are "not commonly accepted in Gaza," thereby "compel[ling]" the staff to use moneychangers to convert their salary into shekels. The moneychangers then allegedly pay Hamas a 10-25% fee, which Hamas uses to finance its military activities. *Id.* ¶¶ 312-14. Plaintiffs further allege that a 2018 audit report put UNRWA on notice that its "cash disbursements" were subject to "leakage"--*i.e.*, that they were being siphoned by Hamas. *Id.* ¶ 315.

The 2018 audit report gives lie to these claims. First, the report confirms that the U.S. dollar is the second-most widely used currency in Gaza and the *preferred* currency of savings because it is considered the "safest and least volatile currency during periods of instability." Key Aid Consulting, "Social Transfers in the Gaza Strip," at 7, 48 n.109, 52-53, 77. It is facially implausible that Gazans would exchange a universally accepted, stable currency for its more volatile alternative; and Plaintiffs cite no public reports that U.S. dollar-holders in Gaza are offloading— rather than hoarding—that currency. Second, as explained above, the audit report concludes that there is *no evidence* that cash payments carry greater "leakage" risks. *Id.* at 58-59. Third, the report confirms that the Israeli Government was not only aware that UNRWA was paying its Gazan staff in dollars—it expressly approved and oversaw those payments. *Id.* at 4, 49 (explaining that "Israel authorises UNRWA to import USD on a monthly basis to pay staff salaries" and oversees and

18

"coordinate[s]" UNRWA's "monthly cash import"). By Plaintiffs' logic, the real co-conspirator in this phantom scheme is Israel, not UNRWA USA, which is not alleged to have any knowledge of this "scheme" nor to have participated in UNRWA's salary payment practices.

The remainder of Plaintiffs' allegations about UNRWA's intertwinement are equally unsupported, actively misleading, or contradicted by the documents referenced in the Amended Complaint. For example, Plaintiffs allege that UNRWA publicly "admitted" to the existence of tunnels near its facilities on three occasions. *Id.* ¶¶ 306-08.  But the press releases announcing these supposed "admissions" show that UNRWA uncovered the tunnels and publicly protested their presence.[26] And the very news article Plaintiffs cite to suggest UNRWA turned a blind eye to Hamas infiltration recounts an incident in which a UNRWA official got into a "shouting match" with a Hamas official and ultimately persuaded him "to let UNRWA block off a tunnel that U.N. officials had discovered near one of its schools."[27]

Plaintiffs allege that Hamas controlled the UNRWA Gaza Staff union, *id.* ¶ 283, but union-management relationships are classically adversarial, and the Amended Complaint does not allege that UNRWA's union was an exception to the rule. It does not allege that UNRWA management

---

[26] *See* Press Release, UNRWA, *The Neutrality and Inviolability of UNRWA Installations Must be Respected at All Times* (June 4, 2021), unrwa.org/newsroom/official-statements/neutrality-and-inviolability-unrwa-installations-must-be-respected-all; Press Release, UNRWA, *UNRWA Condemns Neutrality Violation in Gaza* (Oct. 28, 2017), https://www.un.org/unispal/document/unrwa-condemns-neutrality-violation-in-gaza/; Press Release, UNRWA, "*UNRWA Condemns Neutrality Violation in Gaza in the Strongest Possible Terms* (June 9, 2017), https://www.unrwa.org/newsroom/press-releases/unrwa-condemns-neutrality-violation-gaza-strongest-possible-terms.

[27] Patrick Kingsley & Ronen Bergman, *U.N. Agency in Gaza Fought Hamas Infiltration; Not Hard Enough, Israel Says*, NEW YORK TIMES, Feb. 10, 2024, https://www.nytimes.com/2024/02/10/world/middleeast/unrwa-hamas-gaza.html (cited in Am. Compl. ¶¶ 281-82).

encouraged or facilitated that control,[28] nor does it allege that Hamas used its union influence to enlist UNRWA in terrorist operations, rather than to advance its own, non-military political objectives. *See, e.g., id*. ¶ 251 (alleging that Hamas used the union to help win electoral support). Plaintiffs likewise fail to plead that the union exercised any control over UNRWA's personnel decisions. In fact, the Amended Complaint cites over a dozen instances of UNRWA terminating staff members for being Hamas members or participating in its terrorist activities, *id*. ¶¶ 284(a) & (e), 352, and not one occasion where Hamas used its control over the union to force UNRWA to reinstate or hire someone known to be involved in militant activities.

Plaintiffs wrench quotes from UNRWA leadership out of context to manufacture an admission of lax neutrality enforcement. They cite an UNRWA spokeswoman's remark that UNRWA "takes action when employees are found to have a political position" with Hamas, but did not know where the "line is drawn" after that. *id*. ¶ 286. But Plaintiffs omit the very next sentence: "If they can be members of Hamas, they would be subject to disciplinary action by UNRWA."[29] They do the same with Commissioner-General Lazzarini, selectively quoting his comment that UNRWA focuses on staff holding a "public political function," *id*. ¶ 281, while ignoring the surrounding explanation in the same article: UNRWA "strives to ensure its 13,000 employees in Gaza uphold standards of neutrality," "regularly train[s] its staff to stay above politics," and "investigat[es] those who do not," but—like any large employer drawing from the general population—cannot "track the private political allegiances of all its employees."[30]

---

[28] Plaintiffs allege that UNRWA failed to *prevent* Hamas from winning union elections; but they don't allege that UNRWA had the capacity to prevent that outcome. *Id.* ¶ 283.

[29] Yardena Schwartz, *Palestinian Schools Have a Problem—and Are Running Out of Time*, FOREIGN POLICY (Nov. 5, 2021), https://foreignpolicy.com/2021/11/05/unrwa-palestine-israel-refugees-united-states-funding-corruption-education/.

[30] Kingsley & Bergman, *U.N. Agency in Gaza Fought Hamas Infiltration*, *supra* note 28.

Plaintiffs observe that UNRWA "does not treat Hamas, Hezbollah, and [Palestinian Islamic Jihad ("PIJ")] as terrorist organizations" even though they have been designated by the United States and its allies. *Id.* ¶ 250. But that is a function of the fact that UN agencies, as a rule, do not follow individual member states' terrorist lists, and the Security Council has never voted to include Hamas, Hezbollah, and PIJ on the United Nations Security Council Consolidated List.[31]

## LEGAL STANDARD

To survive a motion to dismiss, a complaint must contain sufficient factual allegations that, if accepted as true, would state a plausible claim to relief. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id*. Instead, plaintiffs must "nudge their claims across the line from conceivable to plausible." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).

