**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

ESTATE OF SIVAN SHA'ARABANY, et al.          :
                                                     :
                        Plaintiffs          :
                                               :   Civil Action No. 1:25-cv-02490-RCL
     v.          :
                                               :
UNITED NATIONS RELIEF AND WORKS          :
AGENCY FOR PALESTINE REFUGEES IN          :
THE NEAR EAST (UNRWA), et al.          :
                                               :
                     Defendants.          :
…………………………………………………………:

**PLAINTIFFS' OPPOSITION TO
DEFENDANT UNRWA USA'S MOTION FOR JUDICIAL NOTICE AND
CONSIDERATION OF DOCUMENTS INCORPORATED BY REFERENCE IN
SUPPORT OF MOTION TO DISMISS THE AMENDED COMPLAINT**

Plaintiffs respectfully oppose Defendant's Motion for Judicial Notice and Consideration of Documents Incorporated by Reference, [Dkt 31] ("UNRWA USA Motion"), as it seeks to expand the record and to draw contested factual inferences from materials outside the pleadings in order to seek to embolden their pending Rule 12(b)(6) motion by importing into the record external materials for consideration by the Court.  Defendant UNRWA USA's Memorandum of Law in Support of Motion to Dismiss Amended Complaint [Dkt 30-1] ("UNRWA USA MOL") cites to various Exhibits, many of which are largely outside the primary assertions of the Amended Complaint and are not properly before the Court for consideration, to challenge Plaintiffs' factual allegations.  What Defendants seek is to inappropriately expand the record with competing inferences by requesting that the Court assume as true certain statements included in its tendered Exhibits and "make factual determinations after weighing and considering the facts relied upon by each party." *In re Domestic Airline Travel Antitrust Litig.*, 221 F. Supp. 3d 46, 72 (D.D.C. 2016).

1

"This is a proper inquiry to conduct when addressing a motion for summary judgment, rather than a motion to dismiss when the Court is tasked with accepting all factual allegations in the Complaint as true." *Id.*

As set forth below, the inferences sought through the Exhibits that the Defendant seeks to attach to UNRWA USA MOL are impermissible at the 12(b)(6) stage and should be rejected.

Accordingly, Defendant's motion should be denied.

I.    **<u>Governing Standards of Expanding the Record at the Rule 12(b)(6) Stage</u>**

On a Rule 12(b)(6) motion to dismiss, the Court may consider only "the facts alleged in the complaint, any documents either attached to or incorporated in the complaint and matters of which [the Court] may take judicial notice." *E.E.O.C. v. St. Francis Xavier Parochial Sch.*, 117 F.3d 621, 624 (D.C. Cir. 1997).[1] Moreover, all factual inferences from any document referenced in the complaint must be resolved in favor of the plaintiff. *Nat'l Cmty. Reinvestment Coal. v. Accredited Home Lenders Holding Co*., 573 F. Supp. 2d 70, 74 (D.D.C. 2008) (factual discrepancies appearing in the record must be resolved in favor of the plaintiff) *citing Crane v. New York Zoological Soc*., 894 F.2d 454, 456, 282 U.S.App. D.C. 295, 297 (D.C.Cir.1990).

A document may be considered under incorporation-by-reference only if it is "referred to in the complaint *and integral to [the plaintiff's] claim*." *Kaempe v. Myers*, 367 F.3d 958, 965 (D.C. Cir. 2004). A document is integral if it a "legally operative document that is a necessary element of the claim." *Banneker Ventures, LLC v. Graham*, 798 F.3d 1119, 1133 (D.C. Cir. 2015); *see e.g., Kaempe*, 367 F.3d at 965 (emphasis added) (incorporating by reference filed patent documents that plaintiff alleged had the legal effect of assigning ownership rights to the preparing attorney, to assess whether they in fact had the legal effect that Plaintiff claimed), *Langeman v. Garland*, 88

---

[1] Plaintiffs will address in more detail in their opposition to Defendant's Motion to Dismiss the standards applicable to ATA cases at the Rule 12(b)(6) stage which per the Court's Scheduling Order is due on March 31, 2026.

F.4th 289, 292–94 (D.C. Cir. 2023) (incorporating by reference the investigative report that lead to plaintiff's termination to assess whether they reflected his claimed deprivation of due process in the termination); *see also U.S. v. Ritchie*, 342 F.3d 903, 908 (9th Cir. 2003) (A defendant may seek to incorporate a document into the complaint but only "if the plaintiff refers extensively to the document or the document forms the basis of the plaintiff's claim").

A plaintiff does adopt wholesale the factual contents of every document it references or attaches to its complaint. *Banneker*, 798 F.3d at 1133-34. It is therefore "necessary to consider why a plaintiff attached the documents, who authored the documents, and the reliability of the documents." *Id.* (internal quotations omitted).  If the plaintiff cites to a document created or commissioned by the defendant merely to support certain factual allegations, that document is not integral. *Id.*; *In re Domestic Airline Travel Antitrust Litig.*, 221 F. Supp. 3d at 72.  The mere mention of the existence of a document is insufficient to incorporate the contents of a document. *Ritchie*, 342 F.3d at 908-09; *Coto Settlement v. Eisenberg*, 593 F.3d.1031, 1038 (9th Cir. 2010). In these contexts, courts need not rely on any portion of the document not adopted by the plaintiff and "must" ignore any opinions, conclusions and new factual allegations advanced by the defendants. *Banneker*, 798 F.3d at 1133.

