# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

ESTATE OF SIVAN SHA'ARABANY, et al.          :
                                             :
                        Plaintiffs           :
                                             :          Civil Action No.  25-cv-2490
            v.                               :
                                             :          **Oral Argument Requested**
UNITED NATIONS RELIEF AND WORKS              :
AGENCY FOR PALESTINE REFUGEES IN             :
THE NEAR EAST (UNRWA), et al.                :
                                             :
                        Defendants.          :
……………………………………………………:

**PLAINTIFFS' MEMORANDUM OF LAW WITH POINTS AND AUTHORITIES IN
OPPOSITION TO DEFENDANT UNRWA USA'S MOTION TO DISMISS**


Dated:  March 31, 2026                    Respectfully Submitted,

                                          HEIDEMAN NUDELMAN & KALIK P.C.


                              By:    */s/ Joseph H. Tipograph*
                                     Richard D. Heideman (No. 377462)
                                     Noel J. Nudelman (No. 449969)
                                     Tracy Reichman Kalik (No. 462055)
                                     Joseph H. Tipograph (No.997533)
                                     HEIDEMAN NUDELMAN & KALIK, PC
                                     5335 Wisconsin Avenue, NW, Suite 440
                                     Washington, DC  20015
                                     Telephone: 202.463.1818
                                     Facsimile: 202.463.2999

# TABLE OF CONTENTS

TABLE OF CONTENTS ............................................................................................................ i

TABLE OF AUTHORITIES ................................................................................................... ii

INTRODUCTION ................................................................................................................. 1

STATEMENT OF FACTS .................................................................................................... 2

   I.    UNRWA USA's Dedicated Role as UNRWA's U.S. Support Arm ............................... 2

   II.   UNRWA's Gaza Operations and the Structure Through Which They Are Conducted .. 3

   III.  UNRWA USA Provided Unrestricted Funding Into These Systems Despite Known Risks and UNRWA's Support for HAMAS ...................................................................... 7

   IV.   The October 7th Attacks ................................................................................................ 7

   V.    Post-Attack Conduct by UNRWA USA ....................................................................... 8

LEGAL STANDARDS ......................................................................................................... 9

   I.    Rule 12(b)(6) Pleading Standard .................................................................................. 9

   II.   Aiding and Abetting Liability ...................................................................................... 10

   III.  Conspiracy Liability ..................................................................................................... 11

ARGUMENT ....................................................................................................................... 11

   I.    Plaintiffs Plausibly Allege a Concrete Nexus Between UNRWA USA's Assistance and HAMAS Terrorism ........................................................................................................ 11

      A.   Defendant Directed Unrestricted Funding Into a System Exploited by HAMAS ......... 12

      B.   Defendant's Tailored, Unrestricted Funding—Deployed Without Applicable Guardrails—Plausibly Enhanced HAMAS's Operational Capacity .................................... 14

      C.   Defendant's Alternative Explanations Cannot Defeat Plausibility Under 12(b)(6) ....... 19

   II.   Plaintiffs Plausibly Allege Culpable Participation Under JASTA ................................. 22

      A.   UNRWA USA Had Actual Awareness of its Role in the Overall Illegal Activity ........ 23

      B.   UNRWA USA Provided Knowing and Substantial Assistance to HAMAS ................. 26

   III.  Plaintiffs Plausibly Allege Conspiracy ........................................................................ 34

   IV.   Plaintiffs Also State a Claim for Primary ATA Liability ............................................. 39

   V.    Plaintiffs State a Claim for Intentional Infliction of Emotional Distress ...................... 42

   VI.   Plaintiffs State a Claim for Negligent Infliction of Emotional Distress ....................... 43

   VII.  Leave to Amend Should Be Granted if Necessary ....................................................... 44

CONCLUSION .................................................................................................................... 45

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Abecassis v. Wyatt*,
785 F. Supp. 2d 614 (S.D. Tex. 2011) ............................................................................. 15, 28

*Akins v. Dist. of Columbia*,
526 A.2d 933 (D.C. 1987) .............................................................................................. 44

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) ..................................................................................................... 9, 20

*Ashley v. Deutsche Bank Aktiengesellschaft*,
144 F.4th 420 (2d Cir. 2025) .......................................................................................... 14

*Atchley v. AstraZeneca UK Ltd.*,*
165 F.4th 592 (D.C. Cir. 2026) .................................................................................. passim

*Banneker Ventures, LLC v. Graham*,
798 F.3d 1119 (D.C. Cir. 2015) .................................................................................... 9, 20

*Bartlett v. Societe Generale de Banque Au Liban SAL*,
2020 WL 7089448 (E.D.N.Y. Nov. 25, 2020) .................................................................. 29

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007) ..................................................................................................... 9, 20

*Bernhardt v. Islamic Republic of Iran*,
47 F.4th 856 (D.C. Cir. 2022) .................................................................... 13, 29, 30, 38

*Boim v. Holy Land Found. for Relief & Dev.*,*
549 F.3d 685 (7th Cir. 2008) ...................................................................................... passim

*Direct Sales Co. v. United States*,
319 U.S. 703 (1943) ..................................................................................................... 32, 34

*E.M. v. Shady Grove Reprod. Sci. Ctr., P.C.*,
2025 WL 947515 (D.D.C. Mar. 28, 2025) ..................................................................... 43, 44

*EIG Energy Fund XIV, L.P. v. Petróleo Brasileiro S.A.*,
621 F. Supp. 3d 30 (D.D.C. 2022) ................................................................................... 24

*Estate of Henkin v. Kuveyt Turk Katilim Bankasi, A.S.*,
495 F. Supp. 3d 144 (E.D.N.Y. 2020) .......................................................................... 22, 41

*Estate of Henkin v. Kuveyt Turk Katilim Bankasi, A.S.*,
2025 WL 218830 (E.D.N.Y, Jan 16, 2025). .................................................................. 29, 34

*FDIC v. Ernst & Young*,
967 F.2d 166 (5th Cir. 1992) ........................................................................................... 24

*Finan v. Lafarge S.A.*,
2025 WL 2504317 (E.D.N.Y. Mar. 20, 2025) .............................................................. passim

*Halberstam v. Welch*,*
705 F.2d 472 (D.C. Cir. 1983) .................................................................................... passim

*Harris v. U.S. Dep't of Veterans Affs.*,
776 F.3d 907 (D.C. Cir. 2015) ......................................................................................... 43

*Honickman v. BLOM Bank SAL*,
6 F.4th 487 (2d Cir. 2021) ........................................................................................... 23, 32

*Hurd v. D.C. Gov't*,
864 F.3d 671 (D.C. Cir. 2017) ...................................................................................... 20
*In re Texas E. Transmission Corp. PCB Contamination Ins. Coverage Litig.*,
870 F. Supp. 1293, 1307 (E.D. Pa. 1992).. ................................................................. 24
*Jan v. People Media Project*,
783 F. Supp. 3d 1300 (W.D. Wash. 2025) ............................................................. 25, 29
*Kaplan v. Lebanese Canadian Bank, SAL*,*
999 F.3d 842 (2d Cir. 2021) .................................................................... 21, 24, 26, 29
*King v. Habib Bank Ltd.*,
2022 WL 4537849 (S.D.N.Y. Sept. 28, 2022) ...................................................... 29, 34
*Kurd v. Republic of Turkey*,
374 F. Supp. 3d 37 (D.D.C. 2019) ....................................................................... 42, 43
*Linde v. Arab Bank, PLC*,
882 F.3d 314 (2d Cir. 2018) ....................................................................................... 41
*Nat'l Council of Resistance of Iran v. Dep't of State*,
373 F.3d 152 (D.C. Cir. 2004) ............................................................................. 13, 23
*Ofisi v. BNP Paribas, S.A*,
77 F.4th 667 (D.C. Cir. 2023) .................................................................................... 30
*Owens v. BNP Paribas, S.A.*,
897 F.3d 266 (D.C. Cir. 2018) ................................................................................... 40
*Owens v. Republic of Sudan*,
864 F.3d 751 (D.C. Cir. 2017) ................................................................................... 18
*Pinkerton v. United States*,
328 U.S. 640 (1946) ................................................................................................... 39
*Rael v. Cadena*,
93 N.M. 684 (1979) .................................................................................................... 33
*Siegel v. HSBC N. Am. Holdings, Inc.*,
933 F.3d 217 (2d Cir. 2019) ................................................................................. 13, 30
*Smith & Wesson Brands, Inc. v. Estados Unidos Mexicanos*,
605 U.S. 280 (2025) ................................................................................................... 14
*Strauss v. Crédit Lyonnais, S.A.*,
925 F. Supp. 2d 414 (E.D.N.Y. 2013) ....................................................................... 21
*Twitter v. Taamneh*,*
598 U.S. 471 (2023) ............................................................................................ passim
*Woods v. Barnett Bank of Ft. Lauderdale*,
765 F.2d 1004 (11th Cir. 1985) ................................................................................. 26
*Estate of Wultz v. Islamic Republic of Iran*,
755 F. Supp. 2d 1, 42 (D.D.C. 2010) ....................................................... 40, 41, 42, 44
*Zobay v. MTN Grp. Ltd.*,
695 F. Supp. 3d 301 (E.D.N.Y. 2023) ............................................................. 26, 27, 29

**Statutes**

18 U.S.C. § 2331(1)(A) .......................................................................................... 40, 41
18 U.S.C. § 2331(1)(B) ................................................................................................ 41
18 U.S.C. § 2331(1)(C) ................................................................................................ 42
18 U.S.C. § 2333(a) ..................................................................................................... 39

18 U.S.C. § 2333(d)(2) ................................................................................................ 10
18 U.S.C. § 2337 ........................................................................................................ 20
18 U.S.C. § 2339A ..................................................................................................... 41
18 U.S.C. § 2339B ..................................................................................................... 41
18 U.S.C. § 2339C ..................................................................................................... 41
22 U.S.C. § 2221(c) .............................................................................................. 15, 20
Pub. L. No. 114-222, § 2(a)(5), 130 Stat. 852, 852 (2016) ......................................... 10
Public Law No. 113-235, Sec. 7048(d)(1)-(7) 128 Stat. 2661-2 ................................. 21

## Rules

Federal Rule of Civil Procedure 15 ............................................................................ 44

## Other Authorities

I.R.S. Pub. 4221-PC ................................................................................................... 44
Rev. Rul. 63-252 ............................................................................................. 13, 35, 44

\* Cases chiefly relied upon

iv

## **INTRODUCTION**

In 2003, as evidence emerged that UNRWA was supporting the Islamic Resistance Movement ("HAMAS") and other U.S.-designated Foreign Terrorist Organizations ("FTOs") in the Second Intifada campaign of terror, during which thousands of innocent civilians and hundreds of U.S. citizens were murdered and maimed, the United States government attempted to prevent U.S. dollars from being used by FTOs by imposing restrictions on its funding for UNRWA.  UNRWA established UNRWA USA in 2005 as a vehicle to obtain U.S. Dollars from U.S. taxpayers that it could use to engage with HAMAS and other FTOs untethered from restrictions imposed by the U.S. government. UNRWA USA provided this funding even though, at all relevant times, it was aware that UNRWA had come to function as an integrated component of the HAMAS-led terror enterprise in Gaza.

As the Amended Complaint meticulously details, UNRWA USA knowingly provided material support to HAMAS by sustaining UNRWA as a lethal resource for HAMAS and other FTOs in several ways, including but not limited to: facilities for logistical terrorist activities, access to otherwise unavailable U.S. dollars for weapons procurement, employment of terrorists as paid UNRWA staff, encouragement, hate-filled education and recruitment of students to commit terror attacks against innocent civilians residing, working and/or visiting in Israel, including the murder and maiming of U.S. citizens.  As new evidence of UNRWA's continued support for HAMAS and other FTOs emerged and as U.S. restrictions of funding to UNRWA increased, so did UNRWA USA's provision of unrestricted funds to UNRWA, year after year and including a whopping $66 million in 2023-24. These funds have been used to sustain, incentive and reward HAMAS's terrorist attacks on Plaintiffs.