In deciding a Rule 12(b)(6) motion, a court may consider "the facts alleged in the complaint, documents attached as exhibits or incorporated by reference in the complaint, or documents upon which the plaintiff's complaint necessarily relies even if the document is produced not by the plaintiff in the complaint but by the defendant in a motion to dismiss." *Ashbourne v. Hansberry*, 245 F. Supp. 3d 99, 103 (D.D.C. 2017); *Langeman v. Garland*, 88 F.4th 289, 291 (D.C. Cir. 2023). The Court "need not accept inferences unsupported by facts or legal conclusions cast in the form of factual allegation," nor does the Court "accept as true the complaint's factual allegations insofar as they contradict exhibits to the complaint or matters subject to judicial notice." *Owens v. BNP Paribas, S.A.*, 897 F.3d 266, 272-73 (D.C. 2018)

---

[31]    *See*    United    Nations    Security    Council    Consolidated    List, https://main.un.org/securitycouncil/en/content/un-sc-consolidated-list; *see also* Martha Crenshaw, THE CONSEQUENCES OF COUNTERTERRORISM 96-99 (2010).

("*Owens IV*"); *see also Acosta Orellana v. CropLife Int'l*, 711 F. Supp. 2d 81, 109 (D.D.C. 2010) ("where some allegations in the complaint contradict other allegations, the conflicting allegations become 'naked assertions devoid of further factual enhancement . . . [, which therefore] cannot be presumed true.'").

## ARGUMENT

### I.  PLAINTIFFS FAIL TO STATE AN ATA AIDING-AND-ABETTING CLAIM

Section 2333(d) of the ATA imposes civil liability on a defendant "who aids and abets, by knowingly providing substantial assistance" to "an act of international terrorism" that is "committed, planned, or authorized" by an FTO. 18 U.S.C. § 2333(d)(2). In *Twitter v. Taamneh*, the Supreme Court explained that "knowing and substantial" assistance will only be found where a defendant has "consciously and culpably participated in" the specific "act of international terrorism that injured the plaintiffs" "in such a way as to help make it succeed." 598 U.S. 471, 497 (2023) (cleaned up); *accord id*. at 493, 496, 498 (similar). Recognizing the "need to cabin aiding-and-abetting liability to cases of truly culpable conduct," *Twitter,* 598 U.S. at 489, the Court laid down several guardrails.

First, "assistance to [the FTO's] activities in general" will not suffice to state a claim. *Id*. at 503; *id.* at 495 (It is "not enough . . . that a defendant have given substantial assistance to a transcendent 'enterprise' separate from and floating above all the actionable wrongs that constitute it."); *Ofisi v. BNP Paribas, S.A.*, 77 F.4th 667, 675 (D.C. Cir. 2023) ("Aiding and abetting requires more than the provision of material support to a terrorist organization."). Instead, the defendant must aid the FTO "in the *commission* of . . . an act of international terrorism." *Twitter*, 598 U.S. at 495 (emphasis added).

Second, aiding-and-abetting liability will not attach to "omissions, inactions, or nonfeasance," *id*. at 489, nor to instances where the defendant simply displays "indifference" or "lack of concern" to the mere possibility that its services might confer some downstream benefit on an FTO's illegal operations. *Ashley v. Deutsche Bank Aktiengesellschaft*, 144 F.4th 420, 443 (2d Cir. 2025); *Smith & Wesson Brands, Inc. v. Estados Unidos Mexicanos*, 605 U.S. 280, 282 (2025) ("What Mexico has plausibly alleged is only that manufacturers know some unidentified dealers [they provided guns to] routinely violate the law—but this describes "indifference" rather than assistance, similar to the insufficient allegations in *Twitter*."). Rather, a plaintiff must allege that the defendant "culpably associated themselves with the . . . attack [that injured plaintiffs], participated in it as something that they wished to bring about, or sought by [their] action to make it succeed." *Twitter*, 598 U.S. at 498.

When Congress enacted Section 2333(d), it pointed to *Halberstam v. Welch*, 705 F.2d 472 (D.C. Cir. 1983), as "providing the proper legal framework for civil aiding and abetting and conspiracy liability." *Twitter*, 598 U.S. at 485. Under that framework, a plaintiff must allege (1) "the party whom the defendant aids [performed] a wrongful act"–*i.e.*, the act of international terrorism–"that cause[d] an injury"; (2) the defendant was "generally aware of his role as part of an overall illegal or tortious activity at the time that he provide[d] the assistance"; and (3) the defendant "knowingly and substantially assist[ed] the principal violation." 705 F.2d at 477.

Plaintiffs' claims fail at every step of this analysis.

### A.    Plaintiffs Fail to Allege an Injury Traceable to an Attack by Hezbollah

The threshold requirement for an ATA aiding-and-abetting claim is pleading "an injury arising from an act of international terrorism committed, planned, or authorized by" an FTO. 18 U.S.C. § 2333(d)(2). Although the Amended Complaint discusses Hezbollah at length, every

injury-causing attack is alleged to have been committed by Hamas. *See, e.g.*, Am. Compl. ¶¶ 35-49, 75-80, 260-61, 433-36 (alleging that Plaintiffs were injured or killed in attacks "committed by Hamas," describing Hamas's rocket barrages, and identifying Hamas as the perpetrator of the October 7 attack).

The Amended Complaint links Hezbollah to only one attack—but even then, it alleges that Hamas was responsible for its commission. *See id.* ¶ 123 (alleging that plaintiff was "injured by a Hezbollah rocket in a Hamas terror attack"). Nor does the Amended Complaint plead any facts allowing the inference that Hezbollah "planned" or "authorized" that attack. It does not allege that Hezbollah coordinated with, trained, or exercised any control or influence over Hamas; that Hezbollah generally provided weapons to Hamas; or that Hezbollah was aware of, approved, ordered, or encouraged that particular attack. *Compare Atchley v. Astrazeneca Uk Ltd.*, 22 F.4th 204, 218-19 (2022) (complaint adequately alleged that Hezbollah "planned" an attack committed by Iraqi militia because Hezbollah trained the militia, provided weapons, "coordinated with [the militia] in specific locations where plaintiffs were injured or killed," helped the militia manufacture weapons, and "instructed" the militia to use certain weapons against Americans); *id.* at 219-20 (complaint alleged that Hezbollah "authorized" the militia's attacks because Hezbollah "exerted religious, personal, and operational authority" over the militia, and "Hezbollah exercised its command [over the militia] by training and directing its fighters, who swore fealty to Hezbollah").[32]

---

[32] *See also Bartlett v. Société Générale de Banque Au Liban SAL*, 2020 U.S. Dist. LEXIS 229921, 2020 WL 7089448, at *8 (E.D.N.Y. Nov. 25, 2020) (complaint adequately alleged that Hezbollah "committed, planned, or authorized" attacks by Iraqi militia because Hezbollah trained the group, "controlled and directed those militias," "planned the Attacks," and "designated and emplaced the weapons used in the Attacks."); *Freeman v. HSBC Holdings PLC*, 413 F. Supp. 3d 67, 96 (E.D.N.Y. 2019) (same, where complaint alleged that Hezbollah was

Plaintiffs merely allege that Hezbollah made an autonomous decision to launch rockets into Israel after October 7 "in a show of solidarity" with Hamas. Am. Compl. ¶ 386. That is plainly insufficient. *See, e.g.*, *Gonzalez v. Google LLC*, 2 F.4th 871, 884, 911-12 (9th Cir. 2021) (no plausible allegation that ISIS "committed, planned, or authorized" an attack despite allegations that the shooters were inspired by ISIS, pledged allegiance to ISIS, and that ISIS later claimed responsibility).