Nor may a defendant use judicial notice to introduce extra-pleading evidence to insert facts not alleged as if they are part of the complaint. Judicial notice may only be taken of facts "not subject to reasonable dispute," and only if they either are "generally known within the trial court's territorial jurisdiction" or "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b); *Ashbourne v. Hansberry*, 245 F. Supp. 3d 99, 102–03 (D.D.C. 2017), *aff'd,* 894 F.3d 298 (D.C. Cir. 2018) (taking judicial notice of public records in other proceedings to determine whether they support defendant's defense of *res*

*judicata*); *Baker v. Islamic Republic of Iran*, 2025 WL 2480075, at *4 (D.D.C. Aug. 28, 2025) (A federal court may take judicial notice of "a fact that *is not* subject to reasonable dispute") (emphasis added). There is no rule, as Defendant implies, that the Court *must* take judicial notice of whatever is requested by a party; FRE 201(c)(2) operates subject to, not independent of the limitations of FRE 201(b). *See e.g., Weinstein v. Islamic Republic of Iran*, 175 F. Supp. 2d 13, 16 (D.D.C. 2001).

A court may not rely on judicially noticed materials for the truth of contested assertions. *Hurd v. D.C. Gov't*, 864 F.3d 671, 686 (D.C. Cir. 2017); *In re Domestic Airline Travel Antitrust Litig.*, 221 F. Supp. 3d at 72. If matters outside the pleadings are used to negate plausible allegations, Rule 12(d) requires exclusion or conversion to summary judgment, resolution of which would necessarily be deferred until after a full-blown discovery. *Kim v. United States*, 632 F.3d 713, 719–20 (D.C. Cir. 2011).

Plaintiffs attached no exhibits to the Amended Complaint, and do not extensively rely on any of the Exhibits proposed for incorporation, which the Court should largely reject as outside the Amended Complaint. None of those documents are central or "integral" to any claim. Plaintiffs do not sue on the legal effect of any report, press release, audit, or policy document. This action, under the Antiterrorism Act, does not rise or fall on the effect of any legally operative document; it turns on the conduct of the Defendants, specifically whether the acts alleged in the Amended Complaint constitute material support for or aiding and abetting acts of international terrorism committed abroad.

Defendant's Motion for judicial notice is sweeping, in that it requests this Court to consider the "documents" it tenders and attaches as exhibits, not the relevant excerpts thereof. To that end, the Defendant explains that "[a]ll of the proposed exhibits are relevant to that claim insofar as they are part of the 'total mix of information' shaping UNRWA USA's awareness of the relationship

between UNRWA and Hamas and whether that relationship put UNRWA USA on notice that its aid to UNRWA was benefitting Hamas." UNRWA USA Motion at 2-3 [Dkt. 31].

While awareness and knowledge comprise part of the Plaintiffs' requisite showing, Plaintiffs' theory of what Defendant UNRWA USA knows or was aware of regarding UNRWA's activities is not limited to what may have been publicly reported. Am. Compl. ¶¶ 5, 20, 388-391, 407-411, 416-419, 422. Moreover, the ATA case Defendant cites to justify judicial notice, specifically states plaintiffs are **not** required to plead that a defendant "actually knew or should have known of" specific public sources. *Honickman v. BLOM Bank SAL*, 6 F.4th 487, 501 (2d Cir. 2021) ("Such a requirement at this juncture would be too exacting"). Thus, those sources to which Plaintiffs refer may contribute to establishing UNRWA USA's awareness, even collectively, are not integral to Plaintiffs' claims.

None of the cases Defendant cites provide any support for expanding the record to allow the Defendant to introduce external inferences to bolster their arguments against what the Plaintiffs allege. The three cases that Defendant cites in which courts have taken judicial notice of public information are all instances in which *the fact of publication* had the operative effect of defeating a legal claim. *See Staehr v. Hartford Fin. Servs. Grp.*, 547 F.3d 406, 425 (2d Cir. 2008); *United States ex rel. Winkelman v. CVS Caremark Corp.*, 827 F.3d 201, 208 (1st Cir. 2016); *United States ex rel. Moore & Co., P.A. v. Majestic Blue Fisheries, LLC,* 812 F.3d 294, 301 n.7 (3d Cir. 2016). Here the Defendant has not disputed having knowledge of the alleged facts in the Amended Complaint, and none of its proposed exhibits contradict any allegations. Rather it is seeking to expand the record to attempt to explain why it continued to provide support despite conceding that it had the knowledge Plaintiffs allege. These are questions for the jury, not a 12(b)(6) motion, and as such the Exhibits presented here are "irrelevant to the Court's rulings" and may not be

5

considered at this stage.  *Slate v. Am. Broad. Companies, Inc.*, 12 F. Supp. 3d 30, 45 (D.D.C. 2013).