On October 7, 2023, this conspiratorial plan, design and scheme to attack Israelis and Americans living, working or visiting in Israel culminated in the genocidal and barbaric HAMAS-led terrorist attacks in which dozens of U.S. citizens were brutally murdered, dozens more were taken hostage, and countless more were wounded ("October 7th Attacks"). Teachers, counselors and administrators of UNRWA schools participated in and celebrated these attacks, reaffirming what was already known—that UNRWA, with the material financial support of UNRWA USA, had been paying members of HAMAS and other FTOs to promote, encourage and recruit UNRWA students to engage in terrorist activities—and U.S. citizens were among those who paid the price. Even after UNRWA's direct role in the October 7th Attacks was confirmed, UNRWA USA did not suspend funding; rather, it decided to "redouble" and accordingly ratify its support, including the unrestricted provision of $44 million in 2024.

The law does not permit a U.S. charitable entity to knowingly finance a terrorist-supporting entity even, and especially, under the guise of humanitarianism. Liability under the Justice Against Sponsors of Terrorism Act ("JASTA") is designed to capture precisely UNRWA USA's alleged "conscious, voluntary, and culpable" participation in HAMAS's underlying illegal activities. Because UNRWA USA chose to provide and maintain unrestricted funding to UNRWA, a system it knew was an operational asset for HAMAS, it is civilly liable for the foreseeable—and catastrophic—consequences of its support.

## STATEMENT OF FACTS

I.    **UNRWA USA's Dedicated Role as UNRWA's U.S. Support Arm**

Defendant UNRWA USA National Committee, Inc. is a U.S.-based nonprofit organization registered in the District of Columbia whose central function is to raise funds in the United States

2

for the benefit of a single "foreign" entity: UNRWA. ¶¶ 11, 20-22, 206.[1] The Amended Complaint alleges that UNRWA USA transfers the substantial majority of the funds it raises to UNRWA and serves as its primary U.S.-based fundraising partner. ¶¶ 20–22, 388–391. UNRWA directs U.S. donors on its website to UNRWA USA as the vehicle for tax-deductible contributions, and UNRWA USA publicly describes its work as conducted "hand in hand" with their UNRWA "colleagues." ¶¶ 13, 20, 390–391, 411.[2] Plaintiffs further allege overlap in personnel and coordination between the two entities, including individuals who served roles connected to both organizations. ¶¶ 408–410. The Amended Complaint also alleges that UNRWA USA's leadership included individuals with prior senior roles within UNRWA, including a former Commissioner-General. ¶¶ 416–419. Public filings reflect that UNRWA USA's funding of UNRWA increased substantially over time, including a sharp rise in recent years.  ¶¶ 393, 405–407, 420.

Accordingly, Plaintiffs allege a dedicated funding pipeline: funds raised in the United States by UNRWA USA, or as a result of UNRWA directing US taxpayers to contribute through UNRWA USA, with the funds collected by UNRWA USA being directed almost exclusively back to UNRWA itself, a single recipient and without intermediary discretion, for use in its operations, including its support for HAMAS, which committed acts of international terror. ¶¶ 20–22, 390–391.

II.    **UNRWA's Gaza Operations and the Structure Through Which They Are Conducted**

UNRWA operates under a framework distinct from other international refugee systems. Unlike the United Nations High Commissioner for Refugees ("UNHCR"), which emphasizes resettlement and integration, UNRWA administers services within a system in which refugee status is

---

[1] All ¶ citations herein refer to Plaintiffs' Amended Complaint found at ECF 8.
[2] The Court may also take judicial notice of the identical light blue logo and font used by UNRWA (https://www.unrwa.org/) and UNRWA USA (https://www.unrwausa.org/) alike.

inheritable across generations, which has resulted in a large, long-term and perpetually growing refugee population within UNRWA's areas of operation, including Gaza. ¶¶ 207–215.

This framework is implemented in practice through UNRWA's on-the-ground operations in Gaza. The Amended Complaint alleges that UNRWA operates a large-scale institutional system in Gaza, including schools, administrative facilities, and a workforce numbering in the thousands. ¶¶ 229, 281–282. That system is operated through locally based personnel and infrastructure within a territory controlled by HAMAS. ¶¶ 248, 251, 283.  Plaintiffs allege that, over time, HAMAS became embedded within multiple components of that system, including its workforce, facilities, and operational structures. ¶¶ 248–249, 283–284, 290–301.

### A.  Workforce and Institutional Structures

Plaintiffs allege that HAMAS-affiliated personnel became embedded within UNRWA's Gaza-based workforce over time, including within employee unions and administrative roles. ¶¶ 248, 281–284. The Amended Complaint alleges that UNRWA employs more than 13,000 individuals in Gaza and that HAMAS-affiliated candidates achieved significant representation in UNRWA staff union elections, including a reported electoral victory in 2009. ¶¶ 281–283.

Plaintiffs further allege that individuals affiliated with HAMAS held positions within UNRWA's institutional structure, including educational and administrative roles. ¶ 284. For example, Suhail al-Hindi is alleged to have served as both a UNRWA school principal and a leader within the UNRWA staff union while also holding a role within HAMAS. ¶ 284(a). Similarly, Jawad Abu Shamala, alleged to have held a senior HAMAS governmental role, is alleged to have previously worked as a UNRWA teacher. ¶ 284(c).

The Amended Complaint alleges that HAMAS consolidated political control over Gaza following the 2006 elections and that UNRWA-affiliated labor structures, including the UNRWA

4

Workers Union, were influenced by HAMAS. ¶¶ 251, 283. The Amended Complaint further alleges that HAMAS subsequently used Gaza as a base for planning and launching terror attacks against Israeli civilians and for developing operational infrastructure over time. ¶¶ 251, 253.

### B. Facilities and Physical Infrastructure

Plaintiffs allege that UNRWA operates a physical infrastructure network in Gaza, including schools, medical clinics, and administrative facilities. ¶¶ 229, 281–282. The Amended Complaint further alleges that, over time, armed groups, including HAMAS, made integrated use of that infrastructure in connection with militant terrorist activity repeatedly over a period of years and involved multiple facilities within UNRWA's Gaza infrastructure. ¶¶ 290–301, 306–310.

A 2015 United Nations Board of Inquiry reported that weapons were discovered in UNRWA schools and documented multiple incidents in which "Palestinian armed groups" placed weapon caches inside UNRWA school facilities. ¶¶ 291–293. The report also identified an incident involving the launching of a projectile from within the vicinity of a UNRWA school. ¶ 294.

Plaintiffs further allege that HAMAS constructed and utilized tunnel infrastructure in proximity to, and in some instances beneath, UNRWA facilities. ¶¶ 304–310. Between 2017 and 2022, UNRWA acknowledged the discovery of tunnels located beneath or near multiple school sites. ¶¶ 306–310. The Amended Complaint also alleges that, following the October 7 attack, additional tunnel infrastructure and a command-and-control facility were discovered in proximity to UNRWA sites, including beneath or near UNRWA's Gaza headquarters. ¶¶ 348–354.

### C. Financial Systems

Plaintiffs allege that UNRWA utilized a distinct payroll practice in Gaza under which employees were paid in U.S. dollars rather than local currency, as was its practice in other operational areas, including Jordan, Lebanon, Syria, and the West Bank. ¶¶ 312–313. Plaintiffs

5

further allege that, because U.S. currency is not commonly used for routine transactions in Gaza, UNRWA employees exchanged those funds through local moneychangers in order to obtain Israeli shekels. ¶ 313. The Complaint alleges that such money changing networks were subject to control, taxation, or influence by HAMAS. ¶¶ 313, 317. The Amended Complaint also alleges that this financial structure was identified in or around 2018 as creating risks of diversion or exploitation within Gaza's financial environment. ¶¶ 314–318. Plaintiffs allege that this system provided HAMAS with access to hard currency that was otherwise unavailable, operating over a sustained period and specific to UNRWA's Gaza operations. ¶¶ 312–318.

### D. Educational Operations

Plaintiffs allege that UNRWA operated an education system in Gaza that, in practice, included materials and instruction aligned with HAMAS ideology and that functioned as a source of recruitment and reinforcement. ¶¶ 342–347. In 2019, the U.S. Government Accountability Office reported that UNRWA schools failed to offset "potentially problematic content" in Gaza textbooks. ¶ 323. In 2021, the European Union temporarily froze funding in response to concerns regarding "antisemitic narratives and glorification of violence" found in UNRWA's educational materials. ¶¶ 324, 332. The Amended Complaint further alleges that UNRWA continued to use these materials and, at times, modified or abandoned reform efforts out of deference to HAMAS and other FTOs. ¶¶ 228, 267, 333, 334, 340. Plaintiffs also allege that HAMAS-affiliated student organizations were permitted access to UNRWA schools for activities and events. ¶¶ 343–345.

### E. Interactions Between UNRWA Leadership and HAMAS Actors

Plaintiffs allege that UNRWA leadership engaged in meetings and communications with individuals affiliated with HAMAS in Gaza. ¶¶ 262–264. The Amended Complaint alleges that such interactions included discussions relating to UNRWA's operations within Gaza. ¶¶ 263–267.

6

The Amended Complaint further alleges that, during a 2017 meeting involving UNRWA leadership and individuals described as affiliated with HAMAS, UNRWA officials expressed a willingness to maintain ongoing coordination regarding operational matters. ¶¶ 265–267. Plaintiffs allege that such interactions occurred in the context of UNRWA's continued operations, fully supported by UNRWA USA, within areas controlled by HAMAS. ¶¶ 262–264, 278.

III.     **UNRWA USA Provided Unrestricted Funding Into These Systems Despite Known Risks and UNRWA's Support for HAMAS**

Plaintiffs allege that UNRWA USA continued providing unrestricted funding to UNRWA despite information indicating that UNRWA's workforce, facilities, financial mechanisms, and educational systems were being exploited by HAMAS.  ¶¶ 248, 290–301, 312–318, 394–395. Specifically, the Amended Complaint alleges that UNRWA USA provided substantial financial support to UNRWA over many years, including tens of millions of dollars in recent periods. ¶¶ 388–397, 420.  Plaintiffs allege that these funds were provided without restrictions governing their ultimate use, even as the U.S. Government increasingly imposed restrictions on its funding. ¶¶17, 393, 397. At the same time, the Amended Complaint alleges that UNRWA's internal governance structures lacked meaningful transparency and external oversight regarding how funds were deployed within its Gaza operations. ¶¶ 290–301, 394–395.

The Complaint alleges that these funds were directed into the same operational systems described above—systems that Plaintiffs allege the Defendant at all relevant times knew to be interacting with and subject to HAMAS exploitation. ¶¶ 290–301, 312–318, 393–397.

IV.     **The October 7th Attacks**

Plaintiffs allege that HAMAS carried out the coordinated October 7th Attacks resulting in mass casualties, kidnappings, and widespread destruction. ¶¶ 1, 348–354. The Amended Complaint further alleges that certain individuals who participated in the attacks were employed by UNRWA

at the time of the events.  ¶¶ 349–350. Plaintiffs allege that these individuals held positions within UNRWA's educational and social service systems. Id.

For example, Plaintiffs allege that a UNRWA school counselor who also held a role within HAMAS participated in the abduction of a civilian woman. ¶ 350(a). Plaintiffs further allege that an UNRWA elementary school teacher led the attack on Kibbutz Be'eri in which 130 people were murdered and 28 were kidnapped, while other UNRWA-affiliated individuals were involved in the detention of hostages and related activities. Id. ¶ 350(b), (c), (i), (j).  UNRWA employees in Gaza used a Telegram Group and social media to ecstatically celebrate the HAMAS atrocities as they occurred, share photos of armed terrorists, praise them and pray for their success. ¶ 346.

The Amended Complaint further alleges that infrastructure in proximity to or associated with UNRWA facilities was used in connection with HAMAS's operational activities, which resulted in mass casualties, including the deaths, injuries, and abductions of numerous U.S. citizens. ¶¶ 348–354. Plaintiffs in this action include United States citizens who were killed, injured, or taken hostage during the October 7th Attacks, as well as their family members. ¶¶ 7, 11. The Amended Complaint identifies, among others:

- U.S. citizens who were murdered or injured at the NOVA music festival. ¶¶ 25–27, 40.
- U.S. citizens killed in attacks on residential communities, including Kibbutz Holit, and family members present. ¶¶ 161-162, 165.
- U.S. citizens taken hostage from communities including Kibbutz Nahal Oz and Kibbutz Nir Oz, and their family members. ¶¶ 140, 203–204.
- U.S. citizens serving in the Israel Defense Forces who were killed in connection with the attacks and subsequent operations. ¶¶ 28, 39, 46, 52, 143.