### B.    Plaintiffs Fail to Allege General Awareness

The Amended Complaint fails to plead that UNRWA USA was generally aware of playing a role in Hamas terrorist activities.[33] To satisfy *Halberstam*'s general awareness requirement, it is not enough that the defendant understood it was generally providing "material support to a designated terrorist *organization*." *Linde v. Arab Bank, PLC*, 882 F.3d 314, 329 (2d Cir. 2018) (emphasis in original). Rather, it must be "generally aware that it was thereby playing a 'role' in Hamas's violent or life-endangering activities." *Id.*; *Ashley*, 144 F.4th at 438 (defendant "must be generally aware of its role in some illegal activity *from which the terrorist attack was foreseeable*.") (emphasis added). Moreover, the defendant must have been "actuall[y] aware[]" of assuming this role. *Bernhardt v. Islamic Republic of Iran*, 47 F.4th 856, 867, n.11 (D.C. Cir. 2022) (rejecting "extreme recklessness" standard for general awareness); *see also Lamm v. State St. Bank & Tr.*, 749 F.3d 938, 950 (11th Cir. 2014) ("Alleging that a bank disregarded 'red flags' such as 'atypical activities' on a customer's account is insufficient to establish knowledge" for purpose of aiding-and-abetting claim").

---

"deeply involved in supporting and coordinating" militia's terrorist campaign, "provided advisors" to militants, and "train[ed] and arm[ed]" the group).

[33] Plaintiffs do not make a single non-conclusory allegation that UNRWA USA played a role in Hezbollah's operations —legal or otherwise—by contributing to UNRWA, let alone any non-conclusory allegations that UNRWA USA was aware of playing such a role.

As a general rule, where a plaintiff alleges that the defendant aided an FTO through an intermediary, the plaintiff must plead that (1) the defendant "was aware of the [intermediary's] connections with [the FTO] *before* the relevant attacks;" and (2) the intermediary was "so closely intertwined with [the FTO's] violent terrorist activities that one can reasonably infer [that the defendant] was generally aware of its role in unlawful activities from which the attacks were foreseeable while it was providing financial services to the [intermediary]." *Honickman v. BLOM Bank SAL*, 6 F.4th 487, 501 (2d Cir. 2021) (emphasis added).

However, where—as here—the intermediary in question has legitimate operations in addition to their alleged FTO ties, courts will presume that the assistance was used for lawful purposes unless the plaintiff plausibly alleges actual receipt by the FTO. *See Bernhardt*, 47 F.4th at 865 (allegation that bank transacted with Iranian banks with known ties to al-Qaeda insufficient because the aid "could just as plausibly benefit [the banks'] otherwise legitimate operations rather than al-Qaeda"); *Keren Kayemeth Leisrael-Jewish Nat'l Fund v. Educ. for a Just Peace in the Middle E.*, 66 F.4th 1007, 1017 (D.C. Cir. 2023) ("*LeIsrael*") (fact that intermediary "engages in lawful civil resistance" defeats the inference that defendant's donations "were used unlawfully"); *Owens IV*, 897 F.3d at 275 (refusing to infer general awareness that funds to Iran benefited FTO because Iran "is a government . . . [with] many legitimate agencies, operations, and programs to fund" and plaintiffs failed to allege that the funds "were in fact sent to [the FTO]"); *O'Sullivan v. Deutsche Bank AG*, No. 17-cv-8709, 2019 U.S. Dist. LEXIS 53134, at *30 (S.D.N.Y. Mar. 28, 2019) (same); *Averbach v. Cairo Amman Bank*, 2020 U.S. Dist. LEXIS 10902, at *45-46 (S.D.N.Y. Jan. 21, 2020) (concession that intermediaries "take part in actual charitable activities and provide actual social services undermine any inference that [defendant] had general

knowledge that by providing financial services to the [intermediaries] it was assuming a role in Hamas's terrorist activities.").

To distill the above principles, Plaintiffs must allege each of the following: (1) that UNRWA USA's financial assistance to UNRWA actually reached Hamas; (2) that UNRWA USA's funds played a role in illegal activity from which Hamas's terrorist attacks were foreseeable; and (3) that UNRWA USA was actually aware that it was playing a role in Hamas's "violent or life-endangering activities" *before* those attacks. *Linde*, 882 F.3d at 329. The Amended Complaint fails at each of these steps.

*First*, the Amended Complaint is devoid of any non-conclusory allegations that any of UNRWA USA's contributions flowed to Hamas. Plaintiffs' factual allegations about those funds are confined to the total amounts UNRWA USA transferred to UNRWA, and descriptions of the humanitarian purposes for which they were donated. Am. Compl. ¶¶ 393, 405-06. The Amended Complaint does not allege that any of these grants were diverted from their intended purpose, that any portion ended up in Hamas's hands, or that they were spent in a manner that benefited Hamas's illegal operations.

Rather than plead actual receipt, Plaintiffs rely on a theory of fungibility. *Id.* ¶ 393. Courts, however, have consistently rejected attempts to infer general awareness based solely on money's fungibility when funds are provided to a legitimate intermediary with "extensive lawful operations" and there is no allegation that "a substantial part of th[o]se operations" supported an FTO. *Bernhardt*, 47 F.4th at 869. In *Bernhardt*, for example, HSBC was alleged to have facilitated $19 billion in transactions with sanctioned Iranian institutions and provided $1 billion in currency sales to a bank that was "founded by a key financial contributor to al-Qaeda, maintained accounts for many of al-Qaeda's charity fronts, advertised the existence of those accounts . . . and facilitated

transactions for terrorists who provided the al-Qaeda cell of 9/11 hijackers with financial and logistical support." *Id.* at 868, 871 (cleaned up). Even so, the court found the complaint deficient because it failed to allege "how much (if any) of that money indirectly flowed to al-Qaeda." *Id.* at 871. *See also Ashley*, 144 F.4th at 444 (unlike material support charge, ATA aiding-and-abetting claim cannot be predicated solely on theory of money's fungibility); *Honickman*, 6 F.4th at 498-99 (same).[34]