II.    **None of Defendant's Exhibits May Be Considered on 12(b)(6)**

The Amended Complaint alleges a long-running institutional scheme in which UNRWA has provided material support to HAMAS perpetuated a grievance-driven humanitarian dependency crisis—which UNRWA USA knowingly aided and abetted and agreed to help sustain as UNRWA's dedicated, official U.S. fundraising arm—that predictably facilitated and supported the ascension, entrenchment and activities of U.S. designated terrorist organizations, including in particular, HAMAS, in various ways.

The Amended Complaint's references to UN materials audits, press statements, and U.S. government publications serve only to illustrate that broader pattern. They do not transform those materials into operative legal documents whose contents may be used to adjudicate disputed factual issues at the pleading stage. *See Banneker*, 798 F.3d at 1133–34.  Moreover, much of what the Defendant relies on from these documents are either statements attributable to a defendant or opinions, neither of which are noticeable as fact. *Id.*; *CITGO Petroleum Corp. v. Starstone Ins. SE*, 2023 WL 2525651, at *8 (S.D.N.Y. Mar. 15, 2023) ("as a rule of thumb, a purported 'fact' will more likely be found 'disputable' if it falls on the opinion end of the traditional 'fact-opinion' spectrum.") (internal quotations omitted). To be sure, Plaintiffs do not dispute that the Defendant's proposed Exhibits are documents of a nature that may very well contain facts that could be judicially noticed and indeed Plaintiffs reserve all rights to properly do so in their responsive Rule 12(b)(6) briefing.  However, Defendant's assertions as to the admissibility of these documents for the opinions contained therein, whether by incorporation by reference or judicial notice, are not permitted by the relevant rules, and thus Defendant's motion must be denied.

### A.    Exhibits 1-16 Are Not Integral as Required to Incorporate by Reference

Exhibits 1 through 16 consist of press releases, audits, reports, media articles, and agency publications. None are integral to Plaintiffs' claims, none contradict Plaintiffs' claims and none may be incorporated into the pleadings for purposes of Rule 12(b)(6).

**Exhibit 1** is an UNRWA USA press release. [Dkt. 31-3].  Its contents confirm--and do not contradict—Plaintiffs' allegation that UNRWA USA sought to raise more money for UNRWA upon the revelation that UNRWA's staff participated in the October 7 attacks. ¶414.   The inferences that the Defendant seeks for the Court to adopt as truth based on its self-serving assertions—regarding humanitarian support, being "horrified", vetting, Israeli approval, or neutrality safeguards—are precisely the improper merits-based variety, found in a document of questionable reliability, that this Court must reject at this stage. UNRWA USA MOL 7-8; *See Hurd*, 864 F.3d at 686; *Banneker*, 798 F.3d at 1133–34.

**Exhibit 2 and 3** are a diplomatic framework agreement between the United States and UNRWA and its annex. [Dkt. 31-4, 5]. As Plaintiffs do not sue on the legal effect of this agreement, it is not integral to any claim. The Complaint references U.S. oversight conditions to illustrate longstanding recognition of diversion and infiltration risk. ¶17. Defendant seeks for the Court to infer from the Framework Agreement that continued U.S. engagement reflected an endorsement by the U.S. government of UNRWA's neutrality mechanisms as being effective such that it negates Defendant's knowledge or foreseeability of HAMAS exploitation. UNRWA USA MOL at 11-12. That is an impermissible inference at the Rule 12(b)(6) stage. These Exhibits' contents support and do not contradict the Plaintiffs' allegations. The Court may not rely on them to accept as true the Defendant's spurious claim that they somehow disprove Plaintiffs' allegations that such safeguards were structurally insufficient or foreseeably circumvented.

**Exhibit 4** is a UN chronology referencing a statement by an UNRWA USA Board Member confirming that she met with HAMAS ministers and the absence of instruction from UN Headquarters prohibiting such meetings. [Dkt. 31-6]. Defendant seeks to draw a substantive inference from this entry, namely, that the absence of internal UN prohibition constitutes institutional authorization, which Defendant claims negates plausibility of Plaintiffs' alleged awareness and agreement. UNRWA USA MOL at 8. Defendant's proposed inference is neither supported by the document nor appropriate at this stage. In fact, the April 2006 chronology document reveals that regardless of what the United Nations may or may not have authorized, the *United States* affirmatively opposed international engagement with HAMAS at the very same time that Defendant's current Board Member admitted to such engagement. Ex. 4 at 5. In any event, the document confirms and does not contradict that meetings with HAMAS officials occurred; it does not adjudicate whether such interactions were foreseeable contributors to HAMAS entrenchment or relevant to aiding-and-abetting liability. Competing interpretations of that conduct cannot be resolved under Rule 12(b)(6), particularly as they are sourced from a UN-curated document of questionably reliability.