## V.    **Post-Attack Conduct by UNRWA USA**

Plaintiffs allege that, following the October 7th Attacks information emerged indicating that certain UNRWA-affiliated personnel had participated in or supported the attacks. ¶¶ 350, 357.

The Complaint further alleges that UNRWA USA became aware of reports concerning communications by UNRWA-affiliated personnel expressing support for the attacks. ¶¶ 346, 413. Plaintiffs allege that, notwithstanding this information, UNRWA USA continued its fundraising and support activities on behalf of UNRWA. ¶ 414. The Complaint further alleges that UNRWA USA publicly announced its intention to "redouble aid efforts" to the agency following the attacks. *Id.* This continued support occurred as the United States terminated all funding to UNRWA and certain other governmental donors suspended or reconsidered funding as well. ¶¶ 21, 357. The support of UNRWA USA materially contributed to UNRWA's funding of HAMAS, which continued to commit acts of international terror following the day of October 7th, and continues to this day.

## LEGAL STANDARDS

### I.      Rule 12(b)(6) Pleading Standard

To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). A claim is plausible when the pleaded facts permit the Court to draw a reasonable inference of liability. *Id*. At this stage, the Court must accept all well-pleaded allegations as true and draw all reasonable inferences in Plaintiffs' favor. *Atchley v. AstraZeneca UK Ltd*., 165 F.4th 592, 600 (D.C. Cir. 2026). At this stage, the Court may not use extra-pleading materials to resolve factual disputes or draw competing merits inferences against the Complaint. *See Banneker Ventures, LLC v. Graham*, 798 F.3d 1119, 1133 (D.C. Cir. 2015). Plaintiffs need only "nudge[] their claims across the line from conceivable to plausible" by alleging enough facts to raise a reasonable expectation that discovery will reveal evidence supporting the claims. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556, 570 (2007).

## II.    <u>**Aiding and Abetting Liability**</u>

The Anti-Terrorism Act ("ATA"), as amended by JASTA, imposes liability on any person who "aids and abets, by knowingly providing substantial assistance," or who conspires with a person who committed an act of international terrorism. 18 U.S.C. § 2333(d)(2). Congress identified *Halberstam v. Welch* as the governing framework. 705 F.2d 472 (D.C. Cir. 1983); JASTA, Pub. L. No. 114-222, § 2(a)(5), 130 Stat. 852, 852 (2016). Under *Halberstam*, aiding-and-abetting liability requires: (1) a wrongful act causing injury; (2) the defendant's general awareness of its role in an overall tortious activity; and (3) knowing and substantial assistance. 705 F.2d at 477.

The Supreme Court has clarified that this standard requires "conscious, voluntary, and culpable participation" in another's wrongdoing. *Twitter v. Taamneh*, 598 U.S. 471, 493 (2023). Courts evaluate culpability along a sliding scale that considers both the defendant's awareness and the nature of the assistance provided. *Id*. at 491–92; *Atchley v. AstraZeneca UK Ltd.*, 165 F.4th 592, 603–04 (D.C. Cir. 2026).

A critical component of this analysis is nexus—i.e., the relationship between the defendant's assistance and the act of international terrorism. *Atchley*, 165 F.4th at 603–04. A sufficiently close nexus exists where the alleged assistance makes the terrorist act a "natural and virtually inevitable consequence" of the defendant's conduct. *Id*. at 607. Direct traceability is not required. *Id*. at 606–07. Nor must assistance be overwhelming as to any single act, so long as it "add[s] up over time to an essential part of the pattern." *Halberstam*, 705 F.2d at 488.

Where the nexus is strong, a lesser showing of scienter is required. *Atchley*, 165 F.4th at 607–08. Conversely, where the connection is attenuated—such as where a defendant provides routine, generally available services—courts require more particularized allegations of culpable participation. *Twitter*, 598 U.S. at 495–96.

Substantial assistance is evaluated under the six *Halberstam* factors, including the nature of the assistance, the defendant's state of mind, and the duration of the support. 705 F.2d at 483–84. These factors capture whether the defendant's participation was significant and culpable enough to justify attribution of the principal's acts. *Twitter*, 598 U.S. at 504; *Atchley*, 165 F.4th at 612.

III.    **Conspiracy Liability**

To plead civil conspiracy under the ATA, a plaintiff must allege: (1) an agreement; (2) to participate in an unlawful act; (3) an injury caused by an overt act; and (4) that the act was done in furtherance of the scheme. *Halberstam*, 705 F.2d at 477.

An agreement may be inferred from coordinated conduct and interdependence among participants. *Id.* at 481, 486–87. Participants need not share identical motives, so long as their actions reflect a common objective. *Finan v. Lafarge S.A.*, 2025 WL 2504317, at *22 (E.D.N.Y. Mar. 20, 2025). Where a defendant's role is systemic and supports an enterprise as a whole, conspiracy liability may extend to "all reasonably foreseeable acts" committed in furtherance of that enterprise. *Twitter*, 598 U.S. at 496.

## ARGUMENT

I.    **Plaintiffs Plausibly Allege a Concrete Nexus Between UNRWA USA's Assistance and HAMAS Terrorism**

Under *Atchley*, a plaintiff establishes nexus by pleading a "localized story" showing that the defendant's assistance was connected to a defined set of attacks in a manner that renders those attacks the "natural and virtually inevitable consequence" of the support. 165 F.4th at 606-07. Direct traceability is not required; it is sufficient to plausibly allege that the defendant's assistance materially enhanced the terrorist enterprise's capacity to carry out the attacks.

Plaintiffs satisfy that standard.

11

**A. Defendant Directed Unrestricted Funding Into a System Exploited by HAMAS**

Plaintiffs plausibly allege that Defendant directed unrestricted funding into a defined institutional system operating in Gaza that was not insulated from HAMAS but instead overlapped with and was repeatedly exploited by HAMAS, the FTO. At the pleading stage, Plaintiffs need not show that Defendant's funds were earmarked for unlawful use, only that they materially enhanced the overall capacity of the enterprise that committed the attacks.

Plaintiffs allege that UNRWA operates within a structural framework that sustains long-term operations in Gaza as a means to preserve, rather than resolve, the refugee status of its beneficiary population. ¶¶ 207–215. Within that framework, Plaintiffs allege that UNRWA's operations overlapped with, and were susceptible to, influence by HAMAS, including through workforce presence, facility use, and institutional interaction.[3] ¶¶ 248–284, 290–301. Plaintiffs further allege that HAMAS's consolidation of control over Gaza occurred in part through UNRWA's operative systems, enabling the development of infrastructure and personnel networks that were later used to carry out large-scale attacks, including the October 7th Attacks. ¶¶ 251, 253.

Plaintiffs further allege that this framework perpetuates claims to territorial return within the State of Israel across generations, thereby sustaining a long-term grievance structure within which competing actors operate. ¶¶ 207–215, 238. While UNRWA and HAMAS employ different means, Plaintiffs plausibly allege that both operate within—and advance—this same underlying framework: UNRWA, with the material support of UNRWA USA, through institutional preservation of those claims, and HAMAS through violent efforts utilizing acts of terror to realize them. At the pleading stage, these allegations support the reasonable inference that the system

---

[3] This allegation is not offered to characterize political positions, but to explain how the institutional system Defendant funded plausibly reinforced the operational environment in which Hamas's violent acts were carried out.

funded by Defendant formed part of the broader operational environment in which HAMAS's activities were conceived, supported, and carried out.

Direct interactions between UNRWA leadership and HAMAS-affiliated actors further reinforce the plausibility and efficacy that the system funded by Defendant UNRWA USA, to UNRWA and HAMAS, was made accessible to the terrorist enterprise operating within the same environmental system. ¶¶ 262–267, 390–395.

Defendant UNRWA USA functions as a dedicated fundraising and advocacy arm for a single beneficiary—UNRWA—and, as alleged, raises funds that, after expenses, are directed exclusively to that entity. ¶¶ 20, 408–411. This relationship plausibly supports the inference that Defendant's assistance was not attenuated through layers of independent actors but instead flowed directly into the same operational system alleged to have been utilized and exploited by HAMAS to commit its acts of terror. Where an entity is "dominate[d] and control[led]" such that funds are "inevitably committed" to its principal, courts may "look past [the entities'] separate juridical identities" and treat them as functionally unified. *Nat'l Council of Resistance of Iran v. Dep't of State*, 373 F.3d 152, 157-58 (D.C. Cir. 2004); Rev. Rul. 63-252.

By contrast to *Twitter*, where the nexus was "highly attenuated" because defendants provided services to billions of users in an "arm's-length, passive, and largely indifferent" manner, UNRWA USA funds exclusively one entity—UNRWA—whose operations were concentrated in the very operational and territorial environment from which the October 7th Attacks were launched. 598 U.S. at 500.[4] This targeted, exclusive funding relationship is the opposite of attenuation.

---

[4] The Defendant's targeted focus heavily distinguishes this case from Twitter as well as the panoply of ATA lawsuits upon which the Defendant relies, which were brought against financial institutions for providing passive financial services to conduits to terror organizations among countless other banking clients they served. *See, e.g., Bernhardt v. Islamic Republic of Iran*, 47 F.4th 856, 872 (D.C. Cir. 2022) (rejecting liability for a bank providing services to "global financial institutions with legitimate operations and uncertain ties to al-Qaeda"); *Siegel v. HSBC N. Am. Holdings, Inc.*, 933 F.3d 217, 224 (2d Cir. 2019) (characterizing services as "routine banking services" provided to "a large bank with vast operations" where the customer's legitimate banking activities "far outweighed any supposedly nefarious

Plaintiffs further allege that HAMAS was sufficiently intertwined with UNRWA's operations such that, together with Defendant, they formed a functionally interdependent operational relationship sufficient at the pleading stage. *Atchley*, 165 F.4th at 609. UNRWA is alleged to have functioned as a logistical and institutional platform repeatedly exploited by HAMAS including through workforce infiltration, facility misuse, and operational coordination. ¶ 249. This integration was reinforced over time through institutional practices that enabled HAMAS-affiliated actors to operate within UNRWA's systems, including the employment of HAMAS members, infiltration and control of UNRWA unions, and the use of UNRWA schools to encourage, educate through hate-filled teachings, recruit, and coordinate acts of violence. ¶¶ 248–284. UNRWA leadership itself described a "spirit of partnership" between UNRWA and HAMAS (and other FTOs), reflecting the entities were so "united" that "no one can separate" them. ¶ 267.

Defendant UNRWA USA's sustained provision of unrestricted funding to that UNRWA-HAMAS operating system plausibly supports the inference that it participated in maintaining an operational structure whose exploitation by HAMAS was "pervasive" and "notorious," rendering Defendant liable for the foreseeable outgrowths of that enterprise, including the October 7th Attacks. *Atchley*, 165 F.4th at 607, 609.

### B. Defendant's Tailored, Unrestricted Funding—Deployed Without Applicable Guardrails—Plausibly Enhanced HAMAS's Operational Capacity

As the United States government imposed—and repeatedly strengthened—restrictions on its funding to UNRWA to prevent diversion to terrorism, Defendant UNRWA USA supplied

---

ones"); *Ashley v. Deutsche Bank Aktiengesellschaft*, 144 F.4th 420, 445 (2d Cir. 2025) (finding no liability where banks "culpably executed financially suspect transactions writ large" rather than acting in a manner that "actively sought to 'associate themselves' with the [terrorist group's] operations"). The Defendant's reliance on *Smith & Wesson Brands, Inc. v. Estados Unidos Mexicanos*, is entirely inapposite because that case was brought under the Protection of Lawful Commerce in Arms Act, a statute that sought to prohibit the precise type of lawsuit Mexico brought by asserting theories of negligence and "passive nonfeasance" involving a failure to regulate the practices of "unaffiliated" downstream bad actors. 605 U.S. 280, 287–89 (2025).

unrestricted U.S. dollars to that same entity without comparable safeguards. See 22 U.S.C. § 2221(c); ECF No. 30-1 at 11–12. Where a defendant provides "unrestricted money" to an entity subject to restrictions designed to ensure funds are used for humanitarian purposes, courts may infer that the "very object" of the support was to achieve ends other than civilian welfare. *Abecassis v. Wyatt*, 785 F. Supp. 2d 614, 647 (S.D. Tex. 2011). Here, while U.S. funding was conditioned on vetting, monitoring, and certification requirements, Defendant's funding was not. Defendant thus operated outside the very guardrails the United States deemed necessary to mitigate the risk that funds would support terrorist activity.