There is no question that UNRWA performs extensive legitimate functions, including the provision of education, health care, emergency assistance and microcredit to millions of Palestinians across five fields of operation. *See, e.g.*, Am. Compl. ¶ 232. Nor do Plaintiffs allege that a "substantial portion of those operations" involve or benefit Hamas. Plaintiffs identify only a handful of Hamas or PIJ militants in UNRWA's employ, out of 30,000. *Id.* ¶¶ 284, 350. They do not allege that Hamas was using UNRWA's health care, emergency assistance, or microcredit operations to further its terrorist aims; nor do they allege that UNRWA's activities in the West Bank, Jordan, Lebanon, or Syria furthered Hamas's terrorist operations. As another court has found in the face of nearly identical allegations, "given [UNRWA']s extensive legitimate operations," UNRWA USA "had little reason to suspect that it was assuming a role in [Hamas's] terrorist activities." *Lavi v. UNRWA USA Nat'l Comm., Inc.*, 2025 U.S. Dist. LEXIS 153757, at *15 (D. Del. Aug. 8, 2025).

---

[34] *Atchley* is not to the contrary. That case did not involve payments to a legitimate intermediary—it alleged that the defendants paid bribes directly to Jaysh al-Mahdi, a Hezbollah proxy that controlled the Iraqi Ministry of Health, while that group was in the midst of carrying out terrorist attacks against Americans in the immediate vicinity. *Id.* at 33-34; *id.* at 34 ("attacks against U.S. citizens were the predictable, virtually inevitable fallout of defendants' direct cash and in-kind payments to Jaysh al-Mahdi under the circumstances then prevailing").

*Second*, even if the Court were to credit Plaintiffs' conclusory allegations about how funds were used, their claims would still fail. The Amended Complaint alleges that UNRWA USA's funds are "commingled with UNRWA's general operating budget," and that UNRWA uses that budget: (i) "to employ individuals affiliated with or sympathetic to Hamas, Hezbollah and other terrorist organizations," (ii) "to operate facilities that had been used for tunnel construction and weapons storage," (iii) "to disseminate educational content in schools that promoted hatred and violence," and (iv) to infuse Gaza with U.S. dollars that Hamas siphoned from moneychangers. Am. Compl. ¶¶ 393, 23(h). But Plaintiffs never allege that UNRWA USA was generally aware that *its* funds were being distributed in that fashion. And even if the Court overlooked that defect as well, none of these outlays amount to playing a role in Hamas's "violent or life-endangering activities," *Linde*, 882 F.3d at 329, or "in unlawful activities" from which Hamas's terrorist attacks "were *foreseeable*." *Honickman*, 6 F.4th at 501 (emphasis added).[35]

The Amended Complaint pleads no facts supporting the inference that mere employment of members of Hamas foreseeably led to terrorism. Plaintiffs do not allege that UNRWA encouraged, directed, or condoned militant activity, or that any employee's salary was provided for or diverted toward terrorist purposes. Nor do they identify anything about UNRWA employment itself–as opposed to alternative employment or unemployment–that would make an individual more likely to commit a terrorist act. As for the "operating facilities" allegation, Plaintiffs fail to allege that UNRWA USA's minuscule contributions foreseeably led to Hamas

---

[35] The Amended Complaint also nonsensically alleges that UNRWA USA aided and abetted Hamas by "[e]ncouraging Hamas violent terror campaign by proclaiming that as 'Palestinian refugees,' Hamas terrorists are entitled to live and possess property rights in Israel by force of arms, in flagrant disregard for Israel's immigration policies." Am. Compl. ¶ 23(a). Even if UNRWA USA had made such a remark (which it isn't pled to have done), it would be protected by the First Amendment.

using those facilities for terroristic purposes. In fact, the report cited in the Amended Complaint supplies the opposite inference: It shows that UNRWA took steps to safeguard its installations from misuse, 2015 UNSG Report ¶¶ 64, 75, but that it needed more funds to hire and train permanent security staff. *Id.* ¶¶ 84-85, 90. The far more plausible inference from this report is that contributions to UNRWA's budget would foreseeably diminish, not facilitate, militant incursions into its facilities.[36]

Plaintiffs likewise fail to allege that funding UNRWA curriculum constitutes the sort of "unlawful" or "violent or life-endangering activities" from which the October 7 attacks were a foreseeable consequence. There is nothing "unlawful" or "violent" about providing an elementary and middle school education to Gazan children, regardless of the content of the lesson plans used in the classroom. Nor do Plaintiffs allege that UNRWA used its funds to develop and distribute offensive curriculum. To the contrary, the GAO reports show that UNRWA acted diligently and used its scarce financial resources to review and replace teaching materials that were out of alignment with UN values. *See supra* at 13-14 & n.18.

The money-skimming scheme allegation fares no better. Not only are the key premises of the scheme manifestly untrue, *see supra* at 18-19, Israel itself approved and coordinated the distribution of U.S. dollars to UNRWA's Gazan staff. Plaintiffs' apparent theory—that UNRWA

---

[36] An independent audit of UNRWA's operations likewise found that UNRWA has "a more developed approach to neutrality than other similar UN or NGO entities," but that it needs more resources to fully enforce those rules. Final Report for the UN Secretary General, *Independent Review of Mechanisms and Procedures to Ensure Adherence by UNRWA to the Humanitarian Principle of Neutrality*, Apr. 20, 2024, at 5, 10, 12, 14, 19 ("Colonna Report"), https://www.un.org/unispal/wp-content/uploads/2024/04/unrwa_independent_review_on_neutrality.pdf (referenced in Am. Compl. ¶ 354).

USA was "generally aware" it was aiding Hamas's terror operations by increasing the number of U.S. dollars that the *Israeli Government* authorized and oversaw entering into Gaza—is, frankly, not a serious one.

*Third*, Plaintiffs fail to allege any facts supporting the inference that UNRWA USA was cognizant of playing any role in Hamas's terrorist operations *prior to* the injury-causing attacks. Most of the general awareness allegations in the Amended Complaint involve revelations in or after late-January 2024. *See* Am. Compl. ¶¶ 345-46, 413 (report detailing how UNRWA teachers applauded the October 7 attacks released January 29, 2024); *id.* ¶ 356 (hostage released in January 2025 claims to have been held in UNRWA facilities); *id.* ¶ 350-53, 414 (allegation that UNRWA staff participated in the attacks surfaces in late January 2024); *id.* ¶ 357 (US suspends funding in late January 2024); *see also Lavi*, 2025 U.S. Dist. LEXIS 153757, at *11 (plaintiffs injured on October 7 attacks cannot rely on information post-dating those attacks to establish general awareness).