**Exhibit 5** is an official U.N. report concerning militant incursions into UNRWA facilities. [Dkt. 31-7]. Defendant asks the Court to adopt its preferred inference—that UNRWA-conducted inspections "negates the inference that UNRWA was 'structurally co-opted by HAMAS.'" UNRWA USA MOL 14-15. That is a merits-based inference, improper at this stage, and one that is hardly supported by the document. The inspections described in paragraphs that the Defendant cites illustrate that UNRWA's inspections somehow did not result in weapons being found, while the adjacent paragraphs reveal weapons being discovered by other means days or weeks later. Ex. 5 at ¶¶54-55, 63-64, 75-76. One paragraph in this part of the document may illustrate why

UNRWA inspections were fruitless, describing an incident in which UNRWA management was notified of a weapon, but did nothing to address it, leading the board to conclude "that it was highly likely that a Palestinian armed group might have used the premises to hide weapons." *Id.* at ¶67. But the Court need not expand the record before it as the Defendant seeks through this Motion. The report itself confirms—and does not contradict—Plaintiffs' allegations of repeated militant incursions into UNRWA facilities. The extent to which UNRWA USA's continued funding foreseeably sustained an infrastructure repeatedly exploited by HAMAS is a factual question that cannot be resolved at the pleading stage. The Court may not credit Defendant's characterization of the reports' implications, while the report itself raises reliability concerns due to the bias of the U.N. towards preserving UNRWA's credibility.

**Exhibits 6 and 7** are U.N. Board of Auditors reports. [Dkt. 31-8.9]. These financial audit reports do not contradict any allegations in the Amended Complaint. Plaintiffs allege the 2019 audit raises concerns about UNRWA's hiring practices, which is not the subject of what UNRWA USA disputes in raising these documents. ¶285, UNRWA MOL at 15. Moreover, that the auditors acknowledged that UNRWA had "a system" of internal controls does not contradict the Plaintiffs' allegation confirmed by the report that the auditors were concerned with its systems and recommended that "UNRWA take measures to update the refugee registration information system and monitor cash distribution in Gaza through the system to ensure the timely and accurate tracking of cash distributions." Ex. 7 at 21. Defendant seeks to convert statements that UNRWA maintained "internal controls" into proof that funds were not foreseeably diverted or exploited. That inference is improper at the pleading stage. The absence of documented diversion in an audit report does not disprove that diversion or coercive extraction may have occurred and was foreseeable, particularly

when considering how UN bias may color its reliability. The Court may not adopt Defendant's interpretation of these documents.

**Exhibits 8–10** are UNRWA press releases concerning the discovery of tunnels near UNRWA facilities. [Dkt. 31-10-12]. Defendant attempts to use these press releases to establish that UNRWA proactively enforced neutrality and prevented misuse of its facilities. UNRWA MOL at 19. That argument misapprehends the procedural posture. The press releases confirm—and do not contradict—Plaintiffs' allegations that neutrality breaches repeatedly occurred and required public condemnation. Whether those incidents demonstrate systemic vulnerability or something else differently is an unresolved factual question that cannot be resolved at the Rule 12(b)(6) stage by crediting self-serving institutional statements that were not included in the pleadings. *See Banneker*, 798 F.3d at 1133–34.

**Exhibit 11** is a newspaper article. [Dkt. 31-13]. It cannot be judicially noticed for the truth of the matters asserted. Defendant attempts to use a quotation from an UNRWA official to argue that UNRWA resisted HAMAS interference and enforced neutrality. UNRWA MOL at 19. That is a merits inference sourced from a Defendant in this action. *See Banneker*, 798 F.3d at 1133–34. Moreover, media reporting is not adjudicative fact, and the Court may not resolve competing inferences drawn from journalistic accounts at the Rule 12(b)(6) stage. If anything, the article confirms that concerns about HAMAS influence and neutrality enforcement were publicly known—supporting Plaintiffs' notice allegations.

**Exhibit 12** is a UNRWA-commissioned consulting report addressing cash transfer mechanisms in Gaza. [Dkt. 31-14]. It is neither integral to any claim nor subject to judicial notice for the truth of contested factual propositions. Nor does it contradict any allegations.  Defendant seeks to rely on the report's statements regarding currency usage and lack of "documented

10

evidence" of leakage to negate Plaintiffs' allegations of diversion and coercive extraction risk. UNRWA MOL at 15.  But an absence of documented proof in an internal consulting review does not permit an inference that diversion risk did not exist, that diversion did not occur nor of UNRWA's mental state as related to these allegations. At most, the report reflects UNRWA's description of its own procedures and risk assessments, which may not be inserted into the record as a competing inference to what has been plead.  *See Banneker*, 798 F.3d at 1133–34. Whether those safeguards were effective in a HAMAS-controlled environment is a disputed factual question inappropriate for resolution on a motion to dismiss.

**Exhibit 13** is the Colonna Independent Review, which was commissioned by the United Nations. [Dkt. 31-15]. Defendant's reliance is selective. While the report notes that UNRWA has implemented neutrality mechanisms, it does not adjudicate that UNRWA's neutrality framework was effective. Nor does it contradict any of Plaintiffs' allegations. To the contrary, and despite its potential bias as a UN commissioned report, it identifies institutional process failures, structural strain, investigative backlogs, enforcement gaps, and resource deficiencies requiring reforms. Ex. 13 at 4-5, 8, 14, 21. Defendant's attempt to characterize the report as exoneration asks the Court to draw an improper merits-based inference against Plaintiffs.