That absence of restriction on the funding side by UNRWA USA was paired with a corresponding absence of meaningful oversight on the recipient side by UNRWA, which operates through a governance structure lacking the transparency, supervisory control, and accountability mechanisms typically imposed on entities handling large-scale humanitarian funding. *See* UNRWA Advisory Comm'n Rules of Proc. pmbl., rr. II(b)(i), IX(iii), XII. Unlike comparable U.N. agencies—which operate under member-state governance bodies that exercise formal oversight and maintain public records—UNRWA's structure lacks the guardrails necessary to constrain diversion or misuse in a high-risk environment. *See, e.g.*, Rules of Proc. of the Exec. Comm. of the High Comm'r's Programme rr. 5(b), 15–17; UNDP Exec. Bd. Rules of Proc. rr. 1, 5(2), 12–13; UNICEF Exec. Bd. Rules of Proc. rr. 5(2), 12–13. In this context, Defendant's provision of unrestricted funding into that structure supports the reasonable inference that its assistance was not merely unmonitored, but effectively unbounded.

Because Defendant's funds were unrestricted and directed to a single beneficiary operating in a known-risk environment, those funds were available for use across UNRWA's Gaza operations, including components alleged to be exploited and used directly by HAMAS. *See* ¶¶ 390–391, 393,

15

397. In such circumstances, where funds are fungible and supplied without restriction into a system lacking effective guardrails, it is reasonable to infer that the assistance supported the enterprise's operations as a whole. *See Atchley*, 165 F.4th at 606. Defendant's assistance was therefore "tailored" and provided in an "unusual way"—not as generalized support to a broad population, but as unrestricted funding directed to a single, known beneficiary operating the very systems in which HAMAS was active and entrenched. *Id*. at 607; *Twitter*, 598 U.S. at 502.

Plaintiffs further allege a concrete financial mechanism through which Defendant's assistance enhanced HAMAS's operational capacity. Specifically, UNRWA is alleged to have paid Gaza-based employees in U.S. dollars—funds supplied, plausibly in material part, by Defendant—which were then exchanged through financial channels subject to HAMAS control, providing the FTO with the U.S. dollars, otherwise unavailable to it, which it needed to pay smugglers in connection with materials procurement in furtherance of its acts of terrorism. ¶¶ 312–318. Defendant's reliance on the report's generalized observations about currency preferences—shared across Palestinian populations—misses the point. The Amended Complaint alleges a specific, differential practice—payment in U.S. dollars in Gaza but not the West Bank, despite those uniform preferences. Taken together with Defendant's unrestricted funding and UNRWA's lack of oversight—each reflecting the rejection of available safeguards—these allegations plausibly establish a pathway by which funds were provided, deployed, and transmitted in a manner that increased the likelihood they entered HAMAS-controlled financial channels and supported illegal life-threatening terrorist activities, satisfying *Atchley* at the pleading stage. 165 F.4th at 606. The convergence of these actions—across funding, governance, and operational practice—plausibly supports the inference of coordinated, mutually reinforcing conduct consistent with a conspiratorial enterprise.

16

This is precisely the type of "localized story" required under JASTA. *Atchley*, 165 F.4th at 607. Defendant's unrestricted funding persisted and expanded at each stage of the system's deterioration: as HAMAS embedded itself within UNRWA's workforce and unions, as UNRWA facilities and financial systems were shown to be vulnerable to HAMAS exploitation, and as the operational environment in Gaza evolved into the one from which the October 7th Attacks were ultimately launched. ¶¶2, 18-20, 26-204, 218, 227-228, 232, 263, 266-280, 392-393, 397.

By 2015, official findings had already confirmed militant misuse of UNRWA facilities. ¶¶ 290–296. Yet from 2015 through 2018, Defendant provided around $9.2 million in unrestricted funding. ¶¶ 290-301, 388-390.[5] During that same period, HAMAS carried out attacks resulting in the murder and injury of U.S. nationals alleged in the Amended Complaint. ¶¶ 175, 186, 194.

After the United States ceased funding UNRWA in 2018 due to concerns that existing safeguards were insufficient, Defendant continued to provide millions of dollars in unrestricted support, sustaining the very system that the United States had sought to constrain. ¶¶ 18, 393, 446.[6] Thus, at the very moment sovereign funding was withdrawn in response to escalating risk, Defendant's unrestricted funding remained available to sustain the compromised structure.

By 2021, HAMAS had begun planning the October 7th Attacks while continuing to operate within UNRWA's institutional framework, including through leadership interactions, educational influence, and operational overlap. ¶¶ 209–210, 265, 267, 342–346. During that time, the mastermind of the October 7th Attacks—Yahya Sinwar, who had been convicted for several counts of murder and had been released in a previous prisoner exchange—met with UNRWA officials and publicly praised UNRWA for its long-standing encouragement for Palestinians to pursue

---

[5] *UNRWA USA Nat'l Comm., Inc.*, Form 990 (2016–2018) (EIN 20-2714426), Part I.13
[6] UNRWA USA Form 990 (2018-2020), Part I.13

precisely the territorial "rights" that the October 7th Attacks sought to achieve through "resistance,"—i.e., armed terror attacks. ¶¶ 3, 217, 228, 271, 278, 284(a), 342(d), 343, 345(e).

The October 7th Attacks were the "predictable, virtually inevitable fallout" of Defendant's unrestricted hard-currency support to a system alleged to be intertwined with HAMAS's operational capacity. *Atchley*, 165 F.4th at 607. In those attacks and the bloody continuing period of terror that followed, UNRWA's physical installations—including schools, clinics, and warehouses—functioned as integrated components of HAMAS's logistics and operational infrastructure. ¶¶ 3, 229, 284. Much like how public hospitals in *Atchley* became "terrorist bases," UNRWA's own headquarters powered a massive HAMAS command-and-control center, providing electricity and other material support. 165 F.4th at 598, 609; ¶¶ 3, 353.[7] For its part, the Defendant dramatically increased its funding, providing UNRWA with around $22.3 million in 2023, of which $19.3 million was earmarked for Gaza, where the attacks continued, resulting in the murder and injury of U.S. nationals, as alleged. ECF No. 31-22; ¶¶ 48, 52, 93, 123, 128, 157.[8]

That same period reflects not only a surge in unrestricted funding, but a substantial financial benefit to Defendant itself. UNRWA USA reported approximately $10 million in net income over 2023 and 2024.[9] At the pleading stage, that financial gain further supports the reasonable inference

---

[7] The Defendant's claim that its contributions represent "roughly 1%" of UNRWA's budget is a misleading quantitative abstraction. According to the Defendant's proposed Exhibit 20, UNRWA USA appears to be UNRWA's top provider of unrestricted U.S. dollars, and its earmarked donation of $19.3 million to Gaza alone constituted the third-largest donor of any kind specific to that theater—over 7% of the total earmarked for Gaza. ECF No. 31-22. When the U.S. Government's restricted funds are removed from the calculation, the Defendant's $19.3 million accounts for over 8.5% of Gaza-earmarked support, a figure that remains a conservative floor as it does not account for the explicit or implicit restrictions other major sovereign donors likely maintain. Thus, UNRWA USA's unrestricted funding to UNRWA was a substantial part of UNRWA's substantial support for HAMAS. ¶ 252.

[8] Defendant's attempt to categorize attacks on IDF soldiers as exempt from the ATA fails. The D.C. Circuit has held that violence against service members constitutes "international terrorism" when it is part of a broader campaign intended to "intimidate a civilian population" or "influence the policy of a government"—the precise aims of the October 7th Attacks, including the hostages taken that day. *Atchley*, 165 F.4th 592, 614 (D.C. Cir. 2026); *Owens v. Republic of Sudan*, 864 F.3d 751, 796–97 (D.C. Cir. 2017).

[9] UNRWA USA Form 990 (2023-2024), Part I.19

that Defendant was not merely passively responding to humanitarian conditions, but actively participating in the continued flow of unrestricted funds into a system it knew to be compromised.

Even as evidence emerged of UNRWA staff participation in the October 7th Attacks, Defendant did not impose safeguards or alter its funding practices. To the contrary, it "redouble[d] aid efforts" nearly doubling support from $22.3 million in 2023 to $44.3 million in 2024, all during the continuing period of HAMAS terror attacks. ¶¶ 414–421.[10] At the pleading stage, that conduct plausibly reflects ratification of a known risk rather than neutral humanitarian action. *See Halberstam*, 705 F.2d at 484–85. October 7 should be understood as the continuation of a long-standing and deepening partnership between UNRWA and HAMAS, and UNRWA USA's material role. The October 7th Attacks reflected an exponential increase in HAMAS's operational lethality following the Defendant's 19 years of sustained unrestricted support. *Atchley*, 165 F.4th at 607. On the single day of October 7, 2023, HAMAS murdered more people than it did over the entire four years of the Second Intifada, and in addition to the dozens of Americans murdered that day, dozens more were among the 250 hostages taken. ¶¶1, 248.

Under settled law, "seed money for terrorism can sprout acts of violence long after the investment." *Boim v. Holy Land Found. for Relief & Dev.*, 549 F.3d 685, 700 (7th Cir. 2008). Plaintiffs' allegations describe precisely such a trajectory: sustained, targeted assistance provided over time into a system known to be compromised, culminating in a set of attacks that were a foreseeable consequence of that material support.

## C. Defendant's Alternative Explanations Cannot Defeat Plausibility Under 12(b)(6)

Defendant's arguments ultimately ask the Court to accept an innocent explanation for its conduct—namely, that its funding was humanitarian in nature and analogous to that of the United

---

[10] UNRWA USA Form 990 (2023-2024), Part I.13

States government. But that is not the Rule 12(b)(6) standard. Where a complaint plausibly alleges that a defendant's conduct materially enhanced a terrorist enterprise's capacity for violence, the existence of competing explanations does not defeat plausibility. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007).[11]

Defendant's reliance on U.S. government funding is misplaced. ECF No. 30-1. In addressing humanitarian needs, the United States is expressly insulated from ATA liability by statute. *See* 18 U.S.C. § 2337. That safe harbor reflects a policy judgment that the government may, under controlled conditions, provide assistance in high-risk environments without incurring liability. It does not extend to private actors. Nor does it permit entities operating outside those safeguards to invoke government conduct as a shield.

Even within that safe harbor, the U.S. government did not "simply . . . donat[e] funds to UNRWA." To the contrary, it imposed what the Defendant itself describes as "rigorous statutory anti-terrorism conditions." ECF No. 30-1 at 1, 11-12. Importantly, the public pronounced restrictions of the U.S. government—while indeed stringent—do not serve to sanitize the Defendant's unrestricted funding, requiring that the Executive take "all possible measures to ensure that no part *of the United States contribution*" is used to assist anyone who has "engaged in any act of terrorism." *Id.*, 22 U.S.C. § 2221(c) (emphasis added). Notably, these are not standard obligations that Congress places on the Executive Branch in connection with all U.S. foreign aid

---

[11] Defendant also seeks to use public reports, press releases, and other extra-pleading materials not merely to establish their existence, but to draw "merits-based inferences" to contradict the Amended Complaint—e.g., that additional funding would mitigate HAMAS influence, that UNRWA's systems were effectively safeguarded, and that UNRWA USA could not have understood its support to benefit HAMAS. *See* ECF No. 31 (Request for Judicial Notice or "RJN"); ECF 30-1 at 4-5, 8-15, 17-20, 30. That is not a proper use of judicial notice or incorporation by reference at Rule 12(b)(6). *See Banneker*, 798 F.3d at 1133–34; *Hurd v. D.C. Gov't*, 864 F.3d 671, 686 (D.C. Cir. 2017). Plaintiffs have separately addressed Defendant's RJN and the limited purposes for which any such materials may be considered. *See* ECF No. 35. To the extent the Court considers any of Defendant's proffered materials, Plaintiffs incorporate by reference the arguments set forth in their RJN Opposition.