In fact, the Amended Complaint alleges only two attacks that occurred after reports surfaced that UNRWA staff participated in or praised the October 7 attacks and after the U.S. paused its funding: one stemming from a rocket attack at an unspecified location on February 14, 2024, and one involving injuries sustained by an IDF soldier on deployment in Gaza on August 5, 2024. Am. Compl. ¶¶ 123, 157. Those claims, however, fail for additional reason: Plaintiffs plead no facts supporting the inference that UNRWA USA was generally aware that the aid it rendered after the October 7 war began went to anything other than supporting the Gazan humanitarian relief effort.

Because Plaintiffs have failed to (i) allege actual receipt, (ii) participation in illegal activities from which terrorism was foreseeable, or (iii) prior knowledge, it is ultimately academic

whether Hamas and UNRWA were "intertwined" in the manner asserted in the Amended Complaint. But even this legally insufficient contention lacks factual support. *Lavi*, 2025 U.S. Dist. LEXIS 153757, at *11-14 (finding that a nearly identical set of allegations did not establish that UNRWA was "so closely intertwined with Hamas's illegal activities as to give rise to an inference that [D]efendant was generally aware of its role in [Hamas's] terrorist activities").[37] Plaintiffs allege that Hamas controlled the composition of UNRWA staff through its control of the union, but the Amended Complaint identifies over a dozen examples of UNRWA *terminating* individuals for Hamas-related activities, Am. Compl. ¶¶ 284(a) & (e), 352-53, and not one example of Hamas using its influence to force the hiring or reinstatement of someone involved in Hamas's terrorist operations. They assert that UNRWA permitted Hamas to commandeer or tunnel under its facilities, but the documents cited in the Amended Complaint make clear that UNRWA investigated and protested this misuse. *See supra* at 15, 19.

The judicially noticeable public record is equally fatal to Plaintiffs' claim that UNRWA USA should have been on notice that it was supporting Hamas by funding UNRWA. Seventy-two countries gave, combined, vastly greater sums of money to UNRWA in the years leading up to the October 7 attacks; the U.S. Government was actively encouraging private donors to do exactly what UNRWA USA did; and the official stance of the U.S. Government prior to the attacks was that UNRWA funding was compliant with Section 301(c) of the Foreign Assistance Act. *See Lavi*, 2025 U.S. Dist. LEXIS 153757, at *16 ("It would be difficult to accept that UNRWA USA was on notice of UNRWA's intertwinement with Hamas while donor states such as the United States and Germany were not.").

---

[37] If anything, the factual allegations in *Lavi* were stronger since the plaintiffs in that case alleged that 10% of UNRWA employees had links to Hamas and Islamic Jihad. *Lavi*, 2025 U.S. Dist. LEXIS 153757, at *12.

### C.    Plaintiffs Fail to Allege Knowing and Substantial Assistance

Even if Plaintiffs could establish general awareness, their claims would fail because they do not plead knowing and substantial assistance. *Atchley v. Astrazeneca Uk Ltd.*, 2026 U.S. App. LEXIS 1742, at *36 (D.C. Cir. Jan. 23, 2026) ("Alleging that a defendant generally knew its assistance was going to a terrorist organization is insufficient."); *see also Twitter*, 598 U.S. at 481, 503 (affirming dismissal of complaint for failure to plead knowing and substantial assistance, even though complaint had pled defendant social media companies knew that ISIS exploited the platforms to recruit, fundraise, and spread its message); *Ashley*, 144 F.4th at 439 (dismissing claim, notwithstanding fact that plaintiffs pled general awareness).

The D.C. Circuit recently provided a roadmap for assessing whether a complaint pleads "knowing and substantial assistance" to a terrorist attack. First, the Court must start by assessing the strength of the nexus between the defendant's aid and the terrorist attack that injured the plaintiff. *Atchley*, 2026 U.S. App. LEXIS 1742, at *25-26. The more attenuated the nexus, the greater the plaintiff's burden of showing culpable conduct. *Id.* at *25. Where a pleading "falls short of tracing defendants' support to any specific attack injuring any plaintiff," the plaintiffs must "show culpable participation through intentional aid that substantially furthered the acts of terrorism in question." *Id.* at *35-36. And where a "concrete nexus between defendants' services and the act of terrorism" is lacking, the claim cannot survive unless the defendants "provided such systemic and pervasive assistance to a terrorist group that they could be said to aid and abet every act of terrorism the group commits as part of a common enterprise." *Id.* at *24.

Next, the Court must assess whether the complaint pleads sufficient indicia of culpability. In answering that question, the Court evaluates the "combined strength of plaintiffs' allegations regarding (a) the substantiality of the assistance defendants provide and (b) the degree of their

awareness or intentionality about the harms they aid." *Id.* at *25. These two factors work in tandem, such that a "lesser showing of one demand[s] a greater showing of the other." *Id.* at *22. Regardless, a plaintiff must still make a showing of both "knowledge and substantiality . . . to prevent aiding-and-abetting liability from sweeping in those who provide only tangential assistance." *Id.* at *22.

> i.  Plaintiffs Fail to Allege Any Nexus Between UNRWA USA's Aid and Attacks
>       that Injured Them

Plaintiffs fail to allege any facts connecting UNRWA USA's financial contributions to the specific attacks that caused Plaintiffs' injuries. As explained above, the Amended Complaint does not plead any facts supporting the inference that a single cent of UNRWA USA's aid reached Hamas, was spent in a manner benefiting Hamas's terrorist operations, or was used to further the injury-causing attacks. *See Lavi*, 2025 U.S. Dist. LEXIS 153757, at *18 (dismissing complaint which failed to allege "any non-conclusory allegations" that UNRWA USA's aid was transferred to Hamas or otherwise used in connection with the October 7th attack"); *see also Ofisi*, 77 F.4th at 675-76, 678 (funds to intermediary with extensive legitimate operations are presumed not to have reached FTO); *accord Bernhardt*, 47 F.4th at 871; *Siegel v. HSBC N. Am. Holdings, Inc*., 933 F.3d 217, 225 (2d Cir. 2019); *LeIsrael*, 66 F.4th at 1017.

Even if the Court were to accept every other aspect of Plaintiffs' theory and simply assume that some portion of UNRWA USA's funds were used to pay the salary of employees who were members of Hamas, build physical installations that Hamas utilized, and fund school curriculum that cultivated support for Hamas, that would not be enough to establish a nexus since Plaintiffs do not allege any of the Hamas members who participated in the specific attacks that caused their injuries used their UNRWA employment or UNRWA facilities to carry out those attacks. At most, Plaintiffs' allegations raise the theoretical possibility that Hamas derived an amorphous,

downstream benefit from UNRWA USA's donations. That is plainly insufficient. *Ashley*, 144 F.4th at 444 (there must be "a discernable nexus between the [assistance] and the specific attacks committed against Plaintiffs"); *Twitter*, 598 U.S. at 495, 503.