**Exhibit 14** is a third-party watchdog report, the methodology of which Defendant attempts to discredit by arguing that it identified only a limited number of employees and verified employment for only some of them. [Dkt. 31-16]. Plaintiffs invite the Court to review the report to determine whether it may be included as part of the pleadings.

**Exhibit 15** is a GAO report. [Dkt. 31-17]. Defendant improperly seeks to use it as substantive proof that UNRWA's educational programming was neutral and that problematic content was effectively remediated. UNRWA USA MOL at 30.  Notably, the text of the GAO report to which

11

the Defendant cites draws its support from UNRWA officials. Ex. 15 at n. 18, 24, 25. The GAO report does not contradict Plaintiffs' allegations. In fact, it reflects that U.S. officials recognized serious curriculum concerns and directly contradicts Defendant's assertion that "UNRWA acted diligently . . . to review and *replace* teaching materials that were out of alignment with UN values." UNRWA USA MOL at 30 (emphasis added).  The report reveals, in fact that "UNRWA . . . identif[ied] content it deemed not aligned with UN values and has developed complementary teaching materials to address this content when considered necessary. However, *UNRWA did not train teachers on the materials or distribute materials to classrooms; as a result, these materials were not used* in UNRWA classrooms." Ex. 15 at 16 (emphasis added).  The extent to which UNRWA's proposed mitigation measures were meaningful as implemented or merely cosmetic is a disputed factual issue that cannot be resolved on Rule 12(b)(6).

**Exhibit 16** is a media article. [Dkt. 31-18]. Defendant argues that Plaintiffs quoted UNRWA leadership out of context and seeks to recast UNRWA's statements to establish that neutrality violations were meaningfully policed. UNRWA USA MOL at 20.  The expanded quote that Defendant invokes does not undermine what Plaintiffs quoted, as the UNRWA spokewoman's reference to "disciplinary action" for employees found to belong to HAMAS is vague at best, and encompasses a range of actions that fall short of terminating financial payments to these known members of the U.S. designated terrorist organization. Nor does the article contradict anything plead in the Amended Complaint.  In fact, it reinforces that in the years immediately prior to the October 7 attacks, the United States was still concerned that UNRWA's education system had problems with incitement, antisemitism, accountability, transparency, neutrality and links to terrorism, Ex. 16 at 2-5. The author of the article interviews current UNRWA students who state they are taught to glorify terrorism and reject peaceful coexistence. *Id.* at 9-10. A former UNRWA

12

student questions U.S. support for UNRWA, stating that it "isn't helping anyone. Look around, and you can see it." *Id.* The article's sources identify UNRWA's education as a reason the Palestinian-Israeli "conflict has remained so intractable*,*" and with "more impact than perhaps any other effort" *Id.* at 14.   Plaintiffs invite the Court to review the report to determine whether it may be included as part of the pleadings.

Regarding each of these Exhibits, even though the Court can acknowledge certain referenced materials exist, it is inappropriate for the Defendant to use selected excerpts from news articles, UNRWA documents, or external commentary to challenge Plaintiffs' claims or establish (disputed or disputable) facts favoring the Defendant at this stage of the pleadings, as we are not at a Summary Judgment stage. The Court cannot incorporate these materials by reference for the purposes the Defendant suggests and none may be treated as part of the pleadings for purposes of Rule 12(b)(6).

### B.    Defendant's Claims Citing to Exhibits 17–24 are Disputed and Cannot be Determined to be Unquestionably Accurate from the Exhibits.

Unlike Exhibits 1–16, which Defendant attempts to shoehorn into incorporation-by-reference, Exhibits 17-23 are offered solely under Federal Rule of Evidence 201. But Defendant again seeks to use them for an impermissible purpose: to transform policy documents, legislative summaries, and executive branch statements into adjudicative findings that negate Plaintiffs' well-pled allegations.

Judicial notice permits a court to recognize indisputable facts, and while some of the public records the Defendant proffers may contain facts that can be noticeable in certain contexts, that does not fully describe the type of information that the Defendant is proposing for this Court to notice here.   This is evident, as set forth below, in certain discrepancies between the Defendant's claimed purpose in requesting judicial notice, and its use of these Exhibits in the motion to dismiss

13

brief. The fact that certain statements were made or that certain policies were adopted does not compel the Court to accept as true contested conclusions within those materials or to draw Defendant-favorable inferences from them. *See Hurd*, 864 F.3d at 686.

Defendant's recurring argument is that because the U.S. government and others have made appropriations, or publicly expressed support for UNRWA's claimed humanitarian objectives, the government was therefore not concerned that supporting UNRWA would equate to supporting HAMAS. That inference is neither indisputable nor judicially noticeable. Congressional funding decisions and Executive Branch policies that reflect the United States' humanitarian, diplomatic, and geopolitical judgment to support the Palestinian people do not constitute adjudications of UNRWA's institutional neutrality or insulation from terrorist influence.

To the contrary, the very existence of recurring conditions, certifications, GAO reviews, CRS reports, and funding pauses underscores that diversion and infiltration risks were persistent and well recognized. They reflect that the U.S. government had serious concerns about UNRWA's problematic nature but felt compelled to engage due to the dependency that UNRWA cultivated when it removed and cabined-off refugees of Arab-Palestinian descent from the widely accepted global refugee protection regime under the UN High Commissioner for Refugees.