20

that is administered; these were imposed in response to documented concerns regarding HAMAS's infiltration of UNRWA. ¶¶ 248-249.

The Defendant, created shortly after the first wave of U.S. government-imposed restrictions on UNRWA's funding, operated outside those constraints. Its funding was unrestricted, unconditioned, and directed into the same institutional system that the United States had determined required heightened safeguards. Its funding remained unrestricted in the face of Congress publicly enacting stricter conditions on UNRWA funding via annual appropriation legislation, requiring reports confirming staff vetting, neutrality training, installation inspections, addressing incitement through education, and implementing a "no-weapons policy." ECF No. 30-1 at 12; ¶¶ 3, 229, 396.[12]  At the pleading stage, that divergence supports a reasonable inference that Defendant's assistance increased—rather than mitigated—the risk that funds would support terrorist activity. Nor do the Treasury Department general licenses cited by Defendant alter this analysis. ECF No. 30-1 at 5. Those licenses broadly authorize international organizations to conduct "official business," but they do not define—or immunize—what constitutes actionable support under the ATA. *See Strauss v. Crédit Lyonnais, S.A.*, 925 F. Supp. 2d 414, 450–51 (E.D.N.Y. 2013).  Transactions that circumvent restrictions designed to prevent terrorist financing are not rendered lawful simply because they occur within a licensed framework. *See Kaplan v. Lebanese Canadian Bank, SAL*, 999 F.3d 842, 866 (2d Cir. 2021).

Defendant's remaining arguments similarly depend on contesting Plaintiffs' inferences— whether regarding the use of funds, the structure of UNRWA's operations, or the causes of increased funding following October 7. But at this stage, the Court may not choose between competing narratives. Plaintiffs plausibly allege that Defendant directed substantial, unrestricted

---

[12] *see e.g.*, Consolidated Appropriations Act, 2015, Public Law No. 113-235, Sec. 7048(d)(1)-(7) 128 Stat. 2661-2 (Dec. 16, 2014).

funding into a system it knew—or recklessly disregarded—was vulnerable to exploitation by HAMAS, and that such support materially enhanced the enterprise's operational capacity.

That is sufficient. At bottom, Defendant asks the Court to disregard a well-pled inference of culpable participation in favor of an alternative, benign explanation. The law does not permit that. Because Plaintiffs plausibly allege that Defendant's material financial support was connected to HAMAS's terrorist activities in a manner that made the October 7th Attacks a foreseeable consequence, the nexus requirement is satisfied.

## II.  **<u>Plaintiffs Plausibly Allege Culpable Participation Under JASTA</u>**

The direct nexus established between UNRWA USA's support and the October 7th Attacks places this case at the lowest end of JASTA's sliding scale for culpability.[13] *Atchley*, 165 F.4th at 607; *Twitter*, 598 U.S. at 491–92. Plaintiffs therefore need only plausibly allege that Defendant knew its assistance would be used by HAMAS to commit acts of terrorism. *Atchley*, 165 F.4th at 608.   Plaintiffs exceed that standard.   The Amended Complaint plausibly alleges that UNRWA USA had actual awareness—through multiple, independent channels—that its unrestricted funding would flow into a system intertwined with HAMAS and materially support its terrorist activities.

---

[13] The first element of ATA aiding-and-abetting cases—the performance of a wrongful act by the principal—is generally not materially challenged. *See, e.g., Atchley*, 165 F.4th at 601 (D.C. Cir. 2026) (noting defendants did not challenge the sufficiency of allegations regarding the underlying acts of international terrorism); *Estate of Henkin v. Kuveyt Turk Katilim Bankasi, A.S.*, 495 F. Supp. 3d 144, 154 (E.D.N.Y. 2020) (observing that where an FTO's responsibility is clear, the first element "warrants little discussion"). Here, HAMAS perpetrated all the attacks Plaintiffs allege, which Defendant do not dispute, except one. ¶¶ 25–122, 140–204. The inclusion of HEZBOLLAH as an FTO relates to the claims of Plaintiff Isaac Bluth—who was injured by HEZBOLLAH gunfire on October 9, 2023—and his family. ¶¶ 128–139. Plaintiffs respectfully request that the Court take judicial notice of the related matter establishing HEZBOLLAH's role in these injuries and its nexus to the October 7th Attacks. Amended Complaint at ¶¶ 48-50, *Axelrad v. Islamic Republic of Iran,* No. 1:25-cv-00061-RCL (D.D.C. Mar. 25, 2025) [Dkt. 12]. The Amended Complaint here provides the specific factual basis required to extend the existing aiding-and-abetting arguments to these acts, alleging that UNRWA functions as an "instrument that supports HEZBOLLAH's claims" and a "facilitator of HEZBOLLAH's goals" in Lebanon. ¶¶ 385. Plaintiffs allege that HEZBOLLAH maintains "systemic penetration" of UNRWA's infrastructure in Lebanon, utilizing UNRWA facilities for weapons storage, command and control, and intelligence gathering. ¶¶ 24, 381. UNRWA's operational reliance on "HEZBOLLAH-aligned security forces" in south Lebanon establishes deep operational coordination. ¶¶ 379, 386; *see Atchley*, 165 F.4th at 616–17.

### A.  UNRWA USA Had Actual Awareness of its Role in the Overall Illegal Activity

#### 1.  Structural and Imputed Knowledge

The Complaint supports the reasonable inference that UNRWA USA was aware that its unrestricted funding would flow into a system in which HAMAS-affiliated personnel operated and from which HAMAS derived operational benefit. *See* ¶¶ 206, 238, 389–390, 392–393, 395.

That awareness is reinforced by the structural relationship between UNRWA and UNRWA USA. As alleged, UNRWA USA operates as the dedicated U.S. fundraising arm of UNRWA, raising funds for a single beneficiary and working in close operational coordination with it. ¶¶ 20, 391, 403, 409–411. Where entities are so closely aligned that funds are "inevitably committed" to the principal, courts may look past formal separateness and treat them as functionally unified. *NCRI*, 373 F.3d at 157–58 (D.C. Cir. 2004). Accordingly, knowledge held by UNRWA— including its awareness of HAMAS's presence within its workforce and operations—is properly imputed to UNRWA USA as its "nominal donee." *Id.*; *Atchley*, 165 F.4th at 609.

#### 2.  Awareness Through Intermediary

Even treating UNRWA as an intermediary, Plaintiffs satisfy the governing standard. Liability attaches where (1) a defendant is aware of the intermediary's connections to the FTO and (2) the intermediary is sufficiently intertwined with the FTO's terrorist activities that support to the intermediary foreseeably supports terrorism. *Honickman v. BLOM Bank SAL*, 6 F.4th 487, 501 (2d Cir. 2021).  Both elements are plausibly alleged here. UNRWA USA knew that UNRWA operated in an environment in which HAMAS was embedded within its workforce, unions, and facilities. ¶¶ 248–284, 290–301.  Plaintiffs further allege that UNRWA personnel, infrastructure, and resources were repeatedly used for militant purposes, including recruitment, indoctrination, and

operational activity. Id. Given that level of intertwinement, it is reasonable to believe that UNRWA USA was surely aware of UNRWA's role in unlawful activities from which terrorist attacks were foreseeable while continuing to provide unrestricted support.

### 3. "Inside Intelligence" and Leadership Knowledge

UNRWA USA's actual awareness is further established through "inside intelligence" known to senior agents and imputed to the organization. *EIG Energy Fund XIV, L.P. v. Petróleo Brasileiro S.A.*, 621 F. Supp. 3d 30, 77 (D.D.C. 2022); *FDIC v. Ernst & Young*, 967 F.2d 166, 171 (5th Cir. 1992). Plaintiffs allege UNRWA USA's leadership included individuals, e.g., former UNRWA Commissioner-General Karen AbuZayd, with direct knowledge of UNRWA's internal operations. ¶¶ 416–419. During her tenure at UNRWA,[14] HAMAS infiltrated UNRWA's workforce and unions, utilized UNRWA facilities for terrorist purposes, and consolidated influence within Gaza. ¶¶ 251, 283, 287. AbuZayd met regularly with HAMAS leadership and did not implement structural safeguards to insulate UNRWA from that influence. ¶¶ 416–420. That knowledge did not dissipate when she joined UNRWA USA's board. To the contrary, it was reinforced and operationalized by ongoing operational coordination between the entities, including shared personnel and collaborative workstreams described as operating "hand-in-hand" as "colleagues." ¶¶ 409–411; *Atchley*, 165 F.4th at 609, 612; *Kaplan*, 999 F.3d at 864–65. Under settled law, a corporation is charged with the collective knowledge of its agents. *In re Texas E. Transmission Corp. PCB Contamination Ins. Coverage Litig.*, 870 F. Supp. 1293, 1307 (E.D. Pa. 1992).

### 4. Notorious and Public Red Flags

Beyond internal knowledge of UNRWA USA, UNRWA's intertwinement with HAMAS was "open, public, and repeated"–that is, "notorious." *Kaplan*, 999 F.3d at 864.

---

[14] Karen AbuZayd was UNRWA's Commissioner-General from 2006 until 2010 and has been UNRWA USA's Board Member since at least 2012. UNRWA USA, 2012 Form 990 at Part VII.A(5).

24

UNRWA USA was placed on notice by a multi-decade record of public reports and official findings, including:

- the 2015 BOI report confirming weapons storage and militant use of UNRWA facilities;
- the 2018 audit identifying UNRWA's Gaza payroll system as vulnerable to diversion into terrorist activities;
- repeated discoveries of HAMAS tunnels under UNRWA facilities; and
- documented interactions between UNRWA leadership and HAMAS officials.

¶¶ 18, 264-280, 290-299, 304-318, 429, Argument I.B, *supra*.

These facts support the inference that Defendant was aware of the extent to which HAMAS had become embedded within UNRWA's workforce and institutional structure, including through staff unions and leadership positions. See ¶¶ 248, 262-267, 281–284, 390-395, 417–418.

### 5.   Educational Programming and Ideological Alignment

Plaintiffs further allege that UNRWA USA was aware of the content of UNRWA's hateful teaching educational materials, including content promoting themes of armed struggle and martyrdom. ¶¶ 23(e), 223, 319–328. Those materials were disseminated within a workforce environment that included HAMAS-affiliated personnel. ¶¶ 248–249, 283–284.  At the pleading stage, these allegations support the inference that Defendant was aware it was funding not merely humanitarian programming, but institutional systems that reinforced and facilitated the broader objectives pursued through HAMAS's violent activities.

### 6.   Comparative Case Law and Scale of Awareness

Courts have found actual awareness on far less evidence and allegations as are present here. In *Jan v. People Media Project*, a U.S.-based nonprofit was deemed to have knowledge of its role in terrorism based on compensating a single HAMAS-affiliated contributor. 783 F. Supp. 3d 1300, 1310 (W.D. Wash. 2025). Here, by contrast, Defendant acknowledges allegations that a substantial portion of UNRWA's workforce had links to HAMAS and other FTOs. ECF No. 30-1 at 32, n.

25

37.[15] The scale and institutional depth of that alleged intertwinement far exceed the circumstances in *Jan*, reinforcing the plausibility of Defendant's awareness.

### 7.  Severe Recklessness Independently Satisfies Scienter

Finally, even if actual knowledge were disputed, the allegations easily establish "severe recklessness," which independently satisfies the scienter requirement. *Woods v. Barnett Bank of Ft. Lauderdale*, 765 F.2d 1004, 1011–12 (11th Cir. 1985); *Twitter*, 598 U.S. at 492, 502 (2023).