Likewise, even if the Court credited Plaintiffs' baseless allegations that UNRWA was helping Hamas access U.S. dollars, that would not establish the requisite nexus between *UNRWA USA*'s aid and the attacks. UNRWA USA is at least four steps removed from Hamas in Plaintiffs' money-skimming theory: UNRWA USA is alleged to have transferred funds to UNRWA, which paid dollars to its employees, who took the dollars to moneychangers, who allegedly paid a fee to Hamas. Courts have dismissed aiding-and-abetting claims predicated on far less attenuated schemes. In *Ashley*, for example, plaintiffs brought ATA claims against several banks that provided direct financial services to an individual who laundered money for a terrorist network. 144 F.4th at 443-44. Even so, the Second Circuit found that the plaintiffs failed to plead the required nexus between the aid and the attack. *Id.* at 444. The court noted that while it was "*possible* that some of the Banks' transactions in the money laundering scheme produced money" that was used in terrorist attacks that injured the plaintiff, the complaint failed to offer enough "information about the Banks' transactions in the money laundering operations" for the court to infer aiding and abetting. *Id.* at 444-45 (emphasis added). The same is true here, only more so: Plaintiffs offer no facts supporting the inference that Hamas's moneychangers skimmed any money whatsoever from UNRWA USA's contributions.

Because Plaintiffs fail to establish a "concrete nexus" between UNRWA USA's aid and the specific injury-causing attacks, the aiding-and-abetting claim can only survive if there is a showing that UNRWA USA "provided such systemic and pervasive assistance to [the] terrorist group that they could be said to aid and abet every act of terrorism the group commits as part of a

common enterprise." *Atchley*, 2026 U.S. App. LEXIS 1742, at *24. To meet that "high bar," Plaintiffs must plead that UNRWA USA's funding practices "were designed or performed with the intent to aid [Hamas]." *Ashley*, 144 F.4th at 445; *see also Twitter*, 598 U.S. at 496 (near-common enterprise liability "begins to blur with conspiracy liability"). The Amended Complaint falls short in both respects: It does not allege any assistance to Hamas, much less assistance that qualifies as systemic and pervasive. Nor, as detailed below, does it allege that UNRWA USA intended to aid Hamas.

> ii.  Plaintiffs Fail to Allege that UNRWA USA Acted with the Requisite Culpability

As *Atchley* explained "defendants are shielded from liability" where, as here, "the nexus is generic and attenuated and there is no showing of a near-common enterprise." 2026 U.S. App. LEXIS 1742, at *34. Thus, the Court can dismiss the aiding-and-abetting claim even without analyzing culpability. But even if this Court found that Plaintiffs had pled a discernible nexus, their claims would still fall short. Having failed to trace UNRWA USA's aid to the specific attacks that injured them, Plaintiffs must make a heightened showing of intent. *Atchley*, 2026 U.S. App. LEXIS 1742, at *35-36. Specifically, they must allege that UNRWA USA participated in the attacks that injured Plaintiffs "as something that they wished to bring about or sought by their action to make it succeed." *Twitter*, 598 U.S. at 490. The Amended Complaint fails to do so. *Lavi*, 2025 U.S. Dist. LEXIS 153757, at *19 (finding that identical allegations failed to establish that UNRWA USA intended to facilitate terrorism).

Plaintiffs do not allege any facts supporting the inference that UNRWA USA donated to UNRWA to further Hamas's terrorist activities rather than to aid UNRWA's humanitarian mission. They do not allege that UNRWA USA had any inkling that its aid was being spent in a manner than benefited Hamas's terrorist operations; that it knowingly or intentionally subsidized salary

payments to Hamas members; that it supported UNRWA schools in order to facilitate Hamas's indoctrination campaign, and not as a means to provide Palestinian children with an education; or that it knew or intended that UNRWA's schools and hospitals be used as staging points by Hamas, and not places to provide education and health care to refugees in need. Nor do Plaintiffs plead any other facts from which one could infer a culpable mind. They do not, for example, allege that UNRWA USA provided its aid in an "unusual way," *Twitter*, 598 U.S. at 502, or that it used improper means to transmit its donations to UNRWA. *Compare Atchley*, 2026 U.S. App. LEXIS 1742, at *45-46 (payment of "cash and in-kind bribes to a known terrorist organization" indicative of culpable mind). To the contrary, in funding UNRWA, UNRWA USA is not alleged to have done anything that was not done by 72 countries, dozens of NGOs, and innumerable private donors.

Moreover, Plaintiffs' own allegations undercut the inference that UNRWA USA sought to facilitate terrorism. UNRWA USA unambiguously condemned the October 7 attacks and called for the criminal prosecution of those involved. *See supra* n.9; *see also Lavi*, 2025 U.S. Dist. LEXIS 153757, at *19-20 (finding that UNRWA USA's public statements condemning the attacks negate the inference of intent). Plaintiffs also acknowledge that UNRWA USA paused its funding after it surfaced that UNRWA staff were involved in the attacks, and that it waited until two investigations ran their course to reinstate funding. *See supra* at 9. The judicially noticeable record reflects that UNRWA USA was not alone in reinstating its funding: By the summer of 2024, every country that had frozen its funds, except the United States, had lifted their freezes. *See* UNRWA Funding Emergency Restoration Act of 2024, H.R. 9649, 118th Cong. § 2(9) (2024) (finding that "[a]lmost all parties, including the European Union, United Kingdom, Germany, Sweden, Japan, France,

Switzerland, Canada, The Netherlands, Australia, Italy, Austria, Finland, Iceland, Romania, and Estonia have already restored funding to UNRWA").

Accordingly, Plaintiffs' ATA aiding-and-abetting claim must be dismissed.

## II.    PLAINTIFFS FAIL TO STATE A CONSPIRACY CLAIM UNDER THE ATA

Section 2333(d) creates conspiracy liability "for an injury arising from an act of international terrorism," for "any person . . . who conspires with the person who committed such an act." 18 U.S.C. § 2333(d)(2). To state an ATA conspiracy claim, a plaintiff must allege "(1) an agreement between two or more parties; (2) to participate in an unlawful act; and (3) an injury caused by an unlawful overt act performed by one of the parties; (4) to advance the common scheme." *Bernhardt,* 47 F.4th at 873.