Defendant cannot convert political mitigation efforts into judicial findings that UNRWA was structurally neutral or that its operations did not foreseeably benefit HAMAS. Accordingly, the Court may not take notice of these reports, statements or Defendant's characterization of them as dispositive proof negating Plaintiffs' allegations. *Baker*, 2025 WL 2480075 at *4.

**Exhibits 17 and 18** are Congressional Research Service Reports. [Dkt. 31-19, 20]. In requesting judicial notice, Defendant claims a broad use.  UNRWA USA Motion at 5 ("These reports discuss the US Government's historical role in funding UNRWA and how US contributions

14

were subject to various "legislative conditions and oversight measures" to ensure that UNRWA funding was not being used to assist anyone engaged in acts of terrorism"). In its motion to dismiss, however, the Defendant mostly cites these reports for seemingly narrow and possibly appropriate purposes in its statement of facts, although as it cites these reports in conjunction with allegations it is not entirely clear. UNRWA USA MOL at 4-5. Plaintiffs do not object to this Court taking judicial notice that the United States has donated over $7.3 billion to UNRWA or similarly discrete facts such as UNRWA's budget. The Defendant cites one additional time to Exhibit 18 in its argument: first to support the statement "UNRWA funding was paused in September 2018 and reinstated in 2021", and second in the parenthetical that follows which states: "as of the report's date, December 12, 2018, 'no arm of the U.S. government has found UNRWA to be out of compliance with Section 301(c)'"). UNRWA USA MOL at 12, n.15. Plaintiffs do not dispute the fact of non-funding during the time period nor that the quoted language regarding Section 301(c) appears as stated. However, both the Defendant's characterization of the termination as a "pause" and characterization of the Section 301(c) language as a U.S. certification "that UNRWA funding was not being used to assist anyone engaged in acts of terrorism" or that UNRWA is "entrusted" are inferences about the U.S. government's intention and views of UNRWA that are contradicted by the Exhibit itself. Ex. 18 at 9 ("United States will no longer commit further funding to this irredeemably flawed operation."); UNRWA USA MOL at 4; UNRWA USA Motion at 5. By and large, these documents confirm, and do not contradict Plaintiffs' allegations about UNRWA's systemic problems. The United States has contributed immensely to UNRWA's operation, and U.S. calls for an expanded donor base "ma[k]e it clear that the United States was no longer willing to shoulder the very disproportionate share of the burden of UNRWA's costs that we had assumed for many years." Ex. 18 at 9. These Exhibits also show that the amounts of donations have

increased at enormous scale in some years, reflecting the natural consequences UNRWA's self-perpetuating crisis mandate driven by its uniquely expansive refugee definition, to which the U.S. government attributes the expanded cost burden. Ex. 17 at 3; Ex. 18 at 9 ("the fundamental business model and fiscal practices that have marked UNRWA for years – tied to UNRWA's endlessly and exponentially expanding community of entitled beneficiaries – is simply unsustainable and has been in crisis mode for many years"). They also reflect that, in so doing, UNRWA has created a dependency from which the United States is desperately seeking to disengage. Ex. 17 at 4; Ex. 18 at 9. Other than to support the limited undisputed facts as identified above, Plaintiffs oppose this judicial notice Motion.

**Exhibit 19** is a GAO Report published in January of 2026 [Dkt. 31-21]. Defendant's Motion seeks judicial notice of this report, which was published after the Amended Complaint was filed, (i) to negate Plaintiffs' claim that UNRWA uses "Hamas-approved" textbooks; and (ii) to establish that UNRWA schools in Gaza only run through Grade 10. UNRWA USA Motion at 5. In its motion to dismiss brief, however, Defendant also cites to this Exhibit: (iii) to establish that "[a]ccording to the GAO, UNRWA follows 'best refugee practice'", by using Palestinian Authority generated textbooks, and (iv) to infer that UNRWA's problematic education is the result of a financial shortfall, and therefore Defendant's funding serves to mitigate not exacerbate those issues. UNRWA MOL at 13. A review of the GAO report reveals that purposes (i) and (iii) are not GAO conclusions, but simply recitations of what UNRWA says. Ex. 19 at 2, n.4 ("Hamas was the *de facto* government in Gaza in the period leading up the Hamas-led attack on Israel on October 7, 2023. UNRWA does not use Hamas textbooks or Hamas supplementary materials, *according to UNRWA officials, and UNRWA officials said* they do not allow them in their schools. The United States designated Hamas as a terrorist organization in 1997") (emphasis added); *Id.* at 1 ("Citing