As a presumptively sophisticated U.S.-based entity, UNRWA USA had an institutional obligation to monitor widely reported risks associated with its sole beneficiary. *Kaplan*, 999 F.3d at 864–65. Yet it continued to provide an unrestricted financial lifeline despite pervasive, well-documented red flags. At this stage, it is more than reasonable to infer Defendant acted with at least severe recklessness—if not actual knowledge—in continuing to provide unrestricted funding to a system it knew, or consciously disregarded, was vulnerable to exploitation by HAMAS. *See Halberstam*, 705 F.2d at 488; *Atchley*, 165 F.4th 592, 608–09 (D.C. Cir. 2026).

### B.  UNRWA USA Provided Knowing and Substantial Assistance to HAMAS

Because Plaintiffs have alleged a direct nexus between UNRWA USA's unrestricted financial support and HAMAS's terror activities, the showing required to establish substantial assistance is at its lowest point on JASTA's sliding scale. *Atchley*, 165 F.4th at 604–05; *Twitter*, 598 U.S. at 506. Even so, Plaintiffs plausibly allege substantial assistance at the highest end of the spectrum: "pervasive and systemic aid" to an operationally interdependent enterprise that carried out the attacks. *Zobay v. MTN Grp. Ltd.,* 695 F. Supp. 3d 301, 348-51 (E.D.N.Y. 2023).

---

[15] The Defendant notes that the *Lavi* court considered allegations that 10% of UNRWA's 30,000 employees were FTO affiliates. The plaintiffs in the *Lavi* case have since updated their pleadings to assert that 12% of their employees have ties to regional FTO. *See* 1:24-cv-00312-RGA, ECF No. 73 at 30.

Substantial assistance is evaluated under the six *Halberstam* factors, which "capture the essence of aiding and abetting" by identifying participation that is significant and culpable enough to justify attributing the principal wrongdoing to the aider and abettor. 705 F.2d at 484; *Twitter*, 598 U.S. at 504. No single factor is dispositive, and the factors operate together on a sliding scale. *Atchley*, 165 F.4th at 603–04. Here, all *Halberstam* factors favor Plaintiffs. Several do so strongly.

### 1.   Nature of the Act: Mass-Casualty Terrorism Makes Even Lesser Aid Material

The first factor examines the nature of the act assisted. *Halberstam*, 705 F.2d at 484 involved" and "dictates what aid might matter." *Halberstam*, 705 F.2d at 484. That inquiry matters because the more heinous the underlying act, the less assistance is required to count as substantial. *Id.*at 484 n.13; *Atchley*, 165 F.4th at 612; *Zobay*, 695 F. Supp. 3d. at 347. The acts here were not isolated assaults, but mass-casualty terrorism: coordinated murder, kidnapping, rape, and cross-border attacks on civilians at a scale unmatched in modern Israeli history. ¶¶ 1, 348–354.

Financing is "indisputably important" to terrorist operations. *Boim*, 549 F.3d at 690–91. And under *Halberstam*, the assistance must be evaluated in the context of the enterprise it enabled. *Halberstam*, 705 F.2d at 488. Here, Plaintiffs plausibly allege that the enterprise assisted was not a single discrete attack but the long-term development of HAMAS into a terrorist apparatus capable of carrying out October 7. ¶¶ 1, 231, 248, 358, 437. On that theory, UNRWA USA's fundraising and unrestricted financial support were not peripheral. They allegedly helped sustain the workforce, facilities, payroll practices, and educational systems through which HAMAS expanded its operational capacity over time.

Plaintiffs further allege that UNRWA's education system functioned as a central institutional component of that enterprise. ¶¶ 217, 397, 403. The Amended Complaint alleges that this system disseminated hate-filled materials glorified armed struggle, and violent territorial "return," and

27

that such instruction occurred in a workforce environment that included HAMAS-affiliated personnel. ¶¶ 217, 221–223, 248–249, 283–284, 342. At the pleading stage, it is reasonable to infer that a purported humanitarian school system carrying that content, staffed in part by HAMAS-affiliated actors, served as an engine of violent ideological reinforcement, recruitment and operational preparation. *See Atchley*, 165 F.4th at 607; *Halberstam*, 705 F.2d at 484.

The October 7th Attacks were unique in that it required the participation of thousands of terrorists breaching the border. ¶ 2. Invitees to UNRWA schools encouraged schoolchildren to participate in test runs for precisely that end. ¶ 345(e).

### 2.   Amount and Kind of Assistance: Tens of Millions of Unrestricted U.S. Dollars

The second factor assesses the amount and kind of assistance. *Halberstam*, 705 F.2d at 484. This factor strongly favors Plaintiffs.  The aid alleged here was money, not merely money in the abstract, but tens of millions of unrestricted U.S. dollars supplied to a single beneficiary allegedly intertwined with HAMAS. ¶¶ 393, 420. Courts repeatedly recognize that unrestricted financial support is especially probative because it can fund whatever part of the enterprise most requires support. See *Boim*, 549 F.3d at 698; *Atchley*, 165 F.4th at 611-12.

That feature distinguishes Defendant's support from sovereign aid tethered to "rigorous anti-terrorism" conditions. ECF No. 30-1 at 3. Plaintiffs allege that while government funding was cabined by statutory safeguards, monitoring, and certification requirements, UNRWA USA's support was unrestricted and commingled. ¶¶ 17, 318, 393, 397. On Plaintiffs' theory, those unrestricted funds plausibly served as the flexible shadow budget that could sustain the very transactions most likely to trigger donor concerns, including the Gaza dollar-payroll system, the employment of HAMAS-linked personnel, and operations within institutions vulnerable to terrorist militant exploitation.  ¶¶ 248, 284, 312-318; *Abecassis*, 785 F. Supp. 2d at 647.

28

The scale is also substantial.  Defendant contributed more than $90 million in unrestricted funds since 2015, including more than $66 million in 2023-24, when most of the alleged attacks took place. *See* Argument at I.B, *supra*. That magnitude exceeds the levels found sufficient in other ATA cases.  *Finan*, 2025 WL 2504317, at *19; *Estate of Henkin v. Kuveyt Turk Katilim Bankasi, A.S.*, 2025 WL 218830, at *9 (E.D.N.Y, Jan 16, 2025). That volume of unrestricted hard currency, provided over years and peaking during the relevant period, qualifies as both qualitatively and quantitatively substantial assistance. *Atchley*, 165 F.4th at 607, 611; *Kaplan*, 999 F.3d at 866.

### 3.    Presence: Physical Participation and Transactional Integration

The third factor considers the defendant's presence at the time of the tort. *Halberstam*, 705 F.2d at 483. In traditional ATA financing cases, this factor often carries less weight because the support is rendered far from the scene of the violence. *Bartlett v. Societe Generale de Banque Au Liban SAL*, 2020 WL 7089448, at *13 (E.D.N.Y. Nov. 25, 2020); *King v. Habib Bank Ltd.*, 2022 WL 4537849, at *10 (S.D.N.Y. Sept. 28, 2022). But the allegations here go further.

First, several UNRWA employees allegedly participated directly in the killings and abductions of October 7 while drawing salaries from the system UNRWA USA funded. ¶¶ 350, That direct overlap between the funded institutional structure and the attack personnel makes this factor more significant than in ordinary banking cases. Even one such employee could be highly probative. *Jan,* 783 F. Supp. 3d at 1306-07.

Second, courts have recognized "presence" in a transactional or operational sense. *Bernhardt*, 47 F.4th at 871-72; *Zobay*, 695 F. Supp. 3d at 349.  Here, Plaintiffs allege UNRWA's infrastructure itself was physically and operationally integrated into the HAMAS apparatus: staging grounds, facilities used for weapons storage, logistics, hostage detention, logistics, tunnels, and a command center powered from UNRWA headquarters.  ¶¶ 3, 229, 290-299, 358. On those allegations, the

29

funding stream from UNRWA USA was not remote from the enterprise's operational presence. It was embedded in it.

This factor also turns against Defendant because, unlike defendants who cut ties before the attacks occurred, UNRWA USA allegedly deepened its support after UNRWA employees' participation in the atrocities were revealed. *Siegel.*, 933 F.3d at 224; ¶¶ 395, 414. This factual profile transforms a traditionally disposable factor into a strong indicator of substantiality.

### 4. Relationship: Active, Direct, and Particularized

The fourth factor considers the relationship between the aider and the tortfeasor. *Halberstam*, 705 F.2d at 484. Plaintiffs plausibly allege an unusually close one. UNRWA USA had a direct and particularized relationship with UNRWA, its sole beneficiary, and Plaintiffs plausibly allege that UNRWA itself was intertwined with HAMAS through workforce overlap, union control, facility exploitation, leadership contact, and shared institutional space. ¶¶ 249, 264–280, 394–395.

That relationship is closer than in cases involving passive provision of services to sovereigns or broad institutions with many legitimate branches. *Ofisi v. BNP Paribas, S.A.* and *Bernhardt* are therefore inapposite. 77 F.4th 667, 678 (D.C. Cir. 2023); 47 F.4th at 865. As *Atchley* explained, those cases are distinguishable where the defendant's support is directed to a single compromised agency rather than a sovereign with many legitimate organs. 165 F.4th at 608.

The Amended Complaint plausibly alleges exactly that here: not support to a diffuse sovereign apparatus, but support to a compromised institutional system whose primary operational outputs in Gaza—including education and infrastructure—were accessible to, and exploited by, HAMAS. ¶¶ 3, 249, 394. On Plaintiffs' theory, this was an active, tailored, and mutually reinforcing relationship, not passive nonfeasance. See *Atchley*, 165 F.4th at 612; *Twitter*, 598 U.S. at 498–99.

30

Defendant's effort to distinguish *Atchley* on the ground that the Iraqi Ministry of Health was already under terrorist control only underscores Plaintiffs' point. Plaintiffs here allege not merely that UNRWA operated in a territory where HAMAS functioned as the "de facto government," but that UNRWA itself helped HAMAS obtain and consolidate that power through its workforce, unions, facilities, and institutional cooperation. ¶¶ 251, 253, 283. In that respect, the relationship alleged here is in some ways closer than in *Atchley*: UNRWA was not simply a ministry later overtaken by a proxy force, but a humanitarian apparatus that Plaintiffs allege was structurally enmeshed with HAMAS's rise, governance, and operational infrastructure from within. Defendant cannot invoke HAMAS's status as Gaza's "de facto government" as though it were an exculpatory fact when the Amended Complaint alleges that UNRWA—and thus its dedicated fundraising arm, UNRWA USA—helped furnish the very institutional pathways through which HAMAS secured and exercised that control. On those allegations, UNRWA USA's relationship to the tortfeasor was at least as "active, direct, and particularized" as the relationship found sufficient in *Atchley*. 165 F.4th at 612.

### 5.  State of Mind: Conscious Intent and Post-Attack Ratification

The fifth factor, state of mind, strongly favors Plaintiffs. A defendant's official decision to continue aiding an entity after learning of its involvement in terrorism is powerful evidence of deliberate participation in an ongoing illicit enterprise and is "treated by the law as if it had in fact desired to produce the result." *Halberstam*, 705 F.2d at 502; *Boim*, 549 F.3d at 694; *Atchley*, 165 F.4th at 610.

That is what Plaintiffs allege here.  After evidence emerged that UNRWA staff participated in the October 7th Attacks, UNRWA USA did not sever ties, suspend its funding, or even impose meaningful new safeguards. Instead, it publicly pledged to "redouble aid efforts" and then

31

dramatically increased support. ¶ 414. At the pleading stage, that conduct plausibly reflects not neutrality, but conscious willingness to continue supporting the same enterprise despite confirmed terrorist contamination. *Atchley*, 165 F.4th at 610; *Halberstam*, 705 F.2d at 502.

The Defendant had a direct financial stake in the continuation of that model. UNRWA USA reported more than $10 million in "revenue less expenses" over 2023 and 2024. Argument I.B, *supra.* A substantial financial benefit arising from the very crisis allegedly produced by the system Defendant helped sustain plausibly supports the inference that UNRWA USA was not merely aware of the enterprise but had a stake in continuing it. *See Direct Sales Co. v. United States*, 319 U.S. 703, 713 (1943); *Atchley*, 165 F.4th at 603 (liability squarely reaches those who "seek only financial gain but pursue it with a general awareness" of aiding a criminal enterprise).