Plaintiffs fail to plausibly allege "an agreement" to participate in an unlawful act. "An 'agreement' in the context of an ATA conspiracy requires that the defendant 'conspire[] with the person who committed' the terrorist act." *Id.* (quoting 18 U.S.C. § 2333(d)(2)). Thus, to state a claim Plaintiffs must allege that UNRWA USA "was pursuing the same object as [Hamas]," *id.*-- namely, to commit the act of international terrorism.[38] *See, e.g.*, *O'Sullivan v. Deutsche Bank AG*, 2019 U.S. Dist. LEXIS 53134, at *37 (S.D.N.Y. Mar. 28, 2019) (ATA conspiracy claim requires that the parties "share[] the common goal of committing an act of international terrorism"); *Cain v. Twitter Inc.*, 2018 U.S. Dist. LEXIS 163457, at *9 (N.D. Cal. Sep. 24, 2018) (dismissing conspiracy claim where plaintiffs failed to allege an agreement "to commit terrorist attacks.").

Plaintiffs fail to plausibly allege *any* shared goal, let alone a shared goal of committing terrorism. Plaintiffs assert in a conclusory fashion that UNRWA, UNRWA USA, Hamas, and

---

[38] The conspiracy claim separately fails as to Hezbollah because, as explained above, the Amended Complaint does not plead that Hezbollah committed any of the acts of terrorism that injured Plaintiffs.

Hezbollah shared the following common objectives: "paying Hamas and/or Hezbollah members, employing Hamas and/or Hezbollah members, building schools that stored Hamas weapons, and developing profoundly antisemitic curricula that calls for the murder of Jewish people." Am. Compl. ¶ 446. That allegation is triply defective. First, it is wholly conclusory. Plaintiffs do not allege that UNRWA USA met with, communicated with, or was in sympathy with Hamas or Hezbollah. *Twombly*, 550 U.S. at 556-57 ("A conclusory allegation of agreement at some unidentified point does not supply facts adequate to show illegality."). Second, Plaintiffs identify an obvious alternative explanation for UNRWA USA's contributions: supporting UNRWA's humanitarian mission. Am. Compl. ¶¶ 392-93; *see Rise v. Bagshaw*, 2025 U.S. Dist. LEXIS 90989, at *37 (D.D.C. May 13, 2025) (conspiracy claim cannot survive where there is an "obvious alternative explanation" for the defendant's conduct); *Black Lives Matter D.C. v. Trump*, 544 F. Supp. 3d 15, 39-40 (D.D.C. 2021) (dismissing a conspiracy claim against federal law enforcement and political officials because "the management of possible violence . . . generated an obvious alternative explanation . . . for the defendants' communications and activities other than having formed an agreement to violate the plaintiffs' civil rights"). Third, even if Plaintiffs' allegation was accepted as true, the claim would still fail. According to Plaintiffs, terrorism was not the agreed-upon goal but a "foreseeable" consequence of funding UNRWA. *Id.* ¶ 448. UNRWA USA has already explained why this is not so. That aside, conspiracy liability only attaches to overt acts in furtherance of the agreed-upon objective, not to all the "natural and foreseeable consequence of the conspiracy." *Freeman ex rel. Est. Freeman v. HSBC Holdings PLC*, 57 F.4th 66, 82 (2d Cir. 2023); *id.* ("To hold a defendant liable for a coconspirator's actions merely because they are foreseeable—even though wholly detached from the shared conspiratorial plan—would stretch the concept of civil conspiracy too far beyond its origin."). *See Lavi*, 2025 U.S. Dist. LEXIS 153757,

at *24 (dismissing identical conspiracy claim because complaint failed to allege "an agreement between [UNRWA USA], UNRWA, and Hamas to commit the October 7th *attack*").

For these reasons, Plaintiffs' ATA conspiracy claim must be dismissed.

## III.    PLAINTIFFS FAIL TO STATE AN ATA DIRECT LIABILITY CLAIM

To state a direct liability claim under 18 U.S.C. § 2333(a), a plaintiff must plead (1) that "the defendant committed an act of international terrorism," and (2) that "the injury was proximately caused" by that act of terrorism. *LeIsrael*, 66 F.4th at 1014 (noting that § 2333(a) requires the injury to be "by reason of" the act of international terrorism). Plaintiffs allege neither.

### A.    Plaintiffs Fail To Plead that UNRWA USA Committed an Act of International Terrorism

For an act to qualify as "international terrorism," it must, *inter alia*, (A) "involve violent acts or acts dangerous to human life" that "are . . . or that would be a criminal violation if committed within the jurisdiction of the United States or of any State"; and (B) "appear to be intended" (i) "to intimidate or coerce a civilian population," (ii) "to influence the policy of a government by intimidation or coercion," or (iii) "to affect the conduct of a government by mass destruction, assassination, or kidnapping." 18 U.S.C. § 2331(1)(A) & (B).

The Amended Complaint fails three times over. First, Plaintiffs do not and cannot allege that UNRWA USA's charitable donations were "violent" or "dangerous to human life." Indeed, courts have repeatedly held that the direct provision of financial services to state sponsors of terrorism—even in violation of U.S. sanctions law—does not meet those criteria. *See, e.g., Kemper v. Deutsche Bank AG*, 911 F.3d 383, 390, 394 (7th Cir. 2018); *O'Sullivan*, 2019 U.S. Dist. LEXIS 53134, at *33. Second, Plaintiffs fail to allege that UNRWA USA committed a criminal violation. They make passing reference to 18 U.S.C. § 2339A, Am. Compl. ¶¶ 450, 454, but that statute requires a showing that the defendant provided material support or resources (1) "knowing or

intending that they are to be used in preparation for, or in carrying out" (2) a violation of one of a long list of federal crimes. 18 U.S.C. § 2339A(a). For reasons already explained, Plaintiffs have not alleged that UNRWA USA's funds reached Hamas, much less that UNRWA USA knew or intended that its donations would be used to commit a federal crime. *See Ofisi*, 77 F.4th at 679 (affirming dismissal of § 2339A claim where complaint failed to allege that financial services with the government of Sudan reached al-Qaeda). Third, Plaintiffs fail to plead the requisite intent. To satisfy this element, Plaintiffs must allege facts that would lead an "objective observer" to conclude that UNRWA USA "desire[d]" to achieve one of the three terroristic goals listed in §2331(1)(B). *Kemper*, 911 F.3d at 390. The Amended Complaint pleads something else altogether: that UNRWA USA raised money to support UNRWA's humanitarian operations. *See, e.g.*, Am. Compl. ¶¶ 13, 206.