16

it as an educational best practice for refugee communities, UNRWA uses the curricula developed by the host governments everywhere it operates. According to UNRWA, this ensures…").  As these assertions draw exclusively from statements made by UNRWA officials and it is impermissible to accept those statements into the record as fact. *See Banneker*, 798 F.3d at 1133–34.  Indeed, right after sharing UNRWA's view that its textbooks are "best refugee practice", the GAO report proceeds to advance a drastically different position. *Id* at 2 ("The government of Israel, international donors, and others have expressed concerns about UNRWA's use of host country curricula and textbooks, including that they may contribute to the promotion of antisemitism and incitement of violence.").  Indeed, other Exhibits Defendant seeks to incorporate into the record affirm that using host country materials "is not something [UNRWA] ha[s] to do." Ex. 16 at 13. Notably, Exhibit 19 reveals that UNRWA has not *always* used "host country" textbooks. Ex. 19 at 6, n.8 ("Prior to 2000, schools in Gaza used Egyptian textbooks and schools in the West Bank used Jordanian textbooks."). The extent to which UNRWA considered using Israel-approved textbooks upon Israel assuming administrative control over Gaza in 1967 is a question that warrants exploration through discovery. As to purpose (ii), the Plaintiffs agree that the report reflects that UNRWA does not provide education for students in Gaza beyond grades 10, but rejects Defendant's inference that this somehow insulates UNRWA from accountability in any way.  If anything, it begs the question as to why, given UNRWA's massive budget, most of which is allocated to education, it would elect to cease educating Palestinian students at precisely the age that they are recruited to join terrorist organizations. As to purpose (iv), Exhibit 19 also shows that UNRWA was set up as a temporary agency to serve 860,000 Palestinian refugee, that today that number has ballooned to 5.9 million, and that now UNRWA is unable to protect most of the refugees that it removed from the global refugee framework.  Ex. 19 at 9. This document merely

17

reflects the self-generating crisis that the Defendant exploits to raise money. Ex. 17 at 4; Ex. 18 at 9.  It does not negate Plaintiffs' well-plead factual allegations and should not be incorporated into the record.

**Exhibit 20** is an UNRWA generated document, purportedly reflecting its Donor List in 2023. [Dkt. 31-22]. Defendant's Motion asserts this Exhibit is "introduced for the purpose of showing the number of countries and NGOs that pledged donations to UNRWA." UNRWA USA Motion at 5. In its Motion to Dismiss brief, Defendant quantifies those as "72 countries and dozens of NGOs".  UNRWA USA MOL at 4. Plaintiffs concede that Exhibit 20 seems to match the chart accessible on the UNRWA website and that more than 24 donors on this list appear by their title to qualify as NGOs and therefore do not dispute the quantification of "dozens.  While the Plaintiffs have no basis to challenge UNRWA's representations, Plaintiffs do not accept as reliable any uncorroborated information furnished by Defendants. *See Banneker*, 798 F.3d at 1133–34. Moreover, as the chart does not specify which donors Defendant is counting as "countries," and as certain donors on the list, including "Palestine", are not recognized countries in the U.S., Plaintiffs dispute that the number of countries listed in this Exhibit is 72. Ex. 20. In any event, Plaintiffs do not believe that the precise number of countries donating to UNRWA is a material fact. As all the U.S. government reports described above illustrate, that countries choose to provide humanitarian support for Palestinians through UNRWA does not establish institutional compliance, negate foreseeability of terrorist penetration or diversion or constitute certification that the funds have been used as intended by the donors. Rule 201 does not allow for judicial notice of this document, including for the purposes Defendant requests.

**Exhibit 21** is an UNRWA Press Release from 2022. [Dkt. 31-23].  The Defendant in its Motion claims to introduce it to establish "the number of teachers UNRWA employs." UNRWA

USA Motion at 5.  The motion to dismiss brief quantifies this number as "nearly 20,000", which is consistent with what the Exhibit states. Ex. 21.  Plaintiffs have no factual basis to dispute Defendant's number, observe that it is not inconsistent with what Plaintiffs do allege, and do not view this as a material fact. Am. Compl. at ¶232 (UNRWA's total staff exceeds 30,000); *Id.* at ¶233 (UNRWA's education staff in Gaza is over 9,400).  However, Plaintiffs do not accept as reliable any uncorroborated information furnished by the Defendants. *See Banneker*, 798 F.3d at 1133–34.  Like other UNRWA generated press releases, this document may not be noticed or used to validate self-serving institutional characterizations as fact. *Id.*

**Exhibit 22** is an OFAC Compliance Communiqué. [Dkt. 31-24].  Defendant's Motion does not explain its intended use and merely notes that it "details the agency's position on providing humanitarian aid that incidentally benefits a blocked person." UNRWA USA Motion at 6. In its motion to dismiss brief, the Defendant claims this document disproves Plaintiffs' allegations about UNRWA USA's duties as a U.S.-based 501(c)(3) organization engaged in foreign grantmaking and that "UNRWA USA was barred from providing financial assistance to UNRWA because UNRWA employed some Hamas members." UNRWA USA MOL at 9-10. Plaintiffs observe that this guidance was issued on November 14, 2023, after a number of the attacks in which Plaintiffs were killed or injured, and therefore construe Defendant's argument as only applying to funding provided by UNRWA USA subsequent to that date.  Given the legal relevance Defendant attributes to this document, Plaintiffs further construe Defendant's proposed use as a concession by the Defendant that payments made by UNRWA USA prior to the issuance of this document was not made subject to this guidance. Moreover, Plaintiffs reject Defendant's characterization of their extensive allegations of UNRWA's support for HAMAS as "incidental".  Lastly, the OFAC Guidance states "[t]he NGO general licenses do not authorize the provision of fuel to blocked