Beyond post-attack ratification, Plaintiffs plausibly allege conscious intent from the longstanding nature of the support. The Amended Complaint alleges that UNRWA openly functioned as a "logistical backstop" and "terrorist apparatus" for HAMAS throughout UNRWA USA's existence. ¶ 249; *see Atchley*, 165 F.4th at 598, 607, 609. UNRWA's Commissioner-General stated he was certain there were HAMAS members on UNRWA's payroll in 2004, just as the four-year wave of HAMAS terror known as the Second Intifada was coming to a close. ¶¶ 248, 249. It is not necessary to show that Defendant knew every operational detail or the date and hour of the October 7th Attacks. *See Twitter*, 598 U.S. at 495, 504; *Honickman*, 6 F.4th at 496. It is enough that Defendant plausibly knew it was supporting an enterprise whose violent objectives were open, repeated, and notorious. *Atchley*, 165 F.4th at 610.

Plaintiffs further allege that UNRWA USA directly supported UNRWA's hate filled and terror glorifying educational system, which—at least prior to the October 7th Attacks—allegedly consumed roughly 58% of its budget and disseminated curricula glorifying martyrdom and violent

32

struggle. ¶¶ 217, 342, 397, 403. As alleged, Defendant's unrestricted funding enabled the hiring of HAMAS-affiliated teachers and administrators to disseminate these materials with institutional authority. ¶ 342. This is almost the organizational equivalent of abusive verbal encouragement found in one of the seminal cases cited by both *Halberstam* and *Twitter*. *Rael v. Cadena*, 93 N.M. 684, 685 (1979); ¶ 217. That is far more than passive support; it is plausibly the provision of the kind of encouragement and reinforcement that *Halberstam* recognized as significant when it helps "plant[] the seeds of action." 705 F.2d at 482. Encouragement is particularly substantial when spoken by those in an "apparent position of authority" and when it demonstrates a defendant is "one in spirit" with the primary actor. *Id.*; *Twitter,* 598 U.S. at 504.

This unity of purpose was also allegedly articulated from within UNRWA itself. Plaintiffs allege that UNRWA's Commissioner-General described a "spirit of partnership" with HAMAS and other FTOs in which they were so "united" that "no one can separate" them. ¶ 267. The Complaint further alleges this partnership was reinforced through numerous meetings and communications between UNRWA and HAMAS leadership, including October 7 mastermind Yahya Sinwar. ¶¶ 264, 267-280. As alleged, around the time HAMAS started planning the October 7th Attacks, Sinwar himself expressed public appreciation for how UNRWA schools encouraged the Palestinian commitment to the very territorial rights that the October 7th Attacks sought to manifest. ¶¶ 217, 265, 278, 342(d).

These allegations, taken together, strongly support the state-of-mind factor.

### 6. Duration: Nineteen Years of Sustained Support

The final factor is duration, which *Halberstam* described as important because the length of involvement affects the quality and extent of the relationship. 705 F.2d at 484. This factor weighs heavily in Plaintiffs' favor.

33

UNRWA USA allegedly provided unrestricted support from its founding in 2005 through at least 2024, including after learning of UNRWA's pervasive role in the October 7th Attacks.  ¶¶ 205, 414.  Nineteen years of sustained support is extraordinary in ATA litigation, and far exceeds the duration found significant in other cases. *See Halberstam*, 705 F.2d at 488 (five-years decisive); *Atchley,* 165 F.4th at 611 (nearly a decade "decidedly" substantial); *King*, 2022 WL 4537849, at *9 (more than a decade strongly favors substantiality); *see also, Henkin*, 2025 WL 218830, at *3 (four-plus years adequate).

That duration matters because Plaintiffs plausibly allege that HAMAS-affiliated personnel operated within UNRWA's workforce and institutional structure across that same period, if not longer. *See* ¶¶ 248-249, 281–284. Continued funding of that system over nearly two decades supports the inference of deliberate, long-term participation rather than episodic or accidental support *See Halberstam*, 705 F.2d at 484–85.

In short, duration here is not merely additive. It is powerful evidence that Defendant consciously committed itself to sustaining a compromised enterprise despite a multi-decade record of red flags, public US government and other reporting, culminating in the October 7th Attacks and continuing thereafter, supporting a powerful inference of Defendant's culpability. ¶¶ 12–13, 18, 290, 315, 395, 414; *Direct Sales Co*, 319 U.S. at 713-14; *King*, 2022 WL 4537849, at *9.

III.    **Plaintiffs Plausibly Allege Conspiracy**

To state a claim for conspiracy liability, Plaintiffs must allege (1) an agreement; (2) to participate in an unlawful act or objective; (3) an injury caused by an overt act; (4) the overt act was in furtherance of the common scheme. *Halberstam*, 705 F.2d at 477. They do so here.

### A. A Plausible Tacit Agreement Exists Between UNRWA USA, UNRWA, and HAMAS to Sustain an Operational Safe Haven for FTO Activities

"[P]roof of a tacit . . . understanding is sufficient to show agreement". *Id.* The Defendant need not "directly interact with the terrorist attacker" to be liable as a co-conspirator; they need only be part of a "common conspiracy" or "pursuit." *Id.* at 481. "[T]he *length of time* two parties work closely together may also strengthen the likelihood that they are engaged in a common pursuit." *Id.* ("Mutually supportive activity by parties in contact with one another over a long period suggests a common plan.") Here, UNRWA, UNRWA USA and HAMAS have been operating as a common enterprise for 19 years, with UNRWA engaging extensively, continuously and simultaneously with both of its co-conspirators throughout.

The agreement between UNRWA USA and the primary intermediary, UNRWA, is established by their coordinated structural design. ¶¶ 12–13, 20–22, 403. Contributions to UNRWA USA, "the nominal donee," are "inevitably committed" to UNRWA "the real donee," pursuant to a fundraising agreement. IRS Revenue Ruling 63-252, Example 3. UNRWA even directs U.S. donors to UNRWA USA to facilitate its receipt of tax-deductible contributions from U.S. taxpayers. ¶¶ 12–13. This directed relationship provides strong evidence of coordinated action rather than arm's-length independence. *Finan,* 2025 WL 2504317, at *21.

This chain conspiratorially extends to HAMAS through UNRWA's documented "partnership arrangement" with the FTOs. ¶264. Just as the *Finan* defendants desired the survival of the ISIS caliphate to protect their cement plant, Plaintiffs here allege that UNRWA USA and UNRWA conspired with HAMAS to preserve UNRWA's operational footprint in Gaza. 2025 WL 2504317, at *21. Plaintiffs plausibly allege not merely parallel conduct but coordinated engagement between UNRWA leadership and HAMAS-affiliated actors. See ¶¶ 262–267. The Complaint describes

35

meetings in which UNRWA officials expressed a willingness to align operational decisions with HAMAS interests and to maintain that coordination outside public scrutiny.  ¶ 267.

As implemented, UNRWA provided HAMAS with logistical facilities for safe haven, hard currency, and institutional cover, while HAMAS served as the terrorist partner realizing the common commitments of keeping Palestinians marginalized and encouraging them to threaten Israel's existence. ¶¶ 267, 301-302, 390-393, 395-400; *see also* ECF No. 30-1 at 13 (claiming the need for *increased* donations to UNRWA on this basis). At this stage, these allegations support the reasonable inference of an agreement—or, at minimum, a tacit understanding—sufficient to satisfy *Halberstam*'s conspiracy framework. 705 F.2d at 477–78.

### B. All Parties Shared a Convergent Objective: Preserving and Advancing Territorial Claims Against Israel Through the Gaza-Based System

UNRWA USA argues that it lacked a "common intent" because it was purportedly motivated by humanitarian concerns, whereas HAMAS sought violence. ECF No. 30-1. at 39 (arguing for dismissal because the parties failed to share a "goal of committing terrorism").  But conspiracy law does not require identical motives—only that the parties "had their own reasons for intending the same thing." *Finan*, 2025 WL 2504317, at *22. A single conspiracy exists where actors, "by different means," pursue a shared objective. *Halberstam*, 705 F.2d at 481.

Here, Plaintiffs plausibly allege a convergent objective: the preservation and advancement of generational territorial claims against the State of Israel through the continued operation of UNRWA's Gaza-based institutional framework. ¶¶ 207–215, 238, 395–401.

That objective is not one this Court is required to treat as a legally enforceable entitlement at the pleading stage. At this stage, the Court need not accept it as such. Rather, Plaintiffs plausibly allege it functioned as a unifying ideological and operational framework—one that UNRWA sustained institutionally and HAMAS pursued violently. *Id*. While UNRWA operationalized that

36

objective through refugee-status perpetuation and education, HAMAS pursued the same objective through armed attacks designed to eliminate Israeli sovereignty. *Id*., ¶¶ 217, 342.

UNRWA USA, as the exclusive U.S. fundraising arm for UNRWA, plausibly shared in that objective by sustaining the very institutional structure through which it was advanced. ¶¶ 12–13, 20, 408–411. Its financial support enabled the continuation of a system that Plaintiffs allege depended on maintaining refugee status across generations and resisting resettlement or resolution. ¶¶ 207–215, 230. Ending that framework would eliminate the basis for UNRWA's operations— and, by extension, UNRWA USA's fundraising model. ¶¶ 12–13, 230, 395. Indeed, UNRWA USA realized more than $10 million in net income during 2023–2024, precisely as it dramatically increased fundraising tied to the Gaza crisis and the October 7th Attacks. Argument I.B, *supra.* At the pleading stage, that financial outcome plausibly reflects not neutral humanitarian activity, but a concrete institutional stake in sustaining—and capitalizing on—the very system through which the shared objective was advanced.

HAMAS, in turn, depended on that same system as a source of legitimacy, recruitment, infrastructure, and financial flows. ¶¶ 3, 248–284, 312–318. UNRWA provided facilities, personnel, and institutional cover; HAMAS provided coercive control, enforcement, and violent implementation of the shared territorial objective. ¶¶ 249, 267, 301–302.

Thus, each actor had distinct incentives but converged on the same end: preserving a system that sustained claims to Israel and resisted their resolution. That convergence is sufficient to establish common purpose. *Finan*, 2025 WL 2504317, at *22.

The Complaint further alleges that this shared objective was not abstract but operationalized through mutually reinforcing conduct: UNRWA's education system inculcated the territorial objective; HAMAS translated it into violence; and UNRWA USA supplied the unrestricted

37

funding necessary to sustain both the institutional and operational components of that system. ¶¶ 217, 248–284, 312–318, 395–401. At the pleading stage, these allegations plausibly establish that Defendants and their co-conspirators "pursue[d] the same object—although by different means," satisfying the common-purpose element of conspiracy liability. *Halberstam*, 705 F.2d at 481.

### C.  The October 7th Attacks Were Overt Acts in Furtherance of the Conspiracy

Consistent with the framework adopted in *Finan*, the requisite "unlawful overt act" that produces the injury may be the act of international terrorism itself. 2025 WL 2504317, at *21; *Bernhardt*, 47 F.4th at 873. Here, the October 7th Attacks—and the related acts of murder, kidnapping, and mass violence alleged in the Amended Complaint—plainly satisfy that requirement. ¶¶ 26-204.

The remaining question is whether those acts were undertaken "pursuant to and in furtherance of the common scheme." *Finan*, 2025 WL 2504317, at *20. Plaintiffs plausibly allege that they were.  As set forth above, the alleged conspiracy centered on sustaining a Gaza-based institutional framework that preserved generational territorial claims against Israel and resisted their resolution. ¶¶ 207–215, 238, 395–401. Within that framework, UNRWA provided infrastructure, personnel, and institutional continuity; HAMAS provided coercive control and violent enforcement; and UNRWA USA supplied the unrestricted funding necessary to sustain both. ¶¶ 249, 267, 312–318, 390–397. The October 7th Attacks were not an aberration from that system—they were its most extreme and fully realized expression. Plaintiffs allege that the attacks advanced the same territorial objective embedded within the UNRWA system: the violent realization of claims to land within Israel and the elimination of Israeli sovereignty. ¶¶ 217, 342. In that sense, the attacks functioned as the operational culmination of a framework that had long combined ideological reinforcement, institutional support, and militant execution.