### B.     Plaintiffs Fail to Allege Proximate Causation

To establish proximate causation for purposes of § 2333(a), a plaintiff must plausibly allege "(1) that defendants' acts were a substantial factor in the sequence of events that led to their injuries and (2) that those injuries were reasonably foreseeable or anticipated as a natural consequence of [defendants'] conduct." *Owens IV*, 897 F.3d at 273. "[T]he central question for proximate causation is whether the alleged violation led *directly to* the plaintiff's injuries." *Id.* at 273 n.8 (emphasis added). Proximate cause precludes liability "based on an attenuated causal link" or "mere fortuity." *Atchley*, 22 F.4th at 226.

The Amended Complaint does not plausibly allege that UNRWA USA's donations— which constituted, at most, around 1% of UNRWA's operating budget—were a substantial factor, or indeed any factor, in the chain of events leading to Plaintiffs' injuries. Courts have found proximate cause lacking where defendants provided far greater sums directly to state sponsors of

terror. Thus, in *Owens IV*, the D.C. Circuit held that allegations that the defendant bank illegally processed $6 billion for Sudan, "which in turn funded and otherwise supported al Qaeda's attack" on U.S. Embassies, were inadequate to demonstrate a substantial connection between the defendant and terrorism, even though the intermediary (Sudan) was a designated sponsor of terrorism. 897 F.3d at 269-70. Likewise, in *Rothstein v. UBS AG*, the Second Circuit held that a bank's transfer of "hundreds of millions of dollars" to Iran did not proximately cause injuries resulting from attacks committed by Iranian-backed terrorists. 708 F.3d 82, 93-97 (2d Cir. 2013). Although Iran's status as a designated sponsor of terrorism "made it more likely" that the funds "would be used for terrorism," "the fact remain[ed] that Iran is a government, and as such it has many legitimate agencies, operations, and programs to fund." *Id*. at 97. The court also dismissed the complaint because the plaintiffs did not allege that "if UBS had not transferred U.S. currency to Iran, Iran, with its billions of dollars in reserve, would not have funded the attacks in which plaintiffs were injured." *Id.* The same shortcoming dooms Plaintiffs' claim, since the Amended Complaint does not allege that UNRWA would not have paid staff salaries or maintained its installations without UNRWA USA's 1% contribution.

Finally, for reasons already explained, Plaintiffs do not plead that Hamas's terrorist attack was a foreseeable consequence of UNRWA USA's donations to UNRWA. *See supra* Section I.B. Accordingly, the direct liability claim must be dismissed.

## IV.    PLAINTIFFS FAIL TO STATE A CLAIM FOR INTENTIONAL OR NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS

"Intentional infliction of emotional distress [IIED] is a particularly narrow cause of action." *E.M. v. Shady Grove Reprod. Sci. Ctr., P.C.*, 2025 U.S. Dist. LEXIS 59290, at *35 (D.D.C. Mar. 28, 2025). To state an IIED claim, a plaintiff must allege "(1) extreme and outrageous conduct on

the part of the defendant which (2) intentionally or recklessly (3) causes the plaintiff severe emotional distress." *Id.* Plaintiffs do not plead any of these elements.

To be "extreme and outrageous," the defendant's conduct must "go beyond all possible bounds of decency" and be "regarded as atrocious, and utterly intolerable in a civilized community." *Steele v. Isikoff*, 130 F. Supp. 2d 23, 36 (D.D.C. 2000). Plaintiffs cannot plausibly claim that funding UNRWA is "beyond all possible bounds of decency" when 72 countries did the same and the U.S. Government explicitly encouraged private donors to fund UNRWA's efforts. Nor, for reasons already explained, do Plaintiffs plead that UNRWA USA acted intentionally or recklessly in contributing to UNRWA or that its contributions proximately caused Plaintiffs' injuries. *E.M.*, 2025 U.S. Dist. LEXIS 59290, at *39 (IIED requires proximate cause).

Plaintiffs' negligent infliction of emotional distress (NIED) claim likewise fails. To state a claim, a plaintiff must allege "(1) the plaintiff was in the zone of physical danger, which was (2) created by the defendant's negligence, (3) the plaintiff feared for his own safety, and (4) the emotional distress so caused was serious and verifiable." *E.M.*, 2025 U.S. Dist. LEXIS 59290, at *39. NIED claims likewise require a showing of proximate cause. *Id.* Plaintiffs do not plead that UNRWA USA owed Plaintiffs a duty of care, that it acted negligently, or that the "zone of physical danger" was created by UNRWA USA's actions as opposed to the intervening criminal acts of Hamas terrorists. *See, e.g.*, A*kins v. District of Columbia*, 526 A.2d 933, 935 (D.C. 1987) ("When a criminal act intervenes between a defendant's negligence and the injury to the plaintiff, we have required that the injury be highly foreseeable before finding the negligent party liable"). For these reasons, the IIED and NIED claims must be dismissed.

## V.  THE COURT SHOULD DISMISS THE CLAIMS WITH PREJUDICE

Plaintiffs have already availed themselves of one amendment and used it to re-plead facially deficient claims that are rife with manifestly false assertions of fact. *Lacy v. Tenn. Civil Rule 15G Third Party*, 2023 U.S. Dist. LEXIS 45912, at *15 (D.D.C. Mar. 20, 2023) (dismissal with prejudice warranted where plaintiff had already re-pled deficient claims). Moreover, there is no way to plead around the fact that UNRWA USA contributed, at most, 1% to UNRWA's budget in the years preceding the attack; that it was joined by 72 countries and dozens of NGOs in funding UNRWA; that the U.S. Government confirmed that, at all times relevant to Plaintiffs' claims, UNRWA was complying with Section 301(c) of the Foreign Assistance Act; and that numerous governmental and UN reports broadcast the conclusion that more funds would help *bolster* UNRWA's efforts to shield its operations from Hamas infiltration. No amount of repleading can convert lawful, government-sanctioned humanitarian aid into terrorist assistance. Amendment would therefore be futile, and dismissal should be with prejudice. *See Jefferies v. District of Columbia*, 916 F. Supp. 2d 42, 44 (D.D.C. 2013) (dismissal with prejudice appropriate where amendment would be futile).

## <u>CONCLUSION</u>

For the foregoing reasons, the Court should dismiss the Amended Complaint in its entirety, with prejudice.

Dated: February 14, 2026

Respectfully submitted,

/s/ Joseph Pace
PACE FREEMAN LLP
30 Wall St, 8th Floor
New York, NY 10005
(917) 336-3948
joseph@pacefreeman.com

Maria LaHood
CENTER FOR CONSTITUTIONAL RIGHTS
666 Broadway, 7th Floor
New York, NY 10012
(212) 614-6430
mlahood@ccrjustice.org

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on February 14, 2026, I caused a true and correct copy of the foregoing to be filed with the Clerk of the Court using the ECF system and thereby served upon all counsel of record, including counsel for Plaintiff.


<u>/S/ Joseph Pace</u>