19

persons such as Hamas . . .  OFAC encourages NGOs to exercise caution to ensure that blocked persons are not the ultimate beneficiary of fuel imported into Gaza." Ex. 22 at 3-4.  UNRWA itself confirmed that it had provided fuel to HAMAS, and subsequently made clear that it was seeking additional fuel.  *See* Ex 1p (Since deleted tweet from UNRWA indicating that "people with trucks purporting to be from the Ministry of Health of the de facto authorities in Gaza, removed fuel and medical equipment from the Agency's compound in Gaza City"); Ex. 2p (Active tweets confirming that "no looting has taken place" and clarifying the movement of "supplies from the UNRWA warehouse to health partners"); Ex. 3p (UNRWA press release calling for more fuel). OFAC's clarification that certain wartime humanitarian transactions may be permissible under sanctions law does not adjudicate whether the alleged conduct constituted substantial assistance under the ATA. Nothing in this document references UNRWA, HAMAS or the ATA. It is not relevant to these proceedings and expanding the record to incorporate it into the pleadings is not a permissible use of judicial notice.  *Slate*, 12 F. Supp. 3d at 45 (D.D.C. 2013).

**Exhibits 23 and 24** are White House public remarks, although no document was filed in connection with Exhibit 24. [Dkt. 31-25]. Defendant claims in its Motion that these Exhibits are not offered for the truth of their contents. UNRWA USA Motion at 7.  However, the Defendant's use these records to suggest "Biden Administration . . . senior officials publicly praised UNRWA's response to the investigations, emphasized the indispensability of its humanitarian work, and urged partners to sustain or increase support to offset Congress's refusal to authorize funds." UNRWA USA MOL at 9. In support of this, the Defendant takes selected quotes from the briefings out of context and mischaracterizes statements of U.S. dependency on UNRWA as endorsement of UNRWA's work.  For example, at the July 25, 2024 briefing, when asked "Is it or is it not the US Government's position that UNRWA is complicit in terrorism?" then White House National

Security Communications Advisor John Kirby did not assert that UNRWA was innocent of the accusation, rather he focused on US dependency on UNRWA.  Ex. 24 (timestamp 37:11). He then proceeded to state: "Now, there has been an investigation done to some of their employees, and I understand that there's been some additional claims or charges against additional employees, that have been laid out there.. . . They eliminated the employment of those that they believe were involved in terrorist activities. . . It's absolutely unacceptable." *Id.*  (timestamp 37:22). And when the reporter asked "And the government's position is that those are claims and charges?", Kirby responded saying "Some of them have been verified… clearly there was something to it." *Id.* (timestamp 38:02).  Executive branch commentary regarding humanitarian necessity and seeking to engage with UNRWA, as an entity that fostered a dependency around its services by removing Palestinians from the global refugee protection system, can hardly serve as a judicially noticeable finding regarding neutrality, intent, or UNRWA's institutional integrity. Moreover, at the September 21, 2024 press gaggle, when discussing UNRWA, Kirby repeatedly emphasized that any funding must be subject to "appropriate safeguards, with transparency measures built in, and certainly with a provision for accountability." Ex. 23 at 3, 4.  This is not the type of endorsement the Defendant claims it to be and asks this court to notice as fact.

III.    **CONCLUSION**

Defendant's Motion aims to convert selective public materials—many generated by UNRWA, the United Nations, or policy-driven government actors—into adjudicative findings capable of negating Plaintiffs' well-pled allegations at the Rule 12(b)(6) stage. The Federal Rules do not permit that expansion of the pleadings record to include the contested narrative assertions within those documents. The Court may not accept contested narrative assertions within those documents as true, nor draw Defendant-favorable inferences to resolve factual allegations in the Amended

Complaint regarding neutrality, knowledge, foreseeability, or substantial assistance. Those issues are merits questions inappropriate for resolution on a motion to dismiss.

Accordingly, Plaintiffs respectfully request that the Court (1) deny the Defendant's Motion to include any of the tendered exhibits as incorporated by reference or judicially noticed; and (2) deny Defendant's Motion to rely on materials outside the pleadings to refute Plaintiffs' plausible allegations. The Rule 12(b)(6) inquiry must remain confined to the well plead allegations in the Amended Complaint and all reasonable inferences must be drawn in Plaintiffs' favor.  The Court should therefore enter an order denying the Defendant's Motion at this stage of the proceedings.

Dated:  February 27, 2026                    Respectfully Submitted,

HEIDEMAN NUDELMAN & KALIK P.C.

By:      */s/ Tracy R. Kalik*
         */s/ Joseph H. Tipograph*
         Richard D. Heideman (No. 377462)
         Noel J. Nudelman (No. 449969)
         Tracy Reichman Kalik (No. 462055)
         Joseph H. Tipograph (No.997533)
         HEIDEMAN NUDELMAN & KALIK, PC
         5335 Wisconsin Avenue, NW; Suite 440
         Washington, DC  20015
         Telephone: 202.463.1818
         Facsimile: 202.463.2999