The manner in which the attacks were carried out further reinforces that inference. Plaintiffs allege that HAMAS relied on infrastructure, personnel networks, and logistical support embedded within UNRWA's operational environment, including facilities, employees, and systems sustained over time through Defendant's funding. ¶¶ 3, 229, 284, 353. Such use of institutional resources aligns directly with the conspiracy's objective of maintaining a system that could be leveraged for both governance and violence.

Defendant's conduct following the attacks provides additional support for the inference that the attacks were within the scope of the conspiracy. Rather than withdrawing support, Defendant publicly committed to "redouble aid efforts" and in fact dramatically increased funding in the immediate aftermath. ¶¶ 414–421; Argument I.B, *supra*. At the pleading stage, that response plausibly reflects ratification of the system that produced the attacks, not disassociation from it. *Halberstam*, 705 F.2d at 484–85.

Under settled law, a conspirator is liable for overt acts that "advance the overall object of the conspiracy," even if carried out by another participant. *Id.* at 487; *Pinkerton v. United States*, 328 U.S. 640, 646–48 (1946). Because Plaintiffs plausibly allege that the October 7th Attacks advanced the shared objective of the conspiracy and were carried out through the very system Defendant funded, those attacks constitute overt acts for which Defendant is liable.

The October 7th Attacks were thus not merely foreseeable—they were the foreseeable execution of the very system UNRWA USA chose to fund.

## IV.  **Plaintiffs Also State a Claim for Primary ATA Liability**

The ATA provides a cause of action for any U.S. national injured "by reason of an act of international terrorism." 18 U.S.C. § 2333(a). Plaintiffs satisfy that standard.

39

To plead proximate cause under the ATA, Plaintiffs need only allege that Defendant's conduct was a "substantial factor" in the sequence of events leading to the injury and that the injury was a foreseeable consequence of that conduct. *Atchley*, 165 F.4th at 606; *Owens v. BNP Paribas, S.A.*, 897 F.3d 266, 273 (D.C. Cir. 2018). Because "[m]oney is fungible," Plaintiffs are not required to trace particular dollars to particular attacks; it is sufficient to plausibly allege that Defendant's support constituted a "considerable source of funding" that "materially enhanced" the FTO's capabilities. *Atchley*, 165 F.4th at 606, 611; *Boim*, 549 F.3d at 698.

Plaintiffs do so here. The Amended Complaint alleges that Defendant provided tens of millions of dollars in unrestricted funding to sustain a system in which HAMAS-affiliated personnel operated, from which HAMAS derived logistical and operational benefit, and through which attacks—including the October 7 atrocities—were planned and executed. ¶¶ 3, 312–318, 346, 350, 358, 390–397. High-ranking UNRWA employees—including educators and administrators—are alleged to have drawn salaries from that funding while participating in or facilitating terrorist activity. *Id.* At the pleading stage, financially sustaining a system plausibly alleged to be structurally co-opted by a terrorist organization renders the resulting attacks the "predictable, virtually inevitable fallout" of that support. *Atchley*, 165 F.4th at 607. At the pleading stage, the Defendant is liable for the "fully embodied execution" of the very ideology its funding and resources nurtured. *Atchley*, 165 F.4th at 606; ¶¶ 3, 209, 353. Plaintiffs thus plausibly allege the requisite causal chain linking Defendant's conduct to their injuries. *Estate of Wultz v. Islamic Republic of Iran,* 755 F. Supp. 2d 1, 42 (D.D.C. 2010)

### A. Defendant's Conduct Involved Acts Dangerous to Human Life in Violation of U.S. Criminal Law

To qualify as "international terrorism," the conduct must "involve violent acts or acts dangerous to human life that are a violation of the criminal laws of the United States." 18 U.S.C.

40

§ 2331(1)(A). Although financial transfers are not themselves violent, courts have repeatedly held that providing funds to terrorist organizations constitutes conduct "dangerous to human life" because it enables those organizations to carry out acts of violence. *Boim*, 549 F.3d at 694; *Linde v. Arab Bank, PLC*, 882 F.3d 314, 326 (2d Cir. 2018); *Wultz*, 755 F. Supp. 2d at 43.

Here, Plaintiffs plausibly allege that Defendant provided unrestricted U.S. dollar funding into a system that enabled HAMAS to access hard currency necessary for operations, including weapons procurement and logistical support. ¶¶ 312-318, 393. That funding is alleged to have flowed through financial channels subject to HAMAS control, thereby augmenting the organization's operational capacity. *Id*.

Such conduct plausibly violates multiple federal criminal statutes:

**18 U.S.C. § 2339A:** providing material support or resources knowing or intending that they be used in preparation for acts of terrorism. ¶¶ 3, 209; *Wultz*, 755 F. Supp. 2d at 44–45.
**18 U.S.C. § 2339B:** knowingly providing material support to an FTO. ¶ 234; *Henkin*, 495 F. Supp. 3d at 155.
**18 U.S.C. § 2339C:** willfully providing funds knowing they will be used, in whole or in part, to carry out terrorist acts. ¶¶ 445–446; *Wultz*, 755 F. Supp. 2d at 46.

At the pleading stage, these allegations are sufficient to establish conduct "dangerous to human life" within the meaning of § 2331(1)(A).

### B. The Conduct Objectively Appeared Intended to Coerce or Intimidate

The ATA does not require proof of a defendant's subjective intent to commit terrorism. It requires only that the acts "appear to be intended" to intimidate or coerce a civilian population or influence government policy. 18 U.S.C. § 2331(1)(B). *Wultz*, 755 F. Supp. 2d at 48.

Plaintiffs plausibly allege that Defendant's conduct meets this standard. Defendant is alleged to have continued—and dramatically increased—its unrestricted funding despite repeated warnings that UNRWA's systems were being exploited by HAMAS and, critically, after evidence emerged of UNRWA staff participation in the October 7th Attacks. ¶¶ 290–301, 414–421.

41

Continuing to provide substantial financial support under those circumstances supports the reasonable inference that the conduct objectively furthered—and thus "appeared intended" to further—HAMAS's campaign of violence against civilians. *Wultz*, 755 F. Supp. 2d at 49.

### C. The Conduct Transcended National Boundaries

Finally, the conduct must "occur primarily outside the territorial jurisdiction of the United States" or "transcend national boundaries." 18 U.S.C. § 2331(1)(C).

Plaintiffs plausibly allege that Defendant, a U.S.-based entity, transferred funds through the U.S. financial system to a foreign recipient operating in Gaza, where those funds were used within a cross-border terrorist enterprise. ¶ 316. Such cross-border financial flows and operational effects readily satisfy the statute's transnational requirement. See *Wultz*, 755 F. Supp. 2d at 49.

### V. **Plaintiffs State a Claim for Intentional Infliction of Emotional Distress**

To state a claim for Intentional Infliction of Emotional Distress ("IIED"), a plaintiff must allege (1) extreme and outrageous conduct, (2) intent or recklessness, and (3) severe emotional distress. *Kurd v. Republic of Turkey*, 374 F. Supp. 3d 37, 55 (D.D.C. 2019). Plaintiffs satisfy each element.

*First,* acts of terrorism are "by their very definition extreme and outrageous and intended to cause the highest degree of emotional distress, literally, terror." *Wultz*, 755 F. Supp. 2d at 66–67. Defendant argues that providing humanitarian aid cannot be "outrageous" as a matter of law. ECF No. 30-1 at 42. But Plaintiffs do not allege neutral humanitarian conduct. They allege that Defendant raised funds under the guise of humanitarian aid and directed those funds, without restriction, as material support into a system plausibly alleged to have been exploited by HAMAS for recruitment, logistics, and violent operations. ¶¶ 3, 290–301, 353.

At the pleading stage, knowingly or recklessly sustaining such a system—particularly one alleged to include the use of schools and facilities for terror-training purposes—plausibly

constitutes conduct that goes "beyond all possible bounds of decency." *Kurd*, 374 F. Supp. 3d at 55; *Boim*, 549 F.3d at 694.

*Second,* intent or recklessness may be inferred from the nature of the conduct. *Kurd*, 374 F. Supp. 3d at 55. As set forth above, Plaintiffs plausibly allege that Defendant acted with, at minimum, conscious disregard of the substantial risk that its funding would support terrorist activity. *See* Argument II.A, B.5, *supra*.

*Third,* Plaintiffs plausibly allege severe emotional distress. The Complaint details that Plaintiffs were either directly exposed to the October 7th Attacks or are immediate family members of victims and suffered acute psychological trauma as a result. ¶¶ 26–204, 464, 471. Such allegations are sufficient to establish distress "of so acute a nature that harmful physical consequences" were likely. *E.M. v. Shady Grove Reprod. Sci. Ctr., P.C.*, 2025 WL 947515, at *13 (D.D.C. Mar. 28, 2025).

Accordingly, Plaintiffs state a claim for IIED.

## VI.    **Plaintiffs State a Claim for Negligent Infliction of Emotional Distress**

To state a claim for Negligent Infliction of Emotional Distress ("NIED"), Plaintiffs must allege that: (1) they were in the "zone of physical danger," (2) that danger was created by Defendant's negligence, (3) they feared for their own safety, and (4) the resulting distress was serious and verifiable. *Harris v. U.S. Dep't of Veterans Affs.*, 776 F.3d 907, 915 (D.C. Cir. 2015). Plaintiffs satisfy each element.

*First*, Plaintiffs allege that they were present in the immediate zone of danger created by the relevant terrorist acts or were closely related to those who were. ¶¶ 26-204, 464, 471.

*Second*, Plaintiffs plausibly allege negligence. Defendant is alleged to have breached its duty to exercise independent judgment and appropriate diligence in directing funds, particularly in light

of repeated public warnings and the U.S. government's imposition of increasingly stringent restrictions on UNRWA's funding.  Rev. Rul. 63-252, 1963-2 C.B. 101; I.R.S. Pub. 4221-PC; *See* Argument I.B, *supra*. Providing substantial unrestricted funding into a system alleged to be vulnerable to terrorist exploitation plausibly constitutes a breach of that duty.

*Third*, Plaintiffs allege that they feared for their safety during the attacks. *See, e.g.,* ¶¶ 25, 84, 91, 101, 113, 141, 150, 153, 156, 162.

*Fourth*, Plaintiffs allege serious and verifiable emotional distress, including trauma arising from direct exposure to violence and loss of family members. *See* Argument V, *supra*.

Defendant argues that HAMAS's criminal acts constitute a superseding cause. ECF No. 30-1 at 44. But where, as alleged here, the intervening criminal acts are a "highly foreseeable" consequence of the defendant's conduct, they do not break the causal chain. *Akins v. Dist. of Columbia*, 526 A.2d 933, 935 (D.C. 1987); *Wultz*, 755 F. Supp. 2d at 66; ¶¶ 3, 318, 350.

Accordingly, Plaintiffs state a claim for NIED.

## VII.    **Leave to Amend Should Be Granted if Necessary**

For all the reasons set forth herein, Defendant's request for dismissal with prejudice, ECF No. 30-1 at 43, should be denied.

To the extent the Court deems the Amended Complaint deficient, under Federal Rule of Civil Procedure 15, leave to amend should be "freely give[n] when justice so requires," and the D.C. Circuit has emphasized a "liberal view of amendment." *Atchley*, 165 F.4th at 592; *E.M.*, 2025 WL 947515, at *13. In such event, Plaintiffs respectfully request leave to file a Second Amended Complaint further given the gravity of the allegations and the early procedural posture, where an amendment would serve the interests of justice for these aggrieved Plaintiffs.

## **CONCLUSION**

For the foregoing reasons, the Court should deny Defendant's Motion to Dismiss in its entirety.

Dated:  March 31, 2026                     Respectfully Submitted,

HEIDEMAN NUDELMAN & KALIK P.C.


By:     */s/ Joseph H. Tipograph*
        Richard D. Heideman (No. 377462)
        Noel J. Nudelman (No. 449969)
        Tracy Reichman Kalik (No. 462055)
        Joseph H. Tipograph (No.997533)
        HEIDEMAN NUDELMAN & KALIK, PC
        5335 Wisconsin Avenue, NW; Suite 440
        Washington, DC  20015
        Telephone: 202.463.1818
        Facsimile: 202.463.2999